UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

    v.

No. _98-99- Cr- ORL- 19A_

18 U.S.C. § 1962(c)
18 U.S.C. § 1962(d)
18 U.S.C. § 1343
18 U.S.C. § 1346
18 U.S.C. § 2314
18 U.S.C. § 1956(a)(1)(A)
18 U.S.C. § 1956(a)(1)(B)
18 U.S.C. § 1957
18 U.S.C. § 1001
18 U.S.C. § 1503
18 U.S.C. § 1963 - Forfeiture
18 U.S.C. § 982 - Forfeiture

SHOLAM WEISS
KEITH POUND
JAN R. SCHNEIDERMAN
YAAKOV STARK
  a/k/a Jan Starr
RICHARD B. HERMAN
  d/b/a Law Offices of Richard B. Herman
  d/b/a Herman, Blutrich & Miller
ISACK ROSENBERG
NADINE ALLEN
ROBERT GORSKI
RICHARD LANGER
SOUTH STAR MANAGEMENT, INC.
ADOS EQUITIES, INC.
NATIONAL HOUSING EXCHANGE, INC.
APX MORTGAGE SERVICES, INC.
RESOURCE ASSET MANAGEMENT, INC.
NATIONAL WORKOUT SPECIALISTS, INC.
SPRITE EQUITIES, INC.

The Grand Jury charges:

## COUNT ONE

## RACKETEERING

### I. INTRODUCTION

#### A. The LifeCo Conglomerate

1.    At all times material to this Indictment, LifeCo Investment Group, Inc.

("LifeCo") was a Florida corporation, which acted primarily as a holding company, holding

SCANNED

the stock of subsidiary corporations, and overseeing the operations of those subsidiaries. Although LifeCo was a publicly held corporation, trading in its stock was restricted.

2.     At all times material to this Indictment, National Heritage Life Insurance Company ("NHLIC") was a Delaware corporation in the business of selling and servicing life insurance policies and annuities; its primary business location was at 390 North Orange Avenue, Orlando, Florida. NHLIC was a wholly owned subsidiary of LifeCo. On May 25, 1994, a Rehabilitation and Injunction Order was executed placing NHLIC under the exclusive possession and control of the Insurance Commissioner of the State of Delaware as Receiver in Rehabilitation.

3.     NHLIC was licensed to sell life insurance policies and annuities in at least 37 states. NHLIC was required by law to set up a reserve fund to pay on the policies and annuities it sold. These reserve funds were required to be held in a trust fund to be expended only for the benefit of policy holders. The ability of NHLIC to pay its contractual liabilities to policy holders and to hold and maintain the reserve funds required by law depended upon the financial soundness and liquidity (ability to pay current obligations) of NHLIC.

4.     The primary responsibility to make required payments to policy holders remained at all times with NHLIC. However, as additional protection for the policy holders of NHLIC and other life insurance companies, most state legislatures where NHLIC was authorized to sell its financial products had non-profit entities or agencies commonly referred to as insurance guaranty associations, which were required by law to reimburse all policy holders of life insurance companies domiciled within those states in the event of

2

the insolvency or failure of any such life insurance company. These guaranty associations were funded through fees assessed all life insurance companies licensed to write business in the respective states.

5.     As a condition of receiving its licenses to sell life insurance, NHLIC was required to submit to regulation by the states (hereinafter the "Regulators"). The many state insurance guaranty associations relied upon said insurance departments to regulate and periodically audit and monitor the operations of such life insurance companies to determine whether the companies were making approved investments and maintaining proper reserves as required by statute.

6.     At all times material to this Indictment, NHLIC, and LifeCo as the sole shareholder of NHLIC, were primarily subject to oversight and regulation by the insurance commissioners for the states of Delaware (the "Delaware Regulators") and Florida (the "Florida Regulators"), because NHLIC was a Delaware corporation domiciled in Orlando, Florida.

7.     At all times material to this Indictment, LifeCo Mortgage Services, Inc. ("LifeCo Mortgage") was a Florida corporation in the business of buying, selling, and managing the real estate and mortgage related assets of NHLIC. LifeCo Mortgage was a wholly owned subsidiary of LifeCo and sister company to NHLIC.

8.     At all times material to this Indictment, QE Financial, Inc. ("QE Financial") was a Nevada corporation which owned mortgage servicing rights to a pool of mortgages (the "QE Asset"). QE Financial was 80% owned by LifeCo and 20% owned by APX MORTGAGE SERVICES, INC. ("APX"), identified in paragraph 31 below.

3

9.     From August 16, 1993 through May 9, 1994, KEITH POUND ("POUND") was President of LifeCo Mortgage, and was President of QE Financial beginning on November 21, 1993.

10.     At all times material to this Indictment, NADINE ALLEN ("ALLEN") was a director and senior vice-president of QE Financial and ROBERT GORSKI ("GORSKI"), her husband, was a director and executive vice-president of QE Financial.   ALLEN and GORSKI were also delegated by NHLIC with the day to day management of the QE Asset.

11.     At all times material to this Indictment prior to April 1, 1994, Patrick C. Smythe ("Smythe") was a director and the Chief Operating Officer of NHLIC, and was a director and the Chief Operating Officer of LifeCo until May 17, 1994.   Smythe owned approximately 45% of LifeCo stock and controlled both LifeCo and NHLIC.

12.     From May 8, 1991 until February 28, 1994, Lambert Aloisi ("Aloisi") was a director and President of NHLIC and was a director and Chief Executive Officer of LifeCo. Aloisi owned approximately 5% of LifeCo stock.

13.     At all times material to this Indictment prior to approximately January 1993, Michael D. Blutrich ("Blutrich") was an attorney who acted as counsel and escrow agent for, and consultant to, both LifeCo and NHLIC on numerous transactions.

### B. The New York Associates

14.     At all relevant times, SHOLAM WEISS ("WEISS") was a New York business man who owned and controlled, individually and with others, in whole or in part, the following corporations and partnerships:

4

a.   SOUTH STAR MANAGEMENT, INC. ("SOUTH STAR"), a Florida corporation.

b.   NATIONAL HOUSING EXCHANGE, INC. ("NHE"), a North Carolina corporation.

c.   IWUB Corp. ("IWUB"), a New York corporation.

d.   ADOS EQUITIES, INC. ("ADOS"), a New York corporation.

e.   Windsor Plumbing Supply Company, Inc. ("Windsor Plumbing"), a New York corporation.

f.   Jasper Properties Corp. ("Jasper"), a New Jersey corporation.

g.   Catskill Funtime, Inc. ("Catskill Funtime"), a New York corporation.

h.   Catskill Funland, Inc. ("Catskill Funland"), a New York corporation.

i.   Eklam Realty Corp. ("Eklam"), a New York corporation.

j.   Y&G Partners & Co. ("Y&G"), a New Jersey partnership.

k.   Fiduciary Equities, Inc. ("Fiduciary Equities"), a New York corporation

l.   E.K. 38th Realty Corp. ("E.K. 38th"), a New York corporation.

m.   Accusharp Realty, Inc. ("Accusharp"), a New York corporation.

n.   Centerpoint Mall, Inc. ("Centerpoint Mall"), a New York corporation.

o.   SPRITE EQUITIES, INC. ("SPRITE"), a New York corporation.

p.   Governale Industries Sales Corp. ("GVI"), a New York corporation.

q.   Sholom Manufacturing Co. ("Sholom Manufacturing"), a New York partnership.

r.   N.E.S. Consulting Corp. ("NES"), a New York corporation.

5

15.    At all times material to this Indictment, JAN R. SCHNEIDERMAN ("SCHNEIDERMAN") was an attorney practicing under the name Jan R. Schneiderman, Attorney at Law, in New York, New York. SCHNEIDERMAN acted as attorney for WEISS and for corporations which WEISS controlled. SCHNEIDERMAN was an officer of SOUTH STAR, ADOS, NHE, Jasper, SPRITE, NES, and Accusharp.

16.    At all times material to this Indictment, YAAKOV STARK, commonly known as JAN STARR ("STARR"), an associate of WEISS, was an officer and director of SOUTH STAR and NHE.

17.    At all times material to this Indictment, ISACK ROSENBERG (ROSENBERG), the husband of WEISS' cousin, partially owned and controlled a number of New York corporations, including Franklin Realty Corp. ("Franklin Realty"), Certified Lumber Corporation ("Certified Lumber"), Boro Park Home Center Corporation ("Boro Park"), and Waterfront Realty Company ("Waterfront").

18.    At all times material to this Indictment, Henry Gutman was a New York businessman who was partner to WEISS in a number of businesses and real estate holdings.

19.    At all times material to this Indictment, Frenkel & Hershkowitz ("F&H") was a law firm doing business at 16 East 34th Street, New York, New York. F&H was attorney to WEISS and to SOUTH STAR. David Schick ("Schick") was an attorney affiliated with F&H and was the F&H attorney primarily responsible for representation of SOUTH STAR. Bernard Shafron ("Shafron") was an attorney affiliated with F&H and caused numerous New York corporations to be formed for WEISS where he and others acted as principals

to conceal WEISS' involvement in those corporations' business transactions, including ADOS, SPRITE, E.K. 38th, Fiduciary Equities, Centerpoint Mall, and Catskill Funtime.

20.     At all times material to this Indictment, Lyle K. Pfeffer ("Pfeffer") was a businessman who conducted business from 2 Park Avenue, New York, New York. Between March 3, 1993 and May 25, 1994, Pfeffer was a member of the Investment and Audit Committees of LifeCo.

21.     At all times material to this Indictment, National Mortgage Corp. ("NMC") was a New York corporation owned and controlled by Pfeffer.

22.     At all times material to this Indictment, LPDA Acquisitions, Inc. ("LPDA") was a New York corporation. Pfeffer and Blutrich controlled, and were officers of, LPDA.

23.     At all times material to this Indictment, Nulenda, Inc. ("Nulenda") was a New York corporation. Pfeffer and Blutrich controlled, and were officers of, Nulenda.

24.     At all times material to this Indictment, Future Diversified Projects, Inc. ("Future Diversified") was a New York corporation. From 1992 up to November 1993 Pfeffer controlled, and was President of Future Diversified. In November 1993, in a transaction where Future Diversified contributed assets to LifeCo in exchange for LifeCo Class E Preferred Stock, WEISS took control of Future Diversified and caused Shafron to execute documents as a Future Diversified officer.

25.     At all times material to this Indictment, FDPI Holding, Inc. ("FDPI Holding") was a New York Corporation owned and controlled by Pfeffer.

26.     At all times material to this Indictment, RICHARD B. HERMAN ("HERMAN") was an attorney practicing under the name Law Offices of Richard B. Herman. In

approximately April 1993, HERMAN became affiliated with Blutrich and used the firm name of Blutrich, Herman & Miller, Attorneys at Law, as well as the name Law Offices of Richard B. Herman. In transactions described in this Indictment, and others, Herman from time to time represented Pfeffer, corporations controlled by Pfeffer, WEISS, corporations controlled by WEISS, and NHLIC.

27.    At all times material to this indictment, RICHARD LANGER was an employee of a corporation owned and controlled by Blutrich and Pfeffer.

### C. The Texas Associates

28.    At all times material to this Indictment, Richard Plato ("Plato") was an attorney practicing and residing in Houston, Texas. In 1993, Plato engaged in transactions with NHLIC, and in transactions which concerned NHLIC assets.

29.    At all times material to this Indictment, Jay Ford ("Ford") was a businessman residing in San Antonio, Texas. In 1993, Ford engaged in transactions with NHLIC, and in transactions which concerned NHLIC assets.

30.    At all times material to this Indictment, the name Phoenix Trust ("Phoenix Trust") was used to describe what was in truth a sole proprietorship of Ford's, but which purported to be a duly formed trust succeeding a Texas corporation. Phoenix Trust was owned and controlled by Ford. Plato acted as agent for Phoenix Trust. Ford, Plato, and others used Phoenix Trust as a vehicle to execute transactions with LifeCo and NHLIC.

### D. The Illinois Associates

31.    At all times material to this Indictment, APX was an Illinois corporation in the mortgage servicing business, doing business in Palatine, Illinois. At all times material to

this Indictment, POUND was a paid agent of APX, ALLEN was Secretary, Treasurer and a director of APX, and GORSKI was President and a director of APX. ALLEN and GORSKI were primarily responsible for APX's day to day business activities.

32.     At all times material to this Indictment, RESOURCE ASSET MANAGEMENT, INC. ("RAM") was an Illinois corporation in the mortgage servicing business, doing business in Palatine Illinois. POUND controlled and was an officer and director of RAM.

33.     At all times material to this Indictment, NATIONAL WORKOUT SPECIALISTS, INC. (NATIONAL WORKOUT) was an Illinois corporation. POUND controlled and was an officer and director of NATIONAL WORKOUT.

34.     At all times material to this Indictment, Frederick Bragiel was in-house counsel to APX, RAM, and NATIONAL WORKOUT. Bragiel died in April 1996.

## II. THE RICO ENTERPRISE

35.     LifeCo and its subsidiaries, including NHLIC, LifeCo Mortgage, and QE Financial, together with individuals who were associated in fact with LifeCo and its subsidiaries, constituted an "enterprise" as defined by Title 18, United States Code, Section 1961(4) ("The LifeCo Enterprise"). The LifeCo Enterprise was engaged in, and its activities affected, interstate and foreign commerce.

36.     WEISS, POUND, SCHNEIDERMAN, STARR, ALLEN, GORSKI, and others conducted and participated directly and indirectly in the conduct of The LifeCo Enterprises' affairs in part for the following purposes:

        a.     To enrich themselves, their friends, and their associates by stealing and taking by fraud, money, and property of The LifeCo Enterprise;

9

b.    To use financial transactions to conceal the receipt of money and property which was stolen and taken by fraud from *The LifeCo Enterprise*;

c.    To fraudulently portray *The LifeCo Enterprise* as financially stable and solvent, with the intent of deceiving the LifeCo shareholders, the NHLIC policyholders, potential NHLIC policyholders, and the Regulators, and the intent of fraudulently selling unrestricted common stock of LifeCo to the general public, with the expectation of enriching themselves in the process;

d.    To conceal proceeds of theft and fraud;

e.    To facilitate additional thefts, frauds, and deceptions;

e.    To engage in monetary transactions in the proceeds of theft and fraud; and

f.    To commit bankruptcy fraud.

### III. MANNER AND MEANS

Among the manner and means whereby WEISS, POUND, SCHNEIDERMAN, STARR, ALLEN, GORSKI, and co-conspirators HERMAN and ROSENBERG, together with Smythe, Blutrich, Pfeffer, Plato, Ford, and their associates, conducted and participated in the conduct of the affairs of *The LifeCo Enterprise* were the following:

37.    WEISS was associated with *The LifeCo Enterprise*, and individually and collectively with others, directed the affairs of *The LifeCo Enterprise* in part as follows:  a) WEISS, through corporations which he owned or controlled, acquired control of over $80,000,000 in NHLIC funds; b) WEISS paid bribes and kickbacks to Smythe, Blutrich, Pfeffer, and POUND to cause them to cause NHLIC to make certain investments; c)

10

WEISS acquired LifeCo preferred stock through collusion and fraud; d) WEISS caused NHLIC to be falsely named as a creditor in bankruptcy proceedings and caused Pfeffer to unlawfully pose as the authorized representative of NHLIC in bankruptcy proceedings; and e) WEISS, through SOUTH STAR and NHE, fraudulently took title to notes and mortgages of a value of approximately $60,000,000 which were in fact the property of NHLIC, and, together with APX, RAM, POUND, SCHNEIDERMAN, and STARR exercised full dominion and control over those NHLIC assets.

38.    POUND was employed by, and associated with *The LifeCo Enterprise*, and individually and collectively with others, directed the affairs of *The LifeCo Enterprise* as follows: a) POUND was president of LifeCo Mortgage, which was part of *The LifeCo Enterprise*; b) POUND was president of QE Financial, which was part of *The LifeCo Enterprise;* c) POUND was given full power and responsibility to oversee all mortgage-related transactions of LifeCo, NHLIC, LifeCo Mortgage and QE; and d) POUND, through APX and RAM, fraudulently took possession of notes and mortgages of a value of approximately $60,000,000 which were in fact the property of NHLIC, and, together with WEISS, SCHNEIDERMAN, STARR, ALLEN, GORSKI, APX, and RAM, exercised full dominion and control over those NHLIC assets.

39.    SCHNEIDERMAN was associated with *The LifeCo Enterprise*, and individually and collectively with others, directed the affairs of *The LifeCo Enterprise* as follows: a) SCHNEIDERMAN acted as an escrow agent for NHLIC and received approximately $46,816,152 of NHLIC funds in that capacity; b) SCHNEIDERMAN, as an officer of SOUTH STAR and of NHE, fraudulently took possession and control of notes and

mortgages of a value of approximately $60,000,000 which were in fact the property of NHLIC, and, together with WEISS, STARR, POUND, APX, and RAM exercised full dominion and control over those NHLIC assets.

40. STARR was associated with *The LifeCo Enterprise*, and individually and collectively with others, directed the affairs of *The LifeCo Enterprise* in that, as an officer of SOUTH STAR and of NHE, he fraudulently took possession of notes and mortgages of a value of approximately $60,000,000 which were in fact the property of NHLIC, and, together with WEISS, SCHNEIDERMAN, POUND, APX, and RAM exercised full dominion and control over those NHLIC assets.

41. ALLEN and GORSKI were associated with *The LifeCo Enterprise*, and individually and collectively with others, directed the affairs of *The LifeCo Enterprise* as follows: a) ALLEN and GORSKI were officers and directors of QE Financial, 80% of which was a LifeCo subsidiary, were charged with the day to day operations of QE Financial, and controlled QE Financial bank accounts; b) ALLEN and GORSKI, through APX and RAM, fraudulently took possession of notes and mortgages of a value of approximately $60,000,000 which were in fact the property of NHLIC, and, together with POUND, WEISS, SCHNEIDERMAN, STARR, APX, and RAM, exercised full dominion and control over those NHLIC assets; and c) ALLEN and GORSKI, through APX, acted as mortgage servicer for additional notes and mortgages of NHLIC of a face value of over $100,000,000.

42. WEISS, POUND, SCHNEIDERMAN, STARR, ALLEN, GORSKI, and their associates, including Smythe, Blutrich, Pfeffer, Plato, Ford, and others, knowingly and intentionally used interstate wire transmissions and the United States mail to devise, to

12

execute, and to attempt to execute, schemes and artifices to defraud the *LifeCo/NHLIC Victims* (described in paragraph 47 below), specifically:  a) to take money and property of *The LifeCo Enterprise* by fraud, and by means of false and fraudulent pretenses, representations, and promises; and b) to cause officers, directors, attorneys, and committee members of *The LifeCo Enterprise* to dishonestly, falsely, and fraudulently portray *The LifeCo Enterprise* as financially stable and solvent, thereby depriving the *LifeCo/NHLIC Victims* of their intangible right of honest services from those officers, directors, attorneys, and committee members.

43.     WEISS, POUND, SCHNEIDERMAN, STARR, ALLEN, GORSKI, and their associates, including Smythe, Blutrich, Pfeffer, Plato, Ford, and others, laundered the proceeds of theft from and fraud on *The LifeCo Enterprise* by engaging in monetary transactions in those proceeds.

44.     WEISS, POUND, SCHNEIDERMAN, STARR, ALLEN, GORSKI, and their associates, including Smythe, Blutrich, Pfeffer, Plato, Ford, and others, engaged in financial transactions in criminal proceeds with the intent to promote the carrying on of additional criminal activity and with the intent to conceal the nature, location, source, ownership, and control of those proceeds.

45.     WEISS, POUND, SCHNEIDERMAN, STARR, ALLEN, GORSKI, and their associates, including Smythe, Blutrich, Pfeffer, Plato, Ford, and others transported and transferred in interstate and foreign commerce, money and property stolen, converted, and taken by fraud from *The LifeCo Enterprise.*

46.     WEISS and his associates, including Blutrich and Pfeffer, conspiring with ROSENBERG, used their positions of control and trust over *The LifeCo Enterprise* and its assets to manipulate bankruptcy proceedings with the intent of defrauding the creditors to those bankruptcy proceedings.

47.     WEISS, POUND, SCHNEIDERMAN, STARR, ALLEN, GORSKI, and their associates, including Smythe, Blutrich, Pfeffer, Plato, Ford, and others, through their joint and several conduct of the affairs of *The LifeCo Enterprise* as described above, defrauded, attempted to defraud, stole from, attempted to steal from, and otherwise harmed, the following persons and entities, hereinafter collectively referred to as the *"LifeCo/NHLIC Victims"*:

        a.      LifeCo of money, property, and the honest services of its directors, officers, attorneys, and agents;

        b.      NHLIC of money, property, and the honest services of its directors, officers, attorneys, and agents;

        c.      the policy holders of NHLIC of money, and of their property interest in the solvency and liquidity of NHLIC and in its ability to promptly redeem its policies when contractually obligated to do so;

        d.      the insurance guaranty associations of Delaware, Florida, and other states of money, and their property interests in the solvency and liquidity of NHLIC and in its ability to promptly redeem its policies when contractually obligated to do so, without jeopardizing the money, funds, and property of said guaranty associations;

14

e.      the over 1200 minority stockholders of LifeCo of money and their property interests in the stock of LifeCo and in the profitability, solvency, and liquidity of NHLIC and LifeCo Mortgage, the wholly-owned subsidiaries of LifeCo.

## IV. BACKGROUND: THE LPDA/NULENDA/FUTURE DIVERSIFIED FRAUDS AND THE CREATION OF THE $35,000,000 HOLE

### A. The LPDA and Nulenda Credit Lines

48.      In or about April or early May 1992, Smythe, Blutrich, and Pfeffer approached Standard Chartered Bank ("SCB") and proposed that SCB issue to LPDA a credit line which would be fully secured by cash/securities provided by NHLIC (the *"LPDA Credit Line"*); the proposal and transaction was concealed from LifeCo, the NHLIC CFO, and the Regulators.

49.      In or about May 1992, Smythe falsely, fraudulently, and under false pretenses caused the NHLIC CFO to transfer $15,000,000 to a Blutrich escrow account, such funds to be held by Blutrich in escrow until transferred to an investment account in NHLIC's name (the *"LPDA Escrow Funds"*).

50.      On or about May 7, 1992, Smythe, Blutrich, and Pfeffer fraudulently transferred the $15,000,000 *LPDA Escrow Funds* to LPDA, and used those funds to secure the *LPDA Credit Line* at SCB, which was ultimately drawn down to the full extent of $15,000,000.

51.      In or about August 1992, Smythe, Blutrich, and Pfeffer approached SCB and proposed that SCB issue to Nulenda a credit line which would be fully secured by

15

cash/securities provided by NHLIC (the *"Nulenda Credit Line"*); the proposal and transaction was concealed from LifeCo, the NHLIC CFO and the Regulators.

52.     In or about September 1992, Smythe falsely, fraudulently and under false pretenses, caused $20,000,000 of NHLIC funds to be transferred to a Blutrich escrow account, such funds were to be held by Blutrich in escrow, in an interest bearing account, until transferred to an investment account in NHLIC's name (the *"Future Diversified Escrow Funds"*).

53.     From on or about September 11, 1992, through May 19, 1993, Smythe, Blutrich, and Pfeffer caused the $20,000,000 *Future Diversified Escrow Funds* to be transferred to Nulenda and pledged as collateral on the *Nulenda Credit Line,* which was ultimately drawn down to the full extent of $20,000,000.

54.     . From September 1992 through June 1993, Smythe, Blutrich, and Pfeffer caused the $35,000,000 described above, plus an additional $10,000,000 of NHLIC funds, to be used to buy securities which were then substituted as the collateral on the *LPDA* and *Nulenda Credit Lines* (the "*LPDA/Nulenda Securities*").

55.     On or about May 10, 1993, SCB advised Pfeffer and Blutrich that it would not renew either the *LPDA Credit Line* or the *Nulenda Credit Line.*

56.     In June 1993, SCB sold the NHLIC securities pledged on the *LPDA Credit Line* and *Nulenda Credit Line* to pay off those debts. The fact that the securities were pledged and sold was concealed from NHLIC. The sale of the NHLIC securities created what Smythe, Blutrich and Pfeffer generally referred to as the *"$35,000,000 Hole"*, because

prior to the end of 1993 the whereabouts and disposition of these assets would have to be explained to LifeCo, NHLIC, independent auditors and the Regulators.

57.    From June 1993 through August 1993, Blutrich, allegedly acting as attorney for NHLIC, directed and caused SCB to sell all securities not sold previously to satisfy the LPDA and Nulenda debts for approximately $12,572,184.

### B. The LifeCo Class D Preferred Stock Fraud

58.    From on or about August 1, 1992, and continuing to on or about July 24, 1997, in Orlando, Orange County, Florida, in the Middle District of Florida, and elsewhere, RICHARD B. HERMAN, individually and d/b/a Law Offices of Richard B. Herman, d/b/a Blutrich, Herman & Miller, together with Smythe, Blutrich and Pfeffer, knowingly and intentionally devised and executed a scheme and artifice to defraud, and to obtain by means of false and fraudulent pretenses, representations, and promises, money and property of LifeCo and NHLIC, specifically 733,334 shares of LifeCo Class D Preferred Stock (the "LifeCo Class D Preferred Stock") and $630,285.08 paid as dividends on the LifeCo Class D Preferred Stock.

59.    On or about September 11, 1992, Smythe, Blutrich, Pfeffer and Future Diversified, through false and fraudulent pretenses, representations, and promises caused LifeCo to agree to sell preferred stock (the "LifeCo Class D Preferred Stock") to Future Diversified for $11,000,000.

60.    Smythe, Blutrich, Pfeffer, and Future Diversified, as part of the LifeCo Class D Preferred Stock purchase agreement, fraudulently caused LifeCo to agree to pay $880,000 described as a brokerage commission (8%), and $220,000 described as a

finder's fee (2%), for a total of $1,100,000, funds which Smythe, Blutrich, and Pfeffer took for their personal benefit.

61. Smythe, Blutrich, Pfeffer, and Future Diversified fraudulently deducted the alleged $1,100,000 in fees from the *LifeCo Class D Preferred Stock* payment, for a net payment to LifeCo of $9,900,000, thereby fraudulently obtaining *LifeCo Class D Preferred Stock* valued at $11,000,000 for $9,900,000.

62. Smythe, Blutrich, Pfeffer and Future Diversified caused the September 11, 1992 stock purchase agreement to provide that the *LifeCo Class D Preferred Stock* would pay monthly dividends, and to further provide that if the dividends were not paid, the dividend payments would accrue to Future Diversified's benefit, regardless of the financial condition of LifeCo or NHLIC.

63. In or around September 1992 HERMAN was told: a) that Nulenda was pledging NHLIC funds on a credit line at Standard Chartered Bank; b) that funds from that credit line were to be the source of funds used by Future Diversified to purchase the *LifeCo Class D Preferred Stock*; and c) that the source of funds used to purchase the stock had to be concealed from NHLIC and LifeCo.

64. HERMAN agreed to represent Future Diversified in the execution of the stock transaction, and agreed to use his attorney escrow account as a conduit for the funds in order to conceal their source.

65. On or about September 11, 1992 HERMAN issued Check No. 1112 on an account in the name of "Law Offices of Richard B. Herman, Attorneys and Counselors at Law, Attorney Trust Account II" at Marine Midland Bank, payable to LifeCo, and delivered

18

the check to attorneys for LifeCo, directing the attorneys not to deposit the check without written consent.

66.     At the time HERMAN issued and delivered the $9,900,000 check, he had only $79,110.03 in his account, insufficient funds to cover the issued check.

67.     After the delivery of the insufficient check by HERMAN, on September 15, 1992, officers of SCB communicated by interstate and international fax to complete the approval of the Nulenda line of credit, and these interstate and international wire communications were caused by HERMAN, who needed the funds from that credit line to cover his insufficient check, as well as by Smythe, Blutrich, and Pfeffer.

68.     On or about September 17, 1992, Nulenda wire transferred $11,000,000 obtained by a draw down of the *Nulenda Credit Line* ( the *"Nulenda Draw Fraud Proceeds"*) to HERMAN's control, and HERMAN used these funds to cover Check No. 1112 and authorized that check to be released from escrow and surrendered to LifeCo.

69.     On or about September 17, 1992, HERMAN and others fraudulently caused NHLIC to issue and deliver the *LifeCo Class D Preferred Stock* to Future Diversified, allegedly in exchange for an infusion of new capital in the amount of $11,000,000, less $1,100,000 fees, whereas, as HERMAN and others then and there well knew, the funds transferred to LifeCo to pay for the *LifeCo Class D Preferred Stock* had been obtained through the pledge of NHLIC assets and the entire transaction was a fraud and a sham.

70.     From September 28, 1992 through March 28, 1994, LifeCo paid dividends to Future Diversified on the *LifeCo Class D Preferred Stock* by issuing checks, such funds

being stolen, converted, and taken by fraud pursuant to **The LifeCo Class D Preferred Stock Fraud**.

### C. The Creation of the $35,000,000 Hole

71.    On or about May 10, 1993, SCB advised Pfeffer and Blutrich that it would not renew either the *LPDA Credit Line* or the *Nulenda Credit Line*.

72.    In June 1993, SCB sold the NHLIC securities pledged on the *LPDA Credit Line* and *Nulenda Credit Line* to pay off those debts. The fact that the securities were pledged and sold was concealed from NHLIC. The sale of the NHLIC securities created what Smythe, Blutrich and Pfeffer generally referred to as the *"$35,000,000 Hole"*, because prior to the end of 1993 the whereabouts and disposition of these assets would have to be explained to LifeCo, NHLIC, independent auditors and the Regulators.

73.    From June 1993 through August 1993, Blutrich, allegedly acting as attorney for NHLIC, directed and caused SCB/FIB to sell all securities not sold previously to satisfy the LPDA and Nulenda debts for approximately $12,572,184.

### D. Money Laundering of the Nulenda Draw Fraud Proceeds

74.    In September 1992, Pfeffer asked HERMAN to act as a conduit in transferring the *Nulenda Draw Fraud Proceeds* to others and to conceal the source and disposition of those funds.

75.    On or about September 24, 1992, in order to conceal the source and disposition of the proceeds of unlawful activity by having HERMAN redistribute the funds, Pfeffer wire transferred $2,100,000 of the *Nulenda Draw Fraud Proceeds* to a HERMAN attorney trust account.

76.    On or about September 25, 1992, HERMAN redistributed $1,500,000 of the *Nulenda Draw Fraud Proceeds* to F&H for the benefit of WEISS; WEISS caused F&H to transfer $1,200,000 of the F&H/WEISS funds to Howard Savings Bank to execute **The Certified Lumber Bankruptcy Fraud** described above.

77.    On or about September 25, 1992, HERMAN redistributed $600,000 of the *Nulenda Draw Fraud Proceeds* for the benefit of WEISS, by issuance of Check No. 1118, drawn on the Herman Attorney Trust Account, in the amount of $600,000, payable to Jan Schneiderman, Esq. as Attorney.

78.    On or about October 7, 1992, HERMAN redistributed $415,556 of the proceeds remaining from $11,000,000 he received as described above, and the $2,100,000 he received as described above, by wire transferring that amount to an off-shore account for the benefit of Smythe.

79.    During December 1992, Pfeffer agreed to provide the *Nulenda Draw Fraud Proceeds* to WEISS in exchange for cash from WEISS, to assist WEISS' concealment of WEISS' use of cash and the concealment of WEISS' involvement in certain business transactions being conducted by Actual Funding Inc., a WEISS controlled corporation.

80.    In order to execute the agreement, and to conceal the nature, location, source, ownership and control of the *Nulenda Draw Fraud Proceeds*, the funds described below were transferred to an account maintained by HERMAN in the name "Law Offices of Richard B. Herman, Actual Funding Inc. Mortgage Trust Acct." at Marine Midland Bank, N.A., New York, New York on the following dates:

21

| Date | Nulenda Draw Fraud Proceeds Transferred |
|------|------------------------------------------|
| 12-17-92 | $60,000 |
| 12-18-92 | $174,000 |
| 01-07-93 | $600,000 |
| 01-13-93 | $100,000 |

81.    During early 1993, HERMAN distributed funds described in the preceding paragraph to the benefit of, and on the instruction of, WEISS, and Pfeffer was reimbursed for the disbursement of these funds, by WEISS, in cash.

## V. THE RACKETEERING VIOLATION

82.    From in or about May 1992, through on or about April 28, 1998, in the Middle District of Florida, and elsewhere,

SHOLAM WEISS
KEITH POUND
JAN R. SCHNEIDERMAN
YAAKOV STARK
a/k/a Jan Starr
NADINE ALLEN
and
ROBERT GORSKI

the defendants herein, together with others both known and unknown to the grand jury, being persons employed by and associated with *The LifeCo Enterprise* described above, which was an enterprise engaged in, and its activities affected, interstate and foreign commerce, did unlawfully, willfully, and knowingly conduct and participate, directly and indirectly, in the conduct of the affairs of that enterprise through a pattern of racketeering activity, that is, through the commission of Racketeering Acts set forth below.

22

## VI. THE PATTERN OF RACKETEERING ACTIVITY

The pattern of racketeering activity, as defined in Title 18, United States Code,

Sections 1961(1) and 1961(5), consisted of the following (The Racketeering Acts are

summarized in Appendix I appended hereto):

**A.    Racketeering Acts 1 Through 8**
**       The Attorney Escrow (South Star) Cash Fraud and Theft**
**       (18 U.S.C. §§ 1343 and 1346)**

### The Scheme and Artifice to Defraud

83.    From on or about June 1, 1993, and continuing to on or about April 28, 1998,

in Orlando, Orange County, Florida, in the Middle District of Florida, and elsewhere,

WEISS and SCHNEIDERMAN, together with Smythe, Blutrich, Pfeffer, and others

knowingly devised and executed: a) a scheme and artifice to defraud the *LifeCo/NHLIC*

*Victims* of money and property, and to obtain money and property of the *LifeCo/NHLIC*

*Victims* by means of false and fraudulent pretenses, representations, and promises,

specifically, approximately $89,157,482 of NHLIC; and b) to deprive the *LifeCo/NHLIC*

*Victims* of their intangible right of honest services from LifeCo and NHLIC officers,

directors, attorneys, agents, and committee members by fraudulently, and through false

and fraudulent pretenses, deceiving, and causing others to deceive, the *LifeCo/NHLIC*

*Victims* as to the assets, liabilities, net worth, and solvency of LifeCo and NHLIC.

### The South Star Mortgage Acquisition Plan

84.    It was part of the scheme and artifice to defraud that from in or about August

1993, through in or about December 1993, WEISS, Smythe, Blutrich, and Pfeffer

concocted a plan to divert NHLIC funds and to use those funds to acquire discounted

23

mortgages, in order to conceal the *$35,000,000 Hole* from NHLIC, and that WEISS,

SCHNEIDERMAN, SOUTH STAR, and others falsely, fraudulently, and through a variety

of false pretenses and representations, caused NHLIC funds in the amount of $89,157,482

to be transferred to SCHNEIDERMAN and F&H to execute the plan, as described in

paragraphs 85 through 91 below.

85.     It was part of the scheme and artifice to defraud that on or about August 19,

1993, WEISS, HERMAN, and STARR incorporated SOUTH STAR, WEISS intending to

use SOUTH STAR as a vehicle to execute the mortgage acquisition scheme.

86.     It was part of the scheme and artifice to defraud that WEISS recruited

SCHNEIDERMAN, who was WEISS' attorney and colleague, to act as a disbursing agent

for SOUTH STAR, recruited STARR to act as the "front" for SOUTH STAR, and, further,

recruited F&H to act as a disbursing agent, as well as a purchasing agent, during the

execution of the mortgage acquisition scheme.

87.     It was part of the scheme and artifice to defraud that beginning in the summer

of 1993, and continuing up to December 21, 1993, the NHLIC CFO was advised that

negotiations were ongoing for the *Reinsurance Deal* (described in paragraph 195 below),

although in truth and in fact, by at least November 22, 1993, those negotiations had failed

and there was no realistic expectation that the *Reinsurance Deal* would be executed.

88.     It was part of the scheme and artifice to defraud that beginning in August

1993, and continuing until December 21, 1993, Smythe advised NHLIC and the NHLIC

CFO that substantial cash assets of NHLIC were required to be accumulated to be used

to execute the *Reinsurance Deal*, and, further, falsely and fraudulently advised NHLIC and

24

its CFO that SCHNEIDERMAN and Schick were attorneys designated to hold the funds in escrow for the *Reinsurance Deal*.

89.    It was part of the scheme and artifice to defraud that, in order to cover the *$35,000,000 Hole*, in or about October 1993, WEISS and SCHNEIDERMAN caused Pfeffer to falsely and fraudulently advise NHLIC that approximately $48,152,012 had been transferred to SCHNEIDERMAN from SCB, to be held in escrow for the *Reinsurance Deal* (such funds alleged to be proceeds of the sale of the *LPDA/Nulenda Securities*), whereas, in truth and in fact, only $12,572,184 was transferred to SCHNEIDERMAN, such funds constituting the proceeds remaining from the sale of the *LPDA/Nulenda Securities* after the pay-off of the *LPDA* and *Nulenda Credit Lines* (as described in paragraphs 56 and 57 above).

90.    It was part of the scheme and artifice to defraud that on or about the dates set forth below, WEISS, SCHNEIDERMAN, SOUTH STAR and others fraudulently caused NHLIC to transfer the funds described below to SCHNEIDERMAN and to F&H, based on a variety of false and fraudulent representations, including that they were to be used as part of investment transactions and that they were to be held in escrow for the *Reinsurance Deal*:

| Date | Amount | From | To |
|------|--------|------|-----|
| 08-31-93 | $30,314,248 | NHLIC Account Smith Barney Shearson NY, NY | Schneiderman |
| 08-31-93 | $4,000,000 | NHLIC Account Barnett Bank Orlando, FL | Schneiderman |

| Date | Amount | From | To |
|---|---|---|---|
| 09-28-93 | $4,604,020 | NHLIC Account<br>Barnett Bank<br>Orlando, FL | F&H |
| 09-28-93 | $5,000,000 | NHLIC Account<br>Barnett Bank<br>Orlando, FL | F&H |
| 10-29-93 | $5,000,000 | NHLIC Account<br>Barnett Bank<br>Orlando, FL | F&H |
| 11-24-93 | $15,000,000 | NHLIC Account<br>Barnett Bank<br>Orlando, FL | F&H |
| 12-13-93 | $407,818 | NHLIC Account<br>Prudential Securities<br>Boca Raton, FL | F&H |
| 12-13-93 | $3,359,214 | NHLIC Account<br>Smith Barney Shearson<br>NY, NY | F&H |
| 12-23-93 | $2,500,000 | NHLIC Account<br>Barnett Bank<br>Orlando, FL | F&H |

91.    It was part of the scheme and artifice to defraud that on or about December 30, 1993, POUND transferred $6,400,000 of the proceeds of **The PACS Fraud** (described below) to SOUTH STAR, these funds and those described in paragraphs 89 and 90 above are hereinafter referred to as the *"Attorney Escrow (South Star) Fraud Proceeds."*

## The SOUTH STAR Deception and Diversion

92.    It was part of the scheme and artifice to defraud that WEISS, SCHNEIDERMAN, SOUTH STAR, and others, knowing full well that the *Attorney Escrow (South Star) Fraud Proceeds* had been transferred to SCHNEIDERMAN and F&H under false and fraudulent pretenses, and that the funds were at all times the property of NHLIC,

26

concealed SOUTH STAR's use of the funds from NHLIC, and misrepresented the amounts received, as described in paragraphs 97 through 99 below.

93.    It was part of the scheme and artifice to defraud that on or about November 11, 1993, in order to perpetuate the artifice that SCHNEIDERMAN and F&H held the *Attorney Escrow (South Star) Fraud Proceeds* in escrow for NHLIC, and to cover the *$35,000,000 Hole*, SCHNEIDERMAN issued to NHLIC an interest check in the amount of $132,683.03, which purported to represent interest on the $92,000,000 allegedly received by SCHNEIDERMAN, whereas, in truth and in fact, as of that date SCHNEIDERMAN had received only $46,816,152 from NHLIC.

94.    It was part of the scheme and artifice to defraud that in or about November 1993 and January 1994, WEISS, SCHNEIDERMAN, and others submitted, and caused to be submitted, a false and fraudulent escrow statement to NHLIC which represented that SCHNEIDERMAN held $92,000,000 in cash for NHLIC as of September 30, 1993, whereas, in truth and in fact, the $46,816,152 she actually had received had been diverted to SOUTH STAR and spent, and SCHNEIDERMAN had less than $300,000 remaining on hand.

95.    WEISS and others used $74,783,834 of the *South Star (Attorney Escrow) Fraud Proceeds* to promote and facilitate additional unlawful activities, in part as described in the following Racketeering Acts:

D.    **Racketeering Act 28**
       **(Money Laundering: The Certified Lumber Fraud Facilitation)**

J.    **Racketeering Act 39**
       **(The LifeCo Class E Stock (Capital Assets) Fraud Facilitation I)**

27

**K.**     **Racketeering Acts 40 Through 48**
          **(The LifeCo Class E Stock (Capital Assets) Fraud Facilitation II)**

**M.**     **Racketeering Act 56**
          **(The PACS Fraud Facilitation)**

**P.**     **Racketeering Act 59**
          **(Money Laundering: The LifeCo Mortgage Commission Fraud Facilitation)**

**R.**     **Racketeering Acts 60 Through 67**
          **(Money Laundering: The National Housing Exchange Bond Fraud Facilitation)**

96.     It was part of the scheme and artifice to defraud that WEISS, SCHNEIDERMAN, Blutrich, Pfeffer and others knowingly and intentionally diverted $27,560,022 of the *Attorney Escrow (South Star) Fraud Proceeds* to their personal benefit as follows:

| Dates | Amount Diverted | From | To | Purpose |
|---|---|---|---|---|
| 08-93 thru 12-93 | $1,882,361 | Schneiderman and F&H Accounts | Weiss Pound | To acquire mortgages retained by South Star until at least September 1995 |
| 01-03-94 | $3,700,000 | F&H | Weiss Schneiderman | To acquire Real estate for NES |
| 11-04-93 and 12-13-93 | $1,150,000 | F&H | Weiss Rosenberg | To acquire Certified Lumber Debt (see *The Certified Lumber Fraud*) |
| 09-07-93 thru 05-09-94 | $7,224,494 | Schneiderman and F&H | Weiss | To acquire and pay encumbrances on Capital Assets (see *The Capital Assets Fraud*) |

| Dates | Amount Diverted | From | To | Purpose |
|-------|-----------------|------|-----|---------|
| 11-04-93 | $2,000,000 | F&H | LifeCo Mortgage | To pay alleged commission to LifeCo Mortgage (see *The LifeCo Mortgage Commission Fraud*) |
| 08-16-93 thru 04-20-94 | $1,194,694 | Schneiderman | Blutrich | Personal use ($750,000 sent offshore) |
| 08-16-93 thru 09-22-93 | $750,000 | Schneiderman | Pfeffer | Personal use ($500,000 sent offshore) |
| 08-24-93 thru 06-09-94 | $3,315,000 | Schneiderman | Weiss | Personal use ($1,755,000 sent offshore) |
| 10-13-93 thru 04-15-94 | $1,888,000 | F&H | Blutrich | Personal use |
| 03-11-94 | $300,000 | F&H | Pfeffer | Personal use |
| 10-29-93 thru 05-20-94 | $4,080,473 | F&H | Weiss | Personal use |
| 12-12-93 | $50,000 | Schneiderman | Michael E. Bachner, Esq. | Weiss' personal use for attorney fees |
| 06-03-94 | $25,000 | South Star | Herald Fahringer | Weiss' personal use for attorney fees |

## The Dishonesty Toward Shareholders and Policyholders

97.     It was part of the scheme and artifice to defraud that WEISS, SCHNEIDERMAN, SOUTH STAR and others dishonestly caused the books and records of NHLIC to overstate assets, understate liabilities, and exaggerate net worth, as described in paragraphs 98 and 99 below.

98.    It was part of the scheme and artifice to defraud that from August 1993 through December 1993, WEISS, SCHNEIDERMAN, and others submitted, and caused to be submitted, to NHLIC, numerous false and fraudulent documents and writings which misrepresented the status and application of the *Attorney Escrow (South Star) Fraud Proceeds*.

99.    Through the dishonest acts described above, WEISS, SCHNEIDERMAN, and others caused the official books and records of NHLIC to contain false and fraudulent representations and entries, including that as of December 28, 1993, SCHNEIDERMAN and F&H held $118,267,031.91 cash in escrow for the benefit of NHLIC.

### The Interstate Wire Transmittals

100.    On or about the dates set forth below, with regard to a scheme and artifice to defraud which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere,

**SHOLAM WEISS**
**KEITH POUND**
**and**
**JAN R. SCHNEIDERMAN**

the defendants herein, together with SOUTH STAR MANAGEMENT, INC., having devised the above-described scheme and artifice to defraud, and for the purpose of executing and attempting to execute the scheme and artifice to defraud, and for the purpose of obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did knowingly transmit, and cause others to transmit, by means of wire

communication in interstate commerce, the writings, signs, and signals described below, in violation of Title 18, United States Code, Sections 1343, 1346, and 2:

| Racketeering Act | Date | Amount | From | To |
|---|---|---|---|---|
| 1 | 08-31-93 | $4,000,000 | NHLIC Account #42-Q662019, Barnett Bank, Orlando, FL | Schneiderman Account #251-04-545, Morgan Guaranty, NY, NY |
| 2 | 09-28-93 | $4,604,019.59 | NHLIC Account #42-Q662019, Barnett Bank, Orlando, FL | F&H Account #01567121, Citibank, NY, NY |
| 3 | 09-28-93 | $5,000,000 | NHLIC Account #42-Q662019, Barnett Bank, Orlando, FL | F&H Account #01567121, Citibank, NY, NY |
| 4 | 10-29-93 | $5,000,000 | NHLIC Account #42-Q662019, Barnett Bank, Orlando, FL | F&H Account #01567121, Citibank, NY, NY |
| 5 | 11-24-93 | $15,000,000 | NHLIC Account #42-Q662019, Barnett Bank, Orlando, FL | F&H Account #9379-131371, Fleet Bank, NY, NY |
| 6 | 12-23-93 | $2,500,000 | NHLIC Account #42-Q662019, Barnett Bank, Orlando, FL | F&H Account #9379-131371, Fleet Bank, NY, NY |
| 7 | 02-01-94 | $2,500,000 | NHLIC Account #42-Q66-2001, Barnett Bank, Orlando, FL | F&H Account #01567164, Citibank, NY, NY |
| 8 | 02-11-94 | $1,000,000 | NHLIC Account #42-Q66-2001, Barnett Bank, Orlando, FL | F&H Account #01567164, Citibank, NY, NY |

**B.    Racketeering Acts 9 Through 26**
**(Interstate Transportation Of Stolen Funds (South Star Fraud Proceeds))**
**(18 U.S.C. § 2314)**

101.    On or about the dates listed below, in Orange County, Florida, in the Middle District of Florida, and elsewhere,

31

**SHOLAM WEISS
KEITH POUND
and
JAN R. SCHNEIDERMAN**

the defendants herein, together with SOUTH STAR MANAGEMENT, INC., knowingly and

intentionally caused money of the value of $5,000 or more to be unlawfully transported,

transmitted, and transferred in interstate commerce, that is, the stolen funds described

below, which are *Attorney Escrow (South Star) Fraud Proceeds*, to be sent from bank

accounts of, or bank accounts held for the benefit of SOUTH STAR, in New York, New

York, to recipients in the states identified below, in violation of Title 18, United States

Code, Sections 2314 and 2.

| Racketeering Act | Date | Amount | From | To |
|---|---|---|---|---|
| 9 | 08-26-93 | $747,000 | Wire Transfer from Schneiderman Account #001-58-206, Morgan Guaranty Bank, NY, NY | RTC, Chicago, IL |
| 10 | 09-03-93 | $113,470.56 | Wire Transfer from Schneiderman Account #001-58-217, Morgan Guaranty Bank, NY, NY | Consolidated Asset Recovery Corporation, Bridgeport, CT |
| 11 | 09-07-93 | $3,100,000 | Cashier Check for $3,100,000 from Morgan Guaranty Bank, NY, NY | United Jersey Bank, Princeton, NJ |
| 12 | 11-03-93 | $844,000 | F&H Check #1378, from Account #01567121, Citibank, NY, NY | NatWest Bank of New Jersey, S. Plainfield, NJ |
| 13 | 11-04-93 | $200,000 | Wire transfer from F&H Account # 9379131371, Fleet Bank, NY, NY | First Fidelity Bank, Newark, NJ |

32

| Racketeering Act | Date | Amount | From | To |
|---|---|---|---|---|
| 14 | 11-17-93 | $311,051.50 | Wire transfer from F&H, Account #01567164, Citibank, NY, NY | FDIC Chicago, IL |
| 15 | 11-24-93 | $305,136 | Wire transfer from F&H, Account #9379131371, Fleet Bank, NY, NY | FDIC Chicago, IL |
| 16 | 11-24-93 | $174,137.73 | Wire transfer from F&H, Account #9379131371, Fleet Bank, NY, NY | FDIC Chicago, IL |
| 17 | 12-01-93 | $25,153.60 | Wire transfer from F&H, Account #9379131371, Fleet Bank, NY, NY | FDIC Chicago, IL |
| 18 | 12-06-93 | $41,650.04 | Wire transfer from F&H, Account #9379131371, Fleet Bank, NY, NY | Consolidated Asset Recovery Corporation, Bridgeport, CT |
| 19 | 12-10-93 | $365,682.34 | Wire transfer from F&H, Account #9379131371, Fleet Bank, NY, NY | Consolidated Asset Recovery Corporation, Bridgeport, CT |
| 20 | 12-10-93 | $950,000 | Wire transfer from F&H, Account #9379131371, Fleet Bank, NY, NY | First Fidelity Bank, Newark, NJ |
| 21 | 12-15-93 | $2,746,226 | Wire transfer from F&H, Account #9379131371, Fleet Bank, NY, NY | FDIC Chicago, IL |
| 22 | 12-21-93 | $226,382.29 | Wire transfer from F&H, Account #313753916, Sterling Bank, NY, NY | FDIC Chicago, IL |
| 23 | 12-21-93 | $415,481.76 | Wire transfer from F&H, Account # 9379131371, Fleet Bank, NY, NY | Consolidated Asset Recovery Corporation, Bridgeport, CT |

| Racketeering Act | Date | Amount | From | To |
|---|---|---|---|---|
| 24 | 12-31-93 | $1,000,000 | Wire transfer from F&H, Account # 9379131371, Fleet Bank, NY, NY | QE Financial, Inc. Cary, IL |
| 25 | 01-20-94 | $537,931.24 | Wire transfer from F&H, Account #9379131371, Fleet Bank, NY, NY | FDIC Chicago, IL |
| 26 | 01-25-94 | $4,700,000 | Wire transfer from F&H, Account #9379131371, Fleet Bank, NY, NY | Northcorp Realty Advisors Dallas, TX |

## C. Racketeering Act 27
### (The Certified Lumber Bankruptcy Fraud)
### (18 U.S.C. § 1341)

### The Scheme and Artifice to Defraud

102. From on or about June 3, 1992 through on or about October 25, 1995, WEISS and ROSENBERG devised a scheme and artifice to defraud creditors of Certified Lumber and Boro Park, and recruited Blutrich and Pfeffer to use their positions of trust with NHLIC to execute the scheme, WEISS, Blutrich and Pfeffer also agreeing to use *Attorney Escrow (South Star) Fraud Proceeds* to further execute the scheme

### The False Bankruptcy Creditor Schedule

103. It was part of the scheme and artifice to defraud that WEISS and ROSENBERG falsely and fraudulently caused NHLIC to be included as an unsecured creditor in bankruptcy proceedings, with the intent to use the deception to defraud true creditors in those proceeding, as described in paragraphs 104 through 107 below.

34

104. On or about March 6, 1991, Howard Savings Bank ("HSB") issued a $4,000,000 loan to Certified Lumber, and $2,500,000 loans to ROSENBERG and his brother Abraham (collectively the "Rosenbergs"). To secure these loans, Certified Lumber and the Rosenbergs gave guarantees, pledged the inventory and assets of Certified Lumber and of Boro Park, gave a $2,500,000 mortgage on Certified Lumber property, and gave a $500,000 mortgage on Boro Park property. The assets of HSB, including these debts and mortgages were ultimately acquired by First Fidelity Bank ("FFB") (HSB and FFB as successor to HSB hereinafter collectively referred to as "HSB/FFB").

105. It was part of the scheme and artifice to defraud that on or about June 3, 1992, Certified Lumber and Boro Park filed Petitions under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Eastern District of New York, which were procedurally consolidated (the "CL/BP Bankruptcy").

106. It was part of the scheme and artifice to defraud that on or about June 17, 1992, and again on or about July 31, 1992, WEISS caused ROSENBERG, in relation to a case under Chapter 11 of the Bankruptcy Code, to falsely and fraudulently make unsworn declarations under penalty of perjury which listed NHLIC and Les Placement Jeton Bleu I.M. Corp. as unsecured creditors in documents filed in the CL/BP Bankruptcy. Specifically, ROSENBERG falsely stated that NHLIC was a creditor holding a $4,300,000 unsecured claim pursuant to an unspecified "Guarantee," whereas Certified Lumber never gave such a guarantee to NHLIC, and no such guarantee had ever been recorded; and further falsely stated that Les Placement Jeton Bleu I.M. Corp. was a creditor holding a $1,800,000 unsecured claim pursuant to an unspecified "Guarantee," whereas Certified

35

Lumber never gave such a guarantee to Les Placement Jeton Bleu I.M. Corp., and no such guarantee had ever been recorded.

107. It was part of the scheme and artifice to defraud that in or about June 1992, WEISS and ROSENBERG recruited Pfeffer to falsely claim that he was the authorized representative of NHLIC in the bankruptcy proceedings in an attempt to have Pfeffer, purportedly on behalf of NHLIC, the largest listed unsecured creditor, take control of the Unsecured Creditors Committee and to urge that committee to support Certified Lumber and Boro Park, and to oppose HSB/FFB, in all controverted matters during the *CL/BP Bankruptcy*, thereby fraudulently attempting to manipulate the *CL/BP Bankruptcy* in order to defeat the efforts of HSB/FFB to have the bankruptcy court appoint a trustee in bankruptcy, and to defeat or frustrate the legitimate claims of HSB/FFB and other secured and unsecured creditors.

## Misrepresentation of Existence of Debts
## Amount of Debts and Repayment Plans

108. It was part of the scheme and artifice to defraud that WEISS and ROSENBERG entered into collusive agreements with LPDA, IWUB, and SOUTH STAR to misrepresent to the bankruptcy court and to the legitimate secured and unsecured creditors, the existence and amount of debts incurred by Certified Lumber with LPDA, IWUB, and SOUTH STAR and the terms of repayment plans pertaining to said real or purported debts.

### The Collusive Confession of Judgments

109.   It was part of the scheme and artifice to defraud that in order to protect certain assets of the Rosenbergs from the claims of legitimate secured and unsecured creditors of Certified Lumber, that WEISS and ROSENBERG entered into a collusive agreement with IWUB to record confessions of judgment by the Rosenbergs upon a $4,000,000 note assigned by HSB/FFB to IWUB, falsely asserting that the $4,000,000 note was delinquent.

### False and Perjured Testimony

110.   It was part of the scheme and artifice to defraud that on or about October 12, 1993, as part of the *CL/BP Bankruptcy* proceedings, ROSENBERG and WEISS caused WEISS, Blutrich, and Shafron to give false and perjured testimony regarding the source of the funds disbursed to or for the benefit of Certified Lumber by LPDA, IWUB, and SOUTH STAR, with the result that Certified Lumber defeated the attempts of HSB/FFB to prevent the proposed plan of reorganization from being confirmed by the bankruptcy court and defeated the HSB/FFB attempt to foreclose on certain property of Certified Lumber, causing HSB/FFB to agree to settle its remaining secured claim of approximately $3,000,000 by selling it to SOUTH STAR for $1,150,000, as specified below in the next paragraph.

### Use of the *Attorney Escrow (South Star) Fraud Proceeds*

111.   It was part of the scheme and artifice to defraud that on or about November 2, 1993, WEISS caused a Stipulation and Order to be filed by Certified Lumber/Boro Park, stipulating that an unspecified entity would assume the remaining portion of the Certified

Lumber/Boro Park debt owed to HSB/FFB in the *CL/BP Bankruptcy*, approximately $3,000,000, for $1,150,000

112.    It was part of the scheme and artifice to defraud that WEISS caused $1,150,000 of the *Attorney Escrow (South Star) Fraud Proceeds* to be transferred to HSB/FFB to execute the above-described transaction.

### The Use of The Mails

113.    On or about October 4, 1993, in Garden City and New York City, New York, Brooklyn, New York, in the Southern and Eastern Districts of New York,

### SHOLAM WEISS

the defendant herein, coconspirator ROSENBERG and other co-conspirators known and unknown to the grand jury, together with IWUB, having devised a scheme and artifice to defraud creditors of Certified Lumber, for the purpose of executing and attempting to execute such scheme and artifice, caused the office of Leo Fox, attorney for Certified Lumber and Boro Park, to send by United States Postal Service Express Mail, a Motion to Fix Secured Claims of First Fidelity Bank New Jersey, N.A., along with attached documents and enclosures, to Scott Stuart, Office of United States Trustee, Garden City, New York, and Christine Black, attorney for HSB/FFB, New York, New York, in violation of Title 18, United States Code, Section 1341.

38

D.   **Racketeering Act 28**
     **(Money Laundering: The Certified Lumber Fraud Facilitation)**
     **(18 U.S.C. §§ 1956(a)(1)(A), 1956(a)(1)(B), and 2)**

114.   On or about December 10, 1993, with regard to the proceeds of specified

unlawful activity which was begun, continued, and completed in Orange County, Florida,

in the Middle District of Florida, and elsewhere, and as a part of money laundering activity

which was begun, continued, and completed in Orange County, Florida, in the Middle

District of Florida, and elsewhere,

### SHOLAM WEISS

the defendant herein, knowing that the proceeds described below were the proceeds of

unlawful activity, the proceeds described below in fact constituting proceeds of violations

of Title 18, United States Code, Section 1343 (wire fraud), and with the intent to promote

the carrying on of **The Certified Lumber Fraud**, and further, to knowingly conceal and

disguise the nature, location, source, and ownership of the proceeds described below, did

knowingly and intentionally cause F&H to wire transfer $950,000 of the *Attorney Escrow*

*(South Star) Fraud Proceeds* from its Account #9379-131371, at Fleet Bank, New York,

New York to HSB, in violation of Title 18, United States Code, Sections 1956(a)(1)(A) and

1956(a)(1)(B).

E.   **Racketeering Act 29**
     **(False Declarations in Certified Lumber Bankruptcy)**
     **(18 U.S.C. § 152)**

115.   On or about June 17, 1992, and again on or about July 31, 1992,

### SHOLAM WEISS

39

the defendant herein, and co-conspirator ROSENBERG and other co-conspirators known and unknown to the grand jury, together with IWUB, caused a false and fraudulent document, that is, an unsworn statement made under penalty of perjury to be filed in the *CL/BP Bankruptcy*, a case under Chapter 11 of the Bankruptcy Code. Specifically, ROSENBERG, at the direction of WEISS, falsely stated that NHLIC was a creditor holding a $4,300,000 unsecured claim pursuant to an unspecified "Guarantee," whereas Certified Lumber never gave such a guarantee to NHLIC, and no such guarantee had ever been recorded, in violation of Title 18, United States Code, Section 152.

**F.     Racketeering Act 30**
         **(False Declarations in Waterfront Realty Company Bankruptcy)**
         **(18 U.S.C. § 152)**

### The Waterfront Realty Bankruptcy

116.   Waterfront Realty Company ("Waterfront") was a partnership owned equally by the Rosenbergs. Waterfront owned a single asset, which was commercial real property located at 462 Kent Avenue, Brooklyn, New York. At all times material herein, the property had an estimated value of approximately $2,600,000.

117.   At all times material herein, Manufacturers and Traders Trust Company, New York, New York held a first mortgage on the Waterfront property with an outstanding balance of approximately $2,000,000. At all times material herein, the payments on said first mortgage remained current.

118.   At all times material herein, Bank of Great Neck, Great Neck, New York, held a second mortgage on the Waterfront property with an outstanding balance of approximately $1,900,000.

119. On or about January 1, 1994, Waterfront defaulted on its monthly principal and interest payments to Bank of Great Neck. On or about March 23, 1994, Bank of Great Neck commenced a foreclosure action against Waterfront in the Supreme Court of the State of New York, Kings County, New York.

120. On or about June 6, 1994, Waterfront filed a Petition under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Eastern District of New York.

### False Declarations in Waterfront Realty Company Bankruptcy

121. On or about June 6, 1994, in Westbury, New York, in the Eastern District of New York,

### SHOLAM WEISS

the defendant herein, and coconspirator ROSENBERG and other co-conspirator known and unknown to the grand jury, together with IWUB, caused a false and fraudulent affidavit sworn to under penalty of perjury by ROSENBERG to be made in relation to a case under Chapter 11 of the Bankruptcy Code, such affidavit falsely listing the following entities as creditors holding unsecured contingent claims in the amounts listed below, based on an unspecified "Guarantee" of Waterfront:

|  |  |
|---|---|
| National Heritage<br>c/o National Mortgage Corp.<br>2 Park Avenue, Suite 1400<br>New York, New York 10016 | $4,300,000 |

IWUB Corp.                                $4,000,000
Bernard Shafron, Esq.
Frenkel & Herskowitz
16 East 34th Street
New York, New York 10016

South Star Management Corp.              $2,500,000
2 Park Avenue, Suite 1400
New York, New York 10016

LPDA Acquisitions Corp.                  $1,000,000
2 Park Avenue, Suite 1400
New York, New York 10016

whereas Waterfront never gave such a guarantee to any of the purported creditors in the

amounts listed, and no such guarantees had ever been recorded, in violation of Title 18,

United States Code, Section 152.

G.    **Racketeering Acts 31 through 33**
      **(The Future Medical Stock/Solar Note Fraud)**
      **(18 U.S.C. §§ 1343, 1346, and 2)**

### The Scheme and Artifice to Defraud

122.   From in or about June 1993, and continuing to on or about April 28, 1998,

in Orlando, Orange County, Florida, in the Middle District of Florida, and elsewhere,

WEISS, SCHNEIDERMAN, Smythe, Blutrich, Pfeffer, and others knowingly devised and

executed: a) a scheme and artifice to defraud LifeCo and NHLIC of money and property,

and to obtain money and property of LifeCo and NHLIC by means of false and fraudulent

pretenses, representations, and promises, specifically, i) $2,605,123.75 of NHLIC used to

purchase stock of Future Medical Products, Inc. ("Future Medical"); ii) $5,000,000 of

NHLIC loaned to Solar Financial Services, Inc. ("Solar"); iii) the NHLIC $5,000,000 Solar

receivable; and iv) stock purchased from Future Medical; and, b) to deprive the

*LifeCo/NHLIC Victims* of their intangible right of honest services from LifeCo and NHLIC officers, directors, attorneys, agents, and committee members by using positions of trust to fraudulently, and through false and fraudulent pretenses, dishonestly deceive, and cause others to deceive, the *LifeCo/NHLIC Victims* as to the assets, liabilities, net worth, and solvency of LifeCo and NHLIC.

## The NHLIC Future Medical Stock Transaction

123. It was part of the scheme and artifice to defraud that WEISS, SCHNEIDERMAN and others manipulated the market in Future Medical stock by arranging for NHLIC to purchase Future Medical stock, purportedly on the open market at market prices, whereas the defendants and others arranged the simultaneous sale of the Future Medical stock, by this device earning substantial profits at NHLIC's expense, all as described in paragraphs 124 through 128 below.

124. On or about June 10, 1993, WEISS and SCHNEIDERMAN caused ADOS to acquire 2,000,000 shares of Future Medical stock (the "*Weiss Future Medical Stock*").

125. It was part of the scheme and artifice to defraud that WEISS offered bribes and kickbacks to Smythe, Blutrich, and Pfeffer if they would cause NHLIC to purchase the *Weiss Future Medical Stock*.

126. It was part of the scheme and artifice to defraud that on or about June 10, 1993, WEISS and others caused NHLIC to wire transfer $5,000,000 to a Prudential account at Morgan Guaranty Trust, New York, New York, to open a NHLIC stock trading account in part for the purpose of purchasing the *Weiss Future Medical Stock* (the "*NHLIC Pru-Bache Trading Account*").

43

127. It was part of the scheme and artifice to defraud that from June 28, 1993 through July 14, 1993, WEISS, SCHNEIDERMAN and others caused ADOS to sell, and NHLIC to purchase, 1,629,100 shares of the *Weiss Future Medical Stock* for $2,324,183.50 (using the funds transferred to the *NHLIC Pru-Bache Trading Account*), thereby manipulating the market in Future Medical stock through the orchestration of these simultaneous sales and purchases, and thereby causing NHLIC to purchase Future Medical stock (the "NHLIC Future Medical Stock") at a grossly inflated price, and ADOS to earn a profit of $695,083.50, such funds being transferred to SCHNEIDERMAN for WEISS' benefit.

128. It was part of the scheme and artifice to defraud that WEISS paid Pfeffer and Blutrich approximately $80,000 cash each and paid Smythe $100,000 cash as kickbacks for facilitating this transaction. .

### The NHLIC/Solar Transaction

129. It was part of the scheme and artifice to defraud that WEISS offered bribes and kickbacks to Smythe, Blutrich and Pfeffer if they would cause NHLIC to make an unsecured loan to Solar in the amount of $5,000,000 (the note issued by Solar being exchangeable for Solar preferred stock upon shareholder approval or convertible to unregistered Solar common stock), all as described in paragraphs 130 through 133 below.

130. It was part of the scheme and artifice to defraud that on or about April 23, 1993, WEISS and Solar executed an agreement which stated in substance that if WEISS assisted Solar with its then existing financial difficulties WEISS would receive at least

$2,000,000 in cash, Solar common stock, and warrants to purchase 1,000,000 shares of Solar common stock, as compensation for his services.

131. It was part of the scheme and artifice to defraud that on or about July 9, 1993, WEISS and others caused NHLIC to wire transfer $5,000,000, in part from the *NHLIC/Pru-Bache Trading Account* to HERMAN, purportedly for NHLIC to purchase Solar preferred stock, and caused HERMAN to deliver a $5,000,000 check to Solar in exchange for an unsecured "$5,000,000 7% Convertible Exchangeable Subordinated Promissory Note" issued to NHLIC (the "*Solar Note*").

132. It was part of the scheme and artifice to defraud that on or about August 30, 1993, WEISS paid a $250,000 kickback to Smythe and promised Smythe 200,000 Solar stock warrants, to induce him to approve the Solar transaction.

133. It was part of the scheme and artifice to defraud that on or about July 13, 1993, WEISS received, and agreed to share with Blutrich and Pfeffer, the following improper fees, commissions, and kickbacks, for arranging the above-described transaction between NHLIC and Solar.

    a.    172,390 shares of unregistered Solar common stock issued to WEISS;

    b.    a $1,396,633.71 promissory note from Solar payable to SPRITE (later modified to a new promissory note secured by all assets of Solar but subordinate to the remaining *Solar Bank Debt*);

    c.    1,000,000 shares of Solar common stock issued to two non-existent corporations, Paragon Investments, Inc. (500,000 shares), and Watch Portfolios, Inc. (500,000 shares); and

d.    Warrants  to purchase 1,000,000 shares of Solar common stock issued to two non-existent corporations, Rainbow Investments, Inc. (550,000), and Warrant Associates, Inc. (450,000 shares).

### The FDPI Holding Fraud

134.    It was part of the scheme and artifice to defraud that, in order to conceal the thefts and frauds described above, and in order to prevent the books and records of LifeCo and NHLIC from reflecting the losses incurred due to those thefts and frauds, WEISS and others orchestrated a sham transaction wherein NHLIC allegedly traded the *Solar Note* and the *NHLIC Future Medical Stock* for mortgage loans, but where in fact NHLIC gave up those assets and received nothing at all, as described in paragraphs 135 through 143 below.

135. .  In late 1993, the Delaware Regulators advised NHLIC that it could not use the face values of either the *Solar Note* or the *Future Medical Stock* in computing the amount of its regulatory capital, due to valuation problems associated with those assets.

136.    In December 1993, Venture Mortgage Fund, L.P. ("Venture Mortgage"), a limited partnership controlled by Schick, owned mortgages with a face value of $7,754,046 (the "*Venture Mortgages*").

137.    It was part of the scheme and artifice to defraud that in or about December 1993, WEISS and others asked Schick to temporarily transfer the *Venture Mortgages* to FDPI Holding, in exchange for a $7,600,000 promissory note from NHLIC due and payable in full on March 15, 1994, and Schick agreed.

46

138. It was part of the scheme and artifice to defraud that in or about December 1993, WEISS and others caused Smythe, Blutrich, and Pfeffer to falsely advise NHLIC that FDPI Holding (a shell corporation formed for the purpose of executing this fraud), would exchange the *Solar Note* and the *NHLIC Future Medical Stock* for the *Venture Mortgages*, thereby solving the regulatory problem described above, and, further, that NHLIC would gain approximately $148,923 in the exchange. Based upon these representations NHLIC approved the exchange.

139. It was part of the scheme and artifice to defraud that on or about December 30, 1993, WEISS, Blutrich, and Pfeffer caused two sets of contradictory agreements to be created and executed as follows:

a. Set One (disclosed to the NHLIC CFO and the Regulators): 1) A Master Loan Sale/Exchange Agreement was executed wherein FDPI Holding agreed to exchange the *Venture Mortgages* for the *NHLIC Future Medical Stock* and for the *Solar Note*, and NHLIC agreed that FDPI Holding would service the *Venture Mortgages* until March 15, 1994, at which time servicing would be transferred to NHLIC; and 2) Assignments to NHLIC of all of FDPI Holding's interest in the *Venture Mortgages* were executed;

b. Set Two (concealed from the NHLIC CFO and from the Delaware Regulators but given to Schick): 1) A letter and promissory note was executed (each allegedly signed by Aloisi but which were either forged or obtained by trickery) which provided that NHLIC would purchase the *Venture Mortgages* from Venture Mortgage for $7,600,000, and that if NHLIC failed to pay as scheduled Venture Mortgage could retake

title to the mortgages; 2) Assignments of the *Venture Mortgages* from FDPI Holding to NHLIC were executed; and 3) Assignments of the *Venture Mortgages* from NHLIC back to Venture Mortgage were executed (which were to be recorded by Venture Mortgage only if NHLIC failed to pay).

140.   The false, fraudulent, and sham documents described above were provided to the NHLIC CFO and formed the basis by which the *Solar Note* and the *NHLIC Future Medical Stock* were removed as assets from the NHLIC books and records, and the *Venture Mortgages* were recorded as assets.

141.   It was part of the scheme and artifice to defraud that on or about December 30, 1993, BLUTRICH telefaxed to NHLIC a memorandum which instructed NHLIC that "per Heritage's contractual commitment" NHLIC was required to immediately transfer the *NHLIC Future Medical Stock* to "Blutrich Herman & Miller, Escrow Attorneys" and, pursuant to such advice, NHLIC mailed those instructions to Prudential Bache.

142.   It was part of the scheme and artifice to defraud that WEISS and others used the sham FDPI Holding transaction to cause NHLIC to instruct Solar to forward its payments on the *Solar Note* to SPRITE, a corporation controlled by WEISS, and that, pursuant to such instructions, Solar paid $147,794.52 to SPRITE.

143.   It was part of the scheme and artifice to defraud that in March 1994, after NHLIC failed to pay on the promissory note (the existence of which was not known to NHLIC), Schick took back the *Venture Mortgages*, with the result that NHLIC owned neither the *Solar Note*, the *Future Medical Stock*, nor the *Venture Mortgages*.

### The Dishonesty Toward Shareholders and Policyholders

144. It was part of the scheme and artifice to defraud that WEISS and others dishonestly caused the books and records of NHLIC to overstate assets, understate liabilities, and exaggerate net worth in that in or about December 1993, WEISS and others dishonestly caused the NHLIC CFO to be advised that NHLIC exchanged the *Solar Note* and the *NHLIC Future Medical Stock* for mortgages valued at $7,754,046, whereas in truth and in fact, those mortgages were only temporarily "loaned" to NHLIC, and, for NHLIC to keep such assets as its property it would have to pay Schick $7,600,000.

### The Interstate Wire Transmittals

### Racketeering Acts 31 and 32

145. On or about the dates specified below, in Orange County, Florida, in the Middle District of Florida, and elsewhere,

### SHOLAM WEISS
### and
### JAN R. SCHNEIDERMAN

the defendants herein, having devised the above-described scheme and artifice to defraud, and for the purpose of executing and attempting to execute the scheme and artifice to defraud, and for the purpose of obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did knowingly transmit, and cause others to transmit, by means of wire communications in interstate commerce, certain signals, that is, wire transfers of funds and telefax communications, as described below, in violation of Title 18, United States Code, Sections 1343 and 1346:

| Racketeering Act | Date | Wire | From | To |
|---|---|---|---|---|
| 31 | 06-04-93 | Wire Transfer $5,000,000 | NHLIC, Barnett Bank Account #2832940187, Orlando, FL | Prudential Securities, Morgan Guaranty Trust Account #722-00011, NY, NY |
| 32 | 12-30-93 | Telefax memorandum re: transfer of Future Medical stock to Blutrich, et al. | Blutrich NY, NY | NHLIC Orlando, FL |

**Racketeering Act 33**

146.    On or about June 8, 1993, in Orange County, Florida, in the Middle District of Florida, and elsewhere,

**SHOLAM WEISS**

the defendant herein, having devised the above-described scheme and artifice to defraud, and for the purpose of executing and attempting to execute the scheme and artifice to defraud, and for the purpose of obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did knowingly transmit, and cause others to transmit, by means of wire communications in interstate commerce, certain signals, that is, $3,000,00 from NHLIC Barnett Bank Account #42-Q662001, Orlando, Florida, to the Herman Marine Midland Account #480152748, New York, New York, in violation of Title 18, United States Code, Sections 1343 and 1346.

**H.**   **Racketeering Acts 34 and 35**
    **(The LifeCo Class E Preferred Stock (Capital Assets) Fraud and Theft)**
    **(18 U.S.C. §§ 1343, 1346, and 2)**

### Introduction

147.   Prior to November 1993, corporations which WEISS owned or controlled,

individually or with others, owned or leased the following real property:

   a.   1382-92 Atlantic Ave., Brooklyn New York (the *"Windsor Atlantic*

*Property"*)

   b.   886-904 Dahill Road, Brooklyn, New York (the *"Windsor Dahill*

*Property"*)

   c.   4002 15th Ave., Brooklyn, New York (the *"Windsor 4002 15th Ave*

*Property"*)

   d.   3916-3920 15th Ave., Brooklyn, New York (the *"Windsor 3916-20 15th*

*Ave Property"*).

   e.   2389 Coney Island Ave., Brooklyn, New York (the *"Windsor/Moses*

*Coney Island Property"*).

   f.   a parcel of real estate in Middletown, New Jersey on which a shopping

center called Center Mall was located (the *"Center Mall Property"*).

   g.   a parcel of real estate in Fallsburg, New York on which an amusement

park was located (the *"Catskill Property"*).

   h.   1433 38th St., Brooklyn, New York (the *"Eklam 38th St. Property"*).

   i.   191-199 Fabyan Place, Newark, New Jersey, (the *"Y&G Fabyan*

*Property"*)

**51**

j.       5502-5524 Ave. N, Brooklyn, New York (the "*Sholom Ave N Property*").

k.       two adjoining commercial condominiums at 5402-24 Avenue N (individually referred to as the "*GVI Avenue N Unit #1 Property*" and the "*GVI Avenue N Unit #2 Property*").

148.   Beginning in 1982 and continuing until at least 1993, corporations and partnerships which WEISS and Gutman owned and controlled individually and jointly accumulated and guaranteed bank debt, and mortgaged real estate to secure repayment of that debt, as follows:

a.       *The Windsor Bond Debt*: A $4,000,000 New York City Industrial Development Bond (the "*Windsor Bond*") was issued to benefit Windsor, and mortgages were placed on the *Windsor Atlantic Property* (hereinafter the "*Windsor Atlantic Mortgage*") and the *Windsor Dahill Property* (hereinafter the "*Windsor Dahill Mortgage*") hereinafter collectively referred to as the "*Windsor Bond Mortgages*."

b.       *The GVI/Jaspa Debt*: GVI owed Jaspa Specialties, Co. ("Jaspa") $205,226.99, and a first mortgage was placed on the *GVI Avenue N Unit #2 Property* (the "*GVI Avenue N Unit #2 Mortgage*").

c.       *The GVI Bond Debt*: A $736,250 New York City Industrial Development Bond (the "*GVI Bond*"), was issued to benefit GVI and mortgages were placed on the *GVI Avenue N Unit #1 Property* (hereinafter the "*GVI Avenue N Unit #1 Mortgage*"), on the *GVI Avenue N Unit #2 Property* (hereinafter the "*GVI Avenue N Unit #2 Second Mortgage*"), and on the *Sholom Avenue N Property* (hereinafter the "*Sholom*

*Mortgage*"), collectively referred to as the "*GVI Bond Mortgages*." On or about July 11, 1991, Sholom Manufacturing sold the *Sholom Ave N Property* to Kalmal Corp. ("Kalmal") for $375,000 and Kalmal's agreement to either redeem part of the *Sholom Ave N Property* back to Gutman, pay an additional $600,000, or assume $600,000 of the *GVI Bond Debt*.

       d.    *The Y&G Debt*: Y&G owed $2,500,000 and a mortgage was placed on the *Y&G Fabyan Property* (the "*Y&G Fabyan First Mortgage*").

       e.    *The GB Debt*: GB owed $2,000,000 and a second mortgage was placed on the *Y&G Fabyan Property* (the "*Y&G Fabyan Second Mortgage*") to secure repayment.

       f.    *The Windsor Bank Debt*:  Windsor owed $5,000,000 and six mortgages were placed: i) two first mortgages, each in the amount of $499,999, one on the *4002 15th Ave Property* (the "*Windsor 4002 15th Ave Mortgage*") and one on the *Windsor 3916-20 15th Ave Property*, (the "*Windsor 3916 15th Ave Mortgage*"); ii) two second mortgages subordinate to *The Windsor Bond Debt*, one in the amount of $499,999 on the *Windsor Atlantic Property* (the "*Windsor Atlantic Second Mortgage*"), and one in the amount of $2,500,005 on the *Windsor Dahill Property* (the "*Windsor Dahill Second Mortgage*"); iii) a $499,999 mortgage on the *Windsor/Moses Coney Island Property;* and iv) a $499,999 mortgage on property WEISS personally owned at 1357 Atlantic Ave, Brooklyn, New York (the "*Weiss Atlantic Ave Mortgage*").

       g.    The *Eklam Debt*: Eklam owed $1,800,000 and gave Amerifederal a mortgage on the *Eklam 38th St. Property* (the "*Eklam Mortgage*").

## The Scheme and Artifice to Defraud

149. From on or about August 12, 1993, and continuing to on or about April 28, 1998, in Orlando, Orange County, Florida, in the Middle District of Florida, and elsewhere, WEISS, POUND, SCHNEIDERMAN, SOUTH STAR and others knowingly devised and executed: a) a scheme and artifice to defraud LifeCo and NHLIC of money and property, and to obtain money and property of LifeCo and NHLIC by means of false and fraudulent pretenses, representations, and promises, specifically, i) 906,617 shares of LifeCo Class E Preferred Stock (the "LifeCo Class E Preferred Stock"); ii) \$2,231,098.20 of NHLIC; iii) \$405,183.08 paid as dividends on the fraudulently acquired LifeCo Class E Preferred Stock; and iv) notes, mortgages received in exchange for the fraudulently acquired LifeCo Class E Preferred Stock, as well as \$649,104.10 income therefrom; and b) to deprive the LifeCo/NHLIC Victims of their intangible right of honest services from LifeCo and NHLIC officers, directors, attorneys, agents, and committee members by using positions of trust to fraudulently, and through false and fraudulent pretenses, dishonestly deceive, and cause others to deceive, the LifeCo/NHLIC Victims as to the assets, liabilities, net worth, and solvency of LifeCo and NHLIC.

## The LifeCo Class E Preferred Stock Proposal

150. It was part of the scheme and artifice to defraud that WEISS and others proposed that Future Diversified would contribute assets to LifeCo in exchange for preferred stock, intending to inflate the value of the assets to be contributed, in order to acquire both the stock, and dividends paid on the stock, by fraud, as described in paragraph 151 through 154 below.

54

151. It was part of the scheme and artifice to defraud that on or about August 12, 1993, WEISS, Smythe, Blutrich, and Pfeffer caused the LifeCo Board of Directors to be advised that "a private investment group," later identified as Future Diversified, was interested in contributing $40,000,000 to LifeCo, comprised in part of mortgages.

152. It was part of the scheme and artifice to defraud that on or about September 10, 1993, WEISS caused Pfeffer to send a telefax letter to LifeCo regulatory counsel in Wilmington, Delaware, outlining the investment proposal.

153. It was part of the scheme and artifice to defraud that on or about September 29, 1993, WEISS, Smythe, Blutrich, and Pfeffer caused the LifeCo Board of Directors to approve the issuance of *LifeCo Class E Preferred Stock* at a sales price of $25.00 per share, in exchange for the following assets (the *"Capital Assets"*):

| Preferred Stock Shares | Asset | Alleged Asset Value |
|---|---|---|
| 80,439 | Y&G Capital Mortgage | $2,010,985 |
| 56,000 | Governale Capital Mortgage | $1,400,000 |
| 174,177 | Accusharp Capital Bond | $4,354,432 |
| 72,000 | Eklam Capital Mortgage | $1,800,000 |
| 24,000 | Kalmal Capital Mortgage | $600,000 |
| 20,000 | Moses Weiss Capital Mortgage | $499,999 |
| 20,000 | Windsor Plumbing Capital Mortgage #1 | $499,999 |
| 20,000 | Windsor Plumbing Capital Mortgage #2 | $499,999 |
| 280,000 | Center Mall Capital Property | $7,000,000 |
| 160,000 | Catskill Funtime Capital Property | $4,000,000 |
| **Total: 906,616** | | **Total: $22,665,414** |

154. It was part of the scheme and artifice to defraud that WEISS and others agreed that dividends to be paid on the preferred stock would more than cover any payment obligations of WEISS or of his nominees on the assets to be contributed.

### The Acquisition of the Capital Mortgages and the Capital Bond

155. It was part of the scheme and artifice to defraud that WEISS had acquired, and did acquire, notes, mortgages, and a bond, at times using *Attorney Escrow (South Star) Fraud Proceeds,* and modified those assets, as described in paragraphs 156 through 161 below.

156. It was part of the scheme and artifice to defraud that from June 1991 through November 1993, WEISS used nominee and straw corporations which WEISS controlled to acquire the *Windsor Bank Debt,* the *Windsor Bond* and the *Eklam Debt,* specifically WEISS: a) caused Fiduciary Equities to purchase the *Windsor Bank Debt* at a deep discount; b) caused Accusharp to purchase the *Windsor Bond* at a deep discount; and c) caused E.K. 38th to use $495,000 in *Attorney Escrow (South Star) Fraud Proceeds* to acquire the *Eklam Debt* at a deep discount.

157. It was part of the scheme and artifice to defraud that as a result of the transactions described above, the *Eklam Debt,* The *Windsor Bank Debt* and the *Windsor Bond Debt* became shams and frauds, because, in each case, after having been acquired by corporations acting as fronts for WEISS, the debts were essentially from WEISS to WEISS, there were no legitimate debtor/creditor relationships, and the debts were kept in place for the sole purpose of defrauding WEISS' creditors and protecting his assets.

158. It was part of the scheme and artifice to defraud that from on or about November 1, 1993 WEISS caused the *Eklam Debt*, the *Windsor Bank Debt* and the *Windsor Bond Debt* to be modified creating the *Eklam Capital Mortgage*, the *Windsor Plumbing Capital Mortgage #1*, the *Windsor Plumbing Capital Mortgage #2*, the *Moses Weiss Capital Mortgage* and the *Accusharp Bond*.

159. It was part of the scheme and artifice to defraud that in or about October 1993, WEISS and Gutman agreed: a) that Future Diversified would lend funds to Gutman for Gutman to pay off the *GVI Bond Debt* and the *GVI/Jaspa Debt*; b) that Future Diversified would acquire the *Y&G Debt* at a discount, then would modify that debt to more favorable terms for Y&G; and c) that Future Diversified would lend Gutman an additional $1,000,000, or in the alternative would reduce the *Y&G Debt* by that amount (the *"Gutman Agreement"*).

160. It was part of the scheme and artifice to defraud that from on or about October 22, 1993 through November 11, 1993, WEISS caused F&H to disburse $1,811,045.97 *Attorney Escrow (South Star) Fraud Proceeds* to execute the *Gutman Agreement*; on or about November 1, 1993 F&H closed the *Gutman Agreement* and documents were executed wherein Future Diversified acquired the *Y&G Capital Mortgage* and the *Governale Capital Mortgage*.

161. After WEISS caused the *GVI Bond Debt* to be paid off using part of the *Attorney Escrow (South Star) Fraud Proceeds*, on or about November 8, 1993, WEISS and others caused Kalmal to execute a new note and mortgage to Future Diversified to satisfy

57

Kalmal's continuing debt obligation to Sholom Manufacturing (hereinafter referred to as the "*Kalmal Capital Mortgage*").

## The Acquisition of the Capital Real Estate

162.   It was part of the scheme and artifice to defraud that WEISS acquired real estate to use as part of a package of assets contributed to LifeCo for Class E Preferred Stock, as described in paragraphs 163 through 169 below.

163.   On or about June 11, 1993, WEISS caused Catskill Funtime to be incorporated for the purpose of acquiring an amusement park and real estate in Fallsburg, New York.

164.   On or about June 25, 1993, Catskill Funtime purchased Catskill Funland, Inc. and the underlying real estate and equipment (the "*Funtime Assets*") for a total of $505,000, the real estate ultimately constituting the *Catskill Funtime Capital Property*.

165.   It was part of the scheme and artifice to defraud that WEISS created, and caused to be created, a false, fraudulent and forged lease between Catskill Funtime and Catskill Funland which was used to establish a grossly inflated value for the *Catskill Funtime Capital Property*.

166.   In the spring of 1993, Center Mall, Inc. ("Center Mall"), owned and operated a shopping center (the "*Center Mall Property*") in New Jersey and was in debt for approximately $4,300,000 (the "*Center Mall Bank Debt*"). Center Mall had given a mortgage on the shopping center (the "*Center Mall Mortgage*") and the principals of Center Mall had guaranteed the debt. Center Mall had defaulted on the *Center Mall Bank Debt*; the lender initiated a foreclosure action and obtained summary judgment against the

property and some of the guarantors. Accordingly, Center Mall and its principals were seeking a substitute lender or investment capital and contacted WEISS for assistance.

167. It was part of the scheme and artifice to defraud that on or about September 1, 1993, WEISS received notes and cash in the total amount of $1,962,500 from Center Mall principals in exchange for those individuals being released from their personal guarantee of the *Center Mall Bank Debt*.

168. It was part of the scheme and artifice to defraud that in September 1993, WEISS and others used Jasper as a front corporation to purchase the *Center Mall Bank Debt*; on or about September 7, 1993, Jasper used $3,100,000 of *Attorney Escrow (South Star) Fraud Proceeds* to purchase the *Center Mall Bank Debt* and to obtain releases on the personal guarantees.

169. It was part of the scheme and artifice to defraud that on or about November 16, 1993 WEISS used $1,400,000 of *Attorney Escrow (South Star) Fraud Proceeds* to purchase the *Center Mall Property*.

## The Capital Mortgages Closing

170. It was part of the scheme and artifice to defraud that on or about November 15, 1993, F&H closed a transaction whereby the *Capital Assets* were transferred to LifeCo and stock was issued to Future Diversified, as described in paragraphs 171 through 177 below.

171. It was part of the scheme and artifice to defraud that in or about October and November 1993, WEISS and others intentionally used approximately $7,161,638.54 of *Attorney Escrow (South Star) Fraud Proceeds* to acquire *Capital Assets*, and to pay off

59

liens and encumbrances on the real estate encumbered by the *Capital Mortgages,* and on the *Capital Real Estate* .

172. It was part of the scheme and artifice to defraud that as part of the Capital Mortgage closing, with no transfer or exchange of any loan proceeds, and with no consideration paid by any party, WEISS and others caused written modifications to be made to the *Capital Mortgages* in part: a) to modify the debt terms to low interest-only payments for five years; b) to establish the framework whereby monthly dividends on the *LifeCo Class E Preferred Stock* would almost equal or would exceed monthly payments on the reassigned debt, in substance causing LifeCo to make the required mortgage payments itself; and c) to exaggerate the value of the notes and mortgages in order to ultimately inflate the assets and net worth of LifeCo and NHLIC.

173. It was part of the scheme and artifice to defraud that POUND, as President of LifeCo Mortgage, instructed WEISS and Pfeffer as to what values needed to be attributed to the *Capital Assets* in order to satisfy regulatory demands and advised them as to what proof of value would be required to satisfy regulatory review.

174. It was part of the scheme and artifice to defraud that POUND, as President of LifeCo Mortgage, falsely represented to LifeCo and NHLIC that he had performed due diligence reviews of the *Capital Assets* files, had visited the properties, and was persuaded of the values of the *Capital Assets*, whereas POUND was aiding and abetting WEISS and others in the execution of the fraud, knew that the properties were overvalued, and knew that *Attorney Escrow (South Star) Fraud Proceeds* were used to pay liens and encumbrances on the assets.

175. It was part of the scheme and artifice to defraud that in December 1993, WEISS and others falsely and fraudulently caused the LifeCo Board of Directors, the Florida Regulators, and the Delaware Regulators to be misled as to the quality of the *Capital Assets* through the false claim that MAI appraisals had been obtained and reviewed by two other appraisal groups, that a title company had performed a full study of the properties, whereas, in truth:  a) the so-called MAI appraisals were aged; b) reviews which confirmed those values were fraudulently acquired; and, c) follow-up reviews of the initial fraudulent reviews were forged and altered.

176. It was part of the scheme and artifice to defraud that from on or about November 8, 1993 through on or about November 15, 1993, WEISS, POUND, SOUTH STAR and others caused the assets described below to be assigned to LifeCo by the nominee corporations described below, in exchange for *LifeCo Class E Preferred Stock* in the amounts, and of the value, described below:

| Capital Asset | Related Asset | Asset Bought or Paid Off By/For | Alleged Valuation at Transfer Date | LifeCo Shares to Future Diversified (appr) |
|---|---|---|---|---|
| Y&G Capital Mortgage | Y&G Fabyan First Mortgage | Future Diversified $844,000 | $2,010,985 | 80,439 |
| Governale Capital Mortgage | The GVI Bond Mortgages | Future Diversified $108,065 | $1,400,000 | 56,000 |
| Accusharp Capital Bond | The Windsor Bond | Accusharp $1,600,000 | $4,354,432 | 174,177 |
| Eklam Capital Mortgage | The Eklam Mortgage | E.K. 38th Realty $700,000 | $1,800,000 | 72,000 |
| Kalmal Capital Mortgage | The Kalmal Mortgage | Future Diversified $475,139 | $600,000 | 24,000 |

| Capital Asset | Related Asset | Asset Bought or Paid Off By/For | Alleged Valuation at Transfer Date | LifeCo Shares to Future Diversified (appr) |
|---|---|---|---|---|
| Moses Weiss Capital Mortgage | The *Moses Coney Island Mortgage* | Fiduciary Equities $333,333 | $499,999 | 20,000 |
| Windsor Plumbing Capital Mortgage #1 | The *Windsor 4002 15th Ave. Mortgage* | Fiduciary Equities $333,333 | $499,999 | 20,000 |
| Windsor Plumbing Capital Mortgage #2 | The *Windsor 3916 15th Ave. Mortgage* | Fiduciary Equities $333,333 | $499,999 | 20,000 |
| Center Mall Capital Property | The *Center Mall Property* | Center Point, Inc. $2,537,500 | $7,000,000 | 280,000 |
| Catskill Funtime Capital Property | The Catskill Funland Property | Catskill Funtime, Inc. $505,000 | $4,000,000 | 160,000 |

177.   It was part of the scheme and artifice to defraud that in order to justify the $7,000,000 valuation of the Center Mall Capital Property, LifeCo was provided a copy of a discharge of the $4,300,000 *Center Mall Mortgage* executed by SCHNEIDERMAN as Secretary of Jasper. That discharge was intentionally not recorded and WEISS and SCHNEIDERMAN by these means fraudulently caused the *Center Mall Mortgage* to remain in place on the public records, then fraudulently caused false and fraudulent documentation to be delivered to LifeCo which represented that the *Center Mall Property* was without encumbrances at the time of transfer.

62

## The Class E Stock Cash Fraud and Theft

178. It was part of the scheme and artifice to defraud that on or about December 1, 1993, WEISS and others fraudulently caused NHLIC to wire transfer $2,231,098.20 to Venture Mortgage, allegedly as a commission on the *LifeCo Class E Preferred Stock* transaction, then to transfer to SOUTH STAR, whereas no such commission was paid or payable, the participants could not properly receive such a commission, and no such commission was owed because the entire transaction was a fraud and a sham.

## The Class E Stock Dividend Fraud and Theft

179. It was part of the scheme and artifice to defraud that on or about the dates set forth below, WEISS, POUND, SCHNEIDERMAN, and others falsely and fraudulently caused LifeCo to pay to Future Diversified the following dividends on the *LifeCo Class E Preferred Stock*:

| Date | Dividend Paid |
|---|---|
| 02-11-94 | $139,563.06 |
| 02-17-94 | $126,056.96 |
| 03-23-94 | $139,563.06 |
| Total: | $405,183.08 |

## The Fraudulent Retaking of the Capital Assets and the Monthly Payment Fraud and Theft

180. It was part of the scheme and artifice to defraud that in May 1994, WEISS, Blutrich, Pfeffer, and others used false and fraudulent Assignments of Mortgage and Real Estate, and false, fraudulent, and forged Powers of Attorney, to steal, convert, and take

by fraud, the *Capital Mortgages* and *Capital Real Estate*, all as described in paragraphs 181 through 185 below.

181. It was part of the scheme and artifice to defraud that in May 1994, WEISS caused Pfeffer to falsely and fraudulently hold himself out to be authorized to act as "attorney-in-fact" for NHLIC, and to act as President of Funtime, and to execute reassignments of the *Capital Mortgages* and *Real Estate* back to Future Diversified.

182. It was part of the scheme and artifice to defraud that from May 1994, and continuing until a court order was filed directing otherwise on November 26, 1996, WEISS and others fraudulently, and with the intent of stealing and converting monies from LifeCo and NHLIC, caused the mortgagors and tenants to the *Capital Mortgages* and to the *Capital Real Estate* to either cease to make any payments at all on their obligations or to make such payments to Future Diversified, thereby taking by fraud at least $600,000 from LifeCo and NHLIC.

183. It was part of the scheme and artifice to defraud that in or about March 1997, WEISS, with the intent of preventing attorneys for NHLIC from recovering the *Center Mall Property* in a pending legal action, caused Pfeffer to execute a fraudulent assignment of the $4,300,000 *Center Mall Mortgage* to a third party who was acting as WEISS' nominee, and who then claimed in legal proceedings that the mortgage was a valid and true encumbrance on the *Center Mall Property*.

184. It was part of the scheme and artifice to defraud that WEISS and Pfeffer both knew at the time that the *Center Mall Mortgage* was reassigned, that it was to have been

64

discharged and that a Discharge of Mortgage had been executed by SCHNEIDERMAN, and provided to LifeCo in November 1993.

185.    It was part of the scheme and artifice to defraud that on or about November 28, 1997, SCHNEIDERMAN executed and filed a false and fraudulent affidavit which claimed that the *Center Mall Capital Property* was lawfully subject to the *Center Mall Mortgage* and that the Discharge of Mortgage had been prepared in error.

### The Interstate Wire Transmittals

### Racketeering Act 34

186.    On or about September 19, 1993, with regard to a scheme and artifice to defraud which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere,

**SHOLAM WEISS**
**and**
**JAN R. SCHNEIDERMAN**

the defendants herein, together with SOUTH STAR MANAGEMENT, INC., having devised the above-described scheme and artifice to defraud, and for the purpose of executing and attempting to execute the scheme and artifice to defraud, and for the purpose of obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did knowingly transmit, and cause others to transmit, by means of wire communication in interstate commerce, the writings, signs, and signals, specifically a telefax letter from Pfeffer, New York, New York, to Kenton, Wilmington, Delaware, in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

**Racketeering Act 35**

187. On or about December 1, 1993, with regard to a scheme and artifice to defraud which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere,

**SHOLAM WEISS
KEITH POUND
and
JAN R. SCHNEIDERMAN**

the defendants herein, together with SOUTH STAR MANAGEMENT, INC., having devised the above-described scheme and artifice to defraud, and for the purpose of executing and attempting to execute the scheme and artifice to defraud, and for the purpose of obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did knowingly transmit, and cause others to transmit, by means of wire communication in interstate commerce, the writings, signs, and signals, that is, $2,231,098.20 from NHLIC Barnett Bank Account #42-Q662019, Orlando, Florida, to Venture Mortgage, Citibank Account #37611278, New York, New York, in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

I.  **Racketeering Acts 36 Through 38
(Interstate Transportation of Stolen Funds (Class E Dividend Checks))
(18 U.S.C. §§ 2314 and 2)**

188. From February 11, 1994 through March 23, 1994, LifeCo paid dividends to Future Diversified on the LifeCo Class E Stock by issuing the checks described below, such funds being stolen, converted, and taken by fraud pursuant to **The LifeCo Preferred Class E Stock (Capital Assets) Fraud and Theft**.

66

189.    On or about the dates listed below, in Orange County, Florida, in the Middle District of Florida, and elsewhere,

### SHOLAM WEISS

the defendant herein, knowingly and intentionally caused money of the value of $5,000 or more to be unlawfully transported, transmitted, and transferred in interstate commerce, that is, the dividend checks described below, drawn upon the LifeCo Investment Group, Inc. checking accounts at Barnett Bank of Central Florida, N.A., Orlando, Florida to be sent from the offices of LifeCo Investment Group, Inc., Maitland and Orlando, Florida, to the offices of Future Diversified Projects, Inc., New York, New York, knowing said money was stolen, converted, and taken by fraud, in violation of Title 18, United States Code, Sections 2314 and 2.

| Racketeering Act | Date | Dividend Paid |
|------------------|------|---------------|
| 36 | 02-11-94 | $139,563.06 |
| 37 | 02-17-94 | $126,056.96 |
| 38 | 03-23-94 | $139,563.06 |

## J.    Racketeering Act 39
(The LifeCo Class E Stock (Capital Assets) Fraud Facilitation I)
(18 U.S.C. §§ 1956(a)(1)(A), 1956(a)(1)(B), and 2)

190.    On or about September 7, 1993, with regard to the proceeds of specified unlawful activity which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere, and as a part of money laundering activity which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere,

**SHOLAM WEISS**
**and**
**JAN R. SCHNEIDERMAN**

the defendants herein, knowing that the *Attorney Escrow (South Star) Fraud Proceeds*

were the proceeds of unlawful activity, the *Attorney Escrow (South Star) Fraud Proceeds*

in fact constituting proceeds of violations of Title 18, United States Code, Section 1343

(wire fraud), and with the intent to promote the carrying on of **The LifeCo Class E Stock**

**(Capital Mortgages/Real Estate) Fraud**, and further, to knowingly conceal and disguise

the nature, location, source, and ownership of the *Attorney Escrow (South Star) Fraud*

*Proceeds*, did knowingly and intentionally transfer, and did cause others to transfer,

$3,100,000 of *Attorney Escrow (South Star) Fraud Proceeds* to United Jersey Bank for

Jasper to acquire the *Center Mall Mortgage*, in violation of Title 18, United States Code,

Sections 1956(a)(1)(A) and 1956(a)(1)(B).

**K.     Racketeering Acts 40 Through 48**
**(The LifeCo Class E Stock (Capital Assets) Fraud Facilitation II)**
**(18 U.S.C. §§ 1956(a)(1)(A), 1956(a)(1)(B), and 2)**

191.    On or about the dates set forth below, with regard to the proceeds of

specified unlawful activity which was begun, continued, and completed in Orange County,

Florida, in the Middle District of Florida, and elsewhere, and as a part of money laundering

activity which was begun, continued, and completed in Orange County, Florida, in the

Middle District of Florida, and elsewhere,

**SHOLAM WEISS**

the defendant herein, knowing that the proceeds described below were the proceeds of

unlawful activity, the proceeds described below in fact constituting proceeds of violations

68

of Title 18, United States Code, Section 1343 (wire fraud), and with the intent to promote

the carrying on of **The LifeCo Class E Stock (Capital Mortgages/Real Estate) Fraud**,

and further, to knowingly conceal and disguise the nature, location, source, and ownership

of *Attorney Escrow (South Star) Fraud Proceeds*, did knowingly and intentionally cause

F&H to issue and deliver the checks described below, each check resulting in the transfer

of *Attorney Escrow (South Star) Fraud Proceeds* for the purpose described below, in

violation of Title 18, United States Code, Sections 1956(a)(1)(A) and 1956(a)(1)(B):

| Racketeering Act | Date | Financial Transaction | Purpose |
|---|---|---|---|
| 40 | 09-14-93 | $495,000 F&H check #1331 Citibank Account #01567121 to Goldstick, Weinberger | Acquire Eklam Capital Mortgage |
| 41 | 10-22-93 | $108,065 F&H check #1365 Citibank Account #01567121 to Jaspa Specialties | Acquire *GVI/Jaspa Debt* |
| 42 | 10-22-93 | $479,138.98 F&H check #1373 Citibank Account #01567121 to Chemical Bank | Acquire *GVI Bond Debt* |
| 43 | 11-03-93 | $844,000 F&H check #1378 Citibank Account #01567121 to Natwest Bank | Acquire *Y&G Capital Mortgage* |
| 44 | 11-10-93 | $100,300 F&H check #5228 Citibank Account #01567164 to Regal Abstract | Pay off liens |
| 45 | 11-10-93 | $215,130.60 F&H check #5233 Citibank Account #01567164 to NIA Title Agency | Pay off liens |
| 46 | 11-12-93 | $140,141.43 F&H check #5227 Citibank Account #01567164 to Regal Abstract | Pay off liens |
| 47 | 11-16-93 | $700,000 F&H check #2366 Citibank Account #01567164 to Isaac Nussen | Acquire *Center Mall Capital Property* |

| Racketeering Act | Date | Financial Transaction | Purpose |
|---|---|---|---|
| 48 | 11-16-93 | $700,000 F&H check #2367 Citibank Account #01567164 to George Weisz | Acquire Center Mall Capital Property |

## L.    Racketeering Acts 49 Through 55
(The PACS Fraud and Theft)
(18 U.S.C. §§ 1343, 1346, and 2)

### Introduction

192.    In September 1993, NHLIC owned nineteen securities called Planned Amortization Class Bonds ("PACS") with a book value of $141,458,700.

193.    In October and November 1993, NHLIC concluded that the actual market value of the PACS was between $100,000,000 and $110,000,000. As a result, NHLIC had to raise additional capital, obtain reinsurance for a substantial portion of NHLIC liabilities, or sell the PACS. The sale of the PACS was not considered a viable option by the NHLIC CFO or the LifeCo Audit Committee because the PACS had declined in value to such an extent that, if sold, NHLIC would be insolvent. The NHLIC officers and directors believed that if the PACS were exchanged for other assets, the substitute assets could be booked at the full value of the PACS before the exchange. The NHLIC officers and directors believed that if the PACS were sold then a loss of between $30,000,000 and $40,000,000 would be incurred, which would render NHLIC insolvent.

194.    During October and November 1993, Plato, and Ford proposed that Phoenix Trust either exchange the PACS for mortgages valued at a minimum of $141,458,700 (hereinafter the "Mortgage Exchange Proposal") or broker the exchange of the PACS for $141,458,700 reinsurance (hereinafter the "Reinsurance Exchange Proposal"); the NHLIC

70

CFO believed that, should either exchange take place, NHLIC would not be required to recognize the loss on the PACS.

195.    During the fall of 1993, Plato attempted to negotiate a reinsurance swap or in the alternative a cash reinsurance transaction with American General Life Insurance Company (AGLIC) (the "*Reinsurance Deal*").    Prior to November 22, 1993, the *Reinsurance Deal* was rejected by AGLIC.

196.    Between December 1, 1993 and December 17, 1993, Smythe, Plato, Ford, and others stole and converted $15,776,399.88 of the cash proceeds of the sale of the seven PACS, by causing $7,776,399.88 and $8,000,000 to be wire transferred to bank accounts of Phoenix Trust in part as follows: a) the PACS were transferred to Phoenix Trust; b) seven PACS were immediately sold by Phoenix Trust; and c) the proceeds of the sale were stolen and divided between Smythe, Plato, Ford, and others.

### Scheme and Artifice to Defraud

197.    From on or about November 1, 1993, and continuing to on or about March 31, 1995, in Orlando, Orange County, Florida, in the Middle District of Florida, and elsewhere, POUND and others knowingly devised and executed: a) a scheme and artifice to defraud LifeCo and NHLIC of money and property, and to obtain money and property of LifeCo and NHLIC by means of false and fraudulent pretenses, representations, and promises, specifically, $40,468,369.65 of NHLIC funds; and b) to deprive the *LifeCo/NHLIC Victims* of their intangible right of honest services from LifeCo and NHLIC officers, directors, attorneys, agents, and committee members by using positions of trust to fraudulently, and through false and fraudulent pretenses, dishonestly deceive, and cause

71

others to deceive, the *LifeCo/NHLIC Victims* as to the assets, liabilities, net worth, and solvency of LifeCo and NHLIC.

### The PACS Shortfall

198.   It was part of the scheme and artifice to defraud that, due to the $39,019,643.74 loss from both the sale and the reduction of value of the PACS, and as a result of the theft of $22,176,399.88, NHLIC incurred a total shortfall in 1993 of $61,196,043.62, which rendered NHLIC insolvent (the "*1993 PACS Shortfall*").

### The PACS Mortgages Cover-Up and Diversions

199.   It was part of the scheme and artifice to defraud that at the end of 1993, POUND, Smythe, Plato, Ford and others concealed from NHLIC, its comptroller, and its CFO the fact that some PACS had been sold, and that NHLIC still held other PACS, by falsely and fraudulently claiming that all nineteen of the PACS had been transferred to Phoenix Trust in exchange for mortgages and notes (the "*Alleged PACS Exchange*"), as described in paragraphs 200 through 209 below.

200.   It was part of the scheme and artifice to defraud that from on or about December 17, 1993 through December 30, 1993, POUND and others caused the remaining twelve PACS to be transferred to a securities account in the name "National Heritage Life Ins. Co." (the "*NHLIC Gruntal Account*"); the transfer and the account was concealed from the NHLIC CFO and its Controller.

201.   It was part of the scheme and artifice to defraud that on or about December 28, 1993, POUND falsely and fraudulently advised the NHLIC CFO that the books and records of NHLIC should be modified to reflect that the PACS were exchanged for cash

of $32,569,486.80 and for mortgages of a face value of $111,756,457.44, for a total value of $144,325,944.24, whereas, in truth and in fact, as of that date seven PACS had been sold for a $27,168,394.87 loss (with most of those funds stolen), twelve PACS were still held in a secret NHLIC trading account, and no mortgages whatsoever had been acquired in exchange for the PACS.

202. It was part of the scheme and artifice to defraud that on or about December 28, 1993, as part of a scheme to conceal the *1993 PACS Shortfall*, POUND falsely, fraudulently, and under false pretenses caused Aloisi to execute a Master Loan Sale Agreement wherein NHLIC agreed to purchase mortgage loans of a face value of $85,054,647 (the "*TPM Mortgages*") for $55,069,393.20 from a Nevada corporation, TPM Holdings, Inc. ("TPM"), and took steps to ensure that the contract was concealed from NHLIC and the NHLIC CFO.

203. It was part of the scheme and artifice to defraud that in order to conceal the thefts, diversions, and losses which resulted in the *1993 PACS Shortfall*, POUND, Smythe and others fraudulently represented to NHLIC and the NHLIC CFO that mortgages had been acquired through the *Alleged PACS Exchange* at the end of 1993, compiled a false and fraudulent list of mortgages (the "*PACS Mortgage List*") which purported to identify mortgage assets obtained through the *Alleged PACS Exchange*, and surrendered the *PACS Mortgage List* to NHLIC and the NHLIC CFO with instructions that those mortgages be recorded as assets on the NHLIC books and records.

204. It was part of the scheme and artifice to defraud that between January 3, 1994 and January 13, 1994, POUND caused the remaining twelve PACS to be sold for

$79,664,848.13 (the "*PACS Fraud Proceeds*") and, on or about January 18, 1994, POUND

caused $36,452,870.99 of these funds (the "*QE/PACS Proceeds*") to be wire transferred

to QE Financial account #1710029411 at State Bank of Woodstock, Woodstock, Illinois

(the "*QE Woodstock Account*") controlled by ALLEN and GORSKI.

205.   It was part of the scheme and artifice to defraud that from on or about

January 19, 1994 through on or about February 23, 1994, POUND fraudulently, and under

false and fraudulent pretenses, caused NHLIC to wire transfer a total of $8,468,496.75 to

SOUTH STAR and $8,177,967.64 to Commonwealth Land and Title Insurance Company

("Commonwealth") under the guise that these funds were being used to acquire mortgage

loans and notes as new assets for NHLIC.

206.   It was part of the scheme and artifice to defraud that the *QE/PACS Proceeds*

and the diverted funds described in the paragraph above were used to purchase the

mortgages which had previously, and falsely, been identified to NHLIC on the *PACS*

*Mortgage Lists*.

207.   It was part of the scheme and artifice to defraud that in 1994, POUND falsely

and fraudulently caused the mortgages previously identified on the *PACS Mortgage List*

(the "*PACS Mortgages*") to be purchased and assigned to NHLIC using the *QE/PACS*

*Proceeds*, using funds sent to SOUTH STAR and Commonwealth, as described in

paragraph 205 above, and using *Attorney Escrow (South Star) Fraud Proceeds;* the

mortgages were purchased at discounts but listed at face value.

208.    It was part of the scheme and artifice to defraud that some of the *PACS Mortgages* were mortgages which Pound pulled from pools originally purchased by SOUTH STAR.

209.    It was part of the scheme and artifice to defraud that because the *PACS Mortgages List* contained the face value of each *PACS Mortgage*, despite the fact that the purchase price, and fair market value, of each mortgage was substantially less than face value, the assets of NHLIC were overstated by at least $46,900,000.

### The Concealment of the Theft and the Loss

210.    It was part of the scheme and artifice to defraud that during 1994, POUND and others engaged in a series of acts designed to conceal the thefts and losses described above, including the acts described in paragraphs 211 through 213 below.

211.    It was part of the scheme and artifice to defraud that on or about January 14, 1994, POUND wire transferred $76,694,564.25 from the sale of the remaining twelve PACS to Plato to perpetuate the illusion that Phoenix Trust had executed the *Alleged PACS Exchange*.

212.    It was part of the scheme and artifice to defraud that on or about January 14, 1994, POUND caused Plato to wire transfer $32,266,433.20 of the *PACS Fraud Proceeds* funds to NHLIC to perpetuate the illusion that Phoenix Trust had executed the *Alleged PACS Exchange,* and caused Plato to transfer the remaining funds to the *QE Woodstock Account* controlled by ALLEN and GORSKI.

213.    It was part of the scheme and artifice to defraud that between January 15, 1994 and mid-1995, in order to conceal the *1993 PACS Shortfall*, and to knowingly and

intentionally deceive the LifeCo shareholders, the NHLIC policyholders, and Florida and Delaware Regulators, POUND and others created and delivered to NHLIC, and to its attorneys, false and fraudulent documents including:

        a.    A false and fraudulent escrow statement from Plato dated and submitted to NHLIC on January 15, 1994, which stated that during 1993 the nineteen PACS had been exchanged for $32,266,433.20 in cash and $111,564,125.26 in mortgages (which were specifically identified).

        b.    A second false and fraudulent escrow statement from Plato dated January 15, 1994, submitted to NHLIC on February 10, 1994, which stated that during 1993 the nineteen PACS had been exchanged for $32,266,433.20 in cash and $111,935,741.66 in mortgages (which identified different mortgages than those in the statement described in subparagraph (a) above).

### The Dishonesty Toward Shareholders and Policyholders

    214.    It was part of the scheme and artifice to defraud that in or about January and February 1994, POUND dishonestly caused the NHLIC CFO to record on the official books and records of NHLIC that the PACS had been exchanged for mortgages valued at $111,564,125.26, whereas in truth and in fact, NHLIC had incurred a loss of $79,488,013.39 from the sale of PACS and from theft, and the mortgages listed had an actual fair market value of less than $65,400,000.

## The Interstate Wire Transmittals

215.    On or about the dates set forth below, with regard to a scheme and artifice to defraud which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere,

### KEITH POUND

the defendant herein, having devised the above-described scheme and artifice to defraud, and for the purpose of executing and attempting to execute the scheme and artifice to defraud, and for the purpose of obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did knowingly transmit, and cause others to transmit, by means of wire communication in interstate commerce, the funds described below, in violation of Title 18, United States Code, Sections 1343, 1346, and 2:

| Racketeering Act | Date | Wire Transmittal | From | To |
|---|---|---|---|---|
| 49 | 12-16-93 | $7,000,000 | Plato Account #06710107, Westcap Securities, Houston, TX | LifeCo Mtg. Services Account #202-0135, Gruntal Co., NY, NY |
| 50 | 01-14-94 | $76,694,564.25 | NHLIC Gruntal Account, NY, NY | Plato Escrow Account, Westcap Securities, Houston, TX |
| 51 | 01-18-94 | $36,452,870.99 | Plato Account #06706410, Westcap Securities, Houston, TX | QE Woodstock Account, Woodstock, IL |
| 52 | 01-19-94 | $8,468,496.75 | NHLIC Account #063009608, Barnett Bank, Orlando, FL | F&H Account #9379-131371, Fleet Bank, NY, NY |

| Racketeering Act | Date | Wire Transmittal | From | To |
|---|---|---|---|---|
| 53 | 02-01-94 | $2,546,963.02 | NHLIC Account #42-Q662001, Barnett Bank, Orlando, FL | Commonwealth Account #10-18-288, Norwest Bank, Minneapolis, MN |
| 54 | 02-10-94 | $2,631,004.62 | NHLIC Account #42-Q662001, Barnett Bank, Orlando, FL | Commonwealth Account #10-18-288, Norwest Bank, Minneapolis, MN |
| 55 | 02-23-94 | $3,000,000 | NHLIC Account #42-Q662001, Barnett Bank, Orlando, FL | Commonwealth Account #10-18-288, Norwest Bank, Minneapolis, MN |

**M.     Racketeering Act 56**
**(The PACS Fraud Facilitation)**
**(18 U.S.C. §§ 1956(a)(1)(A), 1956(a)(1)(B), and 2)**

The defendants named below committed the following acts of racketeering, any one

of which alone constitutes the commission of Racketeering Act 56:

216.   On or about the dates set forth below, with regard to the proceeds of

specified unlawful activity which was begun, continued, and completed in Orange County,

Florida, in the Middle District of Florida, and elsewhere, and as a part of money laundering

activity which was begun, continued, and completed in Orange County, Florida, in the

Middle District of Florida, and elsewhere,

**KEITH POUND**

the defendant herein, knowing that the proceeds described below were the proceeds of

unlawful activity, the proceeds described below in fact constituting proceeds of violations

of Title 18, United States Code, Section 1343 (wire fraud), and with the intent to promote

the carrying on of **The PACS Fraud**, and further, to knowingly conceal and disguise the

78

nature, location, source, and ownership of the *PACS Fraud Proceeds*, did knowingly and intentionally conduct, and caused others to conduct the financial transactions described below, in violation of Title 18, United States Code, Sections 1956(a)(1)(A) and 1956(a)(1)(B):

| Act | Date | Financial Transaction |
|-----|------|-----------------------|
| 56(A) | 01-21-94 | $36,402,870.99 wire transfer from QE Woodstock Account to QE Account #363894381 at Federated Investors, Boston, MA (the "QE Boston Account") |
| 56(B) | 02-01-94 | $36,402,870.99 wire transfer from QE Boston Account to QE Woodstock Account |
| 56(C) | 02-01-94 | $35,552,870.99 wire transfer QE Woodstock Account to Commonwealth |

## N. Racketeering Act 57
### (The QE Fraud and Theft)
### (18 U.S.C. §§ 1343, 1346, and 2)

217. In or about November 1993, POUND, ALLEN, and GORSKI caused LifeCo to acquire 80% ownership of QE Financial through an exchange of stock, on the representation that QE Financial owned an asset worth approximately $1,500,000; at the time QE existed solely to own and hold the QE Asset. APX owned the remaining 20% of the QE Financial stock and ALLEN and GORSKI were responsible for the day to day management of the QE Asset.

218. It was part of the scheme and artifice to defraud that ALLEN and GORSKI had control over NHLIC funds transferred to QE Financial as described above, as well as $1,000,000 of *Attorney Escrow (South Star) Fraud Proceeds* which POUND caused F&H to transfer to QE Financial.

219. It was part of the scheme and artifice to defraud that from December 31, 1993 through August 17, 1994, ALLEN, GORSKI, and APX fraudulently and unlawfully stole and embezzled $802,128.54 of NHLIC funds deposited in bank accounts of QE Financial (the "QE Theft"), by using those funds to acquire an asset for APX.

220. It was part of the scheme and artifice to defraud that, when NHLIC demanded an accounting of NHLIC funds transferred to QE Financial, ALLEN, GORSKI, and APX provided a materially false and fraudulent accounting which concealed the $802,128.54 taken by APX.

221. On or about May 4, 1994, with regard to a scheme and artifice to defraud which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere,

## NADINE ALLEN
### and
### ROBERT GORSKI

the defendants herein, together with APX MORTGAGE SERVICES, INC., having devised the above-described scheme and artifice to defraud, and for the purpose of executing and attempting to execute the scheme and artifice to defraud, and for the purpose of obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did knowingly transmit, and cause others to transmit, by means of wire communication in interstate commerce, $602,722.10 from the QE Cary Account, Cary, Illinois to American Mortgage Investment Co., Account #0013008757, First Fidelity Bank, N.A., Oklahoma City, Oklahoma, in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

**O.** **Racketeering Act 58**
   **(Money Laundering: The Attorney Escrow (South Star) Fraud and Theft)**
   **(18 U.S.C. §§ 1957 and 2)**

   222.   On or about April 7, 1994, with regard to the proceeds of specified unlawful activity which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere, and as a part of money laundering activity which was continued and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere,

**KEITH POUND**

the defendant herein, knowingly engaged in a monetary transaction in criminally derived property, specifically proceeds of **The Attorney Escrow (South Star) Fraud and Theft**, such property derived from unlawful activity specified in Title 18, United States Code, Section 1343 (wire fraud), in that the defendant did cause the transfer of funds of a value greater than $10,000 by, through, and to financial institutions then engaged in interstate commerce, specifically, the defendant caused QE Financial to wire transfer $540,000 from QE Financial Account #070012836 at Suburban Bank Cary Grove in Cary, Illinois (the "*QE Cary Account*") to a Smythe account in the name Lonestar Investment Corp., Tyndall Bank International Ltd., in Isle of Man, in violation of Title 18, United States Code, Sections 1957 and 2.

**P.** **Racketeering Act 59**
   **The LifeCo Mortgage Commission Fraud and Facilitation**

   The defendants named below committed the following acts of racketeering, any one of which alone constitutes the commission of Racketeering Act 59:

81

## Act 59(A): The LifeCo Mortgage Commission Fraud
## (18 U.S.C. §§ 1343, 1346, and 2)

223.  From on or about October 1, 1993, and continuing to on or about April 28, 1998, in Orlando, Orange County, Florida, in the Middle District of Florida, and elsewhere, POUND and others knowingly devised and executed a scheme and artifice to deprive the *LifeCo/NHLIC Victims* of their intangible right of honest services from LifeCo and NHLIC officers, directors, attorneys, agents, and committee members by using positions of trust to fraudulently, and through false and fraudulent pretenses, dishonestly deceive, and cause others to deceive, the *LifeCo/NHLIC Victims* as to the assets, liabilities, net worth, and solvency of LifeCo and NHLIC.

224.  It was part of the scheme and artifice to defraud that as of November 1993, LifeCo Mortgage under POUND's leadership had earned nothing, that Smythe wanted LifeCo Mortgage to show income to enhance LifeCo financial reports, and POUND wanted a $50,000 bonus.

225.  It was part of the scheme and artifice to defraud that on or about November 4, 1993, POUND and others caused $2,000,000 of *Attorney Escrow (South Star) Fraud Proceeds* to be wire transferred to LifeCo Mortgage under the guise that these funds were fees earned for LifeCo Mortgage by POUND.

226.  It was part of the scheme and artifice to defraud that Smythe and POUND fraudulently used this event to justify a $50,000 bonus for Pound.

227.   It was part of the scheme and artifice to defraud that POUND and others created, and caused to be created, a series of false letters and memoranda designed to document the alleged fee payment to LifeCo Mortgage.

228.   It was part of the scheme and artifice to defraud that, through the dishonest acts described in above, POUND and others caused the official books and records of NHLIC to contain false and fraudulent representations and entries, including that LifeCo Mortgage had earned $2,000,000 during 1993.

229.   On or about November 4, 1993, with regard to a scheme and artifice to defraud which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere,

## KEITH POUND

the defendant herein, having devised the above-described scheme and artifice to defraud, and for the purpose of executing and attempting to execute the scheme and artifice to defraud, and for the purpose of obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did knowingly transmit, and cause others to transmit, by means of wire communication in interstate commerce, writings, signs, and signals, specifically the transfer of $2,000,000 from F&H Account #01567121 at Citibank, New York, New York, to the LifeCo Mortgage account at Barnett Bank, Orlando, Florida, in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

### Act 59(B): The LifeCo Mortgage Commission Fraud Facilitation
### (18 U.S.C. §§ 1956(a)(1)(A), 1956(a)(1)(B), and 2)

230.    On or about November 4, 1993, with regard to the proceeds of specified

unlawful activity which was begun, continued, and completed in Orange County, Florida,

in the Middle District of Florida, and elsewhere, and as a part of money laundering activity

which was begun, continued, and completed in Orange County, Florida, in the Middle

District of Florida, and elsewhere,

### KEITH POUND

the defendant herein, knowing that the *Attorney Escrow (South Star) Fraud Proceeds* were

the proceeds of unlawful activity, the *Attorney Escrow (South Star) Fraud Proceeds* in fact

constituting proceeds of violations of Title 18, United States Code, Section 1343 (wire

fraud), and with the intent to promote the carrying on of **The LifeCo Mortgage**

**Commission Fraud**, and further, to knowingly conceal and disguise the nature, location,

source, and ownership of the *Attorney Escrow (South Star) Fraud Proceeds*, did knowingly

and intentionally cause F&H to wire transfer $2,000,000 of *Attorney Escrow (South Star)*

*Fraud Proceeds* to LifeCo Mortgage, in violation of Title 18, United States Code, Sections

1956(a)(1)(A) and 1956(a)(1)(B).

Q.    **Racketeering Acts 60 through 67**
      **(Money Laundering: The National Housing Exchange Bond Fraud Facilitation)**
      **(18 U.S.C. §§ 1956(a)(1)(A), 1956(a)(1)(B), and 2)**

231.    From on or about August 24, 1993, through on or about January 4, 1994,

Smythe, Blutrich, and Pfeffer knowingly and unlawfully used $56,007,115 *Attorney Escrow*

*(South Star) Fraud Proceeds* to purchase the notes and mortgages described herein

(which together with the *Tudor Secured and Unsecured Loans* described below are hereinafter referred to as "the *South Star Bond Mortgages*"), all to facilitate and promote the carrying on of **The National Housing Exchange Bond Fraud and Theft**.

| Mortgage Pool Acquired | Contract Date | Pool Face Amount | Purchase Price |
|---|---|---|---|
| RTC 766622-24-263 & RTC 76622-25-563 | 08-24-93 | $72,931,695 | $38,470,000 |
| CARC 93-10-031 & 038B & 038D | 08-31-93 | $2,007,953 | $647,363 |
| CARC 93-06 & 07 | 08-31-93 | $3,642,453 | $1,134,706 |
| First Nationwide | 12-15-93 | $18,018,395 | $10,760,000 |
| FDIC FCO-93-6AM03 | 12-17-93 | $6,219,205 | $1,741,377 |
| FDIC FCO-93- 6JB20 & 21 | 12-17-93 | $5,294,034 | $3,051,362 |
| FDIC FCO-93-6BM16 | 12-17-93 | $3,768,903 | $2,261,342 |

232. On or about December 14, 1993, WEISS, SCHNEIDERMAN, and STARR caused SOUTH STAR to bid $8,526,000 (the "*South Star Tudor Bid*") to purchase "Co-op Apartment Contracts for 82,018 shares allocated to 317 Co-op Apartments at Tudor City" (the "*317 Tudor Co-ops*"); "Performing and Non-performing Secured Notes of Purchasers of Co-op Apartments at Tudor City" (the "*Tudor Secured Loans*"); and "Certain Non-Performing Notes of Purchasers of Co-op Apartments at Tudor City" (the "*Tudor Unsecured Loans*"), such assets hereinafter collectively referred to as the "*Tudor Assets*."

233. In the *South Star Tudor Bid*, SOUTH STAR fraudulently allocated $100,000 to the *317 Tudor Co-ops*, and $8,426,000 to the *Tudor Secured Loans* and the *Tudor Unsecured Loans*; the *Tudor Unsecured Loans* were essentially valueless, therefore the $8,426,000 was allegedly primarily bid to purchase the *Tudor Secured Loans*.

234. On or about December 16, 1993, Yasuda accepted the *South Star Tudor Bid* and STARR as President of SOUTH STAR executed a Purchase and Sale agreement wherein SOUTH STAR agreed to purchase the *Tudor Assets* for $8,526,000.

235. WEISS, SCHNEIDERMAN, and others caused the SOUTH STAR purchase of the *Tudor City Assets* to be restructured into two separate transactions wherein SOUTH STAR purchased the *Tudor Secured Loans* and the *Tudor Unsecured Loans* for $8,426,000, and NES purchased the *317 Tudor Co-ops* for $100,000, thereby causing SOUTH STAR to purchase assets at an inflated paper value and NES to acquire assets at a deep discount.

236. As of December 30, 1993, SOUTH STAR had insufficient funds to close the Tudor City transaction and POUND caused LifeCo Mortgage to send a telefax to Gruntal and Co. instructing Gruntal to transfer $6,400,000, which were proceeds of **The PACS Fraud and Theft** to F&H. These funds and other *Attorney Escrow (South Star) Fraud Proceeds* were used to complete the Tudor City transaction in the total amount of $8,526,000.

237. On or about December 30, 1993, the Tudor City transaction closed as restructured, SOUTH STAR was assigned the *Tudor Secured Loans* and the *Tudor Unsecured Loans* (which were essentially valueless), and NES was assigned the *317 Tudor Co-ops*.

238. In August 1994, NES engaged in a series of transactions with the result that the *317 Tudor City Co-ops* were transferred to an unrelated corporation, and the persons

controlling that corporation forgave WEISS' personal debt of $3,500,000 and paid NES $200,000.

239.    On or about the dates set forth below, with regard to the proceeds of specified unlawful activity which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere, and as a part of money laundering activity which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere,

**SHOLAM WEISS**
**KEITH POUND**
**and**
**JAN R. SCHNEIDERMAN**

the defendants herein, together with SOUTH STAR MANAGEMENT, INC., knowing that the *Attorney Escrow (South Star) Fraud Proceeds* and *PACS Fraud Proceeds* were the proceeds of unlawful activity, the *Attorney Escrow (South Star) Fraud Proceeds* and *PACS Fraud Proceeds* in fact constituting proceeds of violations of Title 18, United States Code, Section 1343 (wire fraud), and with the intent to promote the carrying on of **The National Housing Exchange Bond Fraud**, and further, to knowingly conceal and disguise the nature, location, source, and ownership of the *Attorney Escrow (South Star) Fraud Proceeds*, did knowingly and intentionally conduct, and did cause others to conduct, the financial transactions described below, as follows, in violation of Title 18, United States Code, Sections 1956(a)(1)(A) and 1956(a)(1)(B):

87

| Racketeering Act | Date | Financial Transaction | From | To |
|---|---|---|---|---|
| 60 | 12-16-93 | Wire Transfer $2,746,226 | F&H Account #9379-131371, Fleet Bank | FDIC (for FDIC FCO-93-6JB20 & 21) |
| 61 | 09-01-93 | Wire Transfer $34,623,000 | Schneiderman Morgan Guaranty Account #251-04-545 | RTC (for RTC 76622-24-266 & 25-563) |
| 62 | 08-23-93 | Wire Transfer $1,021,235 | Schneiderman Account #001-58-206, Morgan Guaranty | CARC (for CARC 93-10-31 & 38B & 38D) |
| 63 | 12-21-93 | Wire Transfer $415,481.76 | F&H Account #9379-131371, Fleet Bank | CARC (for CARC 93-06 & 07) |
| 64 | 12-15-93 | Wire Transfer $1,567,239.57 | F&H Account #9379-131371, Fleet Bank | FDIC (for FDIC FCO-93-6AM03) |
| 65 | 12-27-93 | Cashiers Check $3,600,000 | F&H Account #9379-131371, Fleet Bank | First Nationwide Bank (for First Natwide) |
| 66 | 12-27-93 | Wire Transfer $2,035,207.62 | F&H Account #9379-131371, Fleet Bank | FDIC (for FDIC FCO-93-6BM16) |
| 67 | 01-03-94 | Wire Transfer $7,573,425.50 | F&H Account #01567164, Citibank | Yasuda Trust and Banking (Yasuda) |

**R.    Racketeering Acts 68 and 69**
     **(The National Housing Exchange Bond Fraud and Theft)**
     **(18 U.S.C. §§ 1343, 1346, and 2)**

## Scheme and Artifice to Defraud

240.    From in or about September 1993, and continuing to in or about December 1995, in Orlando, Orange County, Florida, in the Middle District of Florida, and elsewhere, WEISS, POUND, SCHNEIDERMAN, STARR, HERMAN, LANGER, SOUTH STAR, and NHE, together with Smythe, Blutrich, Pfeffer, and others, knowingly devised and executed: a) a scheme and artifice to defraud LifeCo and NHLIC of money and property, and to obtain money and property of LifeCo and NHLIC by means of false and fraudulent

pretenses, representations, and promises, specifically, approximately $62,000,000 in mortgages purchased with *Attorney Escrow (South Star) Fraud Proceeds,* which were at all times equitably owned by NHLIC; and b) to deprive the *LifeCo/NHLIC Victims* of their intangible right of honest services from LifeCo and NHLIC officers, directors, attorneys, agents, and committee members by using positions of trust to fraudulently, and through false and fraudulent pretenses, dishonestly deceive, and cause others to deceive, the *LifeCo/NHLIC Victims* as to the assets, liabilities, net worth, and solvency of LifeCo and NHLIC.

## The NHLIC 1993 Shortfall

241.   By December 28, 1993, NHLIC assets had been reduced by at least $116,000,000, as described in paragraphs 242 through 245 below.

242.   As of December 1993, NHLIC assets had secretly been reduced by events leading to *the $35,000,000 Hole.*

243.   As a result of the transactions described in **The Attorney Escrow (South Star) Cash Fraud and Theft, The Certified Lumber Fraud Facilitation, The LifeCo Class E Stock (Capital Assets) Fraud Facilitation I, The LifeCo Class E Stock (Capital Assets) Fraud Facilitation II, The LifeCo Mortgage Commission Fraud Facilitation,** and **The National Housing Exchange Bond Fraud Facilitation**, as of December 1993, NHLIC assets had secretly been reduced by an additional approximately $80,916,240 in part made up of $1,150,000 used to execute **The Certified Lumber Fraud**, $7,161,638.54 used to execute **The LifeCo Class E Stock (Capital Assets) Fraud**, $60,709,340 used

to purchase the *South Star Bond Mortgages*; and $2,000,000 used to execute **The LifeCo Mortgage Commission Fraud**.

244.  It was part of the scheme and artifice to defraud that as a result of the transactions described in paragraphs 242 and 243 above, by the end of 1993 there was a shortfall in NHLIC assets in the total amount of at least $116,000,000 (the "*1993 Cash Shortfall*").

245.  It was part of the scheme and artifice to defraud that by the end of 1993, as a result of the matters described in paragraphs 242 through 244 above, in the ordinary course of business NHLIC would have been required to reflect a reduction in assets and net worth of $116,000,000 in its books and records, which would have rendered NHLIC insolvent.

## The NHE Debentures Scheme

246.  It was part of the scheme and artifice to defraud that during November and December 1993, WEISS, POUND, SCHNEIDERMAN, HERMAN, and others met from time to time, and during the course of those meetings agreed as follows: a) that the *South Star Bond Mortgages* would not be transferred to NHLIC, but assigned by SOUTH STAR to a shell corporation named NHE; b) that NHE would pool the mortgages into mortgage-backed bonds which would be sold to NHLIC; c) that a nominee would be found to act for NHE in all transactions; d) that by structuring the transaction in this fashion profits could be generated from interest spreads, foreclosures, and pay-offs, and that they would share in those fraudulent profits; and e) that POUND would control the mortgage servicing and would obtain the benefit of those fees.

247.   It was part of the scheme and artifice to defraud that on or about November 24, 1993, HERMAN caused NHE to be incorporated in North Carolina.

248.   It was part of the scheme and artifice to defraud that on or about November 28, 1993, WEISS, POUND, HERMAN, and others retained Frank Cohen, Esquire, to prepare an indenture (the "*NHE Indenture*") which would result in the issuance of twenty-one collateralized debentures (the "*NHE Debentures*") to be sold to NHLIC by NHE; Cohen's retainer was paid by SOUTH STAR with NHLIC funds.

249.   It was part of the scheme and artifice to defraud that between December 2, 1993 and December 21, 1993, POUND and HERMAN worked, and caused others to work, with Cohen to finalize the language of the *NHE Indenture*, and instructed Cohen to include the following false and fraudulent representations, among others:  a) that the mortgages backing the *NHE Debentures* (the "*Debenture Mortgages*") had been acquired by NHE from unaffiliated third parties, whereas those mortgages were in fact the *South Star Bond Mortgages* or were non-existent; b) that to acquire the *Debenture Mortgages,* NHE had given notes to SOUTH STAR which were to be paid out of proceeds from the sale of the *NHE Debentures*; and c) that the *Debenture Mortgages* were performing.

250.   It was part of the scheme and artifice to defraud that in December 1993, WEISS, POUND, HERMAN and others caused Continental Stock Transfer & Trust Co. ("Continental") to agree to be named trustee in the *NHE Indenture*.

251.   It was part of the scheme and artifice to defraud that on or about December 21, 1993, POUND and Smythe finally advised the NHLIC CFO that the *Reinsurance Deal* (which had been rejected by AGLIC in November 1993) was not going to be consummated,

and proposed that the approximately $118,000,000 allegedly being held for the *Reinsurance Deal* (most of which had already been spent by SOUTH STAR) be used for NHLIC to purchase the *NHE Debentures*.

252.   It was part of the scheme and artifice to defraud that by December 21, 1993, POUND and Smythe caused the Investment Committee of NHLIC to approve NHLIC's purchase of the *NHE Debentures*.

253.   It was part of the scheme and artifice to defraud that on or about December 27, 1993, POUND falsely and fraudulently caused Aloisi, as President of NHLIC, to execute a letter wherein NHLIC agreed to purchase the *NHE Debentures*.

### The NHE Debenture Closing

254.   It was part of the scheme and artifice to defraud that on or about December 28, 1993, a closing was held in New York, New York, to finalize the sale of the *NHE Debentures* to NHLIC (the "*NHE Closing*"), the events of which are described in paragraphs 255 through 258 below.

255.   It was part of the scheme and artifice to defraud that on or about December 28, 1993, the following persons attended all or part of the *NHE Closing*: SCHNEIDERMAN, as Assistant Secretary of NHE and Vice-President of SOUTH STAR; LANGER impersonating Lauzon, as the alleged president of NHE; Schick as attorney for SOUTH STAR; Cohen as attorney for NHE; the President of Continental; the attorney for Continental; Bragiel as attorney for APX by telephone; Blutrich, as counsel for NHLIC; and Pfeffer in an undisclosed capacity.

256. It was part of the scheme and artifice to defraud that as part of the *NHE Closing*, the following false and fraudulent documents, among others, were assembled into a composite document referred to as "National Housing Exchange, Inc. Private Placement of $126,000,000 in Mortgage Backed Debentures known as Series 1993 8-1/2% Registered Collateralized Mortgage Debentures (Issuable in 21 series under One Indenture and Servicing Agreement)":

    a.    A private placement memorandum which contained numerous false representations, including that the value of the *Debenture Mortgages* would be at least equal to the outstanding amount of the *NHE Debentures*, that the *Debenture Mortgages* were acquired by NHE from "unaffiliated third parties," and that the *Debenture Mortgages* were fully performing.

    b.    An indenture and servicing agreement, executed by LANGER posing as Lauzon, and by GORSKI, which contained numerous false representations, including that NHE had no reason to believe that a default had occurred, or would occur, on any *Debenture Mortgage*.

    c.    A letter from NHE to Continental, executed by LANGER posing as Lauzon, which contained numerous false representations including that "Lauzon" had examined a sampling of 500 of the *Debenture Mortgage* files and had ascertained that essential documents were included in each file.

    d.    A letter from APX to Continental, executed by GORSKI, which contained numerous false representations including that APX had possession of each *Debenture Mortgage*.

e.    A receipt and an opinion letter executed by Schick as counsel for SOUTH STAR which contained numerous false representations including that Schick had received documents assigning the *Debenture Mortgages* from SOUTH STAR to NHE and from NHE to Continental.

f.    Assignment of Notes, Mortgages, and other Loan and Security Documents executed by SCHNEIDERMAN as Vice President of SOUTH STAR which purported to assign some of the *South Star Mortgages* (which were the equitable property of NHLIC) to NHE.

g.    Lists of the *Debenture Mortgages* (prepared by POUND) which were shown at face value although those loans had fair market values substantially less than face value; the list also included duplicate and non-existent mortgages (the "*Bond Mortgages Lists*").

h.    Certifications executed by SCHNEIDERMAN as Assistant Secretary of NHE, certifying in part that "Michael Lauzon" was President, Chief Executive Officer, and Chief Financial Officer of NHE, and which named another fictional person, Elliott Rehso, as Secretary and Treasurer of NHE.

i.    Master Debenture executed by LANGER posing as Lauzon, promising that NHE would pay NHLIC $126,000,000 pursuant to 21 Debentures collateralized by the *Debenture Mortgages*.

257.    It was part of the scheme and artifice to defraud that on or about December 28, 1993, POUND and others caused inside counsel for NHLIC, in reliance on false and fraudulent representations that the information was accurate, to execute, and to forward

to the *NHE Closing*, by telefax transmission, a letter wherein NHLIC purportedly acknowledged that the mortgage files and mortgage payment histories were in proper order and that NHLIC relied "on its own investigation and due diligence" in deciding to purchase the *NHE Debentures*.

258. It was part of the scheme and artifice to defraud that, as a result of the NHE Bond Closing: a) the grossly overvalued *NHE Debentures* were delivered to NHLIC, allegedly for $118,267,031.91 cash; and b) the *South Star Bond Mortgages* (which were in fact the property of NHLIC, having been acquired with the *Attorney Escrow (South Star) Fraud Proceeds*) were assigned to NHE.

### NHE Ownership and Control

259. It was part of the scheme and artifice to defraud that WEISS secretly owned and operated NHE, but, together with SCHNEIDERMAN, STARR, POUND, LANGER, and others, from January 1994 through April 28, 1998, disguised that ownership and control, in part as described in paragraphs 260 through 270 below.

260. It was part of the scheme and artifice to defraud that on or about January 12, 1994, SCHNEIDERMAN prepared and STARR executed false and fraudulent documents which represented in relevant part: a) that STARR was the sole shareholder of SOUTH STAR; b) that SOUTH STAR was the sole shareholder of NHE; and c) that on January 12, 1994, STARR had been elected President and the sole officer and director of NHE.

261. It was part of the scheme and artifice to defraud that in or about February 1994, WEISS delivered to Smythe a false and fraudulent accounting for the *Attorney*

*Escrow (South Star) Fraud Proceeds* which overstated the amount of funds transferred to SCHNEIDERMAN and Schick.

262. In May 1994, after the Delaware Regulators assumed control of NHLIC, the Delaware Regulators initiated an investigation into the value and origination of the NHE Bond transaction.

263. It was part of the scheme and artifice to defraud that in or about May and June 1994, WEISS, POUND, SCHNEIDERMAN, STARR, and others agreed that they would attempt to maintain control of the *Debenture Mortgages*, conceal information related to the NHE Bond transaction, and provide false and fraudulent information to the Delaware Regulators.

264. It was part of the scheme and artifice to defraud that on or about June 8, 1994, STARR opened a bank account at Morgan Guaranty Trust, New York, New York, in the name National Housing Exchange, Inc., with himself as President, being the sole signator ("the NHE bank account"); in or about July 31, 1994 Morgan Guaranty was instructed to forward the statements on the account to SCHNEIDERMAN.

265. It was part of the scheme and artifice to defraud that WEISS, POUND, SCHNEIDERMAN, and STARR caused a series of attorneys to be retained on behalf of NHE, and caused those attorneys to use the false and fraudulent provisions of the *NHE Indenture* to thwart efforts by NHLIC to reclaim NHLIC assets and to make false and fraudulent claims regarding NHE's purported ownership and control of the *Debenture Mortgages*.

266.   It was part of the scheme and artifice to defraud that from June 1994 through August 1995, WEISS, POUND, SCHNEIDERMAN, STARR and others attempted individually, and through attorneys which they retained to represent NHE, to provide false information to the Delaware Regulators in order to cause NHLIC to agree to a settlement with NHE, whereby NHE would fraudulently receive both cash and continuing rights in the *Debenture Mortgages,* and whereby the *NHE Debentures* would be sold to a Lichtenstein corporation.

267.   It was part of the scheme and artifice to defraud that on or about July 18, 1994, WEISS, POUND, SCHNEIDERMAN, STARR and others caused Harvis & Trien, which was then acting as counsel to NHE, to send to the Delaware Regulators, by telefax communication in interstate commerce, a copy of the fraudulent NHE settlement proposal.

268.   It was part of the scheme and artifice to defraud that on or about August 30, 1994, SCHNEIDERMAN sent to NHLIC a letter wherein she falsely and fraudulently denied receiving funds as an escrow agent for NHLIC.

269.   It was part of the scheme and artifice to defraud that on or about September 26, 1994, SCHNEIDERMAN telefaxed a letter to the Delaware Regulators which falsely represented her role in both the **Attorney Escrow (South Star) Cash Fraud and Theft** and the NHE Bond transaction.

270.   It was part of the scheme and artifice to defraud that from on or about March 11, 1994 through October 25, 1994, POUND intentionally misled NHLIC and the Delaware Regulators as to the origin and quality of the *Debenture Mortgages* in part by POUND stating:  a) that Prudential brokered the sale of the mortgages; b) that Continental had

physical possession of the mortgage files; c) that a Canadian was behind NHE; d) that inside counsel to NHLIC performed due diligence on *the Debenture Mortgages*; and e) the mortgage portfolio was of sufficient quality to be rated and sold.

### The Dishonesty Toward Shareholders and Policyholders

271.    It was part of the scheme and artifice to defraud that POUND, WEISS, SCHNEIDERMAN, and others falsely, fraudulently, and dishonestly caused the records of LifeCo and of NHLIC to reflect that NHLIC had purchased and owned debentures valued at $118,293,665.75, as described in paragraphs 272 through 274 below.

272.    It was part of the scheme and artifice to defraud that on or about January 4, 1994, WEISS and others caused a false and fraudulent escrow statement to be delivered to NHLIC which reflected that F&H had received a total of $26,267,031 from NHLIC, and had disbursed those funds to NHE.

273.    It was part of the scheme and artifice to defraud that in or about January 1994, WEISS, SCHNEIDERMAN and others caused a false and fraudulent escrow statement to be delivered to NHLIC, which reflected that SCHNEIDERMAN had received a total of $92,000,000 from NHLIC, and had disbursed those funds to NHE.

274.    It was part of the scheme and artifice to defraud that NHLIC, in reliance on the false and fraudulent escrow statements described above, assigned a value of $118,293,665.75 to the *NHE Debentures* in the NHLIC and LifeCo books and records.

## The Interstate Wire Transmittals

### Racketeering Act 68

275.   On or about December 28, 1993, with regard to a scheme and artifice to defraud which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere,

**SHOLAM WEISS
KEITH POUND
JAN R. SCHNEIDERMAN
and
YAAKOV STARK
a/k/a Jan Starr**

the defendants herein, and co-conspirators RICHARD B. HERMAN, RICHARD LANGER, and others known and unknown to the grand jury, together with SOUTH STAR MANAGEMENT INC. and NATIONAL HOUSING EXCHANGE, having devised the above-described scheme and artifice to defraud, and for the purpose of executing and attempting to execute the scheme and artifice to defraud, and for the purpose of obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did knowingly transmit, and cause others to transmit, by means of wire communication in interstate commerce, a writing, sign, and signal, to wit: a fax letter regarding due diligence from NHLIC, Orlando, Florida, to Cohen, New York, New York, in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

### Racketeering Act 69

The defendants named below committed the following acts of racketeering, any one of which alone constitutes the commission of Racketeering Act 69:

99

276. On or about the dates set forth below, with regard to a scheme and artifice to defraud which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere,

**SHOLAM WEISS**
**KEITH POUND**
**JAN R. SCHNEIDERMAN**
**and**
**YAAKOV STARK**
**a/k/a Jan Starr**

the defendants herein, and co-conspirators RICHARD B. HERMAN, RICHARD LANGER, and others known and unknown to the grand jury, together with SOUTH STAR MANAGEMENT INC. and NATIONAL HOUSING EXCHANGE, having devised the above-described scheme and artifice to defraud, and for the purpose of executing and attempting to execute the scheme and artifice to defraud, and for the purpose of obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did knowingly transmit, and cause others to transmit, by means of wire communication in interstate commerce, the writings, signs, and signals described below, in violation of Title 18, United States Code, Sections 1343, 1346, and 2:

| Act | Date | Wire Transmittal | From | To |
|------|---------|------------------|------|-----|
| 69(A) | 03-11-94 | Telephone conversation re: background and status of NHE bond transaction | Delaware Commissioner Rehabilitation/ Liquidation Manager, Dover, DE | Pound Orlando, FL |
| 69(B) | 07-18-94 | Fax Letter re: Settlement of NHE/NHLIC dispute | Harvis & Trien (Counsel for NHE), NY, NY | Catherine Mulholland, Delaware Insurance Commissioner's Office, Dover, DE |

| Act | Date | Wire Transmittal | From | To |
|-----|------|------------------|------|-----|
| 69(C) | 09-26-94 | Fax Letter re: Attorney Escrow | Schneiderman NY, NY | Catherine Mulholland, Delaware Insurance Commissioner's Office, Dover, DE |

S.     **Racketeering Acts 70 and 71**
       **(The APX Mortgage Servicing Fraud)**
       **(18 U.S.C. §§ 1343, 1346, and 2)**

### The Scheme and Artifice to Defraud

277.    From on or about November 4, 1993, and continuing to on or about November, 30, 1994 in Orlando, Orange County, Florida, in the Middle District of Florida, and elsewhere, WEISS, POUND, SCHNEIDERMAN, STARR, LANGER, ALLEN, GORSKI, APX, RAM, and NATIONAL WORKOUT knowingly and intentionally devised and executed: a) a scheme and artifice to defraud LifeCo and NHLIC of money and property, and to obtain money and property of LifeCo and NHLIC by means of false and fraudulent pretenses, representations, and promises, specifically, approximately $4,249,285 NHLIC funds and NHLIC mortgages and notes of the approximate value of $60,000,000; and b) to deprive the *LifeCo/NHLIC Victims* of their intangible right of honest services from LifeCo and NHLIC officers, directors, attorneys, agents, and committee members by using positions of trust to fraudulently, and through false and fraudulent pretenses, dishonestly deceive, and cause others to deceive, the *LifeCo/NHLIC Victims* as to the assets, liabilities, net worth, and solvency of LifeCo and NHLIC.

101

## The APX/SOUTH STAR Servicing Transfer

278.   It was part of the scheme and artifice to defraud that in September 1993, WEISS and POUND, together with Smythe, Blutrich, and Pfeffer, caused the servicing of the *South Star Mortgages* to be transferred to APX in preparation for the execution of **The National Housing Exchange Bond Fraud and Theft**, as described in paragraphs 279 through 281 below.

279.   It was part of the scheme and artifice to defraud that in September 1993, POUND, who claimed to act on behalf of LifeCo and NHLIC, caused APX, his former employer, to agree to service the *South Star Mortgages* for a fee, claiming that SOUTH STAR owned the mortgages, and was pooling them into bonds which were to be sold to NHLIC.

280.   It was part of the scheme and artifice to defraud that beginning in September 1993, POUND caused SOUTH STAR to ship the *South Star Mortgages* to APX in Palatine, Illinois.

281.   It was part of the scheme and artifice to defraud that in September 1993, POUND established himself as both the SOUTH STAR and the NHLIC contact for APX, thereby securing and maintaining control of all matters related to the management of the *South Star Mortgages*, and thereby establishing himself as a buffer to conceal from LifeCo, NHLIC and the Regulators the underlying facts related to the acquisition and quality of the *South Star Mortgages*.

## The APX/NHE Debenture Mortgage Servicing Contract

282.   It was part of the scheme and artifice to defraud that WEISS, POUND, SCHNEIDERMAN, LANGER, ALLEN, GORSKI, and others caused the *NHE Bond Indenture* to designate APX as mortgage servicer of the *Debenture Mortgages*, as part of a scheme designed to: a) fraudulently keep title to those assets in NHE's name; b) establish the means by which the income from the *Debenture Mortgages* could be fraudulently diverted to POUND, WEISS, APX, and, through APX, to ALLEN and GORSKI; and c) establish a framework by which facts could be concealed from LifeCo, NHLIC and the Regulators, including, but not limited to the facts that: i) *the Debenture Mortgages* were generally non-performing; ii) certain mortgages identified on the *Bond Mortgage Lists* were non-existent; and iii) certain mortgages identified on the *Bond Mortgage Lists* had not yet been purchased.

283.   It was part of the scheme and artifice to defraud that on or about December 28, 1993, GORSKI knowingly and intentionally executed a false and fraudulent certification that as of on or about that date, APX had a complete file with respect to each *Debenture Mortgage*, whereas APX as of that date only had possession of 200 of the *Debenture Mortgage* files, others had not yet been acquired, and others were non-existent.

284.   It was part of the scheme and artifice to defraud that on or about December 28, 1993, WEISS, POUND, SCHNEIDERMAN, LANGER, GORSKI, ALLEN, and APX caused a Servicing Fee Agreement to be executed by NHE and APX which provided that APX would be paid a "per mortgage" servicing fee (which averaged approximately $10,000 per month) for APX to service the *Debenture Mortgages*.

103

285. It was part of the scheme and artifice to defraud that from December 1993 through at least the fall of 1995, POUND, ALLEN, GORSKI, and APX refused to provide LifeCo, NHLIC, or the Insurance Regulators with material information related to collections, foreclosures or work-outs on the *Debenture Mortgages* and instead unlawfully exercised full dominion and control over those mortgages and the income therefrom.

## The Mortgage Assignment Fraud

286. It was part of the scheme and artifice to defraud that WEISS, POUND, SCHNEIDERMAN, and LANGER caused assignments of the *Debenture Mortgages* from NHE to Continental to be fraudulently created, and that WEISS, POUND, ALLEN, GORSKI, NHE, and APX intentionally prevented those assignments from being recorded, with the result that the *NHE Debentures* were unsecured and, further, that NHE acquired unencumbered title to the *Debenture Mortgages*, as described in paragraphs 287 through 293 below.

287. It was part of the scheme and artifice to defraud that on or about December 28, 1993, in order to create the appearance that the sale of the *NHE Debentures* was legitimate, WEISS, POUND, HERMAN, and others caused the *NHE Indenture* to provide that NHE was to transfer to Continental (as trustee) all right, title and interest in the *Debenture Mortgages* by the execution and delivery of assignments (the "*Debenture Mortgage Assignments*").

288. It was part of the scheme and artifice to defraud that on or about December 28, 1993, in order to create the appearance that the sale of the *NHE Debentures* was legitimate, WEISS, POUND, HERMAN and others caused the *NHE Indenture* to provide

that NHE was to cause the *Debenture Mortgage Assignments* to be recorded in the appropriate jurisdictions in order to perfect the pledge of the *Debenture Mortgages* as collateral on the NHE Debentures.

289. It was part of the scheme and artifice to defraud that on or about December 28, 1993, POUND, WEISS, SCHNEIDERMAN, and others caused Schick to execute a document captioned "RECEIPT," which was included in the *Bond Indenture* and which falsely stated that Schick had received the *Debenture Mortgage Assignments*; thereafter Schick insisted to WEISS, SCHNEIDERMAN, and others that the assignments must actually be executed.

290. It was part of the scheme and artifice to defraud that on or about March 18, 1994, SCHNEIDERMAN executed assignments of most of the *South Star Bond Mortgages* from SOUTH STAR to NHE, and that LANGER executed assignments of those same mortgages from NHE to Continental; LANGER fraudulently using the name "Albert J. Sonnenblick", who was alleged to be the Vice-President of NHE, but was in fact a fictitious person.

291. It was part of the scheme and artifice to defraud that in or about early February 1994, ALLEN advised F&H that APX would handle the recording of the *Debenture Mortgage Assignments* through a title company known to APX; pursuant to those instructions, F&H shipped the *Debenture Mortgage Assignments* to APX.

292. It was part of the scheme and artifice to defraud that APX knowingly and intentionally failed to record the *Debenture Mortgage Assignments*.

293. It was part of the scheme and artifice to defraud that because the *Debenture Mortgage Assignments* were not recorded, title of the *Debenture Mortgages* remained in the name of NHE through at least August 1995, thereby causing the *NHE Debentures* to be completely unsecured, and thereby establishing a means whereby WEISS, POUND, SCHNEIDERMAN, STARR, ALLEN, GORSKI, NHE, APX, and others could convert the *Debenture Mortgages* and steal the income therefrom.

### The APX Collections Fraud, Thefts And Embezzlements

294. It was part of the scheme and artifice to defraud that from November 1993 through November 1994, WEISS, POUND, STARR, ALLEN, GORSKI, NHE, APX, and NATIONAL WORKOUT used their fraudulent control over the servicing of the *Debenture Mortgages* to steal and embezzle funds of LifeCo and NHLIC as described in paragraphs 295 through 302 below:

295. It was part of the scheme and artifice to defraud that between November 1993 and May 1994, the mortgagors to the *Debenture Mortgages* were instructed to forward their mortgage payments to APX; approximately 14% of the mortgages were performing and, in accordance with the instructions, those mortgagors began to send their payments to APX (the *"Debenture Mortgages Collections"*).

296. It was part of the scheme and artifice to defraud that the *Debenture Mortgage Collections* were in fact property of NHLIC in that the *Debenture Mortgages* belonged to NHLIC, having been acquired by SOUTH STAR and NHE with *Attorney Escrow (South Star) Fraud Proceeds* and the collections were to be held in escrow for NHLIC's benefit

106

to secure the NHE payments owed on the *NHE Debentures*, as WEISS, POUND, STARR, ALLEN, GORSKI, NHE, APX, and NATIONAL WORKOUT well knew.

297. It was part of the scheme and artifice to defraud that from December 1, 1993 through November 30, 1994, ALLEN and GORSKI fraudulently, and without legal right, transferred $1,191,922.15 of the *Debenture Mortgages Collections* to APX, recording the funds as servicing fees on the APX books and records, whereas APX was due no more than $120,366 for servicing fees, resulting in a theft of $1,071,556.15.

298. It was part of the scheme and artifice to defraud that on or about a date unknown, but at least by June 1994, POUND, ALLEN, GORSKI, and APX created a false and fraudulent Servicing Fee Agreement, executed only by GORSKI, which falsely provided that APX was entitled to a servicing fee of 1% of the unpaid balance of the *Debenture Mortgages*, or approximately $1,200,000 per year, which they later used to justify the theft of *Debenture Mortgages Collections*.

299. It was part of the scheme and artifice to defraud that in September 1994, WEISS, POUND, STARR, ALLEN, GORSKI, NHE, APX, and NATIONAL WORKOUT generated false and fraudulent documents which indicated in part: a) that NHE was a viable entity and that NHE legitimately owned and controlled the *Debenture Mortgages;* b) that APX was required to consult with POUND as its "special work-out advisor" on work-outs on the *Debenture Mortgages;* c) that POUND would "process" such work-outs through NATIONAL WORKOUT; and d) that APX was to transfer income from the *Debenture Mortgages Collections* to NATIONAL WORKOUT.

300. It was part of the scheme and artifice to defraud that from September 25, 1994 through October 31, 1994, POUND, ALLEN, GORSKI, APX, and NATIONAL WORKOUT fraudulently and unlawfully took $186,147.06 of NHLIC funds paid by mortgagors on the *Debenture Mortgages*, intending to falsely claim, and subsequently falsely claiming, that the funds were owed to NATIONAL WORKOUT as consulting fees, whereas, in truth and in fact NATIONAL WORKOUT was not owed such reimbursements, fees or advances.

301. It was part of the scheme and artifice to defraud that from January 1994 through November 30, 1994, WEISS, POUND, SCHNEIDERMAN, STARR, ALLEN, GORSKI, NHE, and APX fraudulently converted and took by fraud $1,969,422.15 *Debenture Mortgages Collections*, property of NHLIC, through the transfers from APX to the persons identified below:

| Date | Transfer | To |
|---|---|---|
| 01-07-94 | $77,500 | Kathryn L. Pound |
| 07-12-94 | $580,129.13 | APX |
| 07-19-94 | $175,000 | National Housing Exchange |
| 09-28-94 | $25,000 | Kraft & Jacobsen (NHE legal fees) |
| 09-30-94 | $315,237.93 | APX |
| 10-26-94 | $500,000 | South Star (Starr/Schneiderman controlled acct.) |
| 11-01-94 | $125,857.56 | APX |
| 11-15-94 | $62,513.95 | APX |
| 11-22-94 | $45,803.84 | APX |
| 11-30-94 | $62,379.74 | APX |

302.   It was part of the scheme and artifice to defraud that when Continental and

NHLIC independent auditors sought to examine APX accounts and requested information

regarding funds collected and paid APX, POUND, ALLEN, and GORSKI refused to provide

access to any APX financial or other records related to monies received or disbursed.

### The Interstate Wire Transmittals

### Racketeering Act 70

The defendants named below committed the following acts of racketeering, any one

of which alone constitutes the commission of Racketeering Act 70:

303.   On or about the dates set forth below, with regard to a scheme to defraud

which was begun, continued, and completed in Orange County, Florida, in the Middle

District of Florida, and elsewhere,

**SHOLAM WEISS
KEITH POUND
JAN R. SCHNEIDERMAN
YAAKOV STARK
a/k/a Jan Starr
NADINE ALLEN
and
ROBERT GORSKI**

the defendants herein, and co-conspirator RICHARD LANGER, and others known and

unknown to the grand jury, together with NATIONAL HOUSING EXCHANGE INC., APX

MORTGAGE SERVICES, INC., and NATIONAL WORKOUT SPECIALISTS, INC., having

devised the above-described scheme and artifice to defraud, and for the purpose of

executing and attempting to execute the scheme and artifice to defraud, and for the

purpose of obtaining money and property by means of false and fraudulent pretenses,

109

representations, and promises, did knowingly transmit, and cause others to transmit, by means of wire communications in interstate commerce, certain signals, as described below, in violation of Title 18, United States Code, Sections 1343, 1346, and 2:

| Act | Date | Wire Transmittal | From | To |
|------|------|------|------|------|
| 70(A) | 12-28-93 | Telefax transmission of Servicing Fee Agreement | Gorski &APX Palatine, IL | Blutrich NY, NY |
| 70(B) | 02-08-94 | Telefax transmission of Pound work-out approval confirmation | F&H NY, NY | Pound Orlando, FL |
| 70(C) | 09-19-94 | Telefax letter re: Pound selection as work-out advisor | Pound & National Workout, Chicago, IL | Starr & NHE NY, NY |
| 70(D) | 06-09-94 | Telefax letter re: transfer funds to NHE | Kraft & Jacobson (attorneys for NHE), Towson, MD | Allen & APX Palatine, IL |

**Racketeering Act 71**

304. On or about October 8, 1994, with regard to a scheme to defraud which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere,

**SHOLAM WEISS**
**KEITH POUND**
**JAN R. SCHNEIDERMAN**
**YAAKOV STARK**
**a/k/a Jan Starr**
**NADINE ALLEN**
and
**ROBERT GORSKI**

the defendants herein, and co-conspirator LANGER and others known and unknown to the grand jury, together with NATIONAL HOUSING EXCHANGE INC., APX MORTGAGE SERVICES, INC. and NATIONAL WORKOUT SPECIALISTS, INC., having devised the

110

above-described scheme and artifice to defraud, and for the purpose of executing and attempting to execute the scheme and artifice to defraud, and for the purpose of obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did knowingly transmit, and cause others to transmit, by means of wire communications in interstate commerce, certain signals, to wit: a $5,000,000 wire transmittal from APX Account #0700130052, Suburban Bank of Cary Grove, Cary, Illinois, to SOUTH STAR Account #00160043, J.P. Morgan, New York, New York, in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

**T.    Racketeering Act 72**
       **(The *Debenture Mortgages Collections* - Money Laundering I)**
       **(18 U.S.C. §§ 1957 and 2)**

The defendants named below committed the following acts of racketeering, any one of which alone constitutes the commission of Racketeering Act 72:

305.    On or about October 27, 1994, APX transferred $500,000 of the *Debenture Mortgages Collections* to SOUTH STAR account number 00160043 at J.P. Morgan, New York, New York.

306.    From on or about October 26, 1994 through November 1, 1994, WEISS, POUND, SCHNEIDERMAN, SOUTH STAR, and NHE transferred and caused to be transferred the funds described above, to and for the benefit of WEISS, Blutrich and Pfeffer.

307.    On or about the dates set forth below, with regard to the proceeds of specified unlawful activity which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere, and as a part of money laundering

activity which was continued and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere,

**SHOLAM WEISS**
**KEITH POUND**
**and**
**JAN R. SCHNEIDERMAN**

the defendants herein, together with SOUTH STAR MANAGEMENT, INC., NATIONAL HOUSING EXCHANGE, INC., and others, knowingly engaged in the monetary transactions in criminally derived property, specifically proceeds of **The APX Mortgage Servicing Fraud** described below, such property derived from unlawful activity specified in Title 18, United States Code, Section 1343 (wire fraud), in that the defendants did cause the transfer of funds of a value greater than $10,000 by, through, and to financial institutions then engaged in interstate commerce, in violation of Title 18, United States Code, Sections 1957 and 2.

| Act | Date | Proceeds | Monetary Transaction |
|-------|----------|-----------|--------------------------------------------------------------------------------------|
| 72(A) | 10-28-94 | $75,000 | Check #129 Schneiderman Account #00138538 at J.P. Morgan to National Mortgage |
| 72(B) | 10-28-94 | $50,000 | Check #130 Schneiderman Account #138538 at J.P. Morgan to Michael D. Blutrich |
| 72(C) | 11-01-94 | $300,000 | J.P. Morgan cashiers check payable to Moshe Mishal and Norman Langer as Attorney |

112

U.    **Racketeering Act 73**
      **(The *Debenture Mortgages Collections* - Money Laundering II)**
      **(18 U.S.C. §§ 1957 and 2)**

The defendants named below committed the following acts of racketeering, any one of which alone constitutes the commission of Racketeering Act 73:

308.    On or about July 19, 1994, APX transferred $175,000 of the *Debenture Mortgages Collections* to NHE account number 001-58-646 at Morgan Guaranty Bank, New York, New York, as described in paragraph 301 above.

309.    On or about July 27, 1994, WEISS, POUND, SCHNEIDERMAN, STARR, SOUTH STAR and NHE transferred and caused to be transferred the funds described above to and for the benefit of WEISS, STARR, and others.

310.    On or about the dates set forth below, with regard to the proceeds of specified unlawful activity which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere, and as a part of money laundering activity which was continued and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere,

**SHOLAM WEISS**
**KEITH POUND**
**JAN R. SCHNEIDERMAN**
**and**
**YAAKOV STARK**
**a/k/a Jan Starr**

the defendants herein, together with SOUTH STAR MANAGEMENT, INC., NATIONAL HOUSING EXCHANGE, INC., and others, knowingly engaged in the monetary transactions in criminally derived property, specifically proceeds of **The APX Mortgage Servicing**

113

**Fraud**, such property derived from unlawful activity in violation of Title 18, United States Code, Section 1343 (wire fraud), in that the defendant did cause the transfer of funds of a value greater than $10,000 by, through, and to financial institutions then engaged in interstate commerce, in violation of Title 18, United States Code, Sections 1957 and 2.

| Act | Date | Proceeds | Monetary Transaction |
|------|----------|-----------|---------------------------------------------------------------------------------------------------------------------------------------|
| 73(A) | 07-27-94 | $125,000 | Wire transfer from NHE Account #001-58-646 at Morgan Guaranty Bank, NY, NY to South Star Account #001-60-043 at Morgan Guaranty Bank, NY, NY |
| 73(B) | 07-27-94 | $125,000 | Check #341 from South Star Account #001-60-043 at Morgan Guaranty Bank, NY, NY to Jarnow Corp. |

## V.     Racketeering Acts 74 and 75
(The RAM Mortgage Servicing Fraud)
(18 U.S.C. §§ 1956(a)(1)(A), 1956(a)(1)(B), and 2)

### Introduction

311.    During 1992 and 1993, three independent bankers banks began extensive use of APX as a mortgage broker and warehouser. APX would receive mortgages from these banks, package them, then resell them on the secondary mortgage market.

312.    Beginning in the summer of 1994, APX failed to transfer funds received from the sale of the banks' mortgages, with the result that APX owed the banks over $11,500,000, including approximately $5,500,000 owed to Midwest Independent Bank ("MIB") which was located in Jefferson City, Missouri.

114

313. Beginning in the fall of 1994, MIB began the process of seizing and liquidating APX assets to satisfy the debt to MIB, and began preparation of lawsuits designed to recover its loss.

314. In or about November 1994, APX agreed to assign all of its assets, including servicing rights, to MIB and documents and agreements were drafted and exchanged to accomplish the assets transfers.

### The Scheme and Artifice to Defraud

315. From on or about December 1, 1994 and continuing to on or about April 16, 1996, in Orlando, Orange County, Florida, in the Middle District of Florida, and elsewhere, WEISS, POUND, SCHNEIDERMAN, STARR, RAM, and NATIONAL WORKOUT knowingly and intentionally devised and executed: a) a scheme and artifice to defraud LifeCo and NHLIC of money and property, and to obtain money and property of LifeCo and NHLIC by means of false and fraudulent pretenses, representations, and promises, specifically, $1,339,352.65 NHLIC funds and NHLIC mortgages and notes of the approximate value of $60,000,000; and b) to deprive the *LifeCo/NHLIC Victims* of their intangible right of honest services from LifeCo and NHLIC officers, directors, attorneys, agents, and committee members by using positions of trust to fraudulently, and through false and fraudulent pretenses, dishonestly deceive, and cause others to deceive, the *LifeCo/NHLIC Victims* as to the assets, liabilities, net worth, and solvency of LifeCo and NHLIC.

## The RAM Servicing Transfer

316. It was part of the scheme and artifice to defraud that in December 1994, POUND and STARR caused the servicing of the *Debenture Mortgages* to be placed under the control of POUND and RAM as described in paragraphs 317 through 322 below.

317. It was part of the scheme and artifice to defraud that POUND created RAM in October and November 1994.

318. It was part of the scheme and artifice to defraud that on or about November 7, 1994, POUND, STARR and NHE telefaxed to counsel for MIB a letter from STARR, as President of NHE, stating that POUND had the power and authority to transfer the *Debenture Mortgage* servicing rights from APX.

319. It was part of the scheme and artifice to defraud that on or about November 10, 1994, POUND caused APX to telefax to MIB a letter which stated in relevant part: a) that APX was the appointed servicer of the *Debenture Mortgages*; b) that NHE had the power to "pull" the servicing from APX; c) that NHE "through its national work-out advisor" was going to allow former APX employees, through "a company chosen by it" to continue servicing the *Debenture Mortgages*; and d) that APX could assign a portion of the servicing fees income stream to MIB.

320. It was part of the scheme and artifice to defraud that on or about December 19, 1993, STARR advised MIB that NHE would transfer the Debenture Mortgage servicing rights to MIB, contingent on MIB retaining RAM as "sub-servicer".

321. It was part of the scheme and artifice to defraud that from on or about December 9, 1994 through December 23, 1994, documents were executed by POUND,

116

STARR, RAM, MIB and APX whereby servicing rights to the *Debenture Mortgages* were transferred to MIB, then from MIB to RAM, with the result that POUND maintained complete control over the *Debenture Mortgages* and the *Debenture Mortgages Collections,* thereby establishing the means by which the income from the *Debenture Mortgages* could continue to be fraudulently diverted to POUND, WEISS, STARR, RAM and NATIONAL WORKOUT, and establishing a framework by which the concealment of facts from LifeCo, NHLIC and the Regulators could continue.

322.   It was part of the scheme and artifice to defraud that from December 1994 through at least the end of 1995, WEISS, POUND, STARR, and RAM refused to provide LifeCo, NHLIC, or the Insurance Regulators with material information related to collections, foreclosures or work-outs on the *Debenture Mortgages* and instead unlawfully exercised full dominion and control over those mortgages and the income therefrom.

### The RAM Lawsuits and Mortgage Foreclosure Fraud

323.   It was part of the scheme and artifice to defraud that POUND, STARR, RAM, and NHE retained Holleb & Coff (H&C), a Chicago law firm, provided materially false information to H&C, and caused H&C, and other law firms, to unknowingly facilitate the ongoing collections fraud, as described in paragraphs 324 and 325 below.

324.   It was part of the scheme and artifice to defraud that POUND and RAM caused H&C to use fraudulent provisions in the *NHE Indenture* to sue NHLIC and Continental, and to defend lawsuits brought by NHLIC, and provided H&C false and fraudulent information related to the application of *Debenture Mortgages Collections,*

117

thereby maintaining control of the *Debenture Mortgages* and the collections, and thereby continuing thefts from the collections.

325. It was part of the scheme and artifice to defraud that, with the intent of stealing most or all of the mortgage proceeds or alternatively fraudulently taking title to the real estate which secured the mortgages, from December 28, 1993 through December 31, 1995, POUND, WEISS, STARR, NHE, RAM, and NATIONAL WORKOUT provided false and fraudulent information and documentation to H&C, and caused H&C to refer the false and fraudulent information and documentation to law firms throughout the United States, to cause the initiation of the foreclosure actions described below in the name of NHE, RAM or NATIONAL WORKOUT, not knowing that the mortgages were the stolen property of NHLIC and not knowing that the mortgages had been assigned to Continental as trustee of the NHE Indenture:

| Debenture Mortgage | Amount Sued For | Location of Lawsuit |
|---|---|---|
| IH35 Joint Venture | $387,708.09 | Bexar County, TX |
| Vernon & Marcia Rosser | $221,865.74 | Hildago County, TX |
| Kurt Tedhams | $562,447.13 | Maricopa County, AZ |
| Everett Villarrubia | $826,914.54 | Jefferson Parish, LA |
| E.G. Priesmeyer | $867,852.99 | Dallas County, TX |
| Arapaho Car Wash | $1,039,958.56 | Dallas County, TX |

## The RAM Collections Fraud, Thefts And Embezzlements

326. It was part of the scheme and artifice to defraud that from December 1, 1994 through January 6, 1996, WEISS, POUND, STARR, NHE, RAM, and NATIONAL WORKOUT used their fraudulent control over the servicing of the *Debenture Mortgages*

118

to steal and embezzle funds of LifeCo and NHLIC as described in paragraphs 327 through 330 below.

327. It was part of the scheme and artifice to defraud that from December 1, 1994 through January 3, 1996, POUND and RAM fraudulently, and without legal right, transferred $1,155,615 of *Debenture Mortgages Collections* to RAM, recording the funds as servicing fees on the RAM books and records, whereas RAM was due no more than approximately $130,000 for servicing fees, resulting in a theft of approximately $1,025,615.

328. It was part of the scheme and artifice to defraud that POUND and RAM fraudulently used the false and fraudulent Servicing Agreement described above to justify the theft of *Debenture Mortgages Collections*.

329. It was part of the scheme and artifice to defraud that from December 2, 1994 through May 2, 1995, POUND and NATIONAL WORKOUT fraudulently and unlawfully took $92,973.70 of NHLIC funds paid by mortgagors on the *Debenture Mortgages*, intending to falsely claim, and subsequently falsely claiming, that the funds were owed to NATIONAL WORKOUT as consulting fees, whereas, in truth and in fact NATIONAL WORKOUT was not owed such reimbursements, fees or advances.

330. It was part of the scheme and artifice to defraud that from January 15, 1994 through March 27, 1995, WEISS, POUND, STARR, NHE, and RAM fraudulently converted and took by fraud $1,212,623.79 of *Debenture Mortgages Collections*, property of NHLIC, through the transfers from RAM to the persons identified below:

| Date | Transfer | To |
|------|----------|-----|
| 12-15-94 | $49,833.33 | RAM (salaries) |

| Date | Transfer | To |
| --- | --- | --- |
| 12-31-94 | $62,239.57 | RAM (salaries) |
| 01-18-95 | $167,677.83 | QE Financial |
| 01-18-95 | $116,529.71 | SOUTH STAR |
| 01-31-95 | $76,036.85 | RAM |
| 02-24-95 | $18,138.25 | RAM |
| 03-24-95 | $22,928.57 | RAM (late charges) |
| 03-24-95 | $252,484.27 | SOUTH STAR |
| 03-24-95 | $224,473.40 | SOUTH STAR |
| 03-24-95 | $130,007.95 | SOUTH STAR |
| 03-24-95 | $92,274.06 | SOUTH STAR |

## The Interstate Wire Transmittals

### Racketeering Act 74

The defendants named below committed the following acts of racketeering, any one of which alone constitutes the commission of Racketeering Act 74:

331. On or about the dates specified below, with regard to a scheme to defraud which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere,

**SHOLAM WEISS
KEITH POUND
and
YAAKOV STARK
a/k/a Jan Starr**

the defendants herein, together with NATIONAL HOUSING EXCHANGE, INC., RESOURCE ASSET MANAGEMENT, INC., NATIONAL WORKOUT SPECIALISTS, INC.,

and others, having devised the above-described scheme and artifice to defraud, and for the purpose of executing and attempting to execute the scheme and artifice to defraud, and for the purpose of obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did knowingly transmit, and cause others to transmit, by means of wire communications in interstate commerce, certain signals as described below, in violation of Title 18, United States Code, Sections 1343, 1346, and 2:

| Act | Date | Wire Transmittal | From | To |
|---|---|---|---|---|
| 74(A) | 11-07-94 | Letter re: NHE transfer of servicing rights | Starr from APX, Palatine, IL | MIB Jefferson City, MO |
| 74(B) | 11-10-94 | Letter re: transfer of servicing rights | APX, Palatine, Illinois | Counsel to MIB, Jefferson City, MO |
| 74(C) | 12-21-94 | Fax letter re: APX/RAM/MIB documents transferring servicing but not debt | RAM on APX letterhead, Palatine, IL | MIB Jefferson City, MO |

## Racketeering Act 75

The defendants named below committed the following acts of racketeering, any one of which alone constitutes the commission of Racketeering Act 75:

332.    On or about the dates specified below, with regard to a scheme to defraud which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere,

### SHOLAM WEISS
### KEITH POUND
### and
### YAAKOV STARK
### a/k/a Jan Starr

the defendants herein, together with NATIONAL HOUSING EXCHANGE, INC., RESOURCE ASSET MANAGEMENT, INC., NATIONAL WORKOUT SPECIALISTS, INC., and others, having devised the above-described scheme and artifice to defraud, and for the purpose of executing and attempting to execute the scheme and artifice to defraud, and for the purpose of obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did knowingly transmit, and cause others to transmit, by means of wire communications in interstate commerce, certain signals as described below, in violation of Title 18, United States Code, Sections 1343, 1346, and 2:

| Act | Date | Wire Transmittal | From | To |
|-----|------|-----------------|------|-----|
| 75(A) | 09-20-95 | Fax letter re: ability to pay National Workout | Starr Miami, FL | RAM Palatine, IL |
| 75(B) | 09-29-95 | Fax letter re: RAM can make payments before 12/28 interest | Starr Miami, FL | RAM Palatine, IL |

All in violation of Title 18, United States Code, Section 1962(c).

## COUNT TWO
### (The Racketeering Conspiracy)

333. Paragraphs 1 through 81 and 83 through 332 of Count One of this Indictment are realleged and incorporated as if fully set forth herein.

334. From in or about August 1, 1992 and continuously thereafter up to and including April 28, 1998, in the Middle District of Florida, and elsewhere,

**SHOLAM WEISS
KEITH POUND
JAN R. SCHNEIDERMAN
YAAKOV STARK
a/k/a Jan Starr**

122

**RICHARD B. HERMAN**
**d/b/a Law Offices of Richard B. Herman**
**d/b/a Blutrich, Herman & Miller**
**ISACK ROSENBERG**
**NADINE ALLEN**
**and**
**ROBERT GORSKI**

the defendants herein, and others, being persons employed by and associated with *The LifeCo Enterprise*, as defined by Title 18, United States Code, Section 1961(4), and as set forth in paragraphs 1 through 81 and 83 through 333 above, did knowingly, willfully, and intentionally combine, conspire, confederate, and agree together and with each other and with other conspirators, to violate Title 18, United States Code, Section 1962(c), namely, to conduct and participate, directly and indirectly, in the conduct of the affairs of *The LifeCo Enterprise*, an enterprise which was engaged in, and its activities affected interstate and foreign commerce, through a pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and 1961(5).

335.   It was part of the conspiracy that the defendants agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the enterprise.

336.   The pattern of racketeering activity through which the defendants agreed to conduct the affairs of *The LifeCo Enterprise* consisted of the Acts set forth in paragraphs 1 through 81 and 83 through 332 of Count One of the Indictment, which are realleged and incorporated as if fully stated herein, and the following racketeering acts:

**A.   Racketeering Acts 76 and 77**
**(The LifeCo Class D Preferred Stock Fraud)**

### Racketeering Act 76

337.   On or about September 9, 1992, with regard to a scheme and artifice to

defraud which was begun, continued, and completed in Orange County, Florida, in the

Middle District of Florida, and elsewhere,

### RICHARD B. HERMAN
### d/b/a Law Offices of Richard B. Herman
### d/b/a Blutrich, Herman & Miller

the defendant herein, together with Smythe, Blutrich, and Pfeffer, having devised the

above-described scheme and artifice to defraud, and for the purpose of executing and

attempting to execute the scheme and artifice to defraud, and for the purpose of obtaining

money and property by means of false and fraudulent pretenses, representations, and

promises, did knowingly transmit, and cause others to transmit, by means of wire

communication in interstate commerce, the writings, signs, and signals, to wit, the wire

transfer of $20,000,000 from the Raymond James Account at State St. Bank of Boston,

Boston, Massachusetts, for NHLIC Account, to Blutrich Account Number 37081473,

Citibank, N.A., New York, New York, in violation of Title 18, United States Code, Sections

1343, 1346, and 2.

### Racketeering Act 77

The defendant named below committed the following acts of racketeering, any one

of which alone constitutes the commission of Racketeering Act 77:

124

338. On or about the dates set forth below, with regard to a scheme and artifice to defraud which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere,

**RICHARD B. HERMAN**
**d/b/a Law Offices of Richard B. Herman**
**d/b/a Blutrich, Herman & Miller**

the defendant herein, together with Smythe, Blutrich, and Pfeffer, having devised the above-described scheme and artifice to defraud, and for the purpose of executing and attempting to execute the scheme and artifice to defraud, and for the purpose of obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did knowingly transmit, and cause others to transmit, by means of wire communication in interstate commerce, the writings, signs, and signals described below, in violation of Title 18, United States Code, Sections 1343, 1346, and 2:

| Racketeering Act | Date | Wire | From | To |
|---|---|---|---|---|
| 77(A) | 09-15-92 | SCB fax re: Head office Nulenda credit approval | SCB London, England | SCB, Credit Management Phoenix, AZ |
| 77(B) | 09-15-92 | SCB fax re: Nulenda credit approval | SCB Credit Management Phoenix, AZ | SCB NY, NY |

## B.  Racketeering Act 78
### (Use of Nulenda Draw Fraud Proceeds to Promote Unlawful Activity)

339. On or about September 17, 1992, with regard to the proceeds of specified unlawful activity which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere, and as a part of money laundering activity

which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere,

**RICHARD B. HERMAN**
**d/b/a Law Offices of Richard B. Herman**
**d/b/a Blutrich, Herman & Miller**

the defendant herein, knowing that the *Nulenda Draw Fraud Proceeds* were the proceeds of some form of unlawful activity, the *Nulenda Draw Fraud Proceeds* in fact constituting proceeds of a violation of Title 18, United States Code, Section 1343 (wire fraud), with the intent to promote the carrying on of wire fraud in violation of Title 18, United States Code, Section 1343, specifically with the intent to execute the **LifeCo Class D Preferred Stock Fraud** and, further, to knowingly conceal and disguise the nature, location, source, and ownership of the *Nulenda Draw Fraud Proceeds,* did intentionally conduct a financial transaction involving the *Nulenda Draw Fraud Proceeds,* specifically HERMAN issued Check No. 1112, in the amount of $9,900,000, drawn on the Herman Attorney Trust II Account at Marine Midland Bank, New York, New York, in violation of Title 18, United States Code, Sections 1956(a)(1)(A), 1956(a)(1)(B) and 2.

**C.    Racketeering Acts 79 Through 97**
**(Interstate Transportation of Stolen Funds (Class D Dividend Checks))**

340.    On or about the dates listed below, in Orange County, Florida, in the Middle District of Florida, and elsewhere,

**RICHARD B. HERMAN**
**d/b/a Law Offices of Richard B. Herman**
**d/b/a Blutrich, Herman & Miller**

the defendant herein, together with Smythe, Blutrich, and Pfeffer, knowingly and intentionally caused money of the value of $5,000 or more, knowing said money was stolen, converted, and taken by fraud, to be unlawfully transported, transmitted, and transferred in interstate commerce, that is, the dividend checks paid on the *LifeCo Class D Preferred Stock* as described below, drawn upon the LifeCo Investment Group, Inc. checking accounts at First Florida Bank of Orange County, N.A., Orlando, Florida, or Barnett Bank of Central Florida, N.A., Orlando, Florida, as specified below, to be sent from the offices of LifeCo Investment Group, Inc., Maitland and Orlando, Orange County, Florida, to the offices of Future Diversified, Inc., New York, New York, in violation of Title 18, United States Code, Sections 2314 and 2.

| Racketeering Act | Date of Check | Bank | Check Number | Amount of Check |
|---|---|---|---|---|
| 79 | 09-28-92 | First Florida Bank | 4994 | $29,383.56 |
| 80 | 10-26-92 | First Florida Bank | 5121 | $70,068.49 |
| 81 | 11-19-92 | First Florida Bank | 5420 | $67,808.22 |
| 82 | 12-21-92 | First Florida Bank | 5408 | $70,068.49 |
| 83 | 01-25-93 | First Florida Bank | 5563 | $70,068.49 |
| 84 | 02-25-93 | First Florida Bank | 5695 | $63,287.67 |
| 85 | 03-29-93 | Barnett Bank | 269 | $70,068.49 |
| 86 | 04-29-93 | Barnett Bank | 430 | $67,808.22 |
| 87 | 05-27-93 | Barnett Bank | 559 | $70,068.49 |
| 88 | 06-28-93 | Barnett Bank | 720 | $67,808.22 |
| 89 | 07-29-93 | Barnett Bank | 877 | $70,068.49 |
| 90 | 08-30-93 | Barnett Bank | 1065 | $70,068.49 |
| 91 | 09-29-93 | Barnett Bank | 1218 | $67,808.22 |
| 92 | 10-28-93 | Barnett Bank | 1382 | $70,068.49 |

| Racketeering Act | Date of Check | Bank | Check Number | Amount of Check |
|---|---|---|---|---|
| 93 | 11-30-93 | Barnett Bank | 1531 | $67,808.22 |
| 94 | 12-27-93 | Barnett Bank | 1705 | $70,068.49 |
| 95 | 01-27-94 | Barnett Bank | 1781 | $70,068.49 |
| 96 | 02-24-94 | Barnett Bank | 1839 | $63,287.67 |
| 97 | 03-28-94 | Barnett Bank | 1948 | $70,068.49 |

D.    **Racketeering Acts 98 Through 100**
       **(Money Laundering: The Nulenda Draw Fraud Proceeds)**

### Racketeering Act 98

The defendant named below committed the following acts of racketeering, any one of which alone constitutes the commission of Racketeering Act 98:

341.    On or about the dates set forth below, with regard to the proceeds of specified unlawful activity which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere, and as a part of money laundering activity which was continued and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere,

### RICHARD B. HERMAN
### d/b/a Law Offices of Richard B. Herman
### d/b/a Blutrich, Herman & Miller

the defendant herein, knowing that the *Nulenda Draw Fraud Proceeds* represented the proceeds of some form of unlawful activity, did knowingly conduct and caused to be conducted the financial transactions in the *Nulenda Draw Fraud Proceeds* described below, each of which was conducted by, through, and to financial institutions then engaged in interstate commerce, knowing that the financial transactions were designed in whole or

128

part to disguise the nature, location, source, ownership and control of those proceeds, the *Nulenda Draw Fraud Proceeds* in fact having been derived from unlawful activity specified in Title 18, United States Code, Section 1343 (wire fraud), in violation of Title 18, United States Code, Sections 1957 and 2:

| Racketeering Act | Date | Nulenda Draw Fraud Proceeds | Financial Transaction |
|---|---|---|---|
| 98(A) | 09-24-92 | $2,100,000 | Wire Transfer Nulenda checking to Herman Attorney Trust II |
| 98(B) | 09-25-92 | $1,500,000 | Wire Transfer Herman Attorney Trust II to F&H |
| 98(C) | 09-25-92 | $600,000 | Check #118 Herman Attorney Trust II to Schneiderman |

## Racketeering Act 99

342.    On or about October 7, 1992, with regard to the proceeds of specified unlawful activity which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere, and as a part of money laundering activity which was continued and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere,

### RICHARD B. HERMAN
### d/b/a Law Offices of Richard B. Herman
### d/b/a Blutrich, Herman & Miller

the defendant herein, knowing that the *Nulenda Draw Fraud Proceeds* represented the proceeds of some form of unlawful activity, did knowingly conduct and caused to be conducted a financial transaction in the *Nulenda Draw Fraud Proceeds*, to wit: a $415,555.56 wire transfer from the Herman Attorney Trust II to Finsbury Bank and Trust

Co., Grand Cayman Island, BWI, for the benefit of Smythe, which was conducted by, through, and to financial institutions then engaged in interstate commerce, knowing that the financial transactions were designed in whole or part to disguise the nature, location, source, ownership and control of those proceeds, the *Nulenda Draw Fraud Proceeds* in fact having been derived from unlawful activity specified in Title 18, United States Code, Section 1343 (wire fraud), in violation of Title 18, United States Code, Sections 1957 and 2.

## Racketeering Act 100

The defendant named below committed the following acts of racketeering, any one of which alone constitutes the commission of Racketeering Act 100:

343.   On or about the dates set forth below, with regard to the proceeds of specified unlawful activity which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere, and as a part of money laundering activity which was continued and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere,

### RICHARD B. HERMAN
### d/b/a Law Offices of Richard B. Herman
### d/b/a Blutrich, Herman & Miller

the defendant herein, knowing that the *Nulenda Draw Fraud Proceeds* represented the proceeds of some form of unlawful activity, did knowingly conduct and caused to be conducted the financial transactions in the *Nulenda Draw Fraud Proceeds* described below, each of which was conducted by, through, and to financial institutions then engaged in interstate commerce, knowing that the financial transactions were designed in whole or

130

part to disguise the nature, location, source, ownership and control of those proceeds, the

*Nulenda Draw Fraud Proceeds* in fact having been derived from unlawful activity specified

in Title 18, United States Code, Section 1343 (wire fraud), in violation of Title 18, United

States Code, Sections 1957 and 2:

| Racketeering Act | Date | Nulenda Draw Fraud Proceeds | Financial Transaction |
|---|---|---|---|
| 100(A) | 12-17-92 | $60,000 | Wire Transfer Nulenda checking to Herman/Actual Funding Account |
| 100(B) | 12-18-92 | $174,000 | Wire Transfer Nulenda checking to Herman/Actual Funding Account |
| 100(C) | 01-07-93 | $600,000 | Transfer Nulenda checking to Herman/ Actual Funding Account (bank check) |
| 100(D) | 01-13-93 | $100,000 | Nulenda Check No. 1018 to Actual Funding |

All in violation of Title 18, United States Code, Section 1962(d).

## COUNTS THREE THROUGH TEN
### (The Attorney Escrow (South Star) Cash Fraud and Theft)

344.    Paragraphs 1 through 81 and 83 through 100 set forth above are hereby

realleged and incorporated by reference as if set forth in full herein.

345.    On or about the dates set forth below, with regard to a scheme and artifice

to defraud which was begun, continued, and completed in Orange County, Florida, in the

Middle District of Florida, and elsewhere,

**SHOLAM WEISS
KEITH POUND
JAN R. SCHNEIDERMAN
and
SOUTH STAR MANAGEMENT, INC.**

the defendants herein, having devised the above-described scheme and artifice to defraud, and for the purpose of executing and attempting to execute the scheme and artifice to defraud, and for the purpose of obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did knowingly transmit, and cause others to transmit, by means of wire communication in interstate commerce, the writings, signs, and signals described below:

| Count | Date | Amount | From | To |
|-------|------|--------|------|-----|
| Three | 08-31-93 | $4,000,000 | NHLIC Account #42-Q662019, Barnett Bank, Orlando, FL | Schneiderman Account #251-04-545, Morgan Guaranty, NY, NY |
| Four | 09-28-93 | $4,604,019.59 | NHLIC Account #42-Q662019, Barnett Bank, Orlando, FL | F&H Account #01567121, Citibank, NY, NY |
| Five | 09-28-93 | $5,000,000 | NHLIC Account #42-Q662019, Barnett Bank, Orlando, FL | F&H Account #01567121, Citibank, NY, NY |
| Six | 10-29-93 | $5,000,000 | NHLIC Account #42-Q662019, Barnett Bank, Orlando, FL | F&H Account #01567121, Citibank, NY, NY |
| Seven | 11-24-93 | $15,000,000 | NHLIC Account #42-Q662019, Barnett Bank, Orlando, FL | F&H Account #9379-131371, Fleet Bank, NY, NY |
| Eight | 12-23-93 | $2,500,000 | NHLIC Account #42-Q662019, Barnett Bank, Orlando, FL | F&H Account #9379-131371, Fleet Bank, NY, NY |
| Nine | 02-01-94 | $2,500,000 | NHLIC Account #42-Q66-2001, Barnett Bank, Orlando, FL | F&H Account #01567164, Citibank, NY, NY |
| Ten | 02-11-94 | $1,000,000 | NHLIC Account #42-Q66-2001, Barnett Bank, Orlando, FL | F&H Account #01567164, Citibank, NY, NY |

All in violation of Title 18, United States Code, Sections 1343, 1346 and 2.

## COUNTS ELEVEN THROUGH THIRTY-ONE
### (Interstate Transportation Of Stolen Funds)
### (South Star Fraud Proceeds)

346.   Paragraphs 1 through 81 and 83 through 101 set forth above are hereby realleged and incorporated by reference as if set forth in full herein.

347.   On or about the dates listed below, in Orange County, Florida, in the Middle District of Florida, and elsewhere,

### SHOLAM WEISS
### KEITH POUND
### JAN R. SCHNEIDERMAN
### and
### SOUTH STAR MANAGEMENT, INC.

the defendants herein, knowingly and intentionally caused money of the value of $5,000 or more to be unlawfully transported, transmitted, and transferred in interstate commerce, that is, the stolen funds described below, which are *Attorney Escrow (South Star) Fraud Proceeds*, to be sent from bank accounts of, or bank accounts held for the benefit of SOUTH STAR, in New York, New York, to recipients in the states identified below:

| Count | Date | Amount | From | To |
|-------|------|--------|------|-----|
| Eleven | 08-26-93 | $747,000 | Wire Transfer from Schneiderman Account #001-58-206, Morgan Guaranty Bank, NY, NY | RTC, Chicago, IL |
| Twelve | 09-01-93 | $34,623,000 | Wire Transfer from Schneiderman Account #251-04-545, Morgan Guaranty Bank, NY, NY | RTC, Chicago, IL |

| Count | Date | Amount | From | To |
|---|---|---|---|---|
| Thirteen | 09-03-93 | $113,470.56 | Wire Transfer from Schneiderman Account #001-58-217, Morgan Guaranty Bank, NY, NY | Consolidated Asset Recovery Corporation, Bridgeport, CT |
| Fourteen | 09-07-93 | $3,100,000 | Cashier Check for $3,100,000 from Morgan Guaranty Bank, NY, NY | Payable to United Jersey Bank, Princeton, NJ |
| Fifteen | 09-28-93 | $1,021,235.01 | Wire transfer from Schneiderman Account #001-58-206, Morgan Guaranty Bank, NY, NY | Consolidated Asset Recovery Corporation, Bridgeport, CT |
| Sixteen | 11-03-93 | $844,000 | F&H Check #1378, from Account #01567121, Citibank, NY, NY | NatWest Bank of New Jersey, S. Plainfield, NJ |
| Seventeen | 11-04-93 | $200,000 | Wire transfer from F&H Account #9379131371, Fleet Bank, NY, NY | First Fidelity Bank, Newark, NJ |
| Eighteen | 11-17-93 | $311,051.50 | Wire transfer from F&H, Account #01567164, Citibank, NY, NY | FDIC Chicago, IL |
| Nineteen | 11-24-93 | $305,136 | Wire transfer from F&H, Account #9379131371, Fleet Bank, NY, NY | FDIC Chicago, IL |
| Twenty | 11-24-93 | $174,137.73 | Wire transfer from F&H, Account #9379131371, Fleet Bank, NY, NY | FDIC Chicago, IL |
| Twenty-One | 12-01-93 | $25,153.60 | Wire transfer from F&H, Account #9379131371, Fleet Bank, NY, NY | FDIC Chicago, IL |
| Twenty-Two | 12-06-93 | $41,650.04 | Wire transfer from F&H, Account #9379131371, Fleet Bank, NY, NY | Consolidated Asset Recovery Corporation, Bridgeport, CT |
| Twenty-Three | 12-10-93 | $365,682.34 | Wire transfer from F&H, Account #9379131371, Fleet Bank, NY, NY | Consolidated Asset Recovery Corporation, Bridgeport, CT |

| Count | Date | Amount | From | To |
|-------|------|--------|------|-----|
| Twenty-Four | 12-10-93 | $950,000 | Wire transfer from F&H, Account #9379131371, Fleet Bank, NY, NY | First Fidelity Bank, Newark, NJ |
| Twenty-Five | 12-15-93 | $2,746,226 | Wire transfer from F&H, Account #9379131371, Fleet Bank, NY, NY | FDIC Chicago, IL |
| Twenty-Six | 12-15-93 | $1,567,239.57 | Wire transfer from F&H, Account #9379131371, Fleet Bank, NY, NY | FDIC Chicago, IL |
| Twenty-Seven | 12-21-93 | $226,382.29 | Wire transfer from F&H, Account #313753916, Sterling Bank, NY, NY | FDIC Chicago, IL |
| Twenty-Eight | 12-21-93 | $415,481.76 | Wire transfer from F&H, Account # 9379131371, Fleet Bank, NY, NY | Consolidated Asset Recovery Corporation, Bridgeport, CT |
| Twenty-Nine | 12-31-93 | $1,000,000 | Wire transfer from F&H, Account # 9379131371, Fleet Bank, NY, NY | QE Financial, Inc. Cary, IL |
| Thirty | 01-20-94 | $537,931.24 | Wire transfer from F&H, Account #9379131371, Fleet Bank, NY, NY | FDIC Chicago, IL |
| Thirty-One | 01-25-94 | $4,700,000 | Wire transfer from F&H, Account #9379131371, Fleet Bank, NY, NY | Northcorp Realty Advisors Dallas, TX |

All in violation of Title 18, United States Code, Sections 2314 and 2.

## COUNTS THIRTY-TWO THROUGH THIRTY-FOUR
### (The Future Medical Stock/Solar Note Fraud)

348.   Paragraphs 1 through 81, and 122 through 146 set forth above are hereby

realleged and incorporated by reference as if set forth in full herein.

349.   On or about the dates specified below, in Orange County, Florida, in the

Middle District of Florida, and elsewhere,

135

**SHOLAM WEISS**
**JAN R. SCHNEIDERMAN**
**ADOS EQUITIES, INC.**
and
**SPRITE EQUITIES, INC.**

the defendants herein, having devised the above-described scheme and artifice to defraud, and for the purpose of executing and attempting to execute the scheme and artifice to defraud, and for the purpose of obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did knowingly transmit, and cause others to transmit, by means of wire communications in interstate commerce, certain signals, that is wire transfers of funds and telefax communications, as described below:

| Count | Date | Wire | From | To |
|-------|------|------|------|-----|
| Thirty-Two | 06-04-93 | Wire Transfer $5,000,000 | NHLIC, Barnett Bank Account #2832940187, Orlando, FL | Prudential Securities, Morgan Guarantee Trust Account #722-00011, NY, NY |
| Thirty-Three | 07-08-93 | Wire Transfer $3,000,000 | NHLIC, Barnett Bank Account #42-Q662001, Orlando, FL | Richard B. Herman, Marine Midland Bank Account #480152748, NY, NY |
| Thirty-Four | 12-30-93 | Memorandum re: transfer of Future Medical stock to Blutrich, et al. | Blutrich NY, NY | NHLIC Orlando, FL |

All in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

## COUNTS THIRTY-FIVE AND THIRTY-SIX
**(The LifeCo Class E Preferred Stock (Capital Assets) Fraud and Theft)**

350.   Paragraphs 1 through 81, 83 through 100, and 147 through 187 set forth above are hereby realleged and incorporated by reference as if set forth in full herein.

351. On or about the dates set forth below, with regard to a scheme and artifice to defraud which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere,

**SHOLAM WEISS
KEITH POUND
JAN R. SCHNEIDERMAN
and
SOUTH STAR MANAGEMENT, INC.**

the defendants herein, having devised the above-described scheme and artifice to defraud, and for the purpose of executing and attempting to execute the scheme and artifice to defraud, and for the purpose of obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did knowingly transmit, and cause others to transmit, by means of wire communication in interstate commerce, the writings, signs, and signals described below:

| Count | Date | Wire Transmittal | From | To |
|---|---|---|---|---|
| Thirty-Five | 09-19-93 | Telefax Letter | Pfeffer, NY, NY | Kenton, Wilmington, DE |
| Thirty-Six | 12-01-93 | $2,231,098.20 | NHLIC Account #42-Q662019, Barnett Bank, Orlando, FL | Venture Mortgage Account #37611278, Citibank, NY, NY |

All in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

## COUNTS THIRTY-SEVEN THROUGH THIRTY-NINE
### (Interstate Transportation of Stolen Goods (the Class E Dividends))

352. Paragraphs 1 through 81, 83 through 100, and 147 through 189 set forth above are hereby realleged and incorporated by reference as if set forth in full herein.

137

353.    From February 11, 1994 through March 23, 1994, LifeCo paid dividends to

Future Diversified on the LifeCo Class E Stock by issuing the checks described below,

such funds being stolen, converted, and taken by fraud pursuant to **The LifeCo Preferred**

**Class E Stock (Capital Assets) Fraud and Theft** described above.

354.    On or about the dates listed below, in Orange County, Florida, in the Middle

District of Florida, and elsewhere,

**SHOLAM WEISS**
**KEITH POUND**
**JAN R. SCHNEIDERMAN**
**and**
**SOUTH STAR MANAGEMENT, INC.**

the defendants herein, knowingly and intentionally caused money of the value of $5,000

or more to be unlawfully transported, transmitted, and transferred in interstate commerce,

that is, the dividend checks described below, drawn upon the LifeCo Investment Group,

Inc. checking accounts at Barnett Bank of Central Florida, N.A., Orlando, Florida below to

be sent from the offices of LifeCo Investment Group, Inc., Maitland and Orlando, Florida,

to the offices of Future Diversified Projects, Inc., New York, New York, knowing said money

was stolen, converted, and taken by fraud:

| Count | Date | Dividend Paid |
|---|---|---|
| Thirty-Seven | 02-11-94 | $139,563.06 |
| Thirty-Eight | 02-17-94 | $126,056.96 |
| Thirty-Nine | 03-23-94 | $139,563.06 |

All in violation of Title 18, United States Code, Sections 2314 and 2.

138

## COUNT FORTY
### (The LifeCo Class E Stock (Capital Assets) Fraud Facilitation I)

355. Paragraphs 1 through 81, 83 through 100, and 147 through 190 set forth above are hereby realleged and incorporated by reference as if set forth in full herein.

356. On or about the dates set forth below, with regard to the proceeds of specified unlawful activity which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere, and as a part of money laundering activity which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere,

**SHOLAM WEISS**
**JAN R. SCHNEIDERMAN**
**and**
**SOUTH STAR MANAGEMENT, INC.**

the defendants herein, knowing that the *Attorney Escrow (South Star) Fraud Proceeds* were the proceeds of unlawful activity, the *Attorney Escrow (South Star) Fraud Proceeds* in fact constituting proceeds of violations of Title 18, United States Code, Section 1343 (wire fraud), and with the intent to promote the carrying on of **The LifeCo Class E Stock (Capital Assets) Fraud and Theft**, and further, to knowingly conceal and disguise the nature, location, source, and ownership of the *Attorney Escrow (South Star) Fraud Proceeds*, did knowingly and intentionally transfer, and did cause others to transfer, $3,100,000 of *Attorney Escrow (South Star) Fraud Proceeds* to United Jersey Bank for Jasper to acquire the *Center Mall Mortgage*.

All in violation of Title 18, United States Code, Sections 1956(a)(1)(A) and 1956(a)(1)(B).

## COUNTS FORTY-ONE THROUGH FORTY-NINE
### (The LifeCo Class E Stock (Capital Assets) Fraud Facilitation II)

357.   Paragraphs 1 through 81, 83 through 100, and 147 through 191 set forth above are hereby realleged and incorporated by reference as if set forth in full herein.

358.   On or about the dates set forth below, with regard to the proceeds of specified unlawful activity which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere, and as a part of money laundering activity which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere,

**SHOLAM WEISS**
**and**
**SOUTH STAR MANAGEMENT, INC.**

the defendant herein, knowing that the proceeds described below were the proceeds of unlawful activity, the proceeds described below in fact constituting proceeds of violations of Title 18, United States Code, Section 1343 (wire fraud), and with the intent to promote the carrying on of **The LifeCo Class E Stock (Capital Assets) Fraud and Theft**, and further, to knowingly conceal and disguise the nature, location, source, and ownership of *Attorney Escrow (South Star) Fraud Proceeds*, did knowingly and intentionally cause F&H to issue and deliver the checks described below, each check resulting in the transfer of *Attorney Escrow (South Star) Fraud Proceeds* for the purpose described below:

| Count | Date | Financial Transaction | Purpose |
|-------|------|----------------------|---------|
| Forty-One | 09-14-93 | $495,000 F&H check #1331 Citibank Account #01567121 to Goldstick, Weinberger | Acquire Eklam Capital Mortgage |

140

| Count | Date | Financial Transaction | Purpose |
|---|---|---|---|
| Forty-Two | 10-22-93 | $108,065 F&H check #1365 Citibank Account #01567121 to Jaspa Specialties | Acquire GVI/Jaspa Debt |
| Forty-Three | 10-22-93 | $479,138.98 F&H check #1373 Citibank Account #01567121 to Chemical Bank | Acquire GVI Bond Debt |
| Forty-Four | 11-03-93 | $844,000 F&H check #1378 Citibank Account #01567121 to Natwest Bank | Acquire Y&G Capital Mortgage |
| Forty-Five | 11-10-93 | $100,300 F&H check #5228 Citibank Account #01567164 to Regal Abstract | Pay off liens |
| Forty-Six | 11-10-93 | $215,130.60 F&H check #5233 Citibank Account #01567164 to NIA Title Agency | Pay off liens |
| Forty-Seven | 11-12-93 | $140,141.43 F&H check #5227 Citibank Account #01567164 to Regal Abstract | Pay off liens |
| Forty-Eight | 11-16-93 | $700,000 F&H check #2366 Citibank Account #01567164 to Isaac Nussen | Acquire Center Mall Property |
| Forty-Nine | 11-16-93 | $700,000 F&H check #2367 Citibank Account #01567164 to George Weisz | Acquire Center Mall Property |

All in violation of Title 18, United States Code, Sections 1956(a)(1)(A) and 1956(a)(1)(B).

## COUNTS FIFTY THROUGH FIFTY-SIX
### (The PACS Fraud and Theft)

359. Paragraphs 1 through 81, 83 through 100, and 192 through 215 set forth above are hereby realleged and incorporated by reference as if set forth in full herein.

360. On or about the dates set forth below, with regard to a scheme and artifice to defraud which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere,

141

## KEITH POUND

the defendant herein, having devised the above-described scheme and artifice to defraud, and for the purpose of executing and attempting to execute the scheme and artifice to defraud, and for the purpose of obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did knowingly transmit, and cause others to transmit, by means of wire communication in interstate commerce, the funds described below:

| Count | Date | Wire Transmittal | From | To |
|-------|------|------------------|------|-----|
| Fifty | 12-16-93 | $7,000,000 | Plato Account #06710107, Westcap Securities, Houston, TX | LifeCo Mtg. Services Account #202-0135, Gruntal Co., NY, NY |
| Fifty-One | 01-14-94 | $76,694,564.25 | NHLIC Gruntal Account, NY, NY | Plato Escrow Account, Westcap Securities, Houston, TX |
| Fifty-Two | 01-18-94 | $36,452,870.99 | Plato Account #06706410, Westcap Securities, Houston, TX | QE Woodstock Account, Woodstock, IL |
| Fifty-Three | 01-19-94 | $8,468,496.75 | NHLIC Account #063009608, Barnett Bank, Orlando, FL | F&H Account #9379-131371, Fleet Bank, NY, NY |
| Fifty-Four | 02-01-94 | $2,546,963.02 | NHLIC Account #42-Q662001, Barnett Bank, Orlando, FL | Commonwealth Account #10-18-288, Norwest Bank, Minneapolis, MN |
| Fifty-Five | 02-10-94 | $2,631,004.62 | NHLIC Account #42-Q662001, Barnett Bank, Orlando, FL | Commonwealth Account #10-18-288, Norwest Bank, Minneapolis, MN |
| Fifty-Six | 02-23-94 | $3,000,000 | NHLIC Account #42-0662001, Barnett Bank, Orlando, FL | Commonwealth Account #10-18-288, Norwest Bank, Minneapolis, MN |

All in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

## COUNTS FIFTY-SEVEN THROUGH FIFTY-NINE
### (The PACS Fraud Facilitation)

361.   Paragraphs 1 through 81, 83 through 100, and 192 through 216 set forth above are hereby realleged and incorporated by reference as if set forth in full herein.

362.   On or about the dates set forth below, with regard to the proceeds of specified unlawful activity which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere, and as a part of money laundering activity which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere,

### KEITH POUND

the defendant herein, knowing that the proceeds described below were the proceeds of unlawful activity, the proceeds described below in fact constituting proceeds of violations of Title 18, United States Code, Section 1343 (wire fraud), and with the intent to promote the carrying on of The PACS Fraud and Theft, and further, to knowingly conceal and disguise the nature, location, source, and ownership of the *PACS Fraud Proceeds*, did knowingly and intentionally conduct, and caused others to conduct the financial transactions described below:

| Count | Date | Financial Transaction |
|-------|------|----------------------|
| Fifty-Seven | 01-21-94 | $36,402,870.99 wire transfer from QE Woodstock Account to QE Account #363894381 at Federated Investors, Boston, MA ("the *QE Boston Account*") |
| Fifty-Eight | 02-01-94 | $36,402,870.99 wire transfer from QE Boston Account to QE Woodstock Account |

| Count | Date | Financial Transaction |
|-------|------|----------------------|
| Fifty-Nine | 02-01-94 | $35,552,870.99 wire transfer from QE Woodstock Account to Commonwealth |

All in violation of Title 18, United States Code, Sections 1956(a)(1)(A) and 1956(a)(1)(B).

## COUNT SIXTY
### (The QE Fraud and Theft)

363.   Paragraphs 1 through 81, 83 through 100, 192 through 215, and 217 through 221 are hereby realleged and incorporated by reference as if set forth in full herein.

364.   On or about May 4, 1994, with regard to a scheme and artifice to defraud which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere,

**NADINE ALLEN
ROBERT GORSKI
and
APX MORTGAGE SERVICES, INC.**

the defendants herein, having devised the above-described scheme and artifice to defraud, and for the purpose of executing and attempting to execute the scheme and artifice to defraud, and for the purpose of obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did knowingly transmit, and cause others to transmit, by means of wire communication in interstate commerce, $602,722 from the *QE Cary Account,* Cary, Illinois to American Mortgage Investment Co., Account #3008757, First Fidelity Bank, N.A., Oklahoma City, Oklahoma.

144

All in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

## COUNT SIXTY- ONE
### (Money Laundering: The Attorney Escrow (South Star) Fraud and Theft)

365.    Paragraphs 1 through 81, 83 through 100, and 217 through 222 set forth above are hereby realleged and incorporated by reference as if set forth in full herein.

366.    On or about April 7, 1994, with regard to the proceeds of specified unlawful activity which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere, and as a part of money laundering activity which was continued and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere,

### KEITH POUND

the defendant herein, knowingly engaged in a monetary transaction in criminally derived property, specifically proceeds of **The Attorney Escrow (South Star) Fraud and Theft**, such property derived from unlawful activity specified in Title 18, United States Code, Section 1343 (wire fraud), in that the defendant did cause the transfer of funds of a value greater than $10,000 by, through, and to financial institutions then engaged in interstate commerce, specifically, the defendant caused QE Financial to wire transfer $540,000 from the *QE Cary Account,* Cary, Illinois to a Smythe account in the name Lonestar Investment Corp., Tyndall Bank International Ltd., Isle of Man.

All in violation of Title 18, United States Code, Sections 1957 and 2.

## COUNT SIXTY-TWO
### (The LifeCo Mortgage Commission Fraud)

367. Paragraphs 1 through 81, 83 through 100, and 223 through 229 set forth above are hereby realleged and incorporated by reference as if set forth in full herein.

368. On or about November 4, 1993, with regard to a scheme and artifice to defraud which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere,

### KEITH POUND

the defendant herein, having devised the above-described scheme and artifice to defraud, and for the purpose of executing and attempting to execute the scheme and artifice to defraud, and for the purpose of obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did knowingly transmit, and cause others to transmit, by means of wire communication in interstate commerce, writings, signs, and signals, specifically the transfer of $2,000,000 from F&H Account #01567121 at Citibank, New York, New York, to the LifeCo Mortgage account at Barnett Bank, Orlando, Florida.

All in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

## COUNT SIXTY-THREE
### (The LifeCo Mortgage Commission Fraud Facilitation and Concealment)

369. Paragraphs 1 through 81, 83 through 100, and 223 through 230 set forth above are hereby realleged and incorporated by reference as if set forth in full herein.

370. On or about November 4, 1993, with regard to the proceeds of specified unlawful activity which was begun, continued, and completed in Orange County, Florida,

in the Middle District of Florida, and elsewhere, and as a part of money laundering activity which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere,

**KEITH POUND**

the defendant herein, knowing that the *Attorney Escrow (South Star) Fraud Proceeds* were the proceeds of unlawful activity, the *Attorney Escrow (South Star) Fraud Proceeds* in fact constituting proceeds of violations of Title 18, United States Code, Section 1343 (wire fraud), and with the intent to promote the carrying on of **The LifeCo Class E Preferred Stock (Capital Assets) Fraud and Theft**, and further, to knowingly conceal and disguise the nature, location, source, and ownership of the *Attorney Escrow (South Star) Fraud Proceeds*, did knowingly and intentionally cause F&H to wire transfer $2,000,000 of *Attorney Escrow (South Star) Fraud Proceeds* to LifeCo Mortgage.

All in violation of Title 18, United States Code, Sections 1956(a)(1)(A) and 1956(a)(1)(B).

**COUNTS SIXTY-FOUR THROUGH SEVENTY-ONE**
**(The National Housing Exchange Bond Fraud Facilitation and Concealment)**

371.    Paragraphs 1 through 81, 83 through 100, and 231 through 276 set forth above are hereby realleged and incorporated by reference as if set forth in full herein.

372.    On or about the dates set forth below, with regard to the proceeds of specified unlawful activity which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere, and as a part of money laundering

147

activity which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere,

**SHOLAM WEISS**
**KEITH POUND**
**JAN R. SCHNEIDERMAN**
**and**
**SOUTH STAR MANAGEMENT, INC.**

the defendants herein, knowing that the *Attorney Escrow (South Star) Fraud Proceeds* were the proceeds of unlawful activity, the *Attorney Escrow (South Star) Fraud Proceeds* in fact constituting proceeds of violations of Title 18, United States Code, Section 1343 (wire fraud), and with the intent to promote the carrying on of **The National Housing Exchange Bond Fraud and Theft**, and further, to knowingly conceal and disguise the nature, location, source, and ownership of the *Attorney Escrow (South Star) Fraud Proceeds*, did knowingly and intentionally conduct, and did cause others to conduct, the financial transactions described below, as follows:

| Count | Date | Financial Transaction | From | To |
|---|---|---|---|---|
| Sixty-Four | 12-16-93 | Wire Transfer $2,746,226 | F&H Account #9379-131371, Fleet Bank | FDIC (for FDIC FCO-93-6JB20 & 21) |
| Sixty-Five | 09-01-93 | Wire Transfer $34,623,000 | Schneiderman, Morgan Guaranty Account #251-04-545 | RTC (for RTC 76622-24-266 & 25-563) |
| Sixty-Six | 08-23-93 | Wire Transfer $1,021,235 | Schneiderman, Account #001-58-206, Morgan Guaranty | CARC (for CARC 93-10-31 & 38B & 38D) |
| Sixty-Seven | 12-21-93 | Wire Transfer $415,481.76 | F&H Account #9379-131371, Fleet Bank | CARC (for CARC 93-06 & 07) |
| Sixty-Eight | 12-15-93 | Wire Transfer $1,567,239.57 | F&H Account #9379-131371, Fleet Bank | FDIC (for FDIC FCO-93-6AM03) |

| Count | Date | Financial Transaction | From | To |
|-------|------|----------------------|------|-----|
| Sixty-Nine | 12-27-93 | Cashiers Check $3,600,000 | F&H Account #9379-131371, Fleet Bank | First Nationwide Bank (for First Natwide) |
| Seventy | 12-27-93 | Wire Transfer $2,035,207.62 | F&H Account #9379-131371, Fleet Bank | FDIC (for FDIC FCO-93-6BM16) |
| Seventy-One | 01-03-94 | Wire Transfer $7,573,425.50 | F&H Account #01567164, Citibank | Yasuda Trust and Banking (Yasuda) |

All in violation of Title 18, United States Code, Sections 1956(a)(1)(A) and 1956(a)(1)(B).

### COUNTS SEVENTY-TWO THROUGH SEVENTY-FIVE
### (The National Housing Exchange Bond Fraud and Theft)

373.    Paragraphs 1 through 81, 83 through 100, and 231 through 276 set forth above are hereby realleged and incorporated by reference as if set forth in full herein.

374.    On or about the dates set forth below, with regard to a scheme and artifice to defraud which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere,

**SHOLAM WEISS**
**KEITH POUND**
**JAN R. SCHNEIDERMAN**
**YAAKOV STARK**
**a/k/a Jan Starr**
**RICHARD B. HERMAN**
**d/b/a Law Offices of Richard B. Herman**
**d/b/a Blutrich, Herman & Miller**
**RICHARD LANGER**
**SOUTH STAR MANAGEMENT, INC.**
**and**
**NATIONAL HOUSING EXCHANGE, INC.**

the defendants herein, having devised the above-described scheme and artifice to defraud, and for the purpose of executing and attempting to execute the scheme and artifice to defraud, and for the purpose of obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did knowingly transmit, and cause others to transmit, by means of wire communication in interstate commerce, the writings, signs, and signals described below:

| Count | Date | Wire Transmittal | From | To |
|-------|------|------------------|------|-----|
| Seventy-Two | 12-28-93 | Fax Letter re: Due Diligence | NHLIC Orlando, FL | Cohen NY, NY |
| Seventy-Three | 03-11-94 | Telephone conversation re: background and status of NHE bond transaction | Delaware Commissioner Rehabilitation/ Liquidation Manager, Dover, DE | Pound Orlando, FL |
| Seventy-Four | 07-18-94 | Fax Letter re: Settlement of NHE/NHLIC dispute | Harvis & Trien (Counsel for NHE), NY, NY | Catherine Mulholland, Delaware Insurance Commissioner's Office, Dover, DE |
| Seventy-Five | 09-26-94 | Fax Letter re: Attorney Escrow | Schneiderman NY, NY | Catherine Mulholland, Delaware Insurance Commissioner's Office, Dover, DE |

All in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

## COUNTS SEVENTY-SIX THROUGH EIGHTY
### (The APX Mortgage Servicing Fraud)

375.    Paragraphs 1 through 81, 83 through 100, and 231 through 304 set forth above are hereby realleged and incorporated by reference as if set forth in full herein.

376. On or about the dates specified below, with regard to a scheme to defraud which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere,

**SHOLAM WEISS**
**KEITH POUND**
**JAN R. SCHNEIDERMAN**
**YAAKOV STARK**
**a/k/a Jan Starr**
**RICHARD LANGER**
**NADINE ALLEN**
**ROBERT GORSKI**
**NATIONAL HOUSING EXCHANGE, INC.**
**APX MORTGAGE SERVICES, INC.**
**and**
**NATIONAL WORKOUT SPECIALISTS, INC.**

the defendants herein, having devised the above-described scheme and artifice to defraud, and for the purpose of executing and attempting to execute the scheme and artifice to defraud, and for the purpose of obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did knowingly transmit, and cause others to transmit, by means of wire communications in interstate commerce, certain signals as described below:

| Count | Date | Wire Transmittal | From | To |
|---|---|---|---|---|
| Seventy-Six | 12-28-93 | Telefax transmission of Servicing Fee Agreement | Gorski and APX Palatine, IL | Blutrich NY, NY |
| Seventy-Seven | 02-08-94 | Telefax transmission of Pound work-out approval confirmation | F&H NY, NY | Pound Orlando, FL |
| Seventy-Eight | 06-09-94 | Telefax letter re: transfer funds to NHE | Kraft and Jacobson (attorneys for NHE), Towson, MD | Allen and APX Palatine, IL |

151

| Count | Date | Wire Transmittal | From | To |
|-------|------|------------------|------|-----|
| Seventy-Nine | 09-19-94 | Telefax letter re: Pound selection as work-out advisor | Pound and National Workout, Chicago, IL | Starr & NHE, NY, NY |
| Eighty | 10-28-94 | $500,000 | APX Account #0700130052 Suburban Bank of Cary Grove, Cary, IL | South Star Account #00160043, J.P. Morgan, NY, NY |

All in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

## COUNTS EIGHTY-ONE THROUGH EIGHTY-THREE
### (The *Debenture Mortgages Collections* Money Laundering I)

377. Paragraphs 1 through 81, 83 through 100, and 231 through 307 set forth above are hereby realleged and incorporated by reference as if set forth in full herein.

378. On or about October 27, 1994 APX transferred $500,000 of the *Debenture Mortgage Collections* to the SOUTH STAR account #00160043, J.P. Morgan, New York, New York.

379. From on or about October 26, 1994 through November 1, 1994 WEISS, POUND, SCHNEIDERMAN, SOUTH STAR, and NHE transferred and caused to be transferred the funds described above, to and for the benefit of WEISS, Blutrich and Pfeffer.

380. On or about the dates set forth below, with regard to the proceeds of specified unlawful activity which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere, and as a part of money laundering activity which was continued and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere,

152

**SHOLAM WEISS**
**KEITH POUND**
**JAN R. SCHNEIDERMAN**
**SOUTH STAR MANAGEMENT, INC.**
and
**NATIONAL HOUSING EXCHANGE, INC.**

the defendants herein, together with Blutrich and Pfeffer, knowing that the proceeds

described below represented the proceeds of some form of unlawful activity, did knowingly

conduct and caused to be conducted the financial transactions in the proceeds described

below, each of which was conducted by, through, and to financial institutions then engaged

in interstate commerce, knowing that the financial transactions were designed in whole or

in part to disguise the nature, location, source, ownership and control of those proceeds,

the proceeds described below in fact having been derived from unlawful activity specified

in Title 18, United States Code, Section 1343 (wire fraud), specifically **The APX Mortgage**

**Servicing Fraud** described above, as follows:

| Count | Date | Proceeds | Monetary Transaction |
|-------|------|----------|----------------------|
| Eighty-One | 10-28-94 | $75,000 | Check #129 Schneiderman Account #00138538 at J.P. Morgan to National Mortgage |
| Eighty-Two | 10-28-94 | $50,000 | Check #130 Schneiderman Account #00138538 at J.P. Morgan to Michael D. Blutrich |
| Eighty-Three | 11-01-94 | $300,000 | J.P. Morgan cashiers check payable to Moshe Mishal and Norman Langer as Attorney |

All in violation of Title 18, United States Code, Sections 1957 and 2.

## COUNTS EIGHTY-FOUR AND EIGHTY-FIVE
### (The *Debenture Mortgages Collections* Money Laundering II)

381.   Paragraphs 1 through 81, 83 through 100, and 231 through 310 set forth above are hereby realleged and incorporated by reference as if set forth in full herein.

382.   On or about July 19, 1994, APX transferred $175,000 of the *Debenture Mortgage Collections* to NHE account number 001-58-646 at Morgan Guaranty Bank, New York, New York.

383.   On or about July 27, 1994, WEISS, POUND, SCHNEIDERMAN, STARR, SOUTH STAR and NHE transferred and caused to be transferred the funds described above to and for the benefit of WEISS, STARR, and others.

384.   On or about the dates set forth below, with regard to the proceeds of specified unlawful activity which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere, and as a part of money laundering activity which was continued and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere,

**SHOLAM WEISS
KEITH POUND
JAN R. SCHNEIDERMAN
YAAKOV STARK
a/k/a Jan Starr
SOUTH STAR MANAGEMENT, INC.
and
NATIONAL HOUSING EXCHANGE**

the defendants herein, knowingly engaged in the monetary transactions in criminally derived property, specifically proceeds of **The APX Mortgage Servicing Fraud** described above, such property derived from unlawful activity in violation of Title 18, United States

Code, Section 1343 (wire fraud), in that the defendant did cause the transfer of funds of a value greater than $10,000 by, through, and to financial institutions then engaged in interstate commerce:

| Count | Date | Proceeds | Monetary Transaction |
|-------|------|----------|---------------------|
| Eighty-Four | 07-27-94 | $125,000 | Wire transfer from NHE Account #001-58-646 at Morgan Guaranty Bank, NY, NY to South Star Account #001-60-043 at Morgan Guaranty Bank, NY, NY |
| Eighty-Five | 07-27-94 | $125,000 | Check #341 from South Star Account #001-60-043 at Morgan Guaranty Bank, NY, NY to Jarnow Corp. |

All in violation of Title 18, United States Code, Section 1957 and 2.

## COUNTS EIGHTY-SIX THROUGH NINETY
### (The RAM Mortgage Servicing Fraud)

385.   Paragraphs 1 through 81, 83 through 100, and 231 through 332 set forth above are hereby realleged and incorporated by reference as if set forth in full herein.

386.   On or about the dates specified below, with regard to a scheme and artifice to defraud which was begun, continued, and completed in Orange County, Florida, in the Middle District of Florida, and elsewhere,

**SHOLAM WEISS**
**KEITH POUND**
**YAAKOV STARK**
**a/k/a Jan Starr**
**NATIONAL HOUSING EXCHANGE, INC.**
**RESOURCE ASSET MANAGEMENT, INC.**
**and**
**NATIONAL WORKOUT SPECIALISTS, INC.**

the defendants herein, having devised the above-described scheme and artifice to defraud, and for the purpose of executing and attempting to execute the scheme and

artifice to defraud, and for the purpose of obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did knowingly transmit, and cause others to transmit, by means of wire communications in interstate commerce, certain signals as described below:

| Count | Date | Wire Transmittal | From | To |
|-------|------|------------------|------|-----|
| Eighty-Six | 11-07-94 | Letter re: NHE transfer of servicing rights | Starr from APX, Palatine, IL | MIB Jefferson City, MO |
| Eighty-Seven | 11-10-94 | Letter re: transfer of servicing rights | APX Palatine, IL | Counsel to MIB, Jefferson City, MO |
| Eighty-Eight | 12-21-94 | Fax letter re: APX/RAM/MIB documents | RAM on APX letterhead, Palatine, IL | MIB Jefferson City, MO |
| Eighty-Nine | 09-20-95 | Fax letter re: ability to pay National Workout | Starr Miami, FL | RAM Palatine, IL |
| Ninety | 09-29-95 | Fax letter re: RAM can make payments from before 12/28 interest | Starr Miami, FL | RAM Palatine, IL |

All in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

## COUNT NINETY-ONE
### False Statement

387. Paragraphs 1 through 332 set forth above are hereby realleged and incorporated by reference as if set forth in full herein.

388. In or about March 1994, a criminal investigation of matters related to NHLIC was opened in the offices of the Federal Bureau of Investigation, the Criminal Investigation Division of the Internal Revenue Service, the United States Postal Inspection Service, and the United States Attorney's Office for the Middle District of Florida; this matter was within

the jurisdiction of the legislative branch of the United States (hereinafter "the Federal Investigation").

389. On or about January 10, 1995, WEISS approached criminal investigators of the Federal Bureau of Investigation, the Criminal Investigation Division of the Internal Revenue Service, and the United States Postal Inspection Service (collectively "the Investigators), and offered to assist them in the Federal Investigation by providing oral statements and pertinent records.

390. In or about the summer of 1995, the exact date unknown, in Orlando, Orange County, Florida, in the Middle District of Florida,

## SHOLAM WEISS

the defendant herein, in a matter within the jurisdiction of the executive branch of the government of the United States, knowingly and willfully falsified material facts, made materially false, fictitious, and fraudulent statements and representations, and made and used false writings and documents, knowing the same to contain materially false, fictitious, and fraudulent statements and entries, in that in or about the summer of 1995, WEISS delivered and caused to be delivered to the Investigators three false, fraudulent and manufactured documents, two of which purported to be copies of agreements between SOUTH STAR and NHLIC, and the third purporting to be a draft of one of the agreements.

All in violation of Title 18, United States Code, Sections 1001 and 2.

157

## COUNT NINETY-TWO
### (False Statement)

391.   Paragraphs 1 through 332 set forth above are hereby realleged and incorporated by reference as if set forth in full herein.

392.   In or about March 1994, a criminal investigation of matters related to NHLIC was opened in the offices of the Federal Bureau of Investigation, the Criminal Investigation Division of the Internal Revenue Service, the United States Postal Inspection Service, and the United States Attorney's Office for the Middle District of Florida; this matter was within the jurisdiction of the legislative branch of the United States (hereinafter "the Federal Investigation").

393.   On or about August 3, 1995, in Orlando, Orange County, Florida, in the Middle District of Florida,

### SHOLAM WEISS

the defendant herein, in a matter within the jurisdiction of the executive branch of the government of the United States, knowingly and willfully falsified material facts, made materially false, fictitious and fraudulent statements and representations, and made and used false writings and documents knowing the same to contain materially false, fictitious and fraudulent statements and entries, to wit, on or about August 3, 1995, WEISS caused his attorney to deliver to the Investigators a false, fraudulent and manufactured document which purported to be a memorandum from Pfeffer to WEISS' attorney related to the NHLIC loan to Solar, and also caused his attorney to play tape recordings to one of the Investigators which purported to be true and accurate conversations between WEISS,

Blutrich, and Pfeffer, whereas, in truth, the tape recordings had been manufactured for the purpose of deceiving the Investigators, and with the intent to hamper and misdirect the investigation.

All in violation of Title 18, United States Code, Sections 1001 and 2.

## COUNT NINETY-THREE
### (Obstruction of Justice)

394.  Paragraphs 1 through 332 set forth above are hereby realleged and incorporated by reference as if set forth in full herein.

395.  On or about October 30, 1995, a federal grand jury sitting in Orlando, Orange County, Florida, in the Middle District of Florida, issued subpoenas requiring WEISS, as a document custodian of SOUTH STAR and NHE, to surrender certain records of those corporations; the grand jury investigation was transferred to another grand jury in or about April 1996.

396.  From on or about February 16, 1996, and continuing until on or about January 21, 1998, in Orlando, Orange County, Florida, in the Middle District of Florida,

### SHOLAM WEISS

the defendant herein, corruptly endeavored to influence, obstruct, and impede the due administration of justice, in that: a) WEISS caused his attorney to deliver to agents of the grand jury three false, fraudulent and manufactured documents, two of which purported to be copies of agreements between SOUTH STAR and NHLIC, and the third purporting to be a draft of one of the agreements, as records which were responsive to the subpoenas; b) on or about January 21, 1998, WEISS appeared before the grand jury and

under oath acknowledged that he caused his attorney to submit the documents described

in paragraph 394 above to the grand jury; and c) on or about January 21, 1998 WEISS

testified under oath as follows:

Q: I'm going to show you first a subpoena that is directed to Shalom Weiss with the attachment referencing as agent of National Housing Exchange and as agent for Southstar Management Company, Inc.

  Was that the subpoena served on you through your attorney, Mr. Weiss?

A: Yes.

Q: All right. I'm going to show you three documents that have been previously marked before this Grand Jury as Weiss 2, Weiss 3, and Weiss 4. Now, each of those documents is a different version of an Asset Sale Agreement.

  Did you produce those three documents through your agent to this Grand Jury, pursuant to the subpoena we just discussed?

A: Yes; to my attorney.

Q: All right. And did you produce these three documents to the Grand Jury in a representative capacity with regard to Southstar?

A: I would like to clarify that, please.

Q: All right.

  (Whereupon, the witness was excused to confer with his attorney, from 11:34 to 11:37 a.m.)

Foreperson: You're still under oath, Mr. Weiss.

By Ms. Hunt:

Q:      Mr. Weiss, I believe the question was: did you produce those records to this Grand Jury through your agent in a representative capacity on behalf of Southstar?

A:      Yes.

Q:      All right.  So those are the records of Southstar Management Company, Inc.?

A:      I don't know.

Q:      All right.  And are those -- were those records kept in the ordinary business of Southstar Management Company, Inc.?

A:      I don't know.

whereas, in truth and in fact, WEISS then and there well knew that the documents were not business records of SOUTH STAR, but were records he falsely and fraudulently manufactured for the  purpose of influencing, impeding, and obstructing the due administration of justice.

All in violation of Title 18, United States Code, Sections 1503 and 2.

## FORFEITURE PURSUANT TO 18 U.S.C. § 1963

1.      The allegations contained in Counts One and Two of the Indictment are hereby repeated, realleged and incorporated by reference herein as though fully set forth at length for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 1963.

2.      The defendants,

SHOLAM WEISS
KEITH POUND
JAN R. SCHNEIDERMAN
YAAKOV STARK
a/k/a Jan Starr

161

**RICHARD B. HERMAN**
**d/b/a Law Offices of Richard B. Herman**
**d/b/a Blutrich, Herman & Miller**
**ISACK ROSENBERG**
**NADINE ALLEN**
**and**
**ROBERT GORSKI**

i.       have acquired and maintained interests in violation of Title 18, United States Code, Section 1962, which interests are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1);

ii.       have an interest in, security of, claim against, and property and contractual rights which afford a source of influence over, the enterprise named and described herein which the defendants established, operated, controlled, conducted and participated in the conduct of, in violation of Title 18, United States Code, Section 1962, which interests, securities, claims, and rights are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(2); and

iii.       have property constituting and derived from proceeds obtained directly and indirectly from the aforesaid racketeering activity, in violation of Title 18, United States Code, Section 1962, which property is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(3).

3.       The interests of the defendants subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1), (a)(2), and (a)(3), include, but are not limited to at least two hundred fifty million dollars ($250,000,000) and all interest and proceeds traceable thereto.

4.     If any of the property described above, as a result of the act or omission of

any defendant

        (a)     cannot be located upon the exercise of due diligence;

        (b)     has been transferred to or sold to, or deposited with, a third party;

        (c)     has been placed beyond the jurisdiction of the court;

        (d)     has been substantially diminished in value; or

        (e)     has been commingled with other property which cannot be divided

            without difficulty;

the court shall order the forfeiture of any other property of the defendant up to the value

of any property described in paragraphs (a) through (e).

5.     The above named defendants, and each of them, are jointly and severally

liable for the forfeiture obligations as alleged above.

All pursuant to Title 18, United States Code, Section 1963.

### FORFEITURE PURSUANT TO 18 U.S.C. § 982

1.     The allegations contained in Counts Forty through Forty-Nine, Fifty-Seven

through Fifty-Nine, Sixty-One, Sixty-Three through Seventy-One, and Eighty-One through

Eighty-Five of the Indictment are hereby realleged and incorporated by reference for the

purpose of alleging forfeitures pursuant to the provisions of Title 18, United States Code,

Section 982.

2.     The defendants,

163

SHOLAM WEISS[1]
KEITH POUND[2]
JAN R. SCHNEIDERMAN[3]
YAAKOV STARK
a/k/a Jan Starr[4]
SOUTH STAR MANAGEMENT, INC.[5]
and
NATIONAL HOUSING EXCHANGE[6]

shall forfeit to the United States of America, pursuant to Title 18, United States Code,

Section 982(a)(1), any and all right, title, and interest in any property, real or personal,

involved in a violation of Title 18, United States Code, Sections 1956 and 1957 alleged in

Counts Forty through Forty-Nine, Fifty-Seven through Fifty-Nine, Sixty-One, Sixty-Three

through Seventy-One, and Eighty-One through Eighty-Five of the Indictment, and any

property traceable to such property.

     3.    If any of the property described above, as a result of any act or omission of

the defendants:

         (a)    cannot be located upon the exercise of due diligence;

---

[1] Counts Forty through Forty-Nine, Sixty-Four through Seventy-One, and Eighty-One through Eighty-Five.

[2] Counts Fifty-Seven through Fifty-Nine, Sixty-One, Sixty-Three through Seventy-One, and Eighty One through Eighty-Five.

[3] Counts Forty, Sixty-Four through Seventy-One, and Eighty-One through Eighty-Five.

[4] Counts Eighty-Four and Eighty-Five.

[5] Counts Forty through Forty-Nine, Sixty-Four through Seventy-One, and Eighty-One through Eighty-Five.

[6] Counts Eighty-One through Eighty-Five.

164

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided

without difficulty;

the United States of America shall be entitled to forfeiture of substitute property under the

provisions of Title 21, United States Code, Section 853(p), as incorporated by Title 18,

United States Code, Section 982(b)(1)(A).

A TRUE BILL,

_____
Foreman

CHARLES R. WILSON
UNITED STATES ATTORNEY

By: _____
Judy K. Hunt
Assistant United States Attorney
Senior Litigation Counsel

By _____
Rick L. Jancha
Managing Assistant United States Attorney

# APPENDIX I

| RACKETEERING ACT | VIOLATION | DEFENDANTS | PAGE |
|---|---|---|---|
| A. Racketeering Acts 1 - 8<br>The Attorney Escrow (South Star)<br>Cash Fraud and Theft | 18 USC 1343<br>18 USC 1346 | Weiss<br>Pound<br>Schneiderman | 23 |
| B. Racketeering Acts 9 - 26<br>Interstate Transportation of Stolen<br>Funds (South Star Fraud Proceeds) | 18 USC 2314 | Weiss<br>Pound<br>Schneiderman | 31 |
| C. Racketeering Act 27<br>The Certified Lumber Bankruptcy<br>Fraud | 18 USC 1341 | Weiss | 34 |
| D. Racketeering Act 28<br>Money Laundering: The Certified<br>Lumber Fraud Facilitation | 18 USC 1956(a)(1)(A)<br>18 USC 1956(a)(1)(B) | Weiss | 39 |
| E. Racketeering Act 29<br>False Declarations in Certified<br>Lumber Bankruptcy | 18 USC 152 | Weiss | 39 |
| F. Racketeering Act 30<br>False Declarations in Waterfront<br>Realty Company Bankruptcy | 18 USC 152 | Weiss | 40 |
| G. Racketeering Acts 31 - 33<br>The Future Medical Stock/Solar Note<br>Fraud | 18 USC 1343<br>18 USC 1346 | Weiss (Acts 31-33)<br>Schneiderman (Acts 31-32) | 42 |
| H. Racketeering Acts 34 & 35<br>The LifeCo Class E Preferred Stock<br>(Capital Assets) Fraud and Theft | 18 USC 1343<br>18 USC 1346 | Weiss (Acts 34-35)<br>Pound (Act 35)<br>Schneiderman (Acts 34-35) | 51 |
| I. Racketeering Acts 36 - 38<br>Interstate Transportation of Stolen<br>Funds (Class E Dividend Checks) | 18 USC 2314 | Weiss | 66 |
| J. Racketeering Act 39<br>The LifeCo Class E Stock (Capital<br>Assets) Fraud Facilitation I | 18 USC 1956(a)(1)(A)<br>18 USC 1956(a)(1)(B) | Weiss<br>Schneiderman | 67 |
| K. Racketeering Acts 40 - 48<br>The LifeCo Class E Stock (Capital<br>Assets) Fraud Facilitation II | 18 USC 1956(a)(1)(A)<br>18 USC 1956(a)(1)(B) | Weiss | 68 |
| L. Racketeering Acts 49 - 55<br>The PACS Fraud and Theft | 18 USC 1343<br>18 USC 1346 | Pound | 70 |
| M. Racketeering Acts 56(A) - (C)<br>The PACS Fraud Facilitation | 18 USC 1956(a)(1)(A)<br>18 USC 1956(a)(1)(B) | Pound | 78 |
| N. Racketeering Acts 57<br>The QE Fraud and Theft | 18 USC 1343<br>18 USC 1346 | Allen<br>Gorski | 79 |

| RACKETEERING ACT | VIOLATION | DEFENDANTS | PAGE |
|---|---|---|---|
| O. Racketeering Act 58<br>Money Laundering: The Attorney Escrow (South Star) Fraud and Theft | 18 USC 1957 | Pound | 81 |
| P. Racketeering Act 59<br>59(A) - The LifeCo Mortgage Commission Fraud<br>59(B) - The LifeCo Mortgage Commission Fraud and Facilitation | 18 USC 1343, 1346<br><br>18 USC 1956(a)(1)(A)<br>18 USC 1956(a)(1)(B) | Pound | 81 |
| Q. Racketeering Acts 60 - 67<br>Money Laundering: The National Housing Exchange Bond Fraud Facilitation | 18 USC 1956(a)(1)(A)<br>18 USC 1956(a)(1)(B) | Weiss<br>Pound<br>Schneiderman | 84 |
| R. Racketeering Acts 68 & 69(A)-(C)<br>The National Housing Exchange Bond Fraud and Theft | 18 USC 1343<br>18 USC 1346 | Weiss<br>Pound<br>Schneiderman<br>Starr | 88 |
| S. Racketeering Acts 70(A)-(D) & 71<br>The APX Mortgage Servicing Fraud | 18 USC 1343<br>18 USC 1346 | Weiss<br>Pound<br>Schneiderman<br>Starr<br>Allen<br>Gorski | 101 |
| T. Racketeering Act 72(A)-(C)<br>The Debenture Mortgages Collections - Money Laundering I | 18 USC 1957 | Weiss<br>Pound<br>Schneiderman | 111 |
| U. Racketeering Acts 73(A)-(B)<br>The Debenture Mortgages Collections - Money Laundering II | 18 USC 1957 | Weiss<br>Pound<br>Schneiderman<br>Starr | 113 |
| V. Racketeering Acts 74(A)-(C) & 75(A)-(B)<br>The RAM Mortgage Servicing Fraud | 18 USC 1956(a)(1)(A)<br>18 USC 1956(a)(1)(B) | Weiss<br>Pound<br>Starr | 114 |

# APPENDIX II

| COUNT(S) | VIOLATION(S) | DEFENDANT(S) | PAGE |
|---|---|---|---|
| Count 1<br>RICO | 18 USC 1962(c) | Weiss<br>Pound<br>Schneiderman<br>Starr<br>Allen<br>Gorski | 1 |
| Count 2<br>RICO Conspiracy<br>(Racketeering Acts 76-77, 78, 79-97,<br>98(A)-(C), 99, 100(A)-(D)) | 18 USC 1962(d) | Weiss<br>Pound<br>Schneiderman<br>Starr<br>Herman<br>Rosenberg<br>Allen<br>Gorski | 122 |
| Counts 3 - 10<br>The Attorney Escrow (South Star) Cash<br>Fraud and Theft | 18 USC 1343<br>18 USC 1346 | Weiss<br>Pound<br>Schneiderman<br>South Star | 131 |
| Counts 11 - 31<br>Interstate Transportation of Stolen Funds<br>(South Star Fraud Proceeds) | 18 USC 2314 | Weiss<br>Pound<br>Schneiderman<br>South Star | 133 |
| Counts 32 - 34<br>The Future Medical Stock/Solar Note<br>Fraud | 18 USC 1343<br>18 USC 1346 | Weiss<br>Schneiderman<br>Ados<br>Sprite Equities | 135 |
| Counts 35 & 36<br>The LifeCo Class E Preferred Stock<br>(Capital Assets) Fraud and Theft | 18 USC 1343<br>18 USC 1346 | Weiss<br>Pound<br>Schneiderman<br>South Star | 136 |
| Counts 37 - 39<br>Interstate Transportation of Stolen Goods<br>(The Class E Dividends) | 18 USC 2314 | Weiss<br>Pound<br>Schneiderman<br>South Star | 137 |
| Count 40<br>The LifeCo Class E Stock (Capital Assets)<br>Fraud Facilitation I | 18 USC 1956(a)(1)(A)<br>18 USC 1956(a)(1)(B) | Weiss<br>Schneiderman<br>South Star | 139 |
| Counts 41 - 49<br>The LifeCo Class E Stock (Capital Assets)<br>Fraud Facilitation II | 18 USC 1956(a)(1)(A)<br>18 USC 1956(a)(1)(B) | Weiss<br>South Star | 140 |
| Counts 50 - 56<br>The PACS Fraud and Theft | 18 USC 1343<br>18 USC 1346 | Pound | 141 |

i

| COUNT(S) | VIOLATION(S) | DEFENDANT(S) | PAGE |
|---|---|---|---|
| Counts 57 - 59<br>The PACS Fraud Facilitation | 18 USC 1956(a)(1)(A)<br>18 USC 1956(a)(1)(B) | Pound | 143 |
| Count 60<br>The QE Fraud and Theft | 18 USC 1343<br>18 USC 1346 | Allen<br>Gorski<br>APX Mortgage | 144 |
| Count 61<br>Money Laundering: The Attorney Escrow<br>(South Star) Fraud and Theft | 18 USC 1957 | Pound | 145 |
| Count 62<br>The LifeCo Mortgage Commission Fraud | 18 USC 1343<br>18 USC 1346 | Pound | 146 |
| Count 63<br>The LifeCo Mortgage Commission Fraud<br>Facilitation and Concealment | 18 USC 1956(a)(1)(A)<br>18 USC 1956(a)(1)(B) | Pound | 146 |
| Counts 64 - 71<br>The National Housing Exchange Bond<br>Fraud Facilitation and Concealment | 18 USC 1956(a)(1)(A)<br>18 USC 1956(a)(1)(B) | Weiss<br>Pound<br>Schneiderman<br>South Star | 147 |
| Counts 72 - 75<br>The National Housing Exchange Bond<br>Fraud and Theft | 18 USC 1343<br>18 USC 1346 | Weiss<br>Pound<br>Schneiderman<br>Starr<br>Herman<br>Langer<br>South Star<br>National Housing | 149 |
| Counts 76 - 80<br>The APX Mortgage Servicing Fraud | 18 USC 1343<br>18 USC 1346 | Weiss<br>Pound<br>Schneiderman<br>Starr<br>Langer<br>Allen<br>Gorski<br>National Housing<br>APX Mortgage<br>National Workout | 150 |
| Counts 81 - 83<br>The *Debenture Mortgages Collections*<br>Money Laundering I | 18 USC 1957 | Weiss<br>Pound<br>Schneiderman<br>South Star<br>National Housing | 152 |
| Counts 84 & 85<br>The *Debenture Mortgages Collections*<br>Money Laundering II | 18 USC 1957 | Weiss<br>Pound<br>Schneiderman<br>Starr<br>South Star<br>National Housing | 154 |

| COUNT(S) | VIOLATION(S) | DEFENDANT(S) | PAGE |
|---|---|---|---|
| Counts 86 - 90<br>The RAM Mortgage Servicing Fraud | 18 USC 1343<br>18 USC 1346 | Weiss<br>Pound<br>Starr<br>National Housing<br>Resource Asset<br>National Workout | 155 |
| Count 91<br>False Statement | 18 USC 1001 | Weiss | 156 |
| Count 92<br>False Statement | 18 USC 1001 | Weiss | 158 |
| Count 93<br>Obstruction of Justice | 18 USC 1503 | Weiss | 159 |

FORM OBD-34
SEP 1978

*No.* _____

# UNITED STATES DISTRICT COURT
## Middle District of Florida
## Orlando Division

## THE UNITED STATES OF AMERICA
### vs.

SHOLAM WEISS, KEITH POUND, JAN R. SCHNEIDERMAN, YAAKOV STARK
a/k/a Jan Starr, RICHARD B. HERMAN, d/b/a Law Offices of Richard B. Herman
d/b/a Herman, Blutrich & Miller, ISAACK ROSENBERG, NADINE ALLEN,
ROBERT GORSKI, RICHARD LANGER, SOUTH STAR MANAGEMENT, INC.
ADOS EQUITIES, INC., NATIONAL HOUSING EXHANGE, INC.
APX MORTGAGE SERVICES, INC., RESOURCE ASSET MANAGEMENT, INC.
NATIONAL WORKOUT SPECIALISTS, INC., SPRITE EQUITIES, INC.

## INDICTMENT

Violations:  18 U.S.C. §§ 1962(c), 1962(d),1343, 1346, 2314,
1956(a)(1)(A), 1956(a)(1)(B), 1957, 1001 1503,

*A true bill,*

_____
                                          *Foreman*

*Filed in open court this* _____ 29 _____ *day*

*of* _____ April _____, *A.D. 1998.*

_____
                                          *Clerk*

*Bail $* _____

_____