## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

UNITED STATES OF AMERICA

-vs-                                                            Case No.  6:98-cr-99-Orl-19KRS

SHOLAM WEISS, et al.

_____

In re Claim of Richard Gladstone

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This cause came on for consideration after an evidentiary hearing on the Petition of Innocent Owner – Claim to Property filed on behalf of Richard Gladstone pursuant to 18 U.S.C. § 1963(*l*).  (Doc. No. 1406).  The jury in the underlying criminal case found Sholam Weiss guilty of racketeering, in violation of 18 U.S.C. § 1961, and other crimes.  In a special verdict of forfeiture, the jury concluded that Weiss's interests, if any, in Stonewell Corporation and $3.1 million Weiss used to acquire the interest of United Jersey Bank in a mortgage on property known as the Center Mall (the "Center Mall mortgage") were subject to forfeiture. (Pet. ex. 2 ¶ 34; Doc. No. 1 at 54-68, 139).  This Court entered judgment against Weiss forfeiting his interest in this property.  (Doc. No. 1372).

The Honorable Patricia C. Fawsett, presiding United States District Judge, entered a final judgment of forfeiture against Weiss as part of the Judgment and Commitment Order. (Doc. No. 1372).  She also entered an amended preliminary order of forfeiture that states,

-1-

SCANNED

in pertinent part, that the United States is entitled to possession of Stonewell Corporation. (Doc. No. 1445).  Subsequently, Judge Fawsett entered an order finding that the amended preliminary order of forfeiture "should be amended to only order the forfeiture of whatever interest the Defendant[] Weiss . . . might have in the properties." (Doc. No. 1835 at 9).

Gladstone, who is the sole shareholder, officer, and a director of Stonewell Corporation ("Stonewell"), filed a claim of ownership to Stonewell and to the assets of Stonewell, including its asserted ownership of the Center Mall mortgage, pursuant to 18 U.S.C. § 1963(*l*).[1] (Doc. No. 1406).  I entered a case management and scheduling order based on the proposed schedule filed by the parties. (Doc. No. 1504).  Thereafter, the parties filed a number of documents, all of which I have reviewed.  I conducted an evidentiary hearing on Gladstone's claim in August and November 2001.  The exhibits admitted at the hearing are described in the agreed exhibits lists. (Doc. Nos. 1884, 1885).[2]

Judge Fawsett referred the petition to me for issuance of a report and recommendation.  For the reasons discussed herein, I recommend that the petition be granted in part and denied in part.

---

[1]  Initially, Gladstone contended that the jury's forfeiture decision only forfeited shares of stock in Stonewell.  In light of Judge Fawsett's conclusion that the forfeiture also applies to assets of Stonewell (Doc. No. 1835 at 10-11), I will construe the petition to be one made by Gladstone, on behalf of Stonewell, contesting forfeiture of Stonewell's assets.

[2]  During the hearing, I ruled on the admissibility of a number of exhibits offered by the parties.  Near the end of the hearing, the parties reached an agreement pursuant to which they withdrew some exhibits and agreed on the admission of other exhibits.  I accepted the parties' agreement and permitted exhibits to be admitted or withdrawn as agreed.  To the extent that the parties' agreement differed from my earlier rulings on the admissibility of exhibits, my earlier rulings were withdrawn. (Doc. No. 1892 at 2-3).

I. **STATEMENT OF PERTINENT FACTS.**

A. *Underlying Criminal Activity.*

Much of the testimony at the evidentiary hearing described the underlying criminal activity of which Weiss was convicted. Because the Court is well aware of that activity, I will only summarize it.

### The Work-Out of the Center Mall Mortgage.

Issac Nussen and George Weisz had worked together in the jewelry business since 1970. (Nussen Testimony, Pet. Ex. 136, at 22812-13).[3] In 1989, Nussen, Weisz and others, who were owners of Center Mall, Inc., borrowed $4.3 million from United Jersey Bank/Central, N.A. ("United Jersey Bank") to build a shopping mall on real property in Monmouth County, New Jersey. (*Id.* at 22817-19, 22878-82).[4] The real estate and shopping mall were mortgaged to United Jersey Bank as collateral for the loan, and Nussen, Weisz, and David and Meyer Rosenbaum ("the Rosenbaums") personally guaranteed repayment of the loan. (*Id.* at 22878-82).

The construction of the mall exceeded the original cost estimates, resulting in the owners of Center Mall, Inc. having to contribute additional money above the amount

---

[3] The parties agreed that excerpts of Nussen's trial testimony would be admitted as exhibits. Petitioner's exhibit 136 contains the excerpts of Nussen's trial testimony, including portions of both direct and cross-examination, designated by Gladstone. The United States submitted the entire cross-examination of Nussen, which is contained in government exhibit 144.

[4] The other owners of Center Mall, Inc. were David and Meyer Rosenbaum, Zigmond Brach, and Isac Weiss. (Nussen Testimony at 22818-19, 22878-82; Pet. exs. 72, 81, 85). Nussen, Weisz, and Isac Weiss collectively owned 25% of Center Mall, Inc. (Nussen Testimony at 22818-19).

borrowed. (*Id.*). They had problems renting the space in the mall. As a result, they failed to make mortgage payments to United Jersey Bank as required. (*Id.*).

By letter dated December 2, 1992, United Jersey Bank informed the borrowers that the loan had matured, and it demanded payment of the principal and accrued unpaid interest. (Pet. ex. 72). When payment was not received, United Jersey Bank filed an action in chancery to foreclose on the real property known as Center Mall[5] and an action at law against Center Mall, Inc. and the Rosenbaums to collect the money owed to United Jersey Bank. (Pet. exs. 76, 81). A foreclosure order was entered. (Pet. ex. 46). The chancery court appointed a receiver to collect rent payments from the Center Mall tenants. (Pet. exs. 85-90). A judgment was entered against Center Mall, Inc. and the Rosenbaums in the amount of $4,588.651,651.79, which consisted of the principal sum of the mortgage plus accrued interest and late fees. Center Mall, Inc. and the Rosenbaums were also required to pay United Jersey Bank its attorneys' fees and costs. (Pet. ex. 45).

Nussen met Sholam Weiss sometime in 1992. (Nussen Testimony at 22815-16). He learned that Weiss helped people work out business problems, including problem loans. (*Id.* at 22817-18). He approached Weiss and asked for his assistance in working out the debt Center Mall, Inc. owed to United Jersey Bank. (*Id.* at 22882-84).

Weiss negotiated an agreement under which United Jersey Bank would assign the mortgage on the Center Mall property and the judgments United Jersey Bank had against the Rosenbaums to Jasper Properties Corporation ("Jasper") in exchange for a payment of

---

[5] The mall is also referred to as the East Pointe Center. (*See, e.g.*, Pet. ex. 87). I will refer to it throughout this report as the Center Mall.

-4-

$3.1 million. (*Id.* at 22886-88). Nussen and Weisz agreed to pay $1.1375 million, in exchange for which they would own the Center Mall mortgage. (*Id.* at 22894-99). Lyle Pfeffer, a person who Weiss had introduced to Nussen, was to pay $1.1375 million, in exchange for which he would own the Center Mall property. (*Id.* at 22890-99). The Rosenbaums and Brach were also to contribute money. (*Id.* at 2289-93).

Nussen testified that he caused Jasper to be formed to acquire the assignment of the mortgage from United Jersey Bank, but he did not produce stock certificates, tax returns or other indicia of his ownership in Jasper. (*Id.* at 22899-903; Gov't ex. 144 at 23228-32). Nussen testified that he and Weisz were the shareholders in Jasper. (Nussen Testimony at 22899-903). However, Michael Blutrich testified that Jasper was controlled by Sholam Weiss. (TR. 939-40). Jan Schneiderman also testified that Weiss created Jasper solely for the purpose of acquiring the Center Mall mortgage. (Doc. No. 1899 at 90[6]).

Brian Bernstein, an attorney, closed this transaction with United Jersey Bank on behalf of Jasper. (Nussen Testimony at 22894-99). Schneiderman signed closing documents as an officer of Jasper, although she had no interest in or decision-making authority over that corporation. (*Id.* at 23470-71). Nussen caused $1,136,970 to be wire transferred to Bernstein's escrow account to pay his and Weisz' portion of the $3.1 million due to United Jersey Bank. (*Id.* at 22904-06; Pet. ex. 79). Sholam Weiss gave Bernstein

---

[6] The page numbers in the transcript for the evidentiary hearing conducted on November 13, 2001 and November 14, 2001 each begin with page 1, rather than being consecutively numbered to follow the previous transcripts. I will refer to these transcripts by their respective docket numbers: the November 13, 2001 transcript is Doc. No. 1899, and the November 14, 2001 transcript is Doc. No. 1900.

a check in the amount of $3.1 million payable to United Jersey Bank, which money the criminal jury found Weiss had fraudulently obtained from NHLIC. (TR. 607; Nussen Testimony at 22904-06; Pet. ex. 2 ¶ 42; Pet. ex. 79). Bernstein distributed the funds in his escrow account that had been paid by Nussen to Sholam Weiss. (Pet. ex. 79).

The Center Mall mortgage was assigned to Jasper on September 7, 1993. (Pet. exs. 82, 87). Jasper and United Jersey Bank agreed that the receivership for the Center Mall should be terminated. The receiver made a final accounting and obtained permission from the chancery court to turn over monies it held to Jasper. (Pet. exs. 87, 90). The deed to the Center Mall property was transferred to Center Point Mall, Inc., of which Future Diversified Projects, Inc. ("Future Diversified") was the sole shareholder. (Gov't exs. 14, 108). Pfeffer was the president and sole shareholder of Future Diversified. (TR. 575).

Pfeffer and Schneiderman admitted that they acted at the direction of, and as the nominees for, Sholam Weiss (TR. 611-12, 627-28; Doc. No. 1899 at 81, 183) in this and various other transactions. Blutrich also testified that Weiss controlled the entities and individuals involved in the assignment of the Center Mall mortgage. (TR. 873-74, 879).

### The Capital Properties Transaction.

Subsequently, as part of the continuing scheme to defraud NHLIC, Sholam Weiss and others assembled a group of assets that were to be transferred to NHLIC or its affiliates in exchange for stock in LifeCo Investment Group, Inc. ("LifeCo"), NHLIC's parent company. (TR. 574-75, 599, 622, 865-67; Gov't ex. 109). These assets, sometimes referred to as the Capital Properties, included the Center Mall and the land on which it was located. (TR. 579). The agreement with NHLIC was that the Center Mall was to be transferred to NHLIC or its

affiliates free and clear of any mortgages. (TR. 600-02, 616, 873, 941; Doc. No. 1900 at 5-7; Gov't ex. 109).

On November 11, 1993, Schneiderman, acting as Secretary of Jasper at Sholam Weiss's instruction, signed a discharge of the Center Mall mortgage. (TR. 283-86; Doc. 1899 at 93; Gov't ex. 53). The discharge was never recorded in the records of Monmouth County, New Jersey. (TR. 325; Doc. No. 1900 at 32).[7]

Center Point Mall, Inc. conveyed title to the Center Mall property to LifeCo in a deed dated November 15, 1993. (Gov't ex. 113). The title insurance policy obtained for the transfer of the Center Mall reflected that the mortgage, which was then held by Jasper, was still outstanding. (Pet. ex. 25, Schedule B ¶ 2).

In a recorded document dated December 30, 1993, Lambert G. Aloisi, then President of NHLIC, conveyed the Capital Properties, including the Center Mall property, from NHLIC to Future Diversified. (TR. 575-77, 622-23, 883-84; Gov't ex. 15).

Donna Lee H. Williams, the Insurance Commissioner for the State of Delaware, was appointed the receiver of NHLIC after it became insolvent. In 1996, she filed a civil action against Future Diversified, Pfeffer, Blutrich, and others, in which she alleged that the transfer of the Center Mall property from NHLIC to Future Diversified was fraudulent. (Gov't ex. 19 [referred to by the parties as *Williams v. LPDA*]). She caused a Notice of Lis Pendens to be

---

[7] Weiss told Pfeffer that he did not want the discharge of the Center Mall mortgage to be recorded. (TR. 608; *accord* TR. 871-72). He instructed Pfeffer, acting on behalf of Jasper, to execute on the foreclosure judgment against the Center Mall property, the effect of which would be to extinguish a second mortgage on that property. (TR. 599, 604, 609, 686-87). Pfeffer never completed the foreclosure. (TR. 612-13, 686-87, 873).

recorded in the Monmouth County property records. The Notice of Lis Pendens states, in pertinent part, that the general object of the civil action was to affect the title to the Center Mall property. (Gov't ex. 18). Neither the civil complaint nor the Notice of Lis Pendens refers to any mortgages on the Center Mall property.

After the Williams v. LPDA litigation began, Weiss, Pfeffer and Blutrich discussed creating fictitious sales to move property they held into the names of other people. (TR. 614, 863-64). They knew that there was a lis pendens encumbering the real property on which the Center Mall was located. (TR. 617). In July 1996, they learned that the discharge of Center Mall mortgage had never been recorded. (TR. 618, 887-88, 892-93).

Subsequently, the signed but unrecorded discharge of the Center Mall mortgage was discovered by the litigants in Williams v. LPDA. (TR. 650-51). At Weiss's instruction, Schneiderman prepared an affidavit falsely stating that the discharge had been signed in error. (TR. 652; Doc. No. 1899 at 97-102; Gov't ex. 53).

The Center Mall was sold by Order of the United States District Court for the Southern District of New York. After payment of real estate taxes and fees to the receiver, approximately $1,800,000 of the sales proceeds plus accrued interest remain. (Joint Final Pretrial Statement at 24, Doc. No. 1808). Gladstone asserts that this money belongs to Stonewell in partial satisfaction of the Center Mall mortgage.

### The Jarnow/Jasper Swap.

In 1993, Nussen and Weisz formed Jarnow Corporation ("Jarnow"), which was in the business of manufacturing gold jewelry. (Nussen Testimony at 22812-15). In September 1993, Pfeffer, acting as a nominee for Weiss, established a $5 million line of credit for

Jarnow, in exchange for which he, acting as a nominee for Weiss, acquired 30% of the shares of Jarnow. (TR. 627-28, 634-35, 880-81; Nussen Testimony at 22899-903).

On March 19, 1997, Nussen, Weisz, and Pfeffer agreed that Nussen and Weisz would transfer their shares in Jasper to Pfeffer and Pfeffer would, in return, transfer his shares in Jarnow to Nussen and Weisz. (TR. 638, 640; Nussen Testimony at 22929-37, 23576). Pfeffer signed documents prepared by Blutrich and presented to him by Weiss to effectuate the stock swap. (TR. 643-45, 896-97; Gov't ex. 129). Pfeffer testified that the agreement memorializing this transaction (Gov't ex. 33) was signed, amended, and resigned many times. (TR. 836-37). The purpose of the document was merely to disguise the transfer of nominee ownership in these companies. (TR. 836-38, 863-64, 898-99, 928).

B.    *Transactions with Richard Gladstone and Stonewell Corporation.*

### Background of Richard Gladstone.

Richard Gladstone received a B.A. degree from Emory University in 1979. He is married to Lauri Doll Gladstone. They have two children. (TR. 160). He works as an entrepreneur, including investing privately and publicly in securities. (TR. 64,160). He also created a travel business, called Sterling Travel, which was a travel agency used by independent travel consultants and others. (TR. 160-61, 163). In 1996, he had income from investments of approximately $1.4 million. (TR. 63). In 1997, Gladstone's brokerage accounts showed more than $22 million in gross proceeds. (TR. 65). Gladstone's accountant estimated that Gladstone's 1998 tax return would show in excess of $42 million in gross proceeds and that his 1999 tax return would show in excess of $44 million in gross proceeds. (TR. 65-66).

### Introduction to Lyle Pfeffer and Michael Blutrich.

In the summer of 1996, a stockbroker introduced Gladstone to John Nielsen, the president of UC'NWin Systems Corporation ("U Can Win").  (TR. 161-62, 594-95). Thereafter, U Can Win used Sterling Travel for its travel needs, and Gladstone bought stock in U Can Win.  (TR. 162-63).  Gladstone also loaned U Can Win $200,000 for which he received a promissory note.  Shares of U Can Win owned by Lyle Pfeffer were held in escrow as security for the loan.  (TR. 163-64, 594-96; Pet. ex. 102).  U Can Win did not timely repay the loan.  (TR. 166; Pet. ex. 107).  The pledged shares were sold, and Gladstone recouped most of his money.  (TR. 166; Pet. exs. 108, 109).

Gladstone met Pfeffer in September or October 1996 at the offices of Halo Investments, Three Park Avenue, 38th Floor, New York, New York.  (TR. 166-67, 174).  Halo Investments was a financial public relations firm that worked with U Can Win.  Pfeffer was a principal of Halo Investments.  (TR. 167, 373).  Gladstone also learned that Pfeffer either owned or managed a nightclub known as Scores.[8]  (TR. 168).  Gladstone discussed with Pfeffer whether Halo Investments could assist him in making contacts that would be necessary before he tried to make an initial public offering of shares of Sterling Travel.  (TR. 169-70).

Thereafter, Pfeffer approached Gladstone about making a loan to New Contenders, Inc. ("New Contenders") to help the company promote a boxing match between Sugar Ray Leonard and Hector "Macho" Camacho.  (TR. 170-71).  Pfeffer subsequently introduced

---

[8]  Blutrich owned Scores Entertainment, Inc., which operated the nightclub.  (TR. 850). Pfeffer became an owner of Scores in 1992.  (TR. 659).

Gladstone to Blutrich, who he described as the chairman of the board of New Contenders. (TR. 173, 848-50). Blutrich was a lawyer. (TR. 174, 843-45). Blutrich's office was also at Three Park Avenue, 38th Floor, New York, New York. (TR. 174). Gladstone described the offices on the 38th floor of Three Park Avenue as "fancy," "high rent," and "bustling with activity." (TR. 167-68).

After asking a number of questions about the proposal, Gladstone signed an agreement in principle to loan money to New Contenders. (TR. 172-73, 176, 851-53). Gladstone agreed to loan New Contenders $500,000, of which he funded $450,000 from money held by him and his wife in their investment accounts. (TR. 59-61, 176, 853; Pet. ex. 17). He received personal guarantees from Blutrich and Scores. (TR. 244-45, 918, 923; Gov't exs. 26, 27, 28). New Contenders was required to make the first installment payment on the loan on March 15, 1997 and the second installment payment on April 15, 1997. (TR. 154).[9] Gladstone asked his attorney, Maureen Abato, to review the documents after they were signed. (TR. 136).

The Leonard/Camacho fight was widely promoted. Gladstone made sure that Sterling Travel was designated as the contact for tickets and travel arrangements to attend the fight. (TR. 179-81).

### Introduction to Sholam Weiss.

Late in 1996, Gladstone heard and read that New Contenders might not be permitted to promote the boxing match because of the alleged ties of Blutrich, Pfeffer and Scores to

---

[9] Gladstone's loan to New Contenders was not part of any scheme to defraud NHLIC, and the transaction was not controlled by Sholam Weiss. (TR. 729-30, 733, 821).

-11-

organized crime. (TR. 176-77, 385-86, 596-97; Gov't exs. 31, 49 at 55-56). Gladstone called Pfeffer to discuss the problems. Pfeffer said that "they were wrongfully being connected to organized crime." (TR. 388). Gladstone was assured that, despite these problems, New Contenders would continue to promote the fight. (TR. 177-78, 388-89, 597-98, 738-35, 741). Gladstone stopped payment on a check for $50,000 that was the last installment on the money he agreed to loan to New Contenders. (TR. 176, 178). Gladstone contacted Abato and expressed his concerns that Blutrich did not have the financial wherewithal to repay the loan. Abato responded that Gladstone's "chances of recovery seem dubious, given the current legal problems of Scores, New Contenders and Blutrich." (TR. 432-33; Gov't ex. 77).

Meanwhile, Gladstone began making contacts with people to see if he could become involved in promoting the fight, in the event New Contenders was not able to do so. (TR. 178-79, 181-82). He hired Pat English, an attorney with expertise in the field of boxing, to assist him. (TR. 181). Gladstone learned that Caesar's Palace had stepped in to promote the fight in place of New Contenders, but that it was looking for someone to post a $7 million line of credit to secure the purse. (TR. 182). Gladstone had difficulty finding a company that would issue the letter of credit, even though he was willing to pledge stocks as security. (TR. 182). On February 14, 1997, Allen Kline called Gladstone and asked him to come to New York to speak with someone named Sholam who might help him salvage the boxing match. (TR. 96-99). Gladstone knew Kline as the director or stockholder of a company called Sector Communications, Inc. ("Sector"), in which Gladstone had invested. (TR. 183-

-12-

84). Gladstone had previously loaned Kline $50,000, which Kline repaid with an assignment of stock. (TR. 185-86).

Gladstone left for New York on February 14, 1997. (TR. 99). In New York, Kline introduced Gladstone to Weiss. (TR. 187).[10] Gladstone did not know at the time of this meeting that Weiss shared office space with Pfeffer and Blutrich. (TR. 401). Weiss did not help Gladstone obtain the $7 million line of credit for the boxing match. However, in their discussions Gladstone learned that Weiss owned or controlled shares of Sector stock. Between September 1996 and February 1997, Gladstone had sold approximately 500,000 shares of Sector stock short, and he was looking for a way to cover the short sale at less than the market price. (TR. 188, 397). In February and March 1997, Gladstone bought 1.6 million shares of Sector stock from Weiss for approximately $650,000. (TR. 188-89, 402-09; Gov't ex. 103).

At Weiss's instruction, Gladstone wired $200,000, the amount owed to pay for a portion of the stock, to an account in Gladstone's name at a hotel and casino in Atlantic City, New Jersey. (TR. 189, 405-06). Gladstone met Weiss in Atlantic City on March 1, 1997, the night of the Leonard/Camacho fight,[11] and he gave Weiss the $200,000. (TR. 100, 190).

---

[10] Blutrich recalled that he introduced Weiss to Gladstone in 1996, when Gladstone was visiting Scores. (Doc. No. 1899 at 46).

[11] The evidence did not show how Caesar's Palace resolved the line of credit issue, but the boxing match nevertheless occurred. The record contains the program from the Leonard/Camacho fight, which program contains a full page ad for Sterling Travel. (Pet. ex. 71). Sterling Travel also had a banner posted at the boxing arena. (TR. 190-91).

Gladstone recalled that Weiss gambled heavily during their time together in Atlantic City, betting about $10,000 per hand at the blackjack tables. (TR. 191, *see also* TR. 795).

Thereafter, Gladstone continued to engage in stock transactions with Weiss and individuals Weiss represented. (TR. 409-13; Doc. No. 1899 at 118; *see, e.g.*, Gov't ex. 65). For instance, Gladstone began investing in stock of Creative Learning Products, often referred to as CLPI; Pfeffer recommended the stock, and Weiss later told Gladstone that he owned shares of the stock. (TR. 409-11). Gladstone frequently talked by telephone with Weiss, including during Weiss's criminal trial. (TR. 498-99, 527-38). Schneiderman overheard conversations in which Weiss and Gladstone indicated that they were holding various shares of stock for each other. (Doc. No. 1899 at 119, 121-22, 125). After Gladstone testified at the criminal trial in this case, he flew back to New York on a plane chartered by Weiss. During this flight, Schneiderman heard Gladstone and Weiss arguing about which one of them owed the other money related to their stock transactions. (Doc. No. 1899 at 123-25).

### Repayment of the New Contenders Loan.

After the boxing match took place, Gladstone began discussions with Pfeffer about how New Contenders was going to repay the money it owned to him. (TR. 193). He did not speak to Blutrich directly about the repayment of the loan. (TR. 194). Pfeffer assured Gladstone that Blutrich was working on a way to repay the money and that he had the wherewithal to repay the money. (TR. 194-95). Gladstone also discussed with Abato the steps that could be taken to recover the money he had loaned to New Contenders. (TR. 138).

-14-

Gladstone received a number of proposals about repayment of the loan.  At some point, Weiss became involved in these discussions.  (TR. 761-63, 799).  Pfeffer mentioned that there was a first mortgage on a piece of property that he and Blutrich wanted to sell to raise money.  Pfeffer suggested that Gladstone could buy the mortgage at a discount, in exchange for the forgiveness of the loan to New Contenders.  (TR. 196-97).  Gladstone learned that the mortgage was on a piece of real property in New Jersey on which a shopping center, called the Center Mall, was built.  (TR. 197).  The mall was 50,000 square feet, and it cost $7 million to build in 1990.  (TR. 198; Gov't ex. 40).  Pfeffer said that the mortgage was non-performing and tax payments were delinquent.  (TR. 198-99).  Pfeffer testified that he told Gladstone that there were title problems due to a *lis pendens* on the property (TR. 833)[12], but Gladstone denied knowledge of the *lis pendens.*  (TR. 240-41).  The face amount of the mortgage was $4.3 million.  Pfeffer told Gladstone that he could buy the mortgage for $1.5 million, but Gladstone agreed to pay only $1 million of which $450,000 would be credited to the New Contenders' debt and the additional $550,000 would be paid in cash.  (TR. 199, 902-04).  Pfeffer and Blutrich also stated that they might be willing to repurchase the mortgage for $2 million at a later date.  (TR. 474; Gov't ex. 49 at 114-15).

Gladstone did not inquire who owned the mortgage. (TR. 454).  He did not investigate who owned the underlying property.  (TR. 453-56).  He did not obtain an appraisal.  (TR. 473).  He did ask for rent rolls for the property.  (TR. 198, 483).  Gladstone also spoke with his friend Jim Krantz and Jim's brother, John Krantz.  Jim Krantz managed and insured

---

[12] Blutrich also testified that Gladstone was present when Blutrich and Weiss discussed the existence of the *lis pendens*.  (TR. 907-08).

property in New Jersey.   John Krantz managed commercial property in New Jersey, including shopping centers. (TR. 200, 450).  Jim and John Krantz reviewed the rent roll and looked at the property. (TR. 201, 452; Pet. ex. 49).  They told Gladstone that the property was a $3 million asset, but if managed properly it could be worth over $5 million.  (TR. 201). Gladstone also spoke with Abato, who was not a expert in real estate transactions.  Abato spoke with a friend who suggested that Gladstone obtain title insurance to protect his investment.  Abato relayed this advice to Gladstone.  (TR. 146, 153, 200).  Gladstone also discussed the proposed transaction with his brother, who is an attorney.  (TR. 200).

Gladstone agreed to buy the mortgage, but he asked for a title insurance policy.  (TR. 202, 907-08).  Weiss instructed Blutrich to call a specific title company to get title insurance for the transaction so that, if the assignment was contested, the title company would be at fault rather than the participants in the transaction.  (TR. 907-08).  Gladstone could not recall how the title company was selected.  (TR. 446-47).  After Gladstone learned the name of the proposed title company, English told him that the company was reputable.  (TR. 203-04).

### Formation of Stonewell Corporation.

In March 1997, Gladstone asked Abato to form a corporation to accept assignment of the Center Mall mortgage.  (TR. 129, 132, 145, 148-49, 156).  Pursuant to Abato's advice, Richard Gladstone paid Loughlin Associates to incorporate Stonewell Corporation in Nevada.   (TR. 58-59, 130, 132; Pet. ex. 15).  Articles of Incorporation for Stonewell Corporation were signed on March 12, 1997 and filed on April 1, 1997.  (TR. 87; Pet. ex. 13). Thereafter, Gladstone used Stonewell to trade in stocks as well as to acquire the Center Mall mortgage. (TR. 71-73,103, 224-26; Pet. ex. 26). Gladstone is and always has been the

sole officer and shareholder of Stonewell. He is also a director of Stonewell. (TR. 251-57).

Assignment of the Center Mall Mortgage to Stonewell.

On March 20, 1997, Gladstone went to a conference room at Three Park Avenue, 38th Floor, where he signed documents to assign the Center Mall mortgage to Stonewell. (TR. 209-10, 238). Gladstone assigned the $450,000 note due to him from New Contenders to Jasper. (TR. 210-22; Pet. ex. 19). Pfeffer, acting on behalf of Jasper[13], assigned the Center Mall mortgage to Stonewell. (TR. 88, 209-22, 645-46, 899 ; Pet. exs. 18, 19; Gov't exs. 121, 122).[14] Blutrich acted as the attorney for Jasper. (TR. 215, 485). Gladstone left checks for $550,000 at the closing, with the understanding that they would not be cashed until the title insurance policy was issued. (TR. 430-31, 485-86). Gladstone, on behalf of Stonewell, also paid for issuance of the title insurance policy. (TR. 219-20). Gladstone left all of the signed documents at the closing, relying on Blutrich to transmit them to the title insurance company. (TR. 484-85).[15]

---

[13] Records of the Department of Treasury, State of New Jersey, reflect that Jasper's registration was administratively revoked on March 5, 1996 and had not been reinstated as of January 22, 1999. (Gov't ex. 16).

[14] Gladstone did not sign a release of the guarantee provided by Scores  (TR. 440), but he testified in a deposition in *Williams v. LPDA* that part of the deal was that he would not pursue the personal guarantee Scores had made (Gov't ex. 49 at 134).  In December 1998, Gladstone filed a claim in the Scores bankruptcy proceeding seeking to collect funds from Scores pursuant to its agreement to guarantee repayment of the loan to New Contenders, which claim was settled.  (TR. 440-41, 564-65; Gov't ex. 132).

[15] Late in 1996, Blutrich and Pfeffer began cooperating with law enforcement agencies in an organized crime investigation in the Southern District of New York.  They generally advised representatives of the United States Attorney's Office for the Southern District of New York and the FBI of the proposed transactions involving the Center Mall mortgage and property before they occurred.  (TR. 714, 718, 830-32, 894-95).

Gladstone subsequently learned that the title insurance company needed verification that Pfeffer had the authority to act for Jasper. (TR. 212). He later received letters from Pfeffer and Blutrich attesting to Pfeffer's authority to act on behalf of Jasper. (Gov't ex. 121). On March 24, 1997, Gladstone received a letter from the title insurance company acknowledging the assignment of the mortgage to Stonewell Corporation and issuance of the title insurance. (TR. 217-19; Pet. ex. 23). The title insurance policy reflects that the title to the underlying real estate was vested in Future Diversified. The schedule of exceptions (Schedule B) of the title insurance policy did not reflect any problem with the validity of the first mortgage assigned to Stonewell, and it did not include a reference to the *lis pendens* on the underlying property. (TR. 910; Pet. ex. 24). The records of Monmouth County, New Jersey reflect that Jasper assigned the Center Mall mortgage to Stonewell. This Assignment of Mortgage was recorded on March 24, 1997. (Pet. ex. 18).

On March 27, 1997, Gladstone wired $325,000 from his brokerage account to Blutrich as attorney for Jasper; this money was loaned by Gladstone to Stonewell to be used to buy the Center Mall mortgage. (TR. 69, 214-15; Pet. ex. 22). An additional $150,000 was disbursed from another brokerage account belonging to the Gladstones. (TR. 70, 215; Pet. ex. 22). The final $75,000 was disbursed from a partnership owned by Gladstone and his wife. (TR. 216, Pet. ex. 22).

Gladstone testified that he did not act, through Stonewell, as a nominee for Sholam Weiss in the purchase of the Center Mall mortgage. (TR. 226-27, 237). He averred that Weiss did not provide, or repay, the personal funds Gladstone loaned to New Contenders or the personal funds he loaned to Stonewell to purchase the Center Mall mortgage. (TR.

235-37).  Pfeffer testified that Gladstone told him he was acting as Weiss's nominee in causing Stonewell to acquire the Center Mall mortgage,[16] but Gladstone denied making this statement.  (TR. 237, 593).  Pfeffer was unable to give specific information about when this conversation purportedly occurred or the substance of the conversation.  (TR. 592-93, 646-47, 743).

Pfeffer also testified that, before the transaction closed, Gladstone told him that Weiss had agreed to return the money Gladstone, through Stonewell, was paying to purchase the Center Mall mortgage.  Gladstone asked Pfeffer for reassurance that Weiss would repay this money.  (TR. 641).  Pfeffer testified that Weiss told him that he was covering the $550,000 that Gladstone was paying, and that Weiss would take care of the $450,000 debt incurred by New Contenders.  (TR. 647-48).

After the mortgage was assigned to Stonewell, Gladstone interviewed law firms about taking steps to execute on the foreclosure judgment.  (TR. 474-75).  He did not send any demand letters to the owner of the Center Mall property.  (TR. 475).

On November 13, 1997, Gladstone learned that an issue had arisen in *Williams v. LPDA,* which involved, in part, whether the mortgage on the Center Mall property was a valid encumbrance.  (TR. 263, 267, 475, 889).  Gladstone testified that this was the first time he was aware of the *Williams v. LPDA* action.  (TR. 240, 242).  Gladstone discussed this issue with Pfeffer.  Pfeffer told him that it had been contemplated that the mortgage would be

---

[16] Blutrich testified that Weiss later told him that Gladstone was acting as Weiss's nominee.  (TR. 913).

discharged, but that the mortgage had not been discharged and no discharge had been recorded. Pfeffer assured Gladstone that the Center Mall mortgage was valid. (TR. 267).[17]

### Assistance with Attorneys' Fees.

### Jan Schneiderman

In approximately April 1998, Schneiderman asked Weiss for assistance in raising money to pay her attorneys. Weiss told her that he had arranged for her to sell a fictitious option to purchase her Manhattan apartment to Gladstone. The option purchase price was $25,000, which was the amount Schneiderman needed to pay as a retainer to her attorneys. (Doc. No. 1899 at 134-36, 141-42). Gladstone testified that Weiss may have spoken to him about Schneiderman's apartment, but Gladstone could not recall the substance of their conversation. (TR. 522).

Gladstone stated in sworn answers to interrogatories and in his initial testimony at the evidentiary hearing in this case that Schneiderman offered to sell him an option to purchase her apartment in New York, but the transaction was not consummated. (TR. 518-24, 568; Gov't ex. 89, interrogatory 14). Gladstone testified that Weiss did not ask him to engage in this transaction, and he did not know why Schneiderman was trying to raise money. (TR. 520-22). Gladstone did not visit the apartment. (TR. 522-23; Doc. No. 1899 at 142). Gladstone initially did not recall ever issuing a check to Schneiderman. (TR. 568).

Schneiderman agreed to cooperate with the United States in August 2001, shortly before the evidentiary hearing in this matter began. (Doc. No. 1899 at 132, 147). She

---

[17] The presiding judge in *Williams v. LPDA* is awaiting the outcome of these forfeiture proceedings before resolving the issues in that case. (TR. 958-59).

produced copies of the option agreement signed by Gladstone on April 16, 1998 and copies of financial records showing that Gladstone wire transferred $25,000 into her bank account, which money she paid to her attorneys. (Doc. No. 1899 at 134-40).  Before the hearing resumed on November 13, 2001, Gladstone also produced to the United States a copy of the signed agreement to purchase an option on Schneiderman's apartment and records showing that he transferred $25,000 to her on April 16, 1998. (Pet. ex. 122).

### Sholam Weiss

Joel Hirschhorn represented Sholam Weiss during the criminal trial.  As part of his fee agreement with Weiss, Hirschhorn held two stock certificates in United Ventures Group, Inc. issued to Richard Gladstone as collateral for full payment of the agreed fee. (TR. 334). An attorney, Steve Altman, gave Hirschhorn these stock certificates in January 1999, which certificates had been signed on the back by Gladstone and dated December 29, 1998.  No information was inserted indicating to whom the certificates would be transferred. (TR. 341, 354; Gov't exs. 86, 87).  Hirschhorn's office also received a blank Irrevocable Stock or Bond Power signed by Gladstone, but how this document was transmitted to Hirschhorn is not reflected in the record.  (TR. 356-57; Gov't ex. 88).

Hirschhorn did not have any dealings with Gladstone concerning the transfer of this stock.  (TR. 347).  Gladstone testified that he did not know about the transfer of stock to Hirschhorn, and he could not explain the transfer other than to say that Altman's law firm had handled transactions in these securities for Gladstone.  (TR. 503-05, 558-62).  In his normal course of business, Gladstone kept blank, medallion guaranteed, stock powers to

be used when necessary to transfer ownership of stock.  (TR. 507-11, 545-48; Pet. ex. 47).

## II.    STANDARD OF REVIEW.

The United States Court of Appeals for the Eleventh Circuit reviews a district court's factual determinations in a forfeiture proceeding under the clearly erroneous standard. *Braxton v. United States*, 858 F.2d 650, 654 (11th Cir. 1988).

## III.    ANALYSIS.

### A.    *The United States Did Not Establish that Gladstone and Stonewell Acted Solely as the Alter Ego of Sholam Weiss.*

Only an individual other than the convicted defendant can file an ancillary claim under 18 U.S.C. § 1963(*l*).  Here, the United States contends that Gladstone, through Stonewell, acted solely as the nominee for Weiss, a convicted defendant.  As such, the United States argues that Gladstone and Stonewell cannot bring a third-party claim because they are, in reality, acting on behalf of a convicted defendant.

In the extensive forfeiture litigation involving the Bank of Credit and Commerce International and related companies ("BCCI"), the presiding district judge established a procedure for resolving the question whether a third-party claimant is merely a nominee of the convicted defendant.  She required that the United States establish that the person or entity holding the property sought to be forfeited was the alter ego of the defendant.  Once the alter ego finding was made, the court permitted the claimant, through the ancillary forfeiture hearing, to present evidence that it was not the alter ego of the defendant.  *United States v. BCCI Holdings (Luxemborg), S.A.*, 69 F. Supp. 2d 36, 53 (D.D.C. 1999). I find this procedure to be consistent with the provisions of section 1963(*l*), and I will use it as

guidance in resolving the question of whether Gladstone, on behalf of Stonewell, acted solely as Weiss's alter ego.

I find that the United States failed to establish by a preponderance of the evidence that Gladstone and Stonewell acted solely as Weiss's alter ego. The evidence established that Gladstone used Stonewell to make investments, which included trading in stocks as well as the purchase of the Center Mall mortgage. The United States offered no evidence that the stock purchases by Stonewell were done on behalf of Weiss. Indeed, in closing arguments counsel for the United States conceded that all the United States was seeking to forfeit was Stonewell's claim to the Center Mall mortgage and the proceeds from the sale of the Center Mall property. (Doc. No. 1892 at 13-14). Thus, the preponderance of the evidence shows that Stonewell was an entity that acted independently of Weiss. As such, I find that Gladstone, through Stonewell, did not act *solely* as Weiss's alter ego.

The amended preliminary order of forfeiture entered by the Court, at the request of the United States, states that the United States is entitled to possession of Stonewell Corporation. The United States now concedes that it does not claim that Weiss had an interest in all of Stonewell; it limits its forfeiture argument to one of Stonewell's assets. Therefore, I find that Gladstone, on behalf of Stonewell, has standing to contest the amended preliminary order of forfeiture because that order encompasses property that the United States no longer claims is forfeitable, that is the stock and assets of Stonewell Corporation other than its interest in the Center Mall mortgage.

B.      *Weiss's Interest in the Center Mall Mortgage.*[18]

Under 18 U.S.C. § 1963(*l*)(6)(A), Gladstone, on behalf of Stonewell, has the burden of proving by a preponderance of the evidence that Stonewell had a right, title or interest in the Center Mall mortgage that vested before the commission of the acts that gave rise to the forfeiture. Alternatively, under 18 U.S.C. § 1963(*l*)(6)(B), Gladstone, on behalf of Stonewell, must establish by a preponderance of the evidence that Stonewell was a bona fide purchaser for value of the Center Mall mortgage and that it was reasonably without cause to believe that the property was subject to forfeiture at the time of the purchase. *See United States v. Martinez*, 228 F.3d 587, 590 (5th Cir. 2000). Gladstone, on behalf of Stonewell, proceeds under both of these provisions.

### 1.      Stonewell's Claim to the Center Mall Mortgage Vested After the Commission of the Acts that Gave Rise to the Forfeiture.

The Center Mall mortgage was subject to forfeiture at the time it was assigned to Jasper through use of the proceeds of racketeering activity, in this case $3.1 million fraudulently acquired from NHLIC. *See, e.g., Martinez*, 228 F.3d at 590. This assignment, which occurred in 1989, preceded the assignment of the Center Mall mortgage to Stonewell. As such, Gladstone has not proven that Stonewell's interest in the Center Mall mortgage vested before commission of the acts that made the mortgage subject to forfeiture.

---

[18] The United States argues that there was nothing for Stonewell to purchase, because the Center Mall mortgage was discharged as part of the Capital Properties transaction. It is undisputed, however, that the discharge was never recorded in the public records of Monmouth County, New Jersey. I do not reach the question of whether the mortgage existed at the time of its purported transfer to Stonewell because I conclude that, assuming the Center Mall mortgage existed when it was acquired by Stonewell, Gladstone, on behalf of Stonewell, has not met his burden of proof under 18 U.S.C. § 1963(*l*).

2.   **Gladstone, on Behalf of Stonewell, Has Not Established by a Preponderance of the Evidence that He Was a Bona Fide Purchaser for Value Who Was Reasonably Without Cause to Believe the Center Mall Mortgage Was Subject to Forfeiture.**

Richard Gladstone is a wealthy businessman.  Before he ever met Sholam Weiss, Gladstone loaned money to New Contenders, a boxing promotion company with which Blutrich was affiliated.  There is no evidence, and the United States does not argue, that Gladstone acted on behalf of Weiss in this transaction.

When Gladstone learned that New Contenders would not be able to promote the fight because of alleged ties of the company and its principals to organized crime, he began looking for a way to protect his investment.  Through these efforts, the owner of Sector Communications introduced Gladstone to Sholam Weiss.  Weiss did not assist in raising money to promote the boxing match.  He did, however, agree to sell, or arrange for the sale, of stock in Sector to Gladstone, who then held short positions in the stock that he needed to cover.  Thereafter, Gladstone and Weiss engaged in a number of stock transactions. Gladstone purchased blocks of stock – which he defined as at least 10,000 shares – at a discount for such large purchases.  While the United States argues that Weiss gave Gladstone discounts in excess of those commonly offered to purchasers of blocks of stock, there is no evidence of supporting that argument.

Meanwhile, Gladstone was engaged in discussions with Lyle Pfeffer about repayment of the loan Gladstone had made to New Contenders.  At some point, Weiss became directly involved in these discussions.  Weiss and Pfeffer ultimately proposed that Gladstone would purchase the Center Mall mortgage for $1 million, to be paid through transfer of the

$450,000 indebtedness to the seller of the mortgage, Jasper Properties Corporation, and an additional payment of $550,000 by Gladstone. There is no evidence that Gladstone knew that the assignment of this mortgage was part of a scheme to defraud NHLIC.

Gladstone took steps he believed were reasonable to investigate the proposed transaction – he spoke with his attorneys, he conferred with friends knowledgeable about the real estate market in question, and he obtained a title insurance policy that reflected no defects in the mortgage being purchased. Others in a similar situation might have taken additional steps, but Gladstone's failure to do so is consistent with the manner in which he made his investment in New Contenders – that is, he made his own inquires and asked lawyers simply to review the transaction he negotiated.

Gladstone denied that Weiss made promises to repay the money paid for the Center Mall mortgage. Pfeffer testified, however, that Gladstone told him that Weiss had agreed to repay the money and to obtain a resolution of the $450,000 debt from the loan to New Contenders. Pfeffer's testimony is questionable, however. He was unable to provide details of the dates, places or participants in these conversations. Therefore, I must look to other evidence to determine whether to believe Gladstone or Pfeffer on this issue.

Gladstone's actions following the assignment of the Center Mall mortgage to Stonewell support Pfeffer's testimony that Weiss assured Gladstone that the money he used to purchase the Center Mall mortgage was not at risk. In the eight months between the assignment of the mortgage and Gladstone receiving notice that the validity of the mortgage was being questioned in *Williams v. LPDA*, Gladstone did not aggressively seek to convert the mortgage to a tangible asset. He had a forfeiture judgment, which could have

been used to compel a sale of the underlying property. He could have asked Pfeffer, who was the owner of record of the company that owned the Center Mall property, for permission to have John Krantz manage the Center Mall to see if it could become profitable under new management. There is no evidence that he did so. A reasonable investor would have made such efforts, having $1 million at stake. The failure to do so raises a reasonable inference that Gladstone did not believe that his money was truly at risk.

This inference is bolstered by Gladstone's actions after the validity of the mortgage was questioned. He did not seek to rescind the purchase of the Center Mall mortgage based on Pfeffer and Blutrich's failure to disclose the existence of the *Williams v. LPDA* suit to him before Stonewell purchased the Center Mall mortgage. He did not demand that Blutrich and Pfeffer purchase the mortgage based on their earlier representations that they would like an option to purchase the mortgage for $2 million. Instead, he continued to engage in extensive business dealings with Weiss and his associates.

Perhaps most tellingly, in 1999 Gladstone paid Jan Schneiderman $25,000 for an option to purchase an apartment he had never seen. He made no efforts to exercise the option. He offered no plausible reason for the transaction. Indeed, initially he failed to disclose this transaction, despite discovery requests seeking information about it. Gladstone only acknowledged the transaction after he learned that Schneiderman told the United States about the transaction and produced documents to substantiate her testimony. This evidence shows that Gladstone continued to be a willing participant in Weiss's schemes, whether or not he knew the breadth of Weiss's criminal activities.

Gladstone has the burden of proving that he, through Stonewell, was a bona fide purchaser for value of the Center Mall mortgage. Although it is undisputed that the $450,000 loaned to New Contenders and the $550,000 paid for the Center Mall mortgage came from Gladstone's personal funds, the preponderance of the evidence establishes that Gladstone did not believe this money was at risk based on Weiss's promise that the money would be repaid. As such, I find that Gladstone, through Stonewell, was not a bona fide purchaser for value of the Center Mall mortgage because he served only as Weiss's nominee in the purchase of the Center Mall mortgage.

## IV.    RECOMMENDATION.

For the reasons set forth above, I recommend that the Court find that Richard Gladstone has sustained his burden of proof under 18 U.S.C. § 1963(*l*) with respect to his ownership of the stock of Stonewell Corporation and Stonewell Corporation's ownership of all of its assets except for its interest in the Center Mall mortgage. I further recommend that the Court find that Richard Gladstone, on behalf of Stonewell Corporation, has not sustained his burden of proof under 18 U.S.C. § 1963(*l*) with respect to Stonewell Corporation's interest in the Center Mall mortgage and the proceeds from the sale of the Center Mall property. Accordingly, I recommend that the Amended Preliminary Order of Forfeiture be amended to reflect that the United States is entitled to possession only of the

interest of Stonewell Corporation in the Center Mall mortgage, which interest Stonewell held solely as a nominee for Sholam Weiss.

**Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.**

Respectfully recommended in Orlando, Florida on this ___20th___ day of February, 2002.

KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge and Courtroom Deputy
Counsel of Record
Unrepresented Parties

-29-

Date Printed: 02/20/2002


Notice sent to:

    \_\_\_\_  Thomas W. Turner, Esq.
           U.S. Attorney's Office
           Middle District of Florida
           201 U.S. Courthouse
           80 N. Hughey Ave.
           Orlando, FL  32801

    \_\_\_\_  Judy K. Hunt, Esq.
           U.S. Attorney's Office
           Middle District of Florida
           400 N. Tampa St., Suite 3200
           Tampa, FL  33602

    \_\_\_\_  Adelaide G. Few, Esq.
           U.S. Attorney's Office
           Middle District of Florida
           400 N. Tampa St., Suite 3200
           Tampa, FL  33602

    \_\_\_\_  Stephen J. Calvacca, Esq.
           Stephen J. Calvacca, P.A.
           38 E. Pine St.
           Orlando, FL  32801

    \_\_\_\_  William M. Kent, Esq.
           Law Office of William M. Kent
           24 N. Market St., Suite 300
           Jacksonville, FL  32202

    \_\_\_\_  Richard Gladstone
           6087 Northwest 23rd Terrace
           Boca Raton, FL  33496

    \_\_\_\_  Matthew Dollinger, Esq.
           Dollinger, Gonski, Grossman, Permut & Hirschhorn
           One Old Country Rd.
           Carle Place, NY  11514

    \_\_\_\_  Edward B. Gaines, Esq.
           U.S. Attorney's Office
           Middle District of Florida
           200 W. Forsyth St., Suite 700
           P.O. Box 600
           Jacksonville, FL  32201

    \_\_\_\_  Robert Alan Leventhal, Esq.
           Leventhal & Slaughter
           111 N. Orange Ave.
           Suite 700
           Orlando, FL  32801

    \_\_\_\_  Joel Hirschhorn, Esq.

Joel Hirschorn, P.A.
2600 Douglas Rd.
Douglas Centre - Penthouse One
Coral Gables, FL  33134

—  Edwin R. Ivy II, Esq.
Law Office of Edwin R. Ivy, II
710 Springdale Rd.
Orlando, FL  32804

—  John W. Dill, Esq.
Allen & Dill, P.A.
605 E. Robinson St., Suite 130
Orlando, FL  32801

— Keith Pound