FILED

## UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

02 MAR -6 AM 10: 19

CLERK U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

UNITED STATES OF AMERICA

v.                                          Case No.  6:98-cr-99-Orl-19KRS

SHOLAM WEISS

## UNITED STATES' OBJECTION TO FEBRUARY 20, 2002
## REPORT AND RECOMMENDATION (DOCKET NO. ~~1818~~ 1912

The United States of America, pursuant to 28 U.S.C. §636, Fed.R.C.P. 72(b) and

Local Rule 6.02(a), respectfully objects to certain findings contained in the Report and

Recommendation of the Honorable Karla R. Spaulding, United States Magistrate Judge,

dated February 20, 2002 (Doc. No. 1912), for the grounds and reasons stated in this

Objection.

Magistrate Judge Spaulding correctly found that Richard Gladstone ("Gladstone")

and Stonewell Corporation ("Stonewell") acted as the nominee of defendant Sholam Weiss

("Weiss") in the alleged purchase of the Center Mall mortgage from Jasper Properties

Corp. ("Center Mall mortgage"), a Stonewell asset having a nexus to Weiss' money

laundering and RICO activities.  Weiss' interest in Stonewell was properly forfeited by the

jury at the conclusion of his criminal trial.

The United States does not take issue with, nor does it seek to disturb, this correct

and well supported finding by the Court.  Rather, in an abundance of caution, the United

States seeks to correct errors in certain factual findings which do not alter the ultimate

finding as to Richard Gladstone's nominee status for Sholam Weiss, because the failure

to do so will bar the United States from challenging them on appeal.  The United States

1916

SCANNED

further objects to Magistrate Judge Spaulding's improper shifting of the burden of proof from the petitioner to the United States in the ancillary forfeiture proceedings to establish by a preponderance of the evidence that petitioner Gladstone and Stonewell acted solely as Weiss' alter ago, which was clearly erroneous.

## I.   BECAUSE GLADSTONE/STONEWELL WERE DEFENDANT WEISS' NOMINEE IN THE ACQUISITION OF THE CENTER MALL MORTGAGE, NEITHER GLADSTONE NOR STONEWELL HAVE STANDING TO BRING A CLAIM UNDER 1963(l) TO ASSERT A CLAIM TO OWNERSHIP OF THIS ASSET.

Section 1963 of RICO[1] governs criminal penalties, including forfeiture.  It also defines the type and extent of property that can be forfeited, provides the procedure for contesting forfeiture, details the grounds upon which a third party may rely to contest forfeiture, and, establishes the burden of proof necessary for a third party to prevail in a forfeiture contest.

Section 1963(l)(1) and (2) require that a person, other than the defendant, who intends to assert a legal interest in the forfeited property,  file a petition with the court within thirty (30) days from notice of the forfeiture for a hearing to adjudicate the validity of the alleged interest.  **The person filing the petition has the burden of proof**.  To prevail, a petitioner must establish, by a preponderance of the evidence, that the legal right, title or interest in the property is vested in the petitioner rather than the defendant or that the petitioner's right, title or interest in the property was superior to any right, title or interest of the defendant at the time of the acts which gave rise to the forfeiture.  Alternatively, a petitioner may establish that it was a bona fide purchaser for value of the right, title or interest in the property and was at the time of purchase without reasonable cause to

---

[1]  18 U.S.C. §1963 (a), (b), and (l).

2

believe that the property was subject to forfeiture. 18 U.S.C. § 1963(I)(6). These are the only grounds that are available to a petitioner. United States v. Gilbert, 244 F.3d 888, 911 (11th Cir. 2001).

Section 1963(I)(2) expressly provides that only persons *other than the defendant* can preserve their interest in forfeited property. Representatives of a defendant, such as a nominee, are excluded from bringing a claim under Section 1963. Thus, when a petitioner serves as the nominee for a defendant, the petitioner has failed to satisfy Section 1963 and the petition should be dismissed. Braxton v. United States, 858 F.2d 650, 655 (11th Cir.1988). Otherwise, a defendant could be free to re-litigate his entitlement to the property through a representative. This result would be contrary to Congressional intent. United States v. Gilbert, 244 F.3d at 910, fn. 54.

A court's scrutiny of whether a record owner's title is legitimate and obtained at arms length is not unusual. Indeed, it is commonplace in claims of "innocent owners" arising from both criminal and civil forfeitures. Courts recognize that bare legal title may not be sufficient in the world of criminal racketeering and drug smuggling because criminals often attempt to disguise the fruits of their ill gotten gains (property) by placing title in someone else's name. United States v. Single Family Residence And Real Property Located at 900 Rio Vista Blvd., Ft. Lauderdale, 803 F.2d 625, 629-30 (11th Cir. 1986)(courts look behind formal title to determine whether holder is strawman set up to conceal the financial affairs or illegal dealings of another); United States v. Barnette, 902 F.Supp. 1522, 1537-38, 1540 (M.D.Fla 1995)(defendant sought to evade forfeiture by transferring stock to family on eve of indictment; despite transfer, defendant continued to influence company's business affairs); United States v. One 1977 36 Foot Cigarette Ocean Racer, Florida Registration

3

# FL9350CT, 624 F.Supp. 290, 292-93 (S.D.Fla.1985)(strawman is a common tactic of drug smugglers designed to mask ownership and make it easier for the nominal owner to assert the "innocent owner" defense in a forfeiture proceeding).

Thus, in circumstances such as those presented in the case *sub judice*, where the Government has already met its burden to prove by a preponderance of the evidence that an asset is subject to forfeiture and a jury has forfeited a defendant's interest in the property under 18 U.S.C. 1963, the burden is on the claimant to demonstrate, by a preponderance of the evidence, that: (a) he is not the alter ego or instrumentality of the defendant, if that is at issue; and (b) he has a superior right or interest in the forfeited property or he is a bona fide purchaser for value without notice that the property is subject to forfeiture. If the claimant cannot establish that he was not the defendant's nominee, then the inquiry ends as that person does not meet the criteria or standing to bring a claim under Section 1963. United States v. Gilbert, 244 F.3d at 916; Braxton v. United States, 858 F.2d at 654-655.

In this case, although the Court correctly found that Gladstone/Stonewell were Weiss' nominees in the assignment of the Center Mall mortgage from Jasper to Stonewell and therefore not a bona fide purchaser despite this finding, the Magistrate Judge did not recommend dismissal of Gladstone's petition.

Moreover, the Magistrate erred and mis-applied the analysis of the District Court for the District of Columbia of United States v. BCCI Holdings (Luxemborg), S.A., 69 F.Supp. 2d 36 (D.D.C.1999) to this case. The order of July 26, 2001 (Docket No.1817), Magistrate Judge Spaulding denied the United States' July 20, 2001 Motion In Limine that the Court adjudicate the standing of Richard Gladstone as a threshold matter (Docket No. 1802)

4

stating: "The issues of standing are inextricably intertwined with the merits of the claim. Accordingly, I will not decide the petitioner's standing to bring the claim before hearing all of the evidence presented at the evidentiary hearing."  However, Magistrate Judge Spaulding only made a limited finding in the Report and Recommendation concluding, at page 23: "I find that Gladstone, on behalf of Stonewell, has standing to contest the amended preliminary order of forfeiture because that order encompasses property that the United States no longer claims is forfeitable, that is the stock and assets of Stonewell Corporation other than its interest in the Center Mall mortgage."  The Court made no finding as to Gladstone's lack of standing as to the proceeds of the Center Mall mortgage based on his nominee status for Weiss through Stonewell.  Moreover, the United States believes that the Court's analysis as to the other property commingled with the Stonewell Center Mall mortgage property, is flawed for the reasons discussed below.

Further, the Court erred when it relied upon the procedure created by the BCCI court to dispose of third party claims under 1963(l) **when the forfeited property was not part of the jury's original forfeiture.**  Id. at 53.

For example, it was common practice in BCCI for the court to issue supplemental forfeiture orders to include newly discovered forfeitable property which was not known to the Government and not presented for forfeiture at the time the original preliminary order of forfeiture was entered.  Id. at 43-44.  Thus, each time the Government presented the court with additional assets which the government contended were forfeitable, the court was required to make a preliminary finding, by a preponderance of the evidence, whether the property discovered by the Government was in fact subject to forfeiture under §

5

1963(a).  On each occasion, the court conducted an ancillary proceeding in which third parties could petition to amend the order of forfeiture to recognize their legal interests in the forfeited property.  Id. at 44.   This procedure was developed before the adoption of Fed. R. Crim. R. 32.2.

As part of this procedure, the court would make a threshold determination whether the Government established by a preponderance of the evidence that the newly found property was subject to forfeiture and that the person or entity holding the property was the alter ego of one of the defendants.  At this initial stage, only the defendant was permitted to object to the Government's motion to amend the preliminary order of forfeiture to include the newly discovered property.  Once the court found that the property was subject to forfeiture and that the alter ego theory applied, the Government was then required to give notice of the forfeiture to the putative owner and to give the putative owner an opportunity to contest the court's finding in an ancillary proceeding by filing a § 1963(l) claim.  In order to contest the forfeiture, the claimant then had to allege facts sufficient to demonstrate that the court's alter ego finding had been in error.  Id. at 53.  In other words, ultimately the putative owner had the burden of proof on this issue.  This is consistent with the well developed body of law which places the burden of proof in a 1963(l) petition squarely on the shoulders of the claimant, not the United States.  However, this analysis was not germane to the posture of the instant case.

In this case, the Court erred in its interpretation of BCCI to require that the United States prove, by a preponderance of the evidence in this ancillary forfeiture proceeding, that Gladstone/Stonewell were Weiss' nominees for all purposes and that absent such proof they had standing to bring the 1963(l) claim.  The Court applied this analysis even

6

though the District Court had previously concluded that the asset forfeited by the jury in the criminal action was defendant Weiss' interest in the Center Mall mortgage and the proceeds from the sale of the Center Mall.[2]  The Magistrate Judge's application of BCCI is incorrect for two reasons.

First, unlike BCCI, this case does not involve the forfeiture of later discovered forfeitable property.  The threshold determination fashioned by the BCCI court to deal with the unique circumstances before it is unnecessary and improper when applied to this case.  In this case, the jury already made the finding that Weiss used Stonewell as his nominee, through Gladstone, to front for Weiss in the fraudulent encumbrance of the Center Mall so that Weiss could retain possession and control of monies which he had looted from National Heritage Life Insurance Company, Inc.[3]  The jury forfeited Weiss's interest in Stonewell, not its stock, which is a forfeiture of the Stonewell assets having a nexus to Weiss's money laundering activity.  In fact, Gladstone testified in the criminal trial and the scheme involving Stonewell and the Jasper assignment of the Center Mall mortgage was addressed by the United States in detail during the trial.  It was well supported by witness testimony and documents presented to the jury both in support of, and defense to, the

---

[2]  The Court's application of the BCCI analysis is found at pages 22 and 23 of the Report and Recommendation (Doc. No. 1912).  The District Court's finding that the asset forfeited by the jury in the criminal trial was defendant Weiss' interest in the Center Mall mortgage which includes the proceeds from the sale of the Center Mall) is found at pages 8 through 11 of the Order of the Honorable District Judge Patricia C. Fawsett, dated August 16, 2001(Doc. No. 1835).

[3]  Sholam Weiss' counsel, Joel Hirschhorn, argued in the criminal case that the only way that Stonewell could be forfeited would be if the jury rejected Richard Gladstone's testimony and found him to the nominee of Weiss.  The jury did just that through the verdict of forfeiture.

Government's claims.  Therefore, by applying the BCCI procedure to this case, the Court has impermissibly and improperly shifted the burden of proof from Gladstone/Stonewell to the United States.

Second, it is, and has been, the United States' position that despite the fact that the stock and few other assets of Stonewell are properly forfeitable under the law[4], the jury forfeited the Stonewell asset having the nexus to Weiss' money laundering scheme which was the Center Mall mortgage.  Although out of leniency the United States has stated during the evidentiary hearing that it did not seek to forfeit the stock or other assets of Stonewell, it was incorrect for the Court to use the so-called "concession" to draw inferences that Stonewell was materially used for purposes other than to acquire the Center Mall mortgage in the sham transaction with Weiss.  This occurred in the following colloquy where government counsel stated he believed that the stocks were "commingled" with other Stonewell assets (the Center Mall mortgage) by Gladstone "possibly knowing that (Stonewell) was tainted" but in the spirit of leniency, government counsel stated that the Gladstone's "may be entitled to such sums back." (Docket No. 1892 at 13-14). Moreover, the United States believes the Magistrate Judge erred in relying on such "concession" by making the finding at page 23 of the Report and Recommendation that:

---

[4] Stonewell was formed, and its stock created and issued to Gladstone, for the purpose of facilitating and effectuating Weiss' money laundering scheme.  Furthermore, as stated in these Objections, Gladstone's belated stock trading in Stonewell was done strategically to defeat allegations that Gladstone and Stonewell were merely Weiss' nominee in the Center Mall mortgage transaction. United States v. McGauley, 279 F.3d 62, 75-76 (1st Cir. 2002); United States v. Puma, 937 F.2d 151, 157 (5th Cir.1991). Thus, under the law, the Stonewell stock and other assets would be properly forfeitable.

"the preponderance of the evidence shows that Stonewell was an entity that acted independently of Weiss."

Regardless, because the United States contends that Gladstone/Stonewell was Weiss' nominee for purposes of the Center Mall mortgage assignment and that this is the Stonewell asset subject to forfeiture, the Court's requirement that the United States establish that Gladstone/Stonewell was Weiss' nominee for all purposes creates and erects an improper burden for the United States to meet that is contrary to law.

In this case, the Court properly and correctly found that Gladstone/Stonewell were Weiss' nominee in the Center Mall mortgage assignment transaction. The law requires that this Court dismiss Gladstone's Petition of Innocent Owner because he lacks standing to bring this claim under §1963(l).

## II.   THE COURT SHOULD CORRECT FACTUAL FINDINGS THAT ARE NOT SUPPORTED BY THE RECORD

### A.   GLADSTONE DID NOT USE STONEWELL TO TRADE STOCK UNTIL WELL AFTER HE WAS ON NOTICE OF THE CLAIMS CONCERNING WEISS AND STONEWELL AND THEN ONLY DID SO TO REBUT CLAIMS THAT HE OR STONEWELL WAS WEISS' NOMINEE

The Court found in the Report and Recommendation that (emphasis added):

> . . . In March 1997, Gladstone asked Abato to form a corporation to accept assignment of the Center Mall mortgage. (TR 129, 132, 145, 148-49, 156). Pursuant to Abato's advice, Richard Gladstone paid Loughlin Associates to incorporate Stonewell Corporation in Nevada. (TR. 58-59, 130, 132; Pet Ex. 15). Articles of Incorporation for Stonewell Corporation were signed on March 12, 1997 and filed on April 1, 1997. (TR. 87; Pet. Ex. 13). **Thereafter, Gladstone used Stonewell to trade in stocks as well as to acquire the Center Mall mortgage.** (TR. 71-73, 103, 224-26; Pet Ex. 26).

Emphahsis added. Report and Recommendation, p. 16.

9

The Court's finding that Stonewell was formed for the purpose of acquiring the Center Mall mortgage is correct.

By contrast, the Court's finding that after Stonewell was formed Gladstone used it to trade stocks as well as hold the mortgage incorrectly implies that Gladstone formed Stonewell for the dual purposes of Weiss' use in the Center Mall mortgage transaction and for Gladstone's use in trading stock. This implication and finding are not supported by the record. The record contains both direct and circumstantial evidence which strongly supports a finding that Stonewell was only formed for the purpose of facilitating Weiss' money laundering activity and that Gladstone never intended to use Stonewell for any purpose other than to facilitate Weiss in his criminal activity.

For example, Stonewell was incorporated in April 1997, but it was not until September 2000, over three years later and after Gladstone brought his Innocent Owner Petition, that Stonewell first filed Federal tax returns for the years 1997, 1998 and 1999 (TR. 57-59).[5]

It is undisputed that the accountant who filed these tax returns, Jack Levine, C.P.A., was not retained for this task until March/April 2000 (Id.). This was at or about the same time that Gladstone filed the Petition for Innocent Owner. (Doc. No. 1406).

In addition to taxes, Mr. Gladstone also did not pay the administrative fees necessary to keep Stonewell in good standing in Nevada until after he filed his Innocent

---

[5] The tax returns contain the typewritten words "Amended" on the pre-printed tax form, but there is no evidence in the record that these returns amend any prior return. The face page of the 1997 Federal tax return has the "initial" box checked off for the type of return in the top one-third of the page. Mr. Levine's testimony further demonstrates that his filing of these returns was an initial filing.

Owner Petition. (TR. 256-57, Pet. Ex. 38).

Although Mr. Levine opined during his testimony that it was his understanding that
the delay in filing tax returns was due to a dispute that Gladstone had with another
accountant, there is no evidence in the record that the information necessary to prepare
these returns when due was not available from other sources.  Common sense suggests
otherwise. Mr. Levine testified that when he got involved in April 2000, he demanded that
Mr. and Mrs. Gladstone provide him with all of the necessary documentation to prepare the
returns (TR. 58). Mrs. Gladstone testified that she was able to produce the information
necessary to complete the tax filings from the documents in her possession or the
brokerage firms or other financial institutions where she and her husband maintained
accounts. (TR 102-104).

Similar evidence that Stonewell was formed for only one purpose can be found in
the fact that the only activity conducted by Stonewell in 1997 was activity related to the
assignment of the Center Mall mortgage from Jasper. Gladstone attempted to obfuscate
this fact through the testimony of Mr. Levine concerning shareholder loans. Specifically,
Gladstone's attorney and Mr. Levine engaged in the following dialog concerning the
capitalization of Stonewell:

Q:    Okay sir. Now, continuing with the tax return, exhibit 14, as of 1997, how
      much, what was the capital account that was created for the shareholder?

A:    25,000 dollars.

Q:    And how much money was loaned to the corporation?

A:    1,209,522.

Q:    And that was loaned by whom?

11

A:    Lauri and Richard Gladstone.

Q:    And is there interest charged against that sum?

A:    Ten percent.

(TR. 77).

However, a review of Stonewell's 1997 General Ledger, which was generated by

Mr. Levine for use in preparing Stonewell's 1997 Federal tax return, demonstrates that this

shareholder loan is simply a re-characterization of the sham Jasper transaction.    The

General Ledger itemizes the shareholder's loan as follows:

2610 Loans from Shareholders

| | |
|---|---|
| Rec Capital Stock | 25,000.00 |
| Rec Mtg Payments on Shopping Center | -1,000,000.00 |
| Rec Interest Expense | -78,630.14 |
| Rec Legal Fees Paid by S/H | -36,300.37 |
| Rec Purchase of Ins Jersey Search Title Serv Inc 12/31/97 | -9,634.50 |
| Rec Interest Exp - S/H | -109,956.50 |
| Ending Balance | -1,209,521.51 |

(Pet. Ex.14, Stone 00031).  In other words, the $1,000,000 loan consists of the alleged

consideration for the mortgage ($450,000 for New Contenders and additional $550,000 for

the Center Mall mortgage), interest on that sum at ten percent (10%) from March 1997,

legal fees allegedly arising out of the transaction, the purchase of title insurance, and

interest on the obligation. This "loan" was then carried over onto subsequent returns which

increased each year, due in part, to the continued accrual of interest.  (TR. 86).

Mr. Levine also testified that Stonewell's total assets as reflected on Stonewell's

12

1997 federal income tax return were $4,588,652.00. This sum consists solely of the face amount of the Center Mall mortgage of $4,300,000.00, deficiency assessments of $288,652.00 added to the 1993 judgment, interest and other costs. (TR. 76-77).

Even assuming *arguendo* that the $25,000.00 allegedly contributed by Gladstone for the capital stock was not related to the sham transaction with Jasper, a finding not supported by Gladstone's acknowledgment that Stonewell was formed *because of the transaction*[6], approximately ninety-eight percent (98%) of the shareholder's loan in 1997 was related to the Center Mall mortgage transaction.

It was not until October/November 1998, approximately eighteen (18) months after Gladstone formed Stonewell for the Center Mall mortgage assignment, after Gladstone learned of the claims of NHL to the proceeds of the sale of the Center Mall in the LPDA Action, and after Weiss was indicted in the Criminal Action[7], that Gladstone first began using Stonewell to trade in stocks. (TR. 70-73, 263, 267, Govt. Ex. 1).

This conduct by Gladstone, like the other post Center Mall mortgage transaction conduct that Magistrate Judge Spaulding correctly found persuasive in finding that Gladstone was Weiss' nominee in the assignment of the Center Mall mortgage from Jasper, further demonstrates that Stonewell was formed only for Weiss' use to further his money laundering activities. These much later stock trades are nothing more than an attempt to falsely attribute legitimate transactions to Stonewell to rebut later claims that

_____

[6] TR. 149, 156, 205-206.

[7] Gladstone was the alleged unnamed co-conspirator and Weiss nominee referenced in Racketeering Acts 34 and 35 of the Indictment, paragraph 183, which details the fraudulent Stonewell transaction at issue in this proceeding. Gov't Ex. 1

13

Gladstone/Stonewell were Weiss' nominee in the Center Mall mortgage transaction. Indeed, even the relatively small volume and number of the Stonewell trades is probative that they were merely token.

For example, Mr. Levine testified that in compiling Gladstone's personal 1997 Federal income tax return, he determined that Gladstone's stock trading activity that year was in excess of $22 million. He stated that in 1998 and 1999 this figure doubled to approximately $42-44 million. (TR. 65-67). Mr. Levine further testified that the number of Gladstone's personal trades were countless. He illustrated that fact by testifying that Mr. Gladstone's 1996 tax return had approximately ninety-five (95) pages of trades with each page having fifty (50) lines with two (2) trades per line which is approximately 9,500 trades per year. (TR. 66-67).

In stark contrast, the dollar volume of the Stonewell trades conducted by Gladstone in 1998 and 1999 were only a mere .046% and 1.8% of his total personal trading volume for those years respectively.[8] During this two year period, the number of stock trades in the Stonewell account were less than thirty or .016% of Gladstone's number of trades for those years.

Finally, a review of the Stonewell securities accounts for the time period after the forfeiture of Stonewell, from October 1999 through September 2000[9], demonstrates that

---

[8] Stonewell's 1998 GKN securities account statements reflect a dollar volume of stock trades of approximately $196,000.00 and approximately three (3) trades. Similarly, Stonewell's GKN securities account statements for 1999 reflect a volume of stock trades, buys and sells, of approximately $804,000.00 arising from approximately twenty-five (25) trades many of which are trades in stock options.

[9] The GKN securities statements ending September 2000 are the last statements introduced into the record by Gladstone as part of Pet. Ex. 27.

Gladstone's light trading activity dropped from approximately twenty-five trades (25) trades in 1999 to zero (0) trades in 2000[10].  The net value of the account went from a high in 1999 of $216,423.00 to $28,520.00 as of September 2000.  (Pet. Ex. 27, Stone 010697, 003042).  This conduct is yet further evidence that the Stonewell trading was merely an attempt to disguise the fact that the true purpose of Stonewell was to serve Weiss.

It is respectfully submitted that the statement in Magistrate Judge Spaulding's Report and Recommendation that Stonewell was formed for purposes other than to facilitate Weiss' money laundering activity is not supported by the record.

III.    **THE COURT SHOULD ALSO CORRECT MISTAKES MADE IN THE REPORT AND RECOMMENDATION**

   A.    Gladstone Did Not Divulge In His Sworn Responses To Discovery Or Initial Trial Testimony That He Entered Into An Option Agreement To Buy Jan Schneiderman's Apartment For $25,0000 Which Was Used As A Cover To Pay Her Legal Fees.

At page 27 of the Report and Recommendation, the Court correctly found that Gladstone initially failed to disclose a sham transaction between Gladstone and Jan Schneiderman involving a $25,000.00 payment from Gladstone to allegedly purchase on option to buy her apartment.  The true purpose of this transaction was to disguise Weiss' payment of $25,000.00 for Jan Schneiderman's legal fees for her representation in the criminal trial.  This sum was paid through Gladstone and disguised as an arms' length transaction. (TR. 11/13/01, p. 134-42, Gov't Ex. 133, 135, 137 and 139).  Specifically, the Report and Recommendation reads:

---

[10]  Many of the "trades" in 1999 were option purchases, cancellations and re-purchases.

15

> Indeed, [Gladstone] initially...failed to disclose this transaction, despite discovery requests seeking information about it. Gladstone only acknowledged the transaction after he learned that Schneiderman told the United States about the transaction and produced some documents to substantiate her testimony.

This correct finding is in contrast to the inadvertent incorrect earlier finding in the Report and Recommendation, at page 20, that:

> Gladstone stated in sworn answers to interrogatories and in his initial testimony at the evidentiary hearing in this case that Schneiderman offered to sell him an option to purchase her apartment in New York, but the transaction was not consummated. (TR. 518-24, 568; Gov't. ex. 89, interrogatory 14).

As acknowledged by the Court later in the Report and Recommendation on page 27, the record is clear that Gladstone did not initially disclose the transaction and the above statement found at page 20 is incorrect. (TR. 518-24, 568-569; Gov't. Ex. 89, Int. 14, Gov't Ex. 138, Rpd 6).

B.   The Acts Giving Rise To The Forfeiture Occurred in 1993 Not 1989

At page 24 of the Report and Recommendation, the Court correctly found that Stonewell's claim to the Center Mall mortgage vested after the commission of the acts that gave rise to the forfeiture. Notwithstanding, the Court incorrectly found that the date of the acts giving rise to the forfeiture occurred in 1989 instead of 1993 which the Court had previously correctly found was the date of the assignment of the Center Mall mortgage to Jasper through the use of the proceeds of racketeering activity. (Report and Recommendation, p. 6-7, Gov't. Ex. 116, 117). Thus, the following passage should be corrected by amending the underlined date of 1989 to 1993 (underline added):

> The Center Mall Mortgage was subject to forfeiture at the time it was assigned to Jasper through use of proceeds of racketeering activity, and this case $3.1 million fraudulently acquired from NHLIC...That

> assignment, which occurred in 1989, preceded the assignment
> of the Center Mall mortgage to Stonewell [in 1997].

Report and Recommendation, p. 24.

In any event, the Court's conclusion that Stonewell's claim to the Center Mall mortgage vested after the 1993 commission of RICO acts giving rise to the forfeiture is correct because Gladstone's/Stonewell's alleged interest in the mortgage was not allegedly acquired until 1997 and, therefore was not superior to the United State's interest which vested in 1993.

C.      The Reference to "Forfeiture Judgment" Is An Error

At pages 26 and 27 of the Report and Recommendation, the Court states (error underlined):

> In the eight months between the assignment of the mortgage and
> Gladstone receiving notice that the validity of the mortgage was being
> questioned in *Williams v. LPDA*, Gladstone did not aggressively seek
> to convert the mortgage to a tangible asset.  He had a forfeiture
> judgment, which could have been used to compel a sale of the
> underlying property.

The Court's reference to a "forfeiture judgment" should instead refer to a foreclosure judgment which is consistent with the record. Gov't. Ex. 117.

D.      The Reference to the Title Company "Would Be At Fault" is in Error.

At page 16 of the Report and Recommendation, Magistrate Judge Spaulding made the following finding:

> Weiss instructed Blutrich to call a specific title company to get
> title insurance for the transaction [Jasper Assignment to
> Stonewell) so that, if the assignment was contested, the title
> company would be at fault rather than the participants in the
> transaction. (TR. 907-8).

Emphasis added.

17

The Court's aforesaid finding that if the assignment were contested that the title company would be at "fault" is in error because the testimony of Michael Blutrich reflected that if the assignment were contested or reviewed, that if title insurance were obtained then the title company would take the "fall" (be liable) for the title insurance for the assignment. Michael Blutrich's testimony on this point was as follows:

> A. Yes. This is the exact conversation where that exactly occurred. Mr. Weiss, with Mr. Gladstone sitting there, although Mr. Gladstone wasn't speaking, said to me, look Mr. Gladstone doesn't want to close this without title insurance. I indicated title insurance in my opinion wasn't needed in this particular transaction. And he said well there is a lot going on with the bad publicity, with the grand jury sitting, with the civil cases pending and with a lis pendens on the property. What we've got to do is get title insurance on this property so that if there comes a time when somebody contests this or someone's going to look at it <u>it's going to be the title company that takes the fall and not anybody in this room</u> . . . .

Emphasis added.

> Q. Did you then attempt to obtain title insurance as requested by Sholam Weiss for this deal?

> A. And he came up with this concept that I could sell to the title company that a lis pendens runs to the real estate and therefore title insurance might have to list a lis pendens if the property was being sold, but that because it was a mortgage, a lis pendens doesn't run to the mortgage, doesn't affect the mortgage, therefore it need not be placed on the property and it need not be put on the title insurance policy and didn't need to be accepted.

> I basically said that I thought that was unbelievably ridiculous, but that I would do what I could to sell it to the title company. I thereupon in answer to your last question, Mr. Gaines, called Mr. Colshorn from the title, from the title company or the closer or whatever he was, the person that I was indicated to call.

> Q. How did you get that indication to call that person?

18

A. Well, I believe Mr. Weiss told me that that was the person
that I should be doing.

TR. 907, 908-909.

The import of the arrangement for the title company "to take the fall" as opposed to

the Court's finding that the title company would be at "fault," reflects that Gladstone was

not at risk in the Jasper/Stonewell transaction and reflects his role in the scheme as a

nominee for Sholam Weiss and reflects that he was not a <u>bona fide</u> purchaser.

## IV.    CONCLUSION

The United States respectfully makes these objections pursuant to 28 U.S.C. §

636(b)(1) and requests that the District Court, upon *de novo* review, modify the foregoing

Report and Recommendation of Magistrate Judge Karla Spaulding dated February 20,

2002 in accordance with the United States' objections.

Respectfully submitted this __5ᵗʰ__ day of March, 2002.

MAC CAULEY
United States Attorney


By:   *Edward B. Gaines*

EDWARD B. GAINES
Assistant United States Attorney
Florida Bar No. 0864609
200 W. Forsyth Street, Suite 700
Jacksonville, Florida 32202
Tel. No. (904) 232-2682
Fax (904) 232-2620

19

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been sent via

Federal Express to Matthew Dollinger, Esquire, Dollinger, Gonski & Grossman, One Old

Country Road, Carle Place, New York 11514, this $\underline{\text{5th}}$ day of March, 2002.

EDWARD B. GAINES
Assistant United States Attorney

N:\PFuller\Lifeco\Sholam Weiss\objectionsreprec022002.wpd

20