**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**UNITED STATES OF AMERICA,**

**v.**                                                    **Case No.  6:98-cr-99-Orl-19KRS**
                                                          **(Forfeiture)**

**SHOLAM WEISS,**

**In re: Claim of Petitioner, GOLDIE WEISS-FEIG.**

**UNITED STATES' STATEMENT OF UNCONTESTED MATERIAL**
**FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

The United States of America, by and through the undersigned Assistant United

States Attorney, hereby submits this Statement of Uncontested Facts in support of its

Motion for Summary Judgment.

**I.      255 VIOLA ROAD**

1.      In 1975, Sholam Weiss incorporated Windsor Plumbing Supply, Inc.  He

was its president and sole shareholder.  Ex. 1 (Ch. 11 Bankruptcy Petition, Weiss

Affidavit) at Bates 4244.

2.      That same year, on May 19, 1975, he married Petitioner.  Doc. 2309-1

(Petitioner's Amended Response to Request for Admissions "RFA"), RFA 1.

3.      On July 21, 1988, Weiss purchased Viola Road for $950,000 in cash,[1]

taking title in his name only.  Ex. 2 (Deed); Ex. 3 (Weiss's Statement of Assets, Govt.

Trial Exhibits 1236 & 1237).

---

[1] As of October 1, 1988, Weiss reported owning six residential real properties.
Ex. 3 at Bates 3265.  Notably, he reported that there was no mortgage on Viola Road
and that it had a market value of $950,000.  *Id.*

4.      Weiss, Petitioner and their children then moved to Viola Road and used it as the family residence.  Petitioner continues to reside at this address. Ex. 4 (Petitioner's Deposition Transcript dated October 19, 2010) at 8:21-22.

A.      **Weiss's Financial Troubles and Efforts to Protect His Assets**

5.      When Weiss purchased Viola Road in July 1988, he had previously guaranteed, in two transactions, a $5 million loan to Windsor from First Jersey National Bank that was also secured by mortgages on Windsor's property.[2]

6.      On November 28, 1988, only a few months after purchasing Viola Road, CofaCredit, S.A. sued Weiss and Windsor for fraud, conspiracy and civil RICO.  Ex. 6 (*CofaCredit, S.A. v. Windsor Plumbing Supply, Inc., et al.*, Case No. 96-9302, 1999 WL 565607 (2nd Cir. Aug. 3, 1999) at Bates 4072); *see* Ex. 1 at Bates 4248.[3]

7.      Less than two months later, on January 3, 1989, another lawsuit was filed against Weiss and Windsor by Societe Generale for breach of contract.  Ex. 8 (Docket Sheet for Case No. 1:89-cv-00007-ERK-JLC).[4]

8.      In May 1989, Weiss encumbered the Viola Road Property with a $250,000.00 mortgage in favor of his friend, Moshe Mishal.  Ex. 10.

---

[2]  The first loan to Windsor of $3 million occurred in February 1988.  Ex. 5 (Criminal Trial Testimony of Raymond DiStefano) at 90:11-96:14 (discussing Govt. Ex. 572); 101:19-23.  Two months later, the loan was amended to $5 million.  *Id.* at 98:24-99:7 (discussing Govt. Ex. 573).  First Jersey National Bank was later purchased by National Westminster Bank of New Jersey.  *Id.* at 92:23-93:3.

[3]  In 1997, a $999,267.87 judgment was entered.  Ex. 7.

[4]  A default judgment was entered against Weiss in the amount of approximately $429,000.  On August 27, 1990, Societe Generale filed a transcript of the default judgment.  Ex. 9.

**United States' Statement of Uncontested Facts - Page 2**

9.      The next month, Weiss personally guaranteed a $3.5 million promissory

note that Windsor executed in favor of Seward Company.  Ex. 11 (Criminal Trial

Testimony of Sherwood Gordon) at 227:16-228:24; 240:13-21.  This note was secured

by mortgages of $499,000 on each of seven real properties owned by Windsor and

Weiss.  *Id.* at 223:10-14; 235:25-237:30 (discussing Govt. Exs. 505, 500).

10.      On August 17, 1989, less than 90 days after Weiss encumbered the Viola

Road Property with the Mishal Mortgage, a satisfaction of the mortgage was filed.  Ex.

12 (reflecting payment of $300,000).

11.      Also on August 17, 1989, Weiss encumbered Viola Road with another

mortgage in the amount of $390,000 from Williamsburg Savings Bank.  Ex. 13.[5]

12.      Less than four months later, Windsor's creditors filed an Involuntary

Petition for Bankruptcy on January 23, 1990, *In re: Windsor Plumbing Supply Co., Inc.,*

Case No. 190-10224-352 (E.D.N.Y.).  Ex. 1, Weiss Affidavit at Bates 4244.

---

[5]  The same day, Weiss also obtained a $245,000 mortgage from Williamsburg
Savings Bank on 4728 Beach 47th Street, Brooklyn, a home he had purchased on
March 28, 1979 and in which he and Petitioner resided before moving to Viola Road.
Ex. 14 (Deed); Ex. 15 (Mortgage); Ex. 4 at 39:6-7.  Although her Petition asserts that
this home was purchased with money from her parents, Petitioner admits that she "has
no idea" if Weiss used the money her father allegedly gave him as a dowry to purchase
the property.  Ex. 4 at 91:14-92:4.  While the amount of the down payment is unknown,
Weiss completed the purchase with a $70,000 purchase money mortgage extended by
Manufacturer's Hanover Trust.  Ex. 16.  A satisfaction of that mortgage was recorded on
September 11, 1989.  Ex. 17.  On March 15, 1990, Weiss transferred title to Beach 47th
Street to Aron Trynauer.  Ex. 18.

**United States' Statement of Uncontested Facts - Page 3**

13.    On March 9, 1990, Weiss transferred title to Viola Road to Petitioner.[6] Ex. 19.

14.    Not even two weeks later, on March 21, 1990, Weiss, on behalf of Windsor, filed a Chapter 11 Voluntary Petition, converting the involuntary Chapter 7 bankruptcy to a Chapter 11.  Ex. 1.  The petition listed 17 pending actions against Windsor and Weiss, *id.* at Bates 4251-4252, and Weiss acknowledged that the bankruptcy involved more than $18 million in claims.[7]  *Id.* at Bates 4247.

---

[6]  On March 8, 1990, Weiss also transferred title to 4804 16th Avenue, Brooklyn ("16th Avenue"), where his parents had lived since at least 1975 when Weiss and Petitioner married, to Petitioner.  Ex. 20 (Deed); Ex. 4 at 35:14-17.  Petitioner admits that Weiss's parents continued to live there and that she never assumed the financial responsibility for the home.  Ex. 4 at 36:7-10.  On January 2, 1997, while Weiss was still in the vice grip of defending criminal and civil litigation, Petitioner transferred 16th Avenue to Weiss's brother-in-law, Juda Lefkowitz.  Ex. 21.  Petitioner does not recall if she talked with Weiss before making this transfer, although his parents still lived there.  Ex. 4 at 106:23 -107:19.

Ten months after transferring Viola Road to Petitioner, on January 2, 1991, Weiss transferred his interest in 3425 Prairie Avenue, Miami Beach, Florida ("Prairie Avenue") to Petitioner.  Ex. 22.  This property was Weiss's parents' "winter home" and was also used by Weiss, Petitioner and their children for holidays.  Ex. 4 at 37:12-24.  Like 16th Avenue, Weiss, not Petitioner, paid the bills for Prairie Avenue.  *Id.* at 37: 25-38:2; 109:18-24.  Also like 16th Avenue, on July 10, 2001, Petitioner transferred Prairie Avenue to Juda Lefkowitz, purportedly because Weiss owed him money.  Ex. 23 (Deed); Ex. 4 at 110:5-7; 111:25-112:3.  Petitioner admits that she asserted her Fifth Amendment rights and refused to answer questions during her deposition on October 23, 2004 in the foreclosure action of *Denn v. Goldie Weiss* as to: (1) her transfer of 16th Avenue to Lefkowitz; (2) whether Weiss was the real owner of the property; (3) Weiss's transfer of Prairie Avenue to her; and (4) her transfer of Prairie Avenue to Lefkowitz; Petitioner was represented by an attorney in this deposition.  Doc. 2309-1, RFA 32-36. The foreclosure action which was brought by the Receiver was filed on January 17, 2002 in Rockland County, New York and is stayed pending the resolution of this forfeiture.  Ex. 24 (Docket Sheet and an unsigned copy of filed Correspondence).

[7]  Additional lawsuits were also successfully filed against Windsor and Weiss, including: (1) on August 30, 1990, Bank Leumi Trust Company of New York obtained a judgment against Windsor and Weiss for $1,391,486.06, (Ex. 25, Govt. Trial Ex. 1235); (2) on September 22, 1990, a mortgage foreclosure action was brought by Williamsburg

**United States' Statement of Uncontested Facts - Page 4**

**B.     The Sham Separation Agreement**

15.     Although the Deed transferring title of Viola Road from Weiss to Petitioner was executed on March 9, 1990, Petitioner contends that she and Weiss signed a Separation Agreement that transferred title from Weiss to her on October 26, 1989 when the parties allegedly separated. (Doc. 2251 at ¶ 6).[8]

     1.     *Jan Schneiderman's Declaration and the Separation Agreement*

16.     Jan Schneiderman, a former Weiss attorney and a convicted co-defendant in this case, first became acquainted with Weiss in or about January or February 1990. Ex. 28 (Schneiderman Declaration) at ¶ 4.  At the time, Weiss was consulting an attorney, Leo Fox, who rented an office in the same suite as Schneiderman, about the Windsor bankruptcy and a possible personal bankruptcy.  *Id.*     17.     Weiss told Schneiderman his concerns about his business and the fact that he had personally guaranteed many of the business loans with various banks and other creditors.  *Id.* at ¶ 5.  Specifically, he was concerned about losing his home and other real properties to his

_____

Savings Bank against Weiss and Petitioner to foreclose the first mortgage on Viola Road, resulting in a $390,000 judgment against them; (3) on October 9, 1990, National Westminster Bank of New Jersey filed a transcript of judgment for $909,501 against Weiss (based upon his breach of his personal guarantee of Windsor debt) and subsequently filed a transcript of judgment for $4 million (Ex. 26); and on July 24, 1991 a $329,635.42 judgment in favor of Kohler Company was entered against Weiss.  Ex 27.  By the time these creditors could attempt to execute their judgments, Weiss appeared to be penniless.

   [8]  Notably, the Separation Agreement was allegedly signed less than a month after Weiss encumbered Viola Road with a $390,000 mortgage in favor of Williamsburg Savings Bank.  It also purports to be signed before the date that judgments were entered against Weiss in the numerous lawsuits brought against him and Windsor.

**United States' Statement of Uncontested Facts - Page 5**

creditors, including but not limited to Bank Leumi and Cofa Credit, and that his creditors were vigorously trying to collect these debts.  *Id.*

18.     In early 1990, after the Involuntary Bankruptcy Petition had been filed, Weiss told Schneiderman that he needed to enter into a separation agreement with his wife to protect his assets.[9]  *Id.* at ¶ 7.

19.     Weiss subsequently told Schneiderman that for the separation agreement to have its desired effect (i.e., keeping his real and personal property out of his creditors' hands), it would have to be backdated because a bankruptcy proceeding had already been filed against Windsor.  *Id.* at ¶ 11.

20.     To make the agreement seem authentic and accurate in terms of its date of creation, she drafted language in paragraph 8(a) about the cost and style of bar mitzvahs and/or weddings Weiss was to provide at his sole expense, even though one son's bar mitzvah had taken place and another son's bar mitzvah was already planned. *Id.* at ¶ 13.

21.     Although Scheiderman would ordinarily obtain financial information from her client to calculate the appropriate amount of spousal and child support, Weiss simply instructed Schneiderman what amounts to include.  *Id.* at ¶¶ 14-16.  The reason the total support payments were so exorbitant was that Weiss wanted it to appear as if

---

[9]  In fact, Schneiderman testified that Weiss and Fox had just arrived back at Fox's office after a hearing pertaining to the involuntary bankruptcy when Weiss came into her office and told her he needed to enter into a separation agreement with his wife. Ex. 29 (Jan Schneiderman's Deposition Transcript dated January 5, 2011) at 75:23-76:12.

**United States' Statement of Uncontested Facts - Page 6**

there was as little money as possible left for creditors to collect should he actually file personal bankruptcy. *Id.* at ¶ 14.

22.     Although inconsistent with her usual practice, Weiss instructed Schneiderman to provide for an immediate transfer of title to the marital home located at 255 Viola Road to Petitioner exclusively "free of any right or claim of the Husband." *Id.* at ¶¶ 18-19.  This was done again in paragraph 2(a) with regard to the 4804 16th Avenue property, which Weiss told her was his parents' primary residence. *Id.* at 19.

23.     Because Weiss told her that it did not matter, Schneiderman also failed to set forth exactly which holidays would go to which parent in which year and failed to complete "Exhibit A, Disposition of Personal Property" (page 11) and "Exhibit B, Marital Debts" (page 12). *Id.* at ¶¶ 20-21.

24.     At some point in March 1990, before Schneiderman's mother's death, Weiss arrived at her office with his "original" copy of the Separation Agreement. *Id.* at ¶ 24.  When he presented it to her, the agreement bore signatures that purported to be those of Weiss and Petitioner. *Id.*  Schneiderman refused to notarize the document because she did not know if Goldie Weiss had signed it or was even aware of it.[10]  *Id.*

25.     On or about January 20, 1992, Schneiderman was subpoenaed by Kohler Company to be deposed in *Kohler Company v. Sholam Weiss*, (Index No. 90-Civ-3188 (JMC)), in connection with an attempt to execute Kohler's judgment against Weiss, which also required her to produce non-privileged documents, including the Separation

---

[10]  Because Schneiderman was not certain Petitioner was aware of the agreement and under New York law an uncontested divorce can be obtained one year after a "validly executed separation agreement," Schneiderman was concerned that Mrs. Weiss could, without warning, wake up divorced one day.  *Id.* at ¶¶ 25-26.

Agreement.  *Id.*  After being served with the subpoena, Schneiderman asked Weiss

which separation agreement was at issue and whether he had gone to someone else to

finalize the agreement she drafted.  *Id.*

26.    In response to this inquiry, Weiss gave Schneiderman a copy of the

agreement bearing her notary stamp.  *Id.* at ¶ 29; *see* Ex. 28A (Separation Agreement,

Govt. Trial Ex. 1240).

27.    Schneiderman denies that the executed agreement bears her true

signature.  Ex. 28 at ¶ 30.  She also denies having notarized it.  *Id.* at 31.

28.    Schneiderman asserts that although Weiss had an apartment in

Manhattan, he returned to Viola Road on a weekly basis.[11]  *Id.* at ¶ 37.  She also states

that there was a period of time that extended for at least a year during which Weiss did

not maintain an apartment in Manhattan, but lived exclusively at Viola Road.  *Id.*

29.    Schneiderman was often invited to Viola Road for family events,

particularly for the celebration of the Jewish Sabbath on Saturday afternoons.  *Id.* at ¶

38.  In fact, there was a period of time in 1994 when she had lunch on the Sabbath with

Weiss and his family consistently for two or three months.  *Id.*  During her many visits

over the years to Viola Road, Schneiderman believed that Weiss was, in fact, living

there because:  (1) he shared a bedroom with his wife; (2) his wife brought his clothes

---

[11]  According to Schneiderman, Weiss referred to Viola Road as "home" and had
the practice of leaving his New York apartment late at night and driving to Viola Road to
sleep.  Ex. 29 at 56:24-56:2; 63:20-64:11.  Schneiderman testified that Weiss would call
her while he was driving, and they would talk until he arrived at Viola Road.  *Id.* at
63:20-64:11.

to the dry cleaner; (3) his personal items were visible throughout the house; and (4) he

maintained a fully-furnished, newly built home office upstairs.[12]  *Id.* at ¶ 39.

> 2.    *Petitioner's Testimony and the Separation Agreement*

30.    According to Petitioner, Weiss asked her to sign the Separation

Agreement.  Ex. 4 at 30:7-9.  She did not want a divorce.  *Id.* at 30:10-12.

31.    To date, Weiss and the Petitioner are still married.  *Id.* at 70:17-18.  They

never obtained either a civil or religious divorce.  Doc. 2309-1, RFA 10-11.

32.    Petitioner acknowledges that she did not read the Separation Agreement

before signing it.  Ex. 4 at 29:1-3; Doc. 2309-1, RFA 13.

---

[12]  This belief is supported by the testimony of Jan Stark (a/k/a Jan Starr), a convicted co-defendant in this case and Weiss's business associate beginning in the late 1980s, who was a regular overnight guest at Viola Road in the 1990s. Ex. 30 (Jan Stark's Deposition Transcript dated December 14, 2010) at 24:11-13, 25:2-21.  His impression was that Weiss lived at Viola Road in the early 1990s and controlled the day-to-day operations of the household.  *Id.* at 42:10-17, 44:15-18, 45:12-46:11, 73:8-14.  For example, Weiss made all of the decisions regarding the landscaping of the property in advance of oldest son Issac's backyard wedding in the early 1990s.  *Id.* at 38:18-39:17.  Weiss was also "very involved in" a neighborhood dispute about the repaving of a road in the neighborhood (*Id.* at 40:12-24, 41:9-15), and Weiss arranged for the construction of a custom-made television cabinet in his bedroom at Viola Road.  *Id.* at 43:10-44:7.  Stark also testified that the family installed basketball and tennis courts at Viola Road.  *Id.* at 37:17-38:17.  Although Stark did not know who arranged for the courts to be installed, he testified that Petitioner had no control over the "day-to-day decision-making" at Viola Road.  *Id.* at 36:23-25, 72:22-73:14.

Schneiderman also testified that during the time she held NHL money in her trust account for Weiss, she paid phone bills associated with Viola Road with NHL money and may have paid for the tennis court and hot tub Weiss installed at the property with NHL funds.  Ex. 29 at 111:23-112:6; 112:20-113:12.

Although Stark says it was common knowledge in the community that Weiss had mistresses and apartments in Manhattan, he maintains that Petitioner and Weiss did not appear to be separated and, after their move to Viola Road, their marriage continued to function as it always had.  Ex. 30 at 103:13-20, 23:22-24:7.

**United States' Statement of Uncontested Facts - Page 9**

33.     Although the Petition alleges in paragraph 6 that Petitioner and Weiss formally separated on October 26, 1989 and that Weiss "relinquished all right, title and interest in the property and deeded this property back to the undersigned [Petitioner]," Petitioner has admitted that she has no idea when she signed the agreement and she does not recall when Weiss first talked to her about a separation agreement.  Ex. 4 at 29:13-24; 33:12-14.

34.     She does not recall whether she signed the agreement in front of Jan Schneiderman or where she was when she signed it.  *Id.* at 32:20-22; 69:20-22.  She does recall that Weiss used to bring papers in the house for her to sign and that she would sign them without reading them.  *Id.* at 69:9-12.  Petitioner also testified that she never went to Schneiderman's office.  *Id.* at 69:24-70:6.

35.     Petitioner does not think she ever had any legal guidance or help with the agreement.  *Id.* at 47:6-8.  She did not ask a lawyer to review the agreement but never specifically told Weiss that she did not want a lawyer.  Ex. 4 at 47: 9-18; Doc. 2309-1, RFA 12.  She never thought about hiring a lawyer at all.  *Id.* at 47:21-25.

36.     Weiss and Petitioner never had a specific discussion about what real property would be included in the agreement.  *Id.* at 38:17-22.  There were no financial disclosures made by Petitioner or Weiss in connection with the agreement.  Doc. 2309-1, RFA 15.  Before she signed the agreement, Weiss never told Petitioner about all of the businesses, bank accounts, retirement savings, or real property he owned.  Ex. 4 at 48:14-23; Doc. 2309-1, RFA 16-18.  Similarly, Weiss did not tell Petitioner about his

financial affairs before she signed the agreement.[13]  Doc. 2309-1, RFA 19.  He did not

tell her how much money he made every month.  Ex. 4 at 49:3-5.

37.     There were no negotiations between Weiss and Petitioner about the terms

of the agreement.  *Id.* at 49:22-24.

38.     Petitioner stated that Weiss financially supported his family, always

providing what they needed.[14]  *Id.* at 30:13-23.

39.     Weiss made all financial decisions for the family.  *Id.* at p. 31:18-24.  In

fact, Petitioner and Weiss "never really spoke about money because he took care of

money-wise."  *Id.* at 43:22-23.

40.     Similarly, they did not discuss business.  *Id.* at 49:12-14.  In fact, Petitioner

testified that "[e]verything was really hiding.  I really didn't know what he was doing."  *Id.*

at 67:14-19.

41.     Both before and after the agreement was signed, Weiss provided

Petitioner with the money she needed.  *Id.* at 46:12-17.  Most of the time he gave her

the money in cash.  *Id.* at 166:2-5.  From 1989 through October 1999, there was never

a time when Weiss did not have the money to support Petitioner and their children.  *Id.*

at 75:4-9.

---

[13]  However, Sylvie Weiss testified that, although she never spoke with her sister about Weiss's financial situation, it was common knowledge in their community that Windsor was bankrupt.  Ex. 31 (Sylvie Weiss's Deposition Transcript dated January 5, 2011) at 20:19-21:13.  She further testified that she also learned of Weiss's financial and legal troubles from newspaper stories.  *Id.* at 58:12-19.

[14]  He also used provided financial assistance to members of his extended family. Ex. 4 at 35:1-3.

42.     Petitioner does not recall if he ever specifically paid her child support.  *Id.* at 46:18-24.

43.     From May 15, 1975 through October 1999, Petitioner was financially dependent on Weiss, Doc. 2309-1, RFA 24, and Weiss arranged for the payment (directly or through third parties) of the bills associated with Viola Road.[15]  *Id.*, RFA 26.

44.     Although Weiss maintained an apartment in Manhattan prior to October 1989, Ex. 4 at 167:5-8, Petitioner acknowledges that he continued to pay the family bills, go to Viola Road and spend time with his family.[16]  *Id.* at 55:22-56:2.

45.     After the agreement was signed, Petitioner testified that he spent less time at Viola Road.  *Id.* at 56:3-5.  However, she admits he still came on Friday night (for the Sabbath) and stayed until Saturday night, for holidays, and whenever else he wanted.  *Id.* at 56:6-13; 73:21.  Petitioner further confirmed that Weiss continued to keep clothes, toiletries, and personal items at Viola Road.  *Id.* at 56:14-17; Doc. 2309-1, RFA 23.  There was also a time before the 1999 criminal trial when Weiss did not have an apartment and resided at Viola Road.  Ex. 4 at 58:1-5.

46.     Petitioner never told Weiss that he could not stay at Viola Road, because "he was a little bit controlling" and she "couldn't say that."  *Id.* at 58:11-14.  Even after 1989, if Weiss wanted to have guests at Viola Road, "he did what he wanted – what he felt like."  *Id.* at 60:7-10.

---

[15]  Petitioner explained that Weiss would give her money to pay the bills.  *See, e.g.,* Ex. 4 at 98:10-17.

[16]  According to both Sylvie Weiss and Stark, it was common knowledge that Weiss was not a faithful husband.  Ex. 31 at 21:19-22:7; Ex. 30 at 103:16-20.

## II.   65 EAST CONCORD DRIVE

47.   In 1994, when Jan Schneiderman was regularly visiting Weiss and his family on the Sabbath, Weiss told her of *his* plans to purchase a home for his wife's parents.  *Id.* at ¶ 41.[17]

48.   Weiss told Schneiderman that his father-in-law was terminally ill and his wife wanted her parents nearby.  *Id.*  Petitioner confirms that her parents were living in Belgium, Ex. 4 at 114:24 -115:1, and moved in order to be closer to her and her sister and to avoid her mother being alone.  *Id.* at 114:24 -115:12.

49.   Petitioner maintains that she selected the house on Concord Drive for them.[18]  *Id.* at 121:23-25.

50.   On October 31, 1994,[19] the property at 65 East Concord Drive was purchased in Petitioner's name for $290,000.  Ex. 32.  Petitioner did not obtain a purchase money mortgage.

---

[17]  Given the vast amount of money that passed through her trust account, Scheiderman knew that Weiss had the means to purchase whatever he wanted.  *Id.* at ¶ 40.

[18]  Although Sylvie Weiss's testimony as to why their parents moved to the United States was consistent with Petitioner's, Ex. 31 at 27:5-19, Sylvie Weiss testified that *she* selected the Concord Drive house for her parents.  *Id.* at 27:25-28:11.

[19]  The prior week, on October 27, 1994, the bankruptcy court held a hearing on the motion to dismiss the Windsor bankruptcy.  Ex. 1A (Relevant Portion of Docket Sheet for *In re: Windsor Plumbing Supply Co., Inc.*, Case No. 190-10224-352).

**United States' Statement of Uncontested Facts - Page 13**

51.     Instead, Petitioner asserts that her father[20] provided her[21] with the funds to buy the house.[22]  Ex. 4 at 116:5-8; 119:13-15.

52.     Yet Petitioner has no records whatsoever regarding the source of the money used to buy the house, nor does she recall how he got the money to her—in cash, by wire transfer, in person, or from Belgium.  Doc. 2309-1, RFA 44; Ex. 4 at 116:9-16.  She does not recall if her father gave her the money directly or through Weiss.[23]  *Id.* at 116:17-19.  Similarly, she does not remember when her father gave her the money.  *Id.* at 118:9-14.  She believes it was sometime after she had made a small down payment.  *Id.* at 119: 2-6.

---

[20]  Petitioner does not believe that her mother had any involvement in the purchase of the house; she is sure her father did everything.  Ex. 4 at 117:17-25.

[21]  Sylvie Weiss testified that her father arranged to have the funds for the purchase of Concord Drive given to her, not her sister.  Ex. 31 at 29:8-30:25.  Although she initially testified that the funds were the proceeds from the sale of her parent's home in Belgium, Sylvie Weiss later stated that she did not know the exact source of her father's funds, admitting that her parent's home in Belgium was not sold by October 1994.  *Id.* at 65:23-66:24.

[22]  According to Petitioner and her sister, the Feigs did not purchase the house themselves because they were not American citizens.  Ex. 4 at p. 117:10-14; Ex. 31 at 34:20-23.  Yet neither Petitioner nor her sister ever had any specific conversations with their parents or Burnbaum about titling Concord Drive in the Feigs's names.  Ex. 4 at 119:19-25; Ex. 31 at 38:6-13.

[23]  Petitioner never testified that her sister was involved in the purchase of Concord Drive; in contrast, Sylvie Weiss testified that her father asked her – not her sister – to pick up the purchase funds for Concord Drive from various business associates of his living in the United States.  Ex. 31 at 29:11-30:20.  According to Sylvie, she would meet her father's associates at different locations around New York City, and they would give her closed envelopes containing cash and checks which she then delivered to Edward Burnbaum, the attorney who handled the closing of Concord Drive.  *Id.* at 30:21-25.

53.    Edward Burnbaum, who testified on Weiss's behalf at the criminal trial,[24] is an attorney who Weiss had previously retained.[25]  *See* Ex. 28 at ¶ 42.

54.    Because Burnbaum was a lawyer, a friend, lived in the same neighborhood, and attended the same synagogue, Petitioner assumed that he and her husband had a business relationship.  Ex. 4 at 116:22-117:9.

55.    Petitioner admits that Burnbaum represented the purchaser in the sale of Concord Drive, but she does not recall if she hired him.  Doc. 2309-1, RFA 39-40. Although she does not think Weiss was involved in the purchase of Concord Drive in any way, she acknowledged that Weiss might have hired Burnbaum.[26]  Ex. 4 at 115:25-116:2*,* 116:25-177:2.[27]

56.    Petitioner cannot recall whether she or Weiss paid Burnbaum for his work. *Id.* at 119:9-12.

---

[24]  Burnbaum testified on July 14, 1999.

[25]  In fact, on one or two occasions, Schneiderman accompanied Weiss to Burnbaum's office and was introduced to Burnbaum by Weiss.  Ex. 28 at ¶ 42.

[26]  In contrast, Sylvie Weiss testified that she hired Burnbaum because he lived in her neighborhood and handled the closing of her house a few years earlier.  Ex. 31 at 31:14-22.  She also testified when she purchased her home, it was titled in her mother-in-law's name in order to obtain a mortgage, *id.* at 33:3-9, and Concord Drive could not be titled in her name because she was receiving Section 8 housing assistance and therefore could not own a home without losing her benefit.  *Id.* at 37:22-38:5.  During her October 19, 2010 deposition, Petitioner never mentioned that her sister had any involvement in the transaction. Nor does it seem that she consulted her sister in answering discovery requests.  *See* Doc. 2309-1, RFAs 40-43.  Indeed, Petitioner did not identify Sylvie Weiss as a potential witness until November 5, 2010.  *See* Doc. 2315.

[27]  Weiss told Scheiderman that he had retained Burnbaum to handle the closing on his purchase of the home for his in-laws located at 65 East Concord Drive.  Ex. 28 at ¶ 43.

**United States' Statement of Uncontested Facts - Page 15**

57.     Petitioner does not recall whether or not she gave Burnbaum the purchase money; nor does she recall whether the purchase funds passed through his Attorney Trust Account.  *Id.* at 119:16-18; Doc. 2309-1, RFA 41-42.

58.     As reflected in the records of Jacobson & Jacobson, the law firm that handled the closing, virtually all of the $290,000 purchase price was paid through Burnbaum's Attorney Trust Account.  Specifically, the funds were paid as follows:

(1)     A $2,000 official check from the Bank of New York and a $10,000 certified check, (No. 1384 dated October 27, 1994), from the Attorney Trust Account of Rowin Novack Burnbaum & Crystal, P.C. were made payable to Jacobson & Jacobson; and

(2)     Three additional checks from the same Attorney Trust Account completed the payment:

(a)     Certified Check No. 1385 dated October 27, 1994 made payable to the sellers in the amount of $244,000;

(b)     Certified Check No. 1383 dated October 27, 1994 made payable to Flushing Savings Bank in the amount of $38,204.43; and

(c)     Check No. 1386 dated October 31, 1994 made payable to the sellers in the amount of $1,512.57.

Ex. 33.

59.     After the closing, Petitioner arranged to have the kitchen and bathrooms at Concord Drive updated at a cost of approximately $15,000 to $20,000.[28]  Ex. 4 at 120:17-121:4.

---

[28]  According to Sylvie Weiss, however, she and her husband oversaw the renovations at Concord Drive, including payment, and Petitioner had very little to do with the renovations at Concord Drive.  Ex. 31 at 40:20-41:12, 42:10-23.

60.     She asserts that the funds came from her father, but does not remember when her father gave her the money—before or after the house was purchased.[29]  *Id.* at 120:6-121:4-7.

61.     Once the renovations were completed, Petitioner's parents moved to Concord Drive.  *Id.* at 120:17-19.

62.     The bills for Concord Drive have always been sent to Viola Road because Petitioner's parents do not speak English and her mother does not know how to handle bills.[30]  *Id.* at 158:13-19.

63.     Petitioner admits that Weiss provided her with sufficient funds to pay the bills for both properties.  *Id.* at 146:14-15 ("My husband used to give money, and I used to pay what I wanted."); 146:18-19 ("He—I used to get money, and with this money I paid my bills and my mother's bills.  The 65 East Concord."); 147:5-7 ("He provided for bills for my house and East 65 Concord.  He gave me money, and I did what I want with the money.").

64.     Petitioner also indicated that her mother would give her some money as well, approximately $1,200 per month.[31]  *Id.* at 158:20-23; 159:12-19.

---

[29]  Again, Petitioner's testimony conflicts with that of her sister.  Sylvie Weiss testified that her father arranged for her to collect the money for the renovations from his business associates in the same manner she collected money for the purchase of Concord Drive.  Ex. 31 at 41:6-20.

[30]  In contrast, Sylvie Weiss testified that the bills related to Concord Drive were sent directly to her parents at Concord Drive.  Ex. 31 at 48:11-17.  Although the Feigs provided their daughters the funds to pay their bills, Sylvie Weiss testified that she and Petitioner assisted her parents in the process of paying them.  Ex. 31 at 46:8-25.

[31]  Petitioner's mother does not keep records related to these checks.  Doc. 4 at 159:20-23.  Petitioner has not produced any such records and has indicated that any

65.     According to Petitioner, sometime after Concord Drive was purchased, Weiss obtained a mortgage on the property.  *Id.* at 122:20-24.  She does not think she played a role in obtaining that mortgage.  *Id.* at 123:10-12.

66.     Even so, real estate records show that on March 14, 1997, Astoria Federal Savings and Loan Association extended Petitioner a $210,000 mortgage secured by Concord Drive.[32]  Ex. 35.

67.     Petitioner admits having signed the loan application, but stated that she had no recollection of applying for the mortgage loan.  Ex. 4 at 125:14-21; 127:1-20; 128:20-24; 130:9-18.  She does not remember reading the document before she signed it and admits that "a lot of times, I used to [sign documents without reading them]."  *Id.* at 132:25-133:5.  In particular, Petitioner would sign things Weiss gave her without reading them.  *Id.* at 133:6-10; 170:11-20.

68.     Even in the mid-to-late 90s, Petitioner would do what Weiss wanted.  *Id.* at 170:21-171:2.

69.     The mortgage application submitted on February 3, 1997, contains several false statements, including but not limited to, that: (1) Concord Drive was purchased for

---

documents she had about the monetary transactions involved in this case have been thrown away.  *Id.* at 171:3-7.  Although her mother still receives a monthly check, *id.* at 159:16-19, Petitioner has not paid the mortgage on Concord Drive for approximately two years.  *Id.* at 79:21-80:14; *see* Ex. 34 (CitiMortgage Records).

[32]  By this time, civil actions were just starting to be brought to recover funds stolen from NHL.  For example, in 1996, the Delaware Insurance Commissioner, as the Receiver of NHL, brought an action in the Southern District of New York to recover assets looted from NHL by Lyle K. Pfeffer, Michael D. Blutrich and others, *Donna Lee H. Williams, Ins. Comm. of the State of Del., as Receiver for National Heritage Life Insurance Company, In Liquidation v. LPDA Acquisition Corp., et. al.*, No. 96 Civ. 3079 (BDP).  Ex. 36 (Docket Sheet).

$410,000; (2) the loan was for retirement planning;[33] (3) $250,000 in improvements were made to the property; (4) Petitioner had been employed as the Operations Manager at World Wide Plumbing Supply for 15 years earning $15,000 per month;[34] and (5) Petitioner intended to occupy Concord Drive as her primary residence.  Ex. 38[35] at Bates 12070-12072.

70.     Petitioner admits to signing the mortgage too, but again does not remember doing it.  Ex. 4 at 137:8-138:3.

71.     On March 20, 1997, a check for $200,122.35 in loan proceeds was made payable to Petitioner, Ex. 39, but she has no idea how the loan proceeds were used. Ex. 4 at 131:9-16.

72.     On March 24, 1997, the proceeds of the mortgage—a $200,122.35 check from Astoria Federal Savings—were deposited into Petitioner's joint account with her sister, Sylvie, increasing the account balance to $213,524.22.  Ex. 40 (Bank Statement).

---

[33]  Petitioner has never made any financial decision to prepare for retirement.  *Id.* at 85:14-16.

[34]  Apparently, Mrs. Lefkowitz confirmed this information on February 26, 1997. Ex. 38 at Bates 12063.  Yet Petitioner acknowledged that she was never an Operations Manager, Ex. 4 at 87:11-18, and only earned "fun money."  *Id.* at 87:19-88:2.  Petitioner did not file any federal tax returns between 1996 and 2009.  Doc. 2309-1, RFA 52; Ex. 37 (Redacted IRS Certificate).

[35]  A redacted copy of the mortgage loan file is attached; all financial account numbers and personal identifiers have been omitted.  In the interest of space, the appraisal and duplicate copy of Petitioner's credit report have been omitted.

**United States' Statement of Uncontested Facts - Page 19**

73.    Two days later, on March 26, 1997, Petitioner wrote a $100,000 check from this account to Leo Fox, one of Weiss's bankruptcy lawyers.  Ex. 41 (Check); Ex. 31 at 52:23-53:19.

74.    Petitioner does not remember making a payment on the mortgage until two or three years later. *Id.* at 138:4-7.

75.    Again, Petitioner admits that Weiss gave her the money to pay the mortgage.  *Id.* at 141:22-24.

76.    On July 2, 2003, Petitioner refinanced the mortgage.  Ex. 42.

77.    Although she has a bank account and a checkbook, she uses money orders to pay the mortgage.  Ex. 4 at 164:15-165:10.

78.    It was only in 2010, when Petitioner began work at her son's law firm, that Petitioner earned a steady income.  *Id.* at 11:19-12:10; Dkt. 2309-1, RFA 55.

## III.    WEISS'S USE OF NOMINEES

79.    During the course of the criminal trial, Weiss admitted that it was his usual practice to use nominees to conceal his assets and explained that "to a bank or to someone who had a judgment against me, I was trying to hide out . . . ."  Ex. 43 (Excerpts from Weiss's Criminal Trial Testimony) at 28038:12-13.

80.     This Court has also commented on Weiss's *"modus operandi* of installing nominees to act as a front in name for Weiss' ownership interests."  Doc. 1955 at 6-7; *see* Ex. 44 (Schneiderman's Rule 35 Hearing Transcript) at 32:16-23.

Respectfully submitted,

ROBERT E. O'NEILL
United States Attorney

By:     *s/Anita M. Cream*
ANITA M. CREAM
Assistant United States Attorney
Florida Bar Number 56359
400 North Tampa Street, Suite 3200
Tampa, Florida  33602
(813) 274-6000 - telephone
(813) 274-6220 - facsimile
E-mail: anita.cream@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on January 31, 2011, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

James H. Sullivan III, Esquire

*s/Anita M. Cream*
ANITA M. CREAM
Assistant United States Attorney

**United States' Statement of Uncontested Facts - Page 21**