# United States District Court
## Middle District of Florida
### Orlando Division

**UNITED STATES OF AMERICA**

**-vs-**                                               **Case No.  6:98-cr-99-Orl-19KRS**

**SHOLAM WEISS, et al.**

_____

**In re Claim of Goldie Feig Weiss**

_____

## Report And Recommendation

**TO THE UNITED STATES DISTRICT COURT**

This cause came on for consideration without oral argument on the following motions filed

herein:

| MOTION: | UNITED STATES OF AMERICA'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 2327) |
|---|---|
| FILED: | January 31, 2011 |

| MOTION: | PETITIONER GOLDY FEIG WEISS'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 2329) |
|---|---|
| FILED: | January 31, 2011 |

## I.       PROCEDURAL HISTORY.

On April 29, 1998, Sholam Weiss (Weiss) was charged in a ninety-three count indictment

with racketeering, mail fraud, money laundering, false and fraudulent statements and obstruction

of justice arising out his dealing with National Heritage Life Insurance Company (NHL).  Doc.

No. 1.  After a nine month trial, on November 1, 1999, a jury convicted Weiss and others of multiple counts of fraud, including convictions under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et. seq.* (RICO).  Doc. No. 1267. The next day, the jury returned a Special Verdict of Forfeiture and forfeited several items of property, money judgments totaling $57,213,591.46, and Weiss's interest in Windsor Plumbing Supply Company, Inc. (Windsor) which the jury found had served as an instrument for his criminal acts.  Doc. No. 1276.

On January 19, 2009, this Court entered a Preliminary Order of Forfeiture for Substitute Assets belonging to Weiss in partial satisfaction of the outstanding forfeiture money judgments. The substitute assets in the order include real properties located at 255 Viola Road, Monsey, New York (Viola Road) and 65 East Concord Drive, Monsey, New York (Concord Drive).  Viola Road and Concord Drive are each titled in the name of Weiss's wife, Goldie Weiss-Feig (Feig).[1]  Doc. 2137.

On November 24, 2009, Feig filed a Petition of Innocent Owner to exclude Viola Road and Concord Drive from forfeiture because they belonged to her and not her husband.  Doc. 2251. The Petition alleges that Weiss transferred Viola Road to Feig after they formally separated on October 26, 1989, and since then, only she and her children have resided there.  *Id.*  ¶¶ 2, 3-6.  In support, Feig relied only on a signed separation agreement as the consideration for the Viola Road transfer. *Id.*  ¶ 2.  The Petition further alleges that Feig, not Weiss, purchased Concord Drive for $290,000 so that her parents could reside there after moving to the United States.  *Id.*  ¶ 8.

---

[1]  Feig's name is spelled in various ways in the record.  References to Feig shall include Goldie Weiss-Feig, Goldie Feig Weiss, Goldy Weiss and all other variations of Feig's name.

The United States seeks summary judgment based on its assertion that Feig lacks standing to contest the forfeiture of Weiss's interest in Viola Road and Concord Drive. Doc. No. 2327. The United States filed a statement of uncontested material facts and evidence in support of its motion. Doc. No. 2328. Feig responded to the United States' motion for summary judgment and filed a separate response to the statement of uncontested facts and supporting evidence. Doc. Nos. 2339, 2440. The United States replied to both of Feig's responses. Doc. Nos. 2345, 2346.

Feig also filed a motion for summary judgment based on Feig's assertion that the delay in the prosecution of the forfeiture action against her violated her due process rights, violated the equitable doctrine of laches, and that the preliminary order of forfeiture was not supported by evidence. Doc. No. 2329. Feig filed a statement of facts and evidence in support of her motion. Doc. No. 2330. The United States responded to Feig's motion. Doc. No. 2338. Feig filed a reply and an affidavit in reply to the United States' response. Doc. Nos. 2343, 2344, 2348, 2349.

## II.      STATEMENT OF MATERIAL FACTS.

A.      <u>Admissibility of Affidavits and Declarations</u>.

In its reply to Feig's response to the United States' statement of material facts, the United States objected to the affidavits submitted by Feig, Weiss, Solomon Unsdorfer, Leo Fox an the affirmation by Donald Swords. Doc. No. 2345. The Court will consider the United States' arguments regarding the validity of each sworn statement to the extent that it is material to resolution of the pending motions.

Sholam Weiss incorporated Windsor Plumbing Supply, Inc. (Windsor) and was its president and sole shareholder. Doc. No. 2328-1 at 4. In 1975, Weiss married Feig. Doc. 2309-1 at 1. On July 21, 1988, Weiss purchased Viola Road, taking title in his name only. Doc. Nos.

2328-3 at 1; 2328-4 at 3.  Feig has lived at Viola Road since that time. Doc. No. 2328-5 at 3

(transcript page 8, lines 21-25).

     B.    <u>Weiss' Financial Troubles</u>.

     On February 5, 1988, Weiss guaranteed, in two transactions, a $5 million loan to Windsor

from First Jersey National Bank, which was secured by mortgages on Windsor's property.  Doc.

No. 2328-6 at 2-6.  On November 28, 1988, CofaCredit, S.A. sued Weiss and Windsor for fraud,

conspiracy and civil RICO.  *CofaCredit, S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229

(2d Cir. 1999).  On January 3, 1989, Societe Generale sued Weiss and Windsor for breach of

contract.  Doc. No. 2328-9.  In May of 1989, Weiss mortgaged the Viola Road property for

$250,000.00 in favor of Moshe Mishal.  Doc. No. 2328-11.

     In June of 1989, Weiss personally guaranteed a $3.5 million promissory note that Windsor

executed in favor of Seward Company.  Doc. No. 2328-12 at 5 (transcript page 230, lines 6-18).

     On August 17, 1989, Weiss filed a satisfaction of the Mishal mortgage on Viola Road

which showed a payment of $300,000.  Doc. No. 2328-13.  On the same day, Weiss took out

another mortgage on Viola Road in the amount of $390,000 from Williamsburg Savings Bank.

Doc. No. 2328-14.

     On January 23, 1990, Windsor's creditors filed an Involuntary Petition for Bankruptcy of

Windsor.  Doc. No. 2328-1 at 4 ¶ 2.  On March 9, 1990, a deed was filed in New York public

records in which Weiss transferred title to Viola Road to Feig.  Doc. No. 2328-20.  On behalf of

Windsor, Weiss filed a Chapter 11 Voluntary Petition, converting the involuntary Chapter 7

bankruptcy to a Chapter 11 bankruptcy on March 21, 1990.  Doc. No. 2328-1.  The petition listed

seventeen pending actions against Windsor and Weiss, and indicated that the bankruptcy involved $18 million in liabilities. Doc. No. 2328-1 at 3, 11-12.

Feig testified that she did not have conversations with Weiss about how much money they had or other financial decisions. Decisions regarding financial matters were always made by Weiss. Doc. No. 2328-5 at 9 (transcript page 31, lines 18-24). She did not know how much money Weiss made, and they never spoke about Weiss's business or assets. *Id.* at 13 (transcript page 49, lines 3-9).

      C.    <u>Viola Road and the Separation Agreement</u>.

          1.    *Creation of the Separation Agreement*.

The record contains a document entitled "Separation Agreement." Doc. No. 2328-30. Pursuant to that document, Weiss transferred Viola Road to Feig. *Id.* ¶ 2. Weiss agreed to pay Feig $14,000 per month in support and to continue to pay the mortgage on the Viola Road property. *Id.* ¶ 6. Weiss agreed to pay $1,000 per month in child support for each of his children, for a total of $4,000 or $5,000 per month. *Id.* ¶ 8; Doc. No. 2340-1 ¶ 2 (Feig and Weiss have four children); Doc. No. 2340-5 at l, 11-12 (Feig and Weiss have five children). Weiss also agreed to provide each child with a bar mitzvah or wedding at his expense in a manner consistent with the bar mitzvah which had already been held for the eldest son. *Id.* ¶ 8(a). The agreement did not list any personal property to be disposed of nor did it list any marital debts. *Id.* at 12-13.

The Receiver for National Heritage Life Insurance Company deposed Feig on December 18, 2003. Doc. No. 2132-2. ¶ 16. During the deposition, Feig testified that she did not read the Separation Agreement, did not have legal representation for the agreement, and did not discuss the provisions of the agreement with Weiss. *Id.* She also stated in response to numerous questions

regarding the Separation Agreement that she did not remember the circumstances regarding the signing of that agreement.  Doc. No. 2338-1.

In a deposition taken in the present case in 2010, Feig testified that her father and a three rabbi tribunal determined the terms of the Separation Agreement which would allow Feig and her children to continue living in their home.  Doc. No. 2340-1 ¶ 7.  She did not take part in negotiating the terms of the Separation Agreement because that was not her religious custom.  *Id.*  Feig testified that she did not want a divorce, referred to as a "get" (the Jewish divorce document), because she was young and divorce was not favored in her religious community.  *Id.*  ¶ 8.[2]

The Separation Agreement bears the notary public stamp of Jan R. Schneiderman and purported signatures of Schneiderman attesting to the execution of the Separation Agreement before her by Weiss on October 5, 1989, and by Feig on October 26, 1989.  *Id.* at 11.  Schneiderman testified in a civil case in 1992 that she drafted the Separation Agreement based on a list of terms previously agreed upon that were provided to her.  She further testified that Feig came to her office to sign the Agreement.  Doc. No. 2340-8 at 33 (transcript page 17, lines 10-19, and page 19).[3]

---

[2]  In a belatedly submitted affidavit, Weiss averred that Feig's father retained the services of Rabbi Unsdorfer and two other rabbis to negotiate the terms of the Separation Agreement.  Doc. No. 2349-1 ¶ 12; *accord* Affidavit of Salomon Unsdorfer, Doc. No. 2348-1 ¶ 2.  He attested that he asked Attorney Leo Fox to advise him about drafting the formal Separation Agreement.  Fox introduced him to Attorney Donald Swords who prepared the initial draft of the Separation Agreement.  *Id.* ¶ 16.  After Swords became ill, Fox introduced Weiss to Jan Schneiderman, who finalized the Separation Agreement.  *Id.* ¶¶ 17, 19.

[3]The United States argues that the Court cannot consider Schneiderman's testimony from 1992 for the truth of the matter asserted because Schneiderman has now recanted that testimony.  Which version of her prior statements Schneiderman will adopt if this matter proceeds to trial is a question that the Court cannot resolve on summary judgment.

On February 1, 2004, Feig testified during a deposition in a civil case that she signed the Separation Agreement at Schneiderman's office in Manhattan, Doc. No. 2340-5 at 15 (transcript page 8, lines 7-16). On October 27, 2004, Feig testified during a deposition in another civil case that she did not remember the circumstances regarding the signing of the Separation Agreement. Doc. No. 2338-1 (transcript page 10, lines 4-16).[4] Most recently, Feig averred that she cannot recall in detail signing the Separation Agreement. Doc. No. 2340-1 ¶ 6 (2011 Feig Affidavit).

In a declaration signed in October 2010, Schneiderman attested that Weiss first approached her about preparing a separation agreement in early 1990 in order to protect his assets. Doc. No. 2328-29 ¶ 7. She further averred that Weiss instructed her to back-date the agreement so that it would precede the Windsor bankruptcy proceeding. *Id.* ¶ 11. Schneiderman also declared that sometime in March 1990, Weiss brought her the completed Separation Agreement bearing signatures that purported to be those of Weiss and Feig. Schneiderman refused to notarize Feig's signature because she was not present. *Id.* ¶ 24. She further attested that the signatures on the Separation Agreement purporting to notarize the document are not hers and that she did not affix her notary stamp on the documents. *Id.* ¶¶ 30-31. She declared that she lied about these matters in the civil deposition she gave in 1992. *Id.* ¶ 34.[5]

---

[4]On October 23, 2004, in yet another civil case, Feig refused to answer questions regarding who was paying the expenses for Viola Road, asserting her Fifth Amendment rights. Doc. No. 2309-1 ¶ 37. Feig now contends that her assertion of the Fifth Amendment privilege was "made in error based upon poor advice of counsel." *Id.*; *see also* Doc. No. 2328-5 (transcript page 105, lines 12-25).

[5]  Weiss averred that Schneiderman "signed and duly notarized the signatures on the agreement." *Id.* ¶ 21.

2.      *Weiss's Connection with Viola Road after the Separation Agreement.*

Feig averred that after their separation, Weiss only came home to see his children on the Jewish Sabbath and on Jewish holidays.  Doc. No. 2340-1 ¶ 5 (2011 Feig Affidavit).  She attested that Weiss may have occasionally left some personal effects at Viola Road because he would "'keep up appearances' for the sake of [the] children by sitting at the head of the dinner table . . . and playing the host when guests were present."  *Id.* ¶ 9.  He continued to help provide for their family, help with decisions associated with their children, and provide financial support.  *Id.* ¶ 10.  Feig cooperated with Weiss in mortgaging the Viola Road property.  Doc. No. 2340-1 ¶ 11.  She attested, however, that she and Weiss "remained separated."  *Id.* ¶ 9.  Weiss confirmed Feig's testimony about their relationship in his affidavit.  Doc. No. 2349-1 ¶¶ 23, 26, 29, 30.

In her 2010 declaration, Schneiderman attested that while Weiss had apartments in Manhattan at various times, his true residence was Viola Road.  Doc. No. 2328-29 ¶ 37.  Schneiderman visited Weiss at the Viola Road property several times and noted that he shared a bedroom with his wife; that his wife brought his clothes to the dry cleaner; that his personal items were visible throughout the house; and that he maintained a fully-furnished, newly built home office there.  *Id.* ¶ 39.  Schneiderman also paid phone bills and may have paid for improvements to the Viola Road property from money she was holding for Weiss.  Doc. No. 2328-31 at 28-29 (transcript page 111, line 23 through transcript page 115, line 5).  Jan Stark also testified that Weiss was very involved in the Viola Road residence and neighborhood after the Separation Agreement, and that he observed Weiss stay overnight in the house during the week.  Doc. No. 2328-32 at 10-12 (Jan Stark Depo. transcript pages 38-46).

D.   Concord Drive Property.

In 1994, Feig's parents wanted to move to the United States to be closer to Feig and her sister.  Doc. No. 2340-1 ¶ 13.  Schneiderman averred the Weiss told her that he planned to purchase a home for Feig's parents, Doc. No. 2328-29 ¶ 41, but Weiss attested that he did not make this statement and did not help in purchasing a home for Feig's parents, Doc. No. 2349 ¶ 33.[6]  Feig and her sister, Sylvie Weiss, testified that their parents purchased Concord Drive, although their recollection of the events differ in some respects.

Sylvie Weiss (Sylvie) testified in a deposition taken on January 5, 2011.  Doc. No. 2340-9.  She averred that her husband first observed that Concord Drive was for sale.  Sylvie called her parents, who said they would sell their house in Belgium and buy the Concord Drive property. *Id.* at 28.  Her father instructed Sylvie to pick up money he transferred for the purchase of the house.  *Id.* at 29.  She picked up closed envelopes from a friend of her father that contained the payment and gave them to Mr. Burnbaum, the attorney handling the closing.  *Id.* at 30-31.  Her real estate broker told her to use this lawyer.  *Id.* at 31.  The house was titled in Feig's name because their parents were not American citizens and they were not in the United States to sign the necessary papers.  *Id.* at 32, 34-35.  After the house was purchased, Sylvie and her husband hired contractors to renovate the house.  Sylvie's father sent about $30,000 to pay for the renovations, and Sylvie paid the contractors.  *Id.* at 40-41.  Feig was involved in helping to plan the renovation of the

_____

[6]Feig objects that statements Weiss made to Schneiderman are inadmissible hearsay.  The United States contends that the Court should consider the evidence, striking it only if the Court finds that Feig was not acting as Weiss's nominee.  The Court need not resolve this evidentiary issue to render a decision on the United States' motion for summary judgment.

kitchen and other designing.  *Id.* at 42.  After the parents moved into the Concord Drive property

the bills for the house came to that address.  *Id.* at 48.

In a deposition taken on October 19, 2010, Feig testified that she picked out Concord

Drive, Doc. No. 2328-5, at 30 (transcript page 115, lines 18-22), but in her 2011 affidavit she

averred that she picked out the home with her sister, Doc. No. 2340-1 ¶ 13.  The purchase money

came from her father.  Doc. No. 2328-5 at 30 (transcript page 116, lines 5-6).  She did not recall

how the money was received.  *Id.* (transcript page 116, lines 9 -19).  She did not recall whether the

money was given to Mr. Burnbaum, the lawyer.  *Id.* at 31 (transcript page 119, lines 16-18).

Feig's father gave her money and asked her to renovate the house.  *Id.* (transcript page 121, lines

2-4).  Feig averred that the bills for the Concord Drive home are sent to Viola Road, and Feig pays

the bills from money her mother receives from the German and Belgian governments,  *Id.* ¶ 15, or

sometimes from money provided by Weiss, Doc. No. 2328-5 at 38 (transcript page 146, lines 14-

15; transcript page 147, lines 1-7).

In 1997, Weiss mortgaged Concord Drive for $210,000.  Doc. No. 2340-1 ¶ 16.  Feig

admitted that her handwriting was on portions of the loan documents, but she has no recollection

of applying for a mortgage loan on Concord Drive.  Doc. No. 2328-5 at 33-34 (transcript page

127, lines 1 through page 128, line 24; transcript page 130, lines 16-25).  Feig attested that she

never would have agreed to mortgage her parents' home and that Weiss "falsified the necessary

documents and forged the necessary signatures."  *Id.*  Feig also testified that she was not aware

that Weiss disbursed the proceeds from the mortgage for his own benefit.  Doc. No. 2340-1 ¶ 17.

Weiss attested that Feig was not aware of the mortgage on the Concord Drive property, and that

Schneiderman helped him to forge the necessary signatures to obtain the mortgage loan.  Doc. No. 2349-1 ¶ 37.

The loan proceeds in the amount of $200,122.35 were paid in a check dated March 20, 1997 issued to Feig.  Doc. No. 2328-41.  On March 24, 1997, $200,122.35 was deposited into the bank account of Feig and Sylvie Weiss.  Doc. No. 2328-41.  A check in the amount of $100,000.00 was written from that account to Leo Fox on March 26, 1997, which check bears the signature "Goldie Weiss."  Doc. No. 2328-43.  Feig testified that she had no knowledge regarding what was done with the proceeds of the mortgage.  Doc. No. 2328-5 at 34 (transcript page 131, lines 9-16).  Sylvie Weiss also testified that she was not aware of the deposit into her joint bank account with Feig or the check issued to Fox.  Doc. No. 2328-33 at 13 (transcript pages 51, lines 14-25, and 52, lines 1-25).  Weiss testified that he "deceived" Feig to cause her to write the check to Fox by leading her to believe that he had directed money from a business deal into her account for her support.  Doc. No. 2349-1 ¶ 37.

In 2003, the mortgage on Concord Drive was refinanced.  Doc. No. 2328-44.  The refinancing documents bear the initials "GF," and the signature "Goldie Feig."  *Id.*  Feig testified that she sought the refinancing on Concord Drive in order to lower the payment.  Doc. No. 2328-5 at 36 (transcript page 139, lines 5-25, page 140, lines 1-19, page 143, lines 7-15[7]).

---

[7]While Feig initially testified that she refinanced Viola Road, she clarified her testimony to indicate that the refinancing was of Concord Drive.

### III.  APPLICABLE LAW.

A.  <u>Forfeiture</u>.

"Any person, other than the defendant, asserting a legal interest in the property which has been ordered forfeited to the United States," may petition the court for a hearing to adjudicate the validity of the alleged interest.  18 U.S.C. § 1963(l)(2).  The ancillary proceeding creates an orderly procedure whereby third parties who claim their property interests have been forfeited in a criminal case can challenge the validity of the forfeiture order and establish their legitimate ownership interest. *See United States v. Marion*, 562 F.3d 1330, 1336 (11th Cir. 2009).  The only issue in an ancillary proceeding is ownership of the property ordered forfeited in the criminal case. *United States v. Gilbert*, 244 F.3d 888, 911 (11th Cir. 2001).  To warrant an amendment to the forfeiture order, the third party petitioner must demonstrate a right, title, or interest in the property sufficient to trump that of the United States.  18 U.S.C. § 1963(l)(3) & (6); *see also Gilbert*, 244 F.3d at 911.

Third parties can challenge the forfeiture of their claimed interest by demonstrating either that they have legal interests superior to the defendant's or that they are bona fide purchasers for value.  18 U.S.C. § 1963(l)(6); 21 U.S.C. § 853(n)(6) (adopting same standard as § 1963(l)(6)); *Libretti v. United States*, 516 U.S. 29, 44 (1995) (third parties limited in manner in which they can challenge forfeiture); *United States v. Kennedy*, 201 F.3d 1324, 1328 (11th Cir.2000) (third party asserting interest in criminally forfeited property limited to showing superior title or status as bona fide purchaser for value).

Ancillary forfeiture proceedings which arise out of criminal cases are civil in nature and are thus governed by the Federal Rules of Civil Procedure.  *See Gilbert,* 244 F.3d at 907.

Accordingly, the parties may move for summary judgment under Federal Rule of Civil Procedure

56. *See* Fed. R. Crim. P. 32.2(c)(1)(B).

    B.    <u>Summary Judgment</u>.

    Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law." The Supreme Court explained the rule as

follows:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after
> adequate time for discovery and upon motion, against a party who fails to make a
> showing sufficient to establish the existence of an element essential to that party's
> case, and on which that party will bear the burden of proof at trial. In such a
> situation, there can be "no genuine issue as to any material fact," since a complete
> failure of proof concerning an essential element of the nonmoving party's case
> necessarily renders all other facts immaterial. The moving party is "entitled to
> judgment as a matter of law" because the nonmoving party has failed to make a
> sufficient showing on an essential element of her case with respect to which she has
> the burden of proof.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "The Court must consider all inferences

drawn from the underlying facts in a light most favorable to the party opposing the motion, and

resolve all reasonable doubts against the moving party. . . . If material issues of fact exist, the

Court must not decide them, but rather, must deny the motion and proceed to trial." *Kitchings v.*

*Fl. United Methodist Children's Home, Inc*., 393 F. Supp. 2d 1282, 1291 (M.D. Fla. 2005)

(internal citations omitted).

    "'Genuine disputes are those in which the evidence is such that a reasonable jury could

return a verdict for the non-movant. For factual issues to be considered genuine, they must have a

real basis in the record.' . . .  For instance, mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1325-26 (11th Cir. 2005)(quoting *Mize v. Jefferson City Bd. of Educ.,* 93 F.3d 739, 742 (11th Cir. 1996)).

## IV.     ANALYSIS.

### A.     The United States' Motion for Summary Judgment - Standing.

The United States asserts that Feig does not have standing to contest the forfeiture of either Viola Road or Concord Drive.  Third-party claims contesting a preliminary order of forfeiture under 18 U.S.C. § 1963(1)(2) can be filed only by parties who have a "legal interest" in the forfeited property.  *United States v. Weiss*, No. 6:98-cr-99-ORL-19KRS, 2005 WL 1126663, at * 10-11 (citing *United States v. Gilbert*, 244 F.3d 888, 910 (11th Cir. 2001)).  Section 1963(1) limits the grounds upon which a third-party petitioner may rely to establish an interest in property.  *Id.*

In order to establish a legitimate entitlement to property, the petitioner must demonstrate that "(1) title to the property was vested in him rather than the defendant at the time of the act which made the property subject to forfeiture; (2) his title to the property was superior to the title held by the defendant at the time of the act which made the property subject to forfeiture; or (3) that he purchased his interest without reasonable cause to know that the property was subject to forfeiture."  *Id.*  "A claimant need not own the property in order to have standing to contest its forfeiture; a lesser property interest, such as a possessory interest, is sufficient for standing." *United States v. $38,000 in U.S. Currency*, 816 F.2d 1538, 1544 (11th Cir. 1987).

      1.    *Viola Road.*

      **a.**    **Feig as Nominee**.

The United States first argues that Feig was a nominee of Weiss and therefore lacks standing.  "[A] person or entity cannot have a vested interest in property if that person or entity is found to be acting as a nominee for someone whose property is subject to forfeiture."  *Weiss*, 467 F.3d at 1308-09.  In deciding true ownership, courts look beyond who possesses bare legal title to property; the crucial issue is who exercises dominion and control.  *See United States v. One 1990 Beechcraft, 1900 C Twin Engine Turbo-Prop Aircraft*, 619 F.3d 1275, 1278 (11th Cir. 2010) ("a claimant must be more than a 'nominee who exercises no dominion and control'"); *United States v. A Single Family Residence and Real Property Located at 900 Rio Vista Blvd., Ft. Lauderdale*, 803 F.2d 625, 630 (11th Cir. 1986); *United States v. McCorkle*, 143 F. Supp. 2d 1311, 1321 (M.D. Fla. 2001).

Feig presented evidence that the Viola Road house was transferred to her pursuant to the Separation Agreement.  A deed transferring Viola Road to her was filed in New York public records in 1990.  She has continually lived in the Viola Road house with her family.

The United States urges the Court to look behind the formal legal title to the property and to consider the evidence that, it contends, shows that the Separation Agreement which conveyed ownership of the Viola Road property to Feig was a sham.  Weiss admitted during the criminal trial that he previously used nominees.  Doc. No. 2328-45 at 3  ("But to a bank or someone who had a judgment against me, I was trying to hide out . . . . I would say it's Jan Starr, he was my nominee.").  The evidence also shows that at the time the Separation Agreement was drafted and

signed (whether 1989 or 1990), Weiss had ample incentive to fraudulently transfer assets to shield them from his creditors.

The terms of the Separation Agreement also support the United States' theory.  Under that agreement, Weiss purported to transfer the Viola Road property to Feig and promised to make exorbitant payments to Feig and their children.  While Feig and the children continued to live in the house, the United States presented evidence that Weiss kept personal belongings in the house and that he was involved in matters related to upkeep of the house, including a newly built home office.  He provided money to pay the bills on the home.  He continued to reside in the house from time to time.

Feig averred, however, that after their separation, Weiss only came home to see his children on the Jewish Sabbath and on Jewish holidays.  Doc. No. 2340-1 ¶ 5  (2011 Feig Affidavit).  She attested that Weiss may have occasionally left some personal effects at Viola Road because he would "'keep up appearances' for the sake of [the] children by sitting at the head of the dinner table . . . and playing the host when guests were present."  *Id.* ¶ 9.  He continued to help provide for their family, help with decisions associated with their children, and for financial support.  *Id.* ¶10.

Feig's affidavit is sufficient to raise a credibility issue regarding the extent to which Weiss exercised dominion and control over Viola Road after the Separation Agreement and deed transferred legal title to Viola Road to Feig.  The undisputed facts, taken in the light most favorable to Feig, are insufficient to establish that Feig acted as a nominee of Weiss with respect to Viola Road.

**b.      Validity of the Separation Agreement**.

The United States asserts that the Separation Agreement is not valid and should be set aside because (1) it does not comply with New York Law, (2) it violates the New York Uniform Fraudulent Conveyance Act (UFCA), New York Debtor & Creditor Law (D.C.L.) § 276, and (3) the terms of the agreement "evidence overreaching, fraud, duress or a bargain so inequitable that no reasonable or competent person would have consented to it," *Curtis v. Curtis*, 20 A.D. 3d 653, 654 (N.Y App. Div. 2005).  State law determines Feig's interest in Viola Road.  *See United States v. Hovind,* No. 3:06cr83/MCR, 2009 WL 2369340 (N.D. Fla. July 29, 2009)(citing *United States v. Fleet*, 498 F.3d 1225, 1231 (11th Cir. 2007)).

i.      Improper Acknowledgment.

The United States contends that the Separation Agreement is not valid because it was not properly acknowledged.  The United States relies on *Garguilio v. Garguilio*, 504 N.Y.S. 2d 502 (N.Y. App. Div'n 1986), and New York Domestic Relations Law § 170(6) in support of this argument.  *Garguilio* was a matrimonial action in which the husband relied on a separation agreement to establish that he had lived separate and apart from his wife for one or more years. The court found that the husband failed to offer sufficient proof of the separation agreement because their was no showing that the separation agreement was acknowledged in the form required by section 170(6), a statute that sets forth the basis for actions for divorce in New York. *Id.* at 503.

The evidence is undisputed, however, that Weiss and Feig were not seeking to proceed in an action for divorce.  The United States has not shown that simply because the Separation Agreement may not have been sufficient to support an action for divorce it was null and void for

all purposes.  Even if the statutory requirements for a separation agreement govern the validity of the agreement for purposes other than an action in divorce, the evidence is disputed regarding whether and when Feig signed and Schneiderman notarized the signatures on the Separation Agreement.

     ii. <u>New York UFCA and Reasonableness of the Separation Agreement</u>.

   The United States also contends that the Separation Agreement (and deed of transfer) violate the New York UFCA and, therefore, that the transfer of Viola Road is voidable.  Some courts have found that a claimant lacks standing to contest a forfeiture action when her interest in the property is the result of a transfer that violates applicable state fraudulent transfer laws.  *See United States v. Real Property Located at 5208 Los Franciscos Way,*, 385 F.3d 1187, 1192-93 (9th Cir. 2004); *United States v. Gallion*, No. 2:07-39-S-DCR, 2010 WL 3620257, at *21 (E.D. Ky. Sept. 10, 2010).  It is not clear, however, that the United States Court of Appeals for the Eleventh Circuit would adopt the rationale that a court in a criminal ancillary forfeiture proceeding should determine in the first instance whether the transfer of the property at issue is voidable because the transfer violated a UFCA.

   Even assuming that the Eleventh Circuit followed the rationale in *5208 Los Franciscos Way* and *Gallion*, the undisputed evidence is insufficient to establish that the transfer of Viola Road violated the New York UFCA.  New York law provides that a transfer is fraudulent if it is made with "actual intent . . . to hinder, delay, or defraud either present or future creditors."  N.Y. D.C.L. § 276.  The elements of a fraudulent conveyance claim under section 276 are:  (1) the transfer of property; (2) which had value out of which creditors could have realized a portion of

their claim for damages; and (3) actual intent to defraud on the part of the transferor and the transferee. *In re Kovler*, 249 B.R. 238, 247-48, 243 (S.D.N.Y. Bankr. 2000). The *Kovler* court reiterated that "mutual fraudulent intention on the part of both parties to the transaction is required in order to invoke the protection of the law prohibiting fraudulent conveyances; fraudulent intent on the part of one of the parties is insufficient." *Id.*

The United States urges the Court to look for "badges of fraud" as circumstantial evidence of actual intent to defraud by both Weiss and Feig, including the following: (1) the close relationship among the parties to the transaction; (2) a secret and hasty transfer not in the usual course of business; (3) inadequacy of consideration; (4) the transferor's knowledge of a creditor's claim and his inability to pay for it; (5) the use of dummies or fictitious parties; and (6) the transferor retaining control of the property after the conveyance. *In re Kovler*, 249 B.R. at 244-45. Depending on the context, these badges of fraud will vary in significance. *MFS/Sun Life Trust - High Yield Series v. Van Dusen Airport Serv. Co.*, 910 F. Supp. 913, 935 (S.D.N.Y. 1995). Even if for purposes of this motion only, the Court assumes that these criteria are met as to Weiss, they still have to be met as to Feig pursuant to New York law.

The United States contends that constructive knowledge of the fraud can be attributed to Feig because she was aware of circumstances which should have led her to make an inquiry but she did not do so, citing *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 636 (2d Cir. 1995). The United States asserts Feig knew or should have known that Weiss was transferring Viola Road to her for the purpose of hindering his creditors. *In re Corcoran*, 246 B.R. 152, 161 (E.D.N.Y. Bankr. 2000). Feig has denied any knowledge of Weiss' business dealings and finances, even as regarding her home and housing expenses. Weighing the circumstances in which Feig accepted

the conveyance of the property against her testimony that she did know of Weiss' intent or debts will require a credibility determination.  Therefore, there is a genuine issue of material fact regarding Feig's knowledge and intent regarding the transfer of Viola Road.

Accordingly, the United States' motion for summary judgment based on Feig's lack of standing regarding the Viola Road property should be **DENIED**.

> 2.     *Concord Drive.*

The United States asserts that Feig does not have standing to assert a claim for Concord Drive on two alternative theories:  first, that Feig is only the nominal title holder of the property who has not exercised dominion and control over it; and second, that Feig acted as Weiss' nominee as to Concord Drive.  As previously noted, Feig has the obligation of presenting facts showing that she has standing to assert a claim for the Concord Drive property.

Feig presented evidence that Concord Drive was purchased with money furnished by her father, that her parents resided in the home, and that Concord Drive is titled in her name.  Feig's father died two years after he moved into Concord Drive.  Doc. No. 2340-1  ¶ 14.  After her father's death, Feig's mother continued to live at Concord Drive.  Feig and her sister took care of the bills using money provided by their mother.  Weiss also provided her funds to pay bills for the property.  In 2003, Feig decided, on the advice of one of her sons, to refinance the mortgage on Concord Drive because the payments were too high.

The United States asserts that because Weiss often concealed his money in assets owned by nominees, the Court should credit Schneiderman's testimony that Weiss said he would buy a house for Feig's parents.  The United States argues that the inconsistent testimony of Feig and Sylvie Weiss regarding the transfer and receipt of funds used to purchase Concord Drive, Weiss's

use of funds from the mortgage loan on Concord Drive, and Feig's admission that her handwriting appears on some of the loan documents also supports a finding that Feig acted as Weiss's nominee with respect to the purchase of Concord Drive.  However, Feig denies knowing that she signed a mortgage or that she signed checks for the proceeds, which testimony is supported by Weiss's affidavit.  These disputes require credibility determinations that cannot be resolved by summary judgment.

The United States contends, alternatively, that if Feig's testimony is believed, she does not have standing to contest the forfeiture of Concord Drive because she was merely the nominal title holder of the property on behalf of her father.  Feig presented evidence that her father died about two years after Concord Drive was purchased.  Thereafter, Feig continued to be the owner of record of Concord Drive, and she paid bills for Concord Drive.  She also presented testimony that she made the independent decision in 2003 to refinance the mortgage on the property.  This testimony is sufficient, for purposes of summary judgment, to establish that Feig exercised dominion and control over Concord Drive after her father's death.  Therefore, Feig has presented sufficient evidence of standing to contest the forfeiture of Concord Drive for purposes of summary judgment.

Accordingly, the motion for summary judgment based on Feig's lack of standing to contest the forfeiture of Concord Drive should be **DENIED**.

B.      Feig's Motion for Summary Judgment.

Feig filed a motion for summary judgment based on her assertion that the lapse of time between the forfeiture judgment entered after Weiss's criminal trial and entry of the Preliminary

Order of Forfeiture of Substitute Assets violated her due process rights and constitutes laches.

Doc. No. 2329.

      1.    *Due Process.*

The United States filed its petition of forfeiture for Viola Road and Concord Drive more

than nine years after the entry of the Special Verdict of Forfeiture in the criminal case.  Feig

asserts that the nine-year delay has deprived her of a meaningful opportunity to be heard in

violation of her due process rights under the Fifth Amendment to the Constitution.

Feig admits that the United States met the statute of limitations under 18 U.S.C. § 1963 by

filing an indictment, including a forfeiture count, within the five-year period applicable to the

underlying offenses.  Feig also concedes that Federal Rule of Criminal Procedure 32.2(e)(1)(B)

specifies that the court may "at any time" amend an existing order of forfeiture to include

substitute property that qualifies for forfeiture.  However, she argues that the criminal forfeiture

provisions of § 1963 and Rule 32.2 are unconstitutional as applied in this case, because the nine-

year delay has effectively denied her a meaningful opportunity to be heard.  Doc. No. 2329 at 2-3.

Feig is correct that the due process clause at a minimum requires a meaningful opportunity

to be heard.  *Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289, 320 (1973).  A meaningful

opportunity to be heard "comprehends within it a right to be heard without unreasonable delay."

*Id*.  Feig contends that property rights are protected in forfeiture proceedings by the due process

clause and that where an inordinate delay occurs, the owner may file a motion seeking dismissal

of the case on due process grounds.  *Id*. at 3.  However, all of the cases Feig cites for these

propositions are distinguishable because the property at issue had been seized by the United

States.

In *Acadia Technology, Inc. v. United States*, 458 F.3d 1327, 1333-34 (Fed. Cir. 2006), that court stated: "Following seizure of property, the owner of the property has a due process right to either have the government return the property or initiate forfeiture proceedings without unreasonable delay." Feig's property has not been seized, and thus, *Acadia* does not support the existence of a due process claim regarding the timeliness of a forfeiture claim without seizure of the property.

Similarly, Feig cites *United States v. $7,990 in U.S. Currency*, 170 F.3d 843, 846 (8th Cir. 1999), *United States v. Lazarenko*, 476 F.3d 642, 651 (9th Cir. 2007), and *United States v. One 1973 Buick Riviera Automobile*, 560 F.2d 897, 901 (8th Cir. 1977), which address the due process rights of property owners where the property has been taken by the government and then there was an asserted delay in a forfeiture proceeding. Feig's property has not been taken.

Nonetheless, Feig asserts that her due process claim should be analyzed using the four factors outlined in *Barker v. Wingo*, 407 U.S. 514 (1972). These factors are the length of the delay, reason for the delay, the defendant's assertion of right, and prejudice to the defendant. *Id.* at 530. The United States Supreme Court applied the *Barker* factors to a post-seizure forfeiture in *United States v. Eight Thousand Eight Hundred and Fifty Dollars in U.S. Currency*, 461 U.S. 555, 564-65 (1983). Feig has not cited any case supporting the application of these factors to a forfeiture proceeding such as this, where the property at issue was not seized. However, the Court will analyze Feig's claim utilizing these factors in an abundance of caution.

### a.      Length of the delay.

Feig asserts that the length of the delay in filing the motion for forfeiture was nine years, two months, and two weeks. Doc. No. 2329 at 4. Feig asserts that even though she was not

deprived of the use of these properties for nine years, the effect of forfeiting the properties now is the same as if they had been seized nine years ago.  She contends that she would have been better off with an earlier forfeiture proceeding.

Federal Rule of Criminal Procedure 32.2 provides that a forfeiture proceeding may be brought "at any time," which tracks the purpose of the forfeiture statutes and case law.  *See, e.g.*, *United States v. Casey*, 444 F.3d 1071, 1074 (9th Cir. 2006) (if the defendant is insolvent at the time of sentencing, the court must impose a money judgment that remains in effect until it is satisfied); *United States v. Hall*, 434 F.3d 42, 59 (1st Cir. 2006) (even if a defendant does not have sufficient funds to cover the forfeiture at the time of conviction, the Government may seize future assets to satisfy the order to ensure he does not profit from his criminal activity); *United States v. Baker*, 227 F.3d 955, 970 (7th Cir. 2000) (the money judgment places a lien against the defendant personally for the duration of his prison term and beyond); *United States v. Delco Wire and Cable Co., Inc.*, 772 F. Supp. 1511, 1517 (E.D. Pa. 1991) (criminal forfeiture is "like a money judgment that runs against the defendant until satisfied in full"); *see also United States v. Vampire Nation*, 451 F.3d 189, 202-03 (3d Cir. 2006) (following *Casey, Hall*, and *Baker*).

As the United States points out, in analogous situations much longer periods are allowed for collection of judgments.  *See, e.g.*, 18 U.S.C. § 3613 (b) & (f) (liability to pay a fine or restitution shall terminate the later of 20 years from the entry of judgment or twenty years after release from imprisonment); 28 U.S.C. § 3201 (pursuant to Federal Debt Collection Procedures Act, a civil judgment creates a lien on all real property of the judgment debtor which is enforceable for twenty years and may be renewed for an additional twenty years).  In addition, the United States Supreme Court has also stated that Congress intended for RICO statutes to be

"liberally construed to effectuate [their] remedial purpose," *Russello v. United States*, 464 U.S. 16, 27 (1983).

Accordingly, I find that the period of the delay does not weigh in favor of finding a due process violation, in light of language of Federal Rule of Criminal Procedure 32.2, the purpose of the forfeiture provisions, and the longer periods allowed for similar situations.

### b.   Reason for the Delay.

Feig argues that the second factor, the reason for the delay, also weighs in favor of a due process violation. Feig states that the United States has been aware of Viola Road and Concord Drive since the beginning of the criminal case against Weiss and has alleged that Weiss used nominees to hold property since that time.

Section 1963(m) provides the circumstances under which the United States may seek forfeiture of substitute assets, as follows:

> If any of the [forfeited property], as a result of any act or omission of the defendant - - (1) cannot be located upon the exercise of due diligence; (2) has been transferred to sold to, or deposited with, a third party; (3) has been placed beyond the jurisdiction of the court; (4) has been substantially diminished in value; or (5) has been commingled with other property which cannot be divided without difficulty; the court shall order the forfeiture of any other property of the defendant . . . .

18 U.S.C. § 1963(m). In a declaration in support of a motion for a preliminary order of forfeiture of substitute assets, IRS Special Agent Harry J. Brister detailed the efforts of the United States and the Receiver of NHL to track and recover Weiss's assets. Doc. No. 2132-1 ¶¶ 9-19. The United States cooperated with private parties, and was later able to obtain testimony from Weiss's co-conspirators which led them to seek the forfeiture of the Viola Road and Concord Drive. Notably,

during this process Feig was given an opportunity, through depositions, to explain the transfer to her of Viola Road and the Separation Agreement, but she declined to do so, at one time asserting her Fifth Amendment privilege against self-incrimination. *Id.* ¶ 16.

Feig has not presented any evidence or argument that the steps taken by the United States and NHL to identify assets held by Weiss could have been completed sooner. Further, the evidence shows that Feig could have advanced the issue of her ownership of Viola Road much sooner, but she chose not to do so. Under these circumstances, the reason for the delay does not weigh in favor of Feig's argument that her due process rights were violated.

### c.     **Assertion of Feig's Right**.

The third *Barker* factor is whether Feig has timely asserted her rights. Feig argues that because the United States delayed bringing the forfeiture action, she had no opportunity to timely assert her rights.

Feig's position fails in two respects. First, as noted above, Feig had the opportunity to explain the circumstances under which she acquired Viola Road as early as 1993, but she declined to do so. Second, Feig has repeatedly delayed the progress of the litigation of her ancillary forfeiture claim. She did not timely file her claim, Doc. Nos. 2216, 2217 (Feig filed her petition for innocent ownership and motion to file her claim late on June 19, 2009, five months after the preliminary order of forfeiture was entered), and she repeatedly sought extensions of time, Doc. No. 2300 (Feig requested an extension of time to complete discovery and file dispositive motions); Doc. No. 2315 (Feig sought additional discovery following the expiration of the discovery deadline); Doc. No. 2322 (the Court notes Feig's pattern and practice of "deliberate delay and failure to comply with Court orders.").

Accordingly, I find that this factor weighs against any due process violation.

### d.   Prejudice to Feig.

The fourth *Barker* factor is whether there has been any prejudice to Feig due to the delay. Feig asserts that memories have faded and evidence has disappeared due to the nine-year delay. In considering this factor, the United States Supreme Court has stated that the "consideration of prejudice is not limited to the specifically demonstrable." *Doggett v. United States*, 505 U.S. 647, 655 (1992). The Court cautioned that the importance of this factor increases with the length of the delay.

In *Doggett*, however, the Court cited an "egregious persistence in failing to prosecute" the defendant. As discussed above, the United States has acted diligently in its attempt to locate and collect Weiss's assets. The evidence shows that Feig obstructed and delayed this process.

Furthermore, the Court notes Feig served as a surety on a $500,000 appearance bond securing Weiss's pretrial release, and posted a mortgage in the amount of $100,000 on Viola Road as security for his release. Doc. No. 173. After Weiss failed to appear during trial, the United States filed a motion to forfeit the bond, a copy of which was served on Feig. Doc. No. 1256. Feig took no action to challenge the forfeiture. As a result, a Judgment of Default was entered in 1999 against Weiss and Feig in the amount of $500,000. Doc. No. 1285. Since that time, the United States could have sought to  foreclose on the mortgage on Viola Road and levied on the Concord Drive property to satisfy Feig's judgment debt. Under these circumstances, Feig and her family have been rewarded with many years of use and enjoyment of Viola Road and Concord Drive to which they would not have been entitled if the United States has initiated collection

efforts against these properties to satisfy Feig's debt to the United States.  Therefore, the final

factor in the *Barker v. Wingo* analysis also does not support Feig's due process argument.

Accordingly, Feig has failed to present evidence sufficient to support her claim that any

delay in bringing this forfeiture action deprived her of due process.

   2. *Laches.*

In the alternative, Feig asserts that the forfeiture is barred by the equitable doctrine of

laches.  To establish laches, Feig must show a delay in the proceedings, that the delay was

unexcusable, and that the delay caused undue prejudice to Feig.  *Ambrit, Inc. v. Kraft, Inc.*, 812

F.2d 1531, 1545 (11th Cir. 1986) (citations omitted).  Feig asserts that where the delay is

outrageous, inexcusable and unreasonable, then laches may be established without a showing of

prejudice, citing *United States v. Barfield*, 396 F.3d 1144, 1151 n.10 (11th Cir. 2005).

In *United States v. Summerlin*, 310 U.S. 414, 416 (1940), the United States Supreme Court

wrote that "[i]t is well settled that the United States is not . . . subject to the defense of laches in

enforcing its rights."  The Eleventh Circuit continues to follow *Summerlin.  See United States v.*

*Moore*, 968 F.2d 1089, 1100 (11th Cir. 1992)(quoting *United States v. Summerlin*, 310 U.S. 414,

416 (1940).

Even if the defense of laches were available against the United States, the evidence does

not establish that there was any undue delay for the reasons discussed above.  Finally, a claimant

seeking to rely on an equitable defense, such as laches, must come before the Court with "clean

hands."  Because Feig has contributed substantially to the delay in seeking forfeiture of Viola

Road and has continued to impede the resolution of her claim to Viola Road and Concord Drive,

she has not established that she comes before the Court with clean hands.

Thus, Feig has failed to show that laches applies here.

3. *Insufficient Basis for Forfeiture Order.*

Feig alleges that the United States presented insufficient evidence to support the Court's Preliminary Order of Forfeiture of Substitute Assets. Doc. No. 2137. Specifically, Feig alleges that the only allegations in support of forfeiting the Concord Drive property were the following: (1) that Weiss used nominees to hold property; and (2) that Feig asserted her Fifth Amendment rights and did not testify regarding the property. Feig asserts that this evidence is insufficient to support the Preliminary Order of Forfeiture of Substitute Assets.

The Preliminary Order of Forfeiture of Substitute Assets is an adjudication that Defendant Weiss's interest in the identified substitute assets should be forfeited. The purpose of the ancillary proceedings is to resolve the extent to which Weiss has an interest in the substitute assets. Accordingly, Rule 32.2(b) provides that a preliminary order of forfeiture is entered "without regard to any third party's interest in the property." Therefore, Feig does not have standing to challenge the preliminary order of forfeiture finding that Defendant Weiss's interest in Viola Road and Concord Drive is subject to forfeiture under the substitute asset provision. Rather, the ancillary proceeding is the vehicle through which Feig may present evidence that Defendant Weiss has no interest in the substitute properties. *See United States v. Cone*, 627 F.3d 1356, 1358 (11th Cir. 2010)(non-party claimants do not have standing to challenge Court's decision regarding preliminary order of forfeiture entered in the criminal case); *see also United States v. Muckle*, 709 F. Supp. 2d 1371, 1374 (M.D. Ga. 2010)(third-party claimant has no right to challenge the preliminary order's finding of forfeitability); *United States v. Rothstein*, No. 09-60331-CR-COHN, 2010 WL 2351466, at * 2 (S.D. Fla. June 11, 2010)(same).

Accordingly, Feig's motion for summary judgment should be **DENIED.**

**V.      RECOMMENDATION.**

Based on the foregoing, I respectfully recommend that the United States' motion for summary judgment, Doc .No. 2327, be **DENIED**, and Feig's motion for summary judgment, Doc. No. 2329, be **DENIED**.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on April 15, 2011.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy

-30-