**U**NITED **S**TATES **D**ISTRICT **C**OURT
**M**IDDLE **D**ISTRICT OF **F**LORIDA
**O**RLANDO **D**IVISION

**UNITED STATES OF AMERICA**

-vs-                                                              **Case No.  6:98-cr-99-Orl-19KRS**

**SHOLAM WEISS, et al.**

_____

# ORDER

This case comes before the Court on the following:

1.      Motion for Summary Judgment by United States of America (Doc. No. 2327, filed Jan. 31, 2011);

2.      Statement of Uncontested Material Facts in Support of Motion for Summary Judgment by United States of America (Doc. No. 2328, filed Jan. 31, 2011);

3.      Motion for Summary Judgment by Petitioner Goldie Feig (Doc. No. 2329, filed Jan. 31, 2011);

4.      Statement of Facts in Support of Motion for Summary Judgment by Petitioner Goldie Feig (Doc. No. 2330, filed Jan. 31, 2011);

5.      Response to Petitioner's Motion for Summary Judgment by United States of America (Doc. No. 2338, filed Feb. 14, 2011);

6.      Response to Government's Motion for Summary Judgment by Petitioner Goldie Feig (Doc. No. 2339, filed Feb. 14, 2011);

7.      Response to Government's Statement of Uncontested Material Facts by Petitioner Goldie Feig (Doc. No. 2340, filed Feb. 14, 2011);

8.   Reply to Response to Petitioner's Motion for Summary Judgment by Petitioner Goldie Feig (Doc. No. 2343, filed Feb. 25, 2011);

9.   Notice of Filing Apostille for the Affidavit of Rabbi Solomon Unsdorfer by Petitioner Goldie Feig (Doc. No. 2344, filed Mar. 2, 2011);

10.  Notice of Filing a Re-Notarized Affidavit of Rabbi Salomon Unsdorfer by Petitioner Goldie Feig (Doc. No. 2348, filed Mar. 17, 2011);

11.  Notice of Filing a Re-Notarized Affidavit of Sholam Weiss by Petitioner Goldie Feig (Doc. No. 2349, filed Mar. 17, 2011);

12.  Reply to Response to Government's Statement of Uncontested Material Facts in Support of Motion for Summary Judgment by United States of America (Doc. No. 2345, filed Mar. 7, 2011);

13.  Reply to Response to Government's Motion for Summary Judgment by United States of America (Doc. No. 2346, filed Mar. 7, 2011);

14.  Report and Recommendation of United States Magistrate Judge Recommending the Denial of the Motions for Summary Judgment of Petitioner and United States of America (Doc. No. 2367, filed Apr. 15, 2011);

15.  Objections to Report and Recommendation by United States of America (Doc. No. 2371, filed Apr. 28, 2010);

16.  Objections to Report and Recommendation by Petitioner Goldie Feig (Doc. No. 2372, filed Apr. 29, 2010);

17.  Response to Petitioner's Objections to Report and Recommendation by United States of America (Doc. No. 2378, filed May 13, 2011); and

18.      Response to Government's Objections to Report and Recommendation by Petitioner

Goldie Feig (Doc. No. 2379, filed May 13, 2011).

## Background

## I. Procedural History

Defendant Sholam Weiss was convicted of various crimes, including racketeering in
violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961,
et seq. (Doc. No. 1267, filed Nov. 1, 1999.)  The jury found that Weiss should forfeit specifically
named properties and money.  (Doc. No. 1276, filed Nov. 2, 1999.)  During the criminal trial Weiss
admitted that he used nominees to "hide out" from banks and judgment creditors.  (Doc. No. 2328-
45 at 3.)  The Court has noted throughout the post-trial proceedings in this case that Weiss typically
used the *modus operandi* of installing nominees to act as a front in name for Weiss's ownership
interests.  (Doc. No. 1955 at 6-7.)

On January 19, 2009, the Court entered a Preliminary Order of Forfeiture for Substitute
Assets belonging to Weiss in partial satisfaction of the outstanding forfeiture money judgment.
(Doc. No. 2137.)  The substitute assets include real properties located at 255 Viola Road, Monsey,
New York ("Viola Road") and 65 East Concord Drive, Monsey, New York ("Concord Drive").  (*Id.*
at 1-2.)  Both of these properties are presently titled in the name of Weiss's wife, Goldie Feig Weiss
("Feig").  (*Id.*)

On November 24, 2009, Feig filed a Petition of Innocent Ownership to exclude the Viola
Road and Concord Drive properties from forfeiture.  (Doc. No. 2251.)  Both the Government and
Feig have moved for summary judgment on the Petition, and Magistrate Judge Karla R. Spaulding
has entered a Report and Recommendation denying both Motions.  (Doc. Nos. 2327, 2328, 2367.)

Feig and the Government have filed objections to the Report and Recommendations, and both parties' objections are opposed by a response. (Doc. Nos. 2371-72, 2378-79.)

## II.  Viola Road

The disputed ownership of the Viola Road property centers on the validity of a Separation Agreement between Feig and Weiss purporting to transfer the Viola Road property from Weiss to Feig and the extent to which Weiss resided at and exercised control over the Viola Road property after he and Feig separated. The evidence of record on each of these matters is discussed below.

### A.  Separation Agreement

Weiss and Feig were married in 1975. (Doc. No. 2309-1 at 1.) On July 2, 1988, Weiss purchased the Viola Road property, taking title in his name only. (Doc. No. 2328-3 at 1; Doc. No. 2328-4 at 3.) Feig has lived at the Viola Road property since 1989. (Doc. No. 2328-5 at 3; Doc. No. 2251 ¶¶ 5, 7.)

Weiss was the President and sole shareholder of Windsor Plumbing Supply, Inc. ("Windsor"). (Doc. No. 2328-1 at 4.) Two lawsuits were filed against Weiss and Windsor in November of 1988 and January of 1989. (Doc. No. 2328-7 at 7; Doc. No. 2328-9 at 1.) On May 25, 1989, Weiss mortgaged the Viola Road property for $250,000 in favor of Moshe Mishal. (Doc. No. 2328-11.) On August 17, 1989, Weiss filed a satisfaction of this mortgage reflecting payment of $300,000. (Doc. No. 2328-13.) On the same day, Weiss took out another mortgage on the Viola Road property in the amount of $390,000 from Williamsburg Savings Bank. (Doc. No. 2328-14.)

Pursuant to a "Separation Agreement" dated October 26, 1989, Weiss transferred the Viola Road property to Feig. (Doc. No. 2328-30 ¶ 2.) On March 9, 1990, approximately six weeks after

Windsor's creditors filed a petition for involuntary bankruptcy against Windsor,[1] Weiss filed a deed in the New York public records transferring title of Viola Road to Feig.  (*Id.*; Doc. No. 2328-20.)

In her deposition of October 19, 2010, taken for purposes of the instant proceeding, Feig testified that she did not have conversations with Weiss about family financial decisions and that Weiss alone made those decisions.  (Doc. No. 2328-5 at 9.)  Feig further stated that Weiss never told her how much money he made per month and that she and Weiss never discussed Weiss's business or assets.  (*Id.* at 13-14.)

The Receiver for National Heritage Life Insurance Company deposed Feig on October 27, 2004.  (Doc. No. 2338-1.)  During that deposition, Feig asserted that she did not read the Separation Agreement and did not speak with any lawyer about the Agreement prior to signing it.  (*Id.* at 3-4, 7.)  Feig also testified that Weiss did not disclose his financial status to her before she signed the Agreement.  (*Id.* at 7-8.)

Feig filed an affidavit dated February 14, 2011, in response to the Government's Statement of Undisputed Facts filed in support of its Motion for Summary Judgment.  (Doc. No. 2340-1.)  In her February 2011 affidavit, Feig asserted that at the time Weiss purchased Viola Road in 1988, she mistakenly believed that Viola Road was owned by Weiss and her together.  (*Id.* ¶ 3.)  Feig further explained that she "did not really take part" in negotiating the terms of the Separation Agreement because that was not her religious custom.  (*Id.* ¶ 6.)  Rather, she trusted her father and a three-rabbi tribunal "to make a fair arrangement that would allow [her] and [her] children to continue to live"

---

[1] On March 21, 1990, Weiss filed a petition converting Windsor's involuntary Chapter 7 bankruptcy to a Chapter 11 bankruptcy.  (Doc. No. 2328-1.)  The petition listed seventeen pending actions against Windsor and Weiss and indicated that the bankruptcy involved $18 million in liabilities.  (Doc. No. 2328-1 at 3, 11-12.)

at the Viola Road residence. (*Id.*) Feig maintained that she did not want to get a divorce in 1989 because her children were still young and because divorce was not favored in her religious community. (*Id.* ¶ 8.)

The Separation Agreement bears the notary public stamp of Jan R. Schneiderman and two purported signatures of Schneiderman attesting to the execution of the Separation Agreement before her by Weiss on October 5, 1989, and by Feig on October 26, 1989. (Doc. No. 2328-30 at 11.) Schneiderman testified in a deposition in 1992 that she drafted the Separation Agreement based on a list of terms provided to her. (Doc. No. 2340-8 at 33.) She further testified that Feig came to her office to sign the Agreement. (*Id.*)

On February 1, 2004, Feig testified during a deposition in a civil case that she signed the Separation Agreement at Schneiderman's office. (Doc. No. 2340-5 at 15.) During her October 2004 deposition, Feig testified that she did not remember the circumstances surrounding the signing of the Separation Agreement, including whether Weiss was present when she signed the Agreement. (Doc. No. 2338-1 at 3.) Most recently, Feig averred in her February 2011 affidavit that she "can[]not really recall" signing the Separation Agreement "in detail." (Doc. No. 2340-1 ¶ 6.)

In a declaration signed in October 2010 and filed by the Government in support of its present Motion for Summary Judgment, Schneiderman attested that Weiss first approached her in early 1990 about preparing a separation agreement in order to protect his assets. (Doc. No. 2328-29 ¶ 7.) She further averred that Weiss instructed her to back-date the agreement so that it would precede the Windsor bankruptcy proceeding. (*Id.* ¶ 11.) Schneiderman also declared that sometime in March 1990, Weiss brought her the executed Separation Agreement, at which time she refused to notarize Feig's signature because Feig was not present. (*Id.* ¶ 24.) Schneiderman asserted that she did not

actually sign or affix her notary stamp on the Separation Agreement.  (*Id.* ¶¶ 30-31.)  Finally, Schneiderman claimed to have lied about these matters in her 1992 deposition discussed above.  (*Id.* ¶ 34.)

Feig filed an affidavit by Weiss dated March 17, 2011, in response to the Government's Statement of Undisputed Facts filed in support of its Motion for Summary Judgment.  (Doc. No. 2349-1.)  In this Affidavit, Weiss contended that Feig's father retained the services of Rabbi Salomon Unsdorfer to represent Feig in a divorce from Weiss.  (*Id.* ¶ 12.)  This assertion is corroborated by Rabbi Unsdorfer, who averred that he was one of the three rabbis that assisted in the Settlement Agreement negotiations.  (Doc. No. 2348-1 ¶ 4.)  Both Weiss and Rabbi Unsdorfer further asserted that it was agreed amongst Weiss, Feig's father, and the three rabbis that a Separation Agreement would be drafted in lieu of a divorce at that time.  (*Id.* ¶¶ 7-9; Doc. No. 2349-1 ¶ 12.)  Weiss maintained that after the terms of the Settlement Agreement were negotiated, attorney Leo Fox introduced Weiss to attorney Donald Swords, who made the initial draft of the Settlement Agreement.  (Doc. No. 2349-1 ¶ 16.)  According to Weiss, Swords took ill, and Fox introduced Weiss to Schneiderman who finalized the Settlement Agreement.  (*Id.* ¶ 17.)

### B.  Weiss's Involvement with Viola Road after the Separation Agreement

In her February 2011 affidavit, Feig averred that her marital relationship with Weiss ended in 1989 shortly after they moved to the Viola Road property and that Weiss rented an apartment in Manhattan where he spent "the majority of his time living and working."  (Doc. No. 2340-1 ¶ 5.)  Feig further stated that Weiss only came to the Viola Road residence to see his children on the Jewish Sabbath and for Jewish holidays.  (*Id.*)  Feig recalled that although Weiss occasionally left some personal and religious effects at the Viola Road residence, he did not keep his regular

wardrobe at Viola Road after their separation. (*Id.* ¶ 9.)  Feig asserted that despite remaining separated from Weiss, he would "occassional[ly]" visit to "keep up appearances" for the sake of the children by sitting at the head of the dinner table and playing host to guests in the home. (*Id.*)  Feig maintained that despite Weiss's presence at Viola Road, they remained separated. (*Id.* ¶ 10.)  Feig conceded to cooperating with Weiss in subsequently mortgaging the Viola Road property, "but only with the understanding that such cooperation was for the purpose of guaranteeing [Weiss'] ongoing ability to support the family." (*Id.* ¶ 11.)  Weiss's averments in his March 2011 affidavit regarding his involvement with the Viola Road property following his separation from Feig are consistent with Feig's account in her February 2011 affidavit. (Doc. No. 2349-1 ¶¶ 23, 26, 29, 30.)

The assertions of Feig and Weiss about Weiss's limited presence at the Viola Road property are contrasted by the testimonies of Schneiderman and Jan Stark.  Schneiderman attested in her October 2010 declaration that while Weiss had apartments in Manhattan at various times, his true residence was Viola Road. (Doc. No. 2328-29 ¶ 37.)  According to Schneiderman, it was not "uncommon" for Weiss to leave his New York apartment late at night, drive to Viola Road to sleep, and call Schneiderman on the telephone along the way. (Doc. No. 2328-31 at 16.)  Schneiderman also recalled frequent invitations to the Viola Road property for family events, most particularly for the celebration of the Jewish Sabbath on Saturday afternoons. (Doc. No. 2328-29 ¶ 38.)  During her visits to Viola Road, Schneiderman noted that Weiss shared a bedroom with his wife, that his wife brought his clothes to the dry cleaner, that his personal items were visible throughout the house, that he maintained a fully-furnished, newly built home office there, and that he referred to Viola Road in Monsey, New York as his "home." (*Id.* ¶ 39.)  Schneiderman also claimed to have paid phone

bills and for improvements to the Viola Road property from money she was holding for Weiss between 1992 and 1994.  (Doc. No. 2328-31 at 28-30.)

Jan Stark, who at times lived at the Viola Road property, also indicated that Weiss retained control over the Viola Road property following the Separation Agreement.  (Doc. No. 2328-32 at 11-12.)  Stark recalled that Weiss was "very involved" in a neighborhood dispute concerning the repaving of a road, (*id.* at 10), and that Weiss arranged for the construction of a custom-made television cabinet in his bedroom at the Viola Road property.  (*Id.* at 11.)  Stark asserted that he saw Weiss stay overnight at the Viola Road residence during the week, not merely on the Sabbath.  (*Id.* at 11-12.)  Stark also testified that Feig was not involved in the day-to-day decision making at the Viola Road residence.  (*Id.* at 19.)

## III.  Concord Drive

The parties' dispute over the Concord Drive property surrounds whether Feig's actions demonstrate that she is more than a mere nominal title holder of the property.  Feig's parents wanted to move from Belgium to the United States in 1994 to be closer to her and her sister.  (Doc. No. 2340-1 ¶ 13; Doc. No. 2340-9 at 27-28.)  Schneiderman averred that in 1994 when she was visiting Weiss and his family on the Sabbath, Weiss told her "of his plans to purchase a home for his wife's parents."  (Doc. No. 2328-29 ¶ 41.)  Weiss denied making this statement to Schneiderman, (Doc. No. 2349-1 ¶ 33), and other evidence of record indicates that Feig's father actually purchased the Concord Drive property.

The testimonies of Feig and her sister, Sylvie Weiss ("Sylvie"), differ in some respects regarding how their parents purchased the Concord Drive property.  Sylvie testified that she and Feig viewed the property once and that her parents informed her over the telephone from Belgium

that they would buy the home.  (Doc. No. 2340-9 at 28-29.)  Sylvie recalled her father instructing

her to pick up money from one of his business associates that he transferred to the United States.

(*Id.* at 29.)  Sylvie asserted that these funds covered the total purchase price of the house.  (*Id.* at 37.)

Sylvie testified that she picked up the funds and delivered them to Edward Burnbaum, the attorney

who handled the closing.  (*Id.* at 30-31.)  According to Sylvie, the Concord Drive property was titled

in Feig's name rather than her parents' names because her parents were not American, were old, and

were not in the United States to sign the necessary papers at the time of closing.  (*Id.* at 32, 34-35.)

Sylvie further explained that the house was titled in Feig's name rather than her name because she

was receiving Section 8 housing at the time.  (*Id.* at 38.)

Sylvie testified that after the house was purchased, she and her husband hired contractors to

renovate the house, her father sent $30,000 to pay for the renovations, she paid the contractors that

money, and that Feig helped plan the renovations.  (*Id.* at 40-42.)  According to Sylvie, her parents'

bills were sent to the Concord Drive property, and she and Feig assisted their parents in remitting

their bills for payment with their parents' funds.  (*Id.* at 46-48.)

During her October 2010 deposition, Feig testified that she picked out the Concord Drive

property for her parents, (Doc. No. 2328-5 at 30), but she averred in her February 2011 affidavit that

she picked out the home with Sylvie.  (Doc. No. 2340-1 ¶ 13.)  Like Sylvie, Feig stated that the

purchase money for the Concord Drive property came from her father, although Feig did not recall

how the money was received from her father.  (Doc. No. 2328-5 at 30.)  Unlike Sylvie, Feig

maintained that the bills for the Concord Drive property were sent to the Viola Road address.  (Doc.

No. 2340-1 ¶ 15.)  Feig further averred, consistent with Sylvie's testimony, that her mother's bills

were paid from her mother's own funds.  (*Id.*)  However, Feig explained during her October 2010

deposition that Weiss provided her money to pay the bills for the Concord Drive property and that she paid her mother's bills with funds provided by both Weiss and her mother. (Doc. No. 2328-5 at 38, 41.)

In 1997, a mortgage was taken out on the Concord Drive property for $210,000. (Doc. No. 2340-1 ¶ 16.) Feig averred in her February 2011 affidavit that she was unaware of the mortgage in 1997 and that Weiss fraudulently arranged for that mortgage by falsifying the necessary documents and forging the necessary signatures. (*Id.*) At the same time, Feig admitted during her October 2010 deposition that her handwriting and signature were on some, but not all, of the loan documents, and she did not recall applying for a mortgage loan on Concord Drive. (Doc. No. 2328-5 at 34.) Feig also conceded that she regularly signed documents that Weiss gave her without reading them. (*Id.* at 34, 44.)

Weiss contended in his March 2011 affidavit that Feig was not aware of the mortgage on the Concord Drive property and that Schneiderman forged the signatures required to obtain the mortgage loan. (Doc. No. 2349-1 ¶ 37.) In contrast, Schneiderman stated that she had no knowledge of a mortgage taken out on the Concord Drive property in 1997. (Doc. No. 2328-21 at 26.)

The mortgage proceeds of $200,122.35 were disbursed by a check payable to Feig dated March 20, 1997. (Doc. No. 2328-41.) On March 24, 1997, $200,122.35 was deposited into the bank account of Feig and Sylvie. (Doc. No. 2328-41 at 1.) A check bearing the signature "Goldie Weiss" in the amount of $100,000.00 was written from that account to Leo Fox on March 26, 1997. (Doc. No. 2328-43 at 1.) Feig testified that she had no knowledge regarding what was done with the proceeds of the mortgage. (Doc. No. 2328-5 at 34.) She also did "not specifically recall signing any

checks." (Doc. No. 2340-1 ¶ 17.) Similarly, Sylvie Weiss testified that she was not aware of the mortgage proceeds deposited into her joint bank account with Feig or the check issued to Fox. (Doc. No. 2328-33 at 13-14.) Weiss maintained that he "deceived" Feig to cause her to write the check to Fox by leading her to believe that he had directed money from a business deal into her account for her support. (Doc. No. 2349-1 ¶ 37.)

During her October 2010 deposition, Feig could not recall when she started making payments on the Concord Drive mortgage, except that she was making payments "two [or] three years later." (Doc. No. 2328-5 at 36.) Feig admitted that she received money to pay the mortgage from Weiss. (*Id.*) In 2003, Feig refinanced the mortgage on Concord Drive in order to lower the payment pursuant to her son's advice. (Doc. No. 2328-44; Doc. No. 2328-5 at 36-37.) The refinancing documents bear the initials "GF" and the signature "Goldie Feig." (*Id.*)

**Standard of Review**

## I. RICO Forfeiture

RICO provides for the criminal forfeiture of "any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity . . . ." 18 U.S.C. § 1963(a)(3). Following the entry of an order of forfeiture, "[a]ny person, other than the defendant, asserting a legal interest in the property which has been ordered forfeited to the United States" may petition the court for a hearing to adjudicate the validity of the alleged interest. *Id.* § 1963(l)(1)-(2). The ancillary proceeding permitting a third party to challenge the forfeiture of assets is "essentially identical" to the criminal forfeiture proceeding following a conviction for a controlled substances offense as set forth in 21 U.S.C. § 853(n). *United States v. Marion*, 562 F.3d 1330, 1341 n.8 (11th Cir. 2009); *see also United States v. De La Mata*, 535 F.3d 1267, 1272 n.17 (11th Cir.

2008) ("21 U.S.C. § 853(n) . . . authorizes third party proceedings identical to those of 18 U.S.C. § 1963(l)."); *United States v. Watkins*, 320 F.3d 1279, 1283 n.2 (11th Cir. 2003) ("[C]ases applying one of these analogous statutes have used section 853(n) and section 1963(l) cases interchangeably." (quotation omitted)).

"To establish his legitimate entitlement to the forfeited property, the petitioner must show that (1) title to the property was vested in him rather than the defendant at the time of the act which made the property subject to forfeiture; (2) his title to the property was superior to the title held by the defendant at the time of the act which made the property subject to forfeiture; or (3) that he purchased his interest without reasonable cause to know that the property was subject to forfeiture." *United States v. Gilbert*, 244 F.3d 888, 911 (11th Cir. 2001), *superseded in part by rule as stated in*, *Marion*, 562 F.3d at 1341; *accord* 18 U.S.C. § 1963(l)(6)(A)-(B). "[T]he third-party petitioner, and not the government, bears the burden of proving one of these limited grounds by a preponderance of the evidence." *Gilbert*, 244 F.3d at 911. In addition to any evidence presented by the petitioner and Government during the ancillary proceedings, "the court shall consider the relevant portions of the record of the criminal case which resulted in the order of forfeiture." 18 U.S.C. § 1963(l)(5). Ancillary forfeiture proceedings are civil in nature and thus governed by the Federal Rules of Civil Procedure. *See Gilbert*, 244 F.3d at 907 ("[A] third-party petition filed under section 1963(l) is civil in nature even though it is ancillary to a criminal forfeiture trial.").

"[A] person or entity cannot have a vested interest in property if that person or entity is found to be acting as a nominee for someone who property is subject to forfeiture." *United States v. Weiss*, 467 F.3d 1300, 1308-09 (11th Cir. 2006). "Although federal law defines what interests are subject to criminal forfeiture, 'state property law defines what those interest are.'" *United States v. Browne*,

552 F. Supp. 2d 1342, 1345 (S.D. Fla. 2008) (quoting *United States v. Kennedy*, 201 F.3d 1324, 1334 (11th Cir. 2000)).  "Accordingly, a district court will look to the law of the state where the property is located to determine whether the petitioner has a legal right to the forfeited property." *Id.* (citing *Kennedy*, 201 F.3d at 1334).

## II.  Summary Judgment

Courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259 (11th Cir. 2004).  An issue of fact is "material" under the applicable substantive law if it might affect the outcome of the case.  *Hickson Corp.*, 357 F.3d at 1259.  An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party.  *Id.* at 1260.  The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.*; *Anderson*, 477 U.S. at 251-52.

The party moving for summary judgment has the burden of proving that: (1) there is no genuine issue as to any material fact, and (2) it is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in the light most favorable to the party opposing the motion and resolves all reasonable doubts against the moving party.  *Anderson*, 477 U.S. at 255.  The court may not weigh conflicting evidence or weigh the credibility of the parties.  *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993).  If a reasonable fact finder could draw more than one inference from the facts and that inference

creates an issue of material fact, the court must not grant summary judgment.  *Id.*  On the other hand, summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial."  *Celotex Corp.*, 477 U.S. at 322.  In addition, when a claimant fails to produce "anything more than a repetition of his conclusory allegations," summary judgment for the movant is "not only proper but required."  *Morris v. Ross*, 663 F.2d 1032, 1034 (11th Cir. 1981).

### III. Objection to a Report and Recommendation of a United States Magistrate Judge

A party seeking to challenge the findings in a Report and Recommendation of a United States Magistrate Judge must file "written objections which shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection."  *Macort v. Prem, Inc.*, 208 F. App'x 781, 783 (11th Cir. 2006) (quoting *Heath v. Jones*, 863 F.2d 815, 822 (11th Cir. 1989)).  If a party makes a proper objection, the District Court must conduct a de novo review of the portions of the report to which objection is made.  *Macort*, 208 F. App'x at 783-84; *see also* 28 U.S.C. § 636(b)(1).  The District Court may accept, reject, or modify in whole or in part, the findings or recommendations made by the Magistrate Judge.  *Macort*, 208 F. App'x at 784; 28 U.S.C. § 636(b)(1).

### Analysis

Both Feig and the Government have lodged several objections to the Magistrate's Report and Recommendation denying their respective Motions for Summary Judgment.  (Doc. Nos. 2371, 2372.)  The Court will address each in turn.

**I. Feig's February 2011 Affidavit as a "Sham" Affidavit**

In denying the Government's Motion for Summary Judgment, Magistrate Judge Spaulding found that several of the assertions made by Feig in her February 2011 affidavit created genuine issues of material fact regarding the validity of Feig's claims of ownership of the Viola Road and Concord Drive properties. (Doc. No. 2367 at 16, 21.) The Government contends that Feig's February 2011 affidavit was erroneously considered for purposes of summary judgment because it is a sham. (Doc. No. 2371 at 8-9.)

The sham affidavit rule states that "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins and Assoc. v. U.S. Indus.*, 736 F.2d 656, 657 (11th Cir. 1984). However, "[e]very discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence." *Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir. 1986) (internal quotation marks omitted). Courts must distinguish "between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence." *Id.* at 953.

The sham affidavit rule is inapplicable to Feig's February 2011 affidavit because her prior deposition testimony did not negate the existence of a genuine issue of material fact that her subsequent affidavit attempted to revive. *Junkins*, 736 F.2d at 657. The Government points to the fact that in her February 2011 affidavit, Feig asserted for the first time that the Separation Agreement was negotiated by her father, her husband, and a tribunal of three rabbis, despite extensive questioning during discovery about the existence and nature of negotiations and

disclosures.  (Doc. No. 2371 at 8.)  Feig testified during her October 2010 deposition that she did not think she ever had a lawyer provide her any guidance or help with the Separation Agreement. (Doc. No. 2328-5 at 13.)  Feig further maintained during her deposition and in her responses to the Government's requests for admissions that she did not ask a lawyer to review the Separation Agreement, never specifically told Weiss that she did not want a lawyer, and never thought about hiring a lawyer at all.  (*Id.*; Doc. 2309-1 ¶ 12.)  Feig also stated that she and Weiss never discussed what real property would be included in the Separation Agreement or made financial disclosures to each other in connection with the Settlement Agreement.  (Doc. No. 2328-5 at 11; Doc. 2309-1 ¶¶ 15-19; Doc. No. 2328-5 at 13.)  Feig maintained that Weiss did not tell her how much money he made per month and that there were no negotiations between Weiss and Petitioner about the terms of the Separation Agreement.  (Doc. No. 2328-5 at 13.)  Feig's testimony during her October 2010 deposition is consistent with her October 2004 deposition, in which she stated that she did not read the Separation Agreement prior to signing it, that she did not speak with any lawyer about the Agreement prior to signing it, and that Weiss did not disclose his financial status to her before she signed the Agreement.  (*Id.* at 3-4, 7-8.)

Feig's assertion in her February 2011 affidavit that Weiss, Feig's father, and three rabbis negotiated the Settlement Agreement is not an unexplained contradiction of her prior deposition testimony that she executed the Settlement Agreement without counsel and without any disclosures from Weiss.  (Doc. No. 2340-1 ¶ 7.)  Feig was not squarely asked during her October 2010 deposition or otherwise during discovery how the Settlement Agreement was negotiated apart from the fact that she did not herself negotiate the Agreement with Weiss.  (Doc. No. 2328-5 at 13.)  In addition, Feig's deposition testimony that she signed the Settlement Agreement without advice of

a lawyer's counsel or full disclosure from Weiss is not wholly inconsistent with her subsequent averments that she did not personally participate in the negotiation of the Settlement Agreement. (Doc. No. 2340-1 ¶ 7.)  Accordingly, Feig's deposition testimony that she signed the Settlement Agreement absent counsel or full disclosure from Weiss does not justify striking her February 2011 affidavit as a sham.

The Government further argues that Feig's February 2011 affidavit is a sham because she was extensively questioned about Rabbi Unsdorfer but never stated that he represented her in the Separation Agreement negotiations.  (Doc. No. 2371 at 8.)  During her October 2010 deposition, Feig was asked to explain who Rabbi Unsdorfer was, and she responded that Unsdorfer was the son-in-law of the Rabbi of the synagogue in Brooklyn where she and Weiss used to pray.  (Doc. No. 2328-5 at 7.)  Feig further testified that she did not recall ever discussing personal issues with Unsdorfer or meeting with him by herself.  (*Id.* at 8.)  Feig's deposition testimony is not wholly inconsistent with her averment in her February 2011 affidavit, corroborated by the sworn statements of Unsdorfer, that the Separation Agreement was negotiated by Weiss, Feig's father, and three rabbis in accordance with religious custom.  (Doc. No. 2348-1 ¶¶ 5-11; Doc. No. 2350-1 ¶ 7.)

The Government also claims that Feig's February 2011 affidavit is a sham because her averment that she signed the Separation Agreement on October 26, 1989, conflicts with her October 2010 deposition testimony that she had no idea when she signed the Separation Agreement.  (Doc. No. 2371 at 8 n.3.)  A failure to recall a fact and subsequent recollection of that fact goes to the witness's credibility and is not, by itself, sufficient justification for striking Feig's affidavit as a sham.  *See Tippens*, 805 F.2d at 953-54 (noting that a witness's "failure of memory throughout the course of discovery create[s] an issue of credibility," not a sham).

-18-

The Government next contends that Feig's February 2011 affidavit is a sham because her assertions that Weiss fraudulently obtained a mortgage on the Concord Drive property by forging her signature on the loan documents blatantly contradict her deposition testimony. (Doc. No. 2371 at 9.) In her February 2011 affidavit, Feig stated as follows:

> In 1997, I was not aware of the $210,000 mortgage taken on the Concord Drive residence. My husband fraudulently arranged for that mortgage. I would never have agreed to mortgage my mother's residence, but my husband apparently falsified the necessary documents and forged the necessary signatures.

(Doc. No. 2340-1 ¶ 16.) In contrast, Feig testified during her October 2010 deposition that her signature appeared on several of the Concord Drive mortgage loan documents, and she admitted to often signing documents given to her by Weiss without reading them. (Doc. No. 2328-5 at 33-36.) However, Feig also testified that some of the handwriting and one signature on the mortgage documents were not her own, and it is unclear whether Feig was asked about all of the mortgage documents during her deposition. (*Id.*) Therefore, Feig's averment in her February 2011 affidavit that Weiss "falsified the necessary documents and forged the necessary signatures" is not inherently or necessarily inconsistent with her prior deposition testimony regarding the Concord Drive mortgage documents, and the sham affidavit rule is not triggered. *See Tippens*, 805 F.2d at 954 (declining to strike an affidavit under the sham affidavit rule because it was not "inherently inconsistent" with the deposition testimony); *Lane v. Celotex Corp.*, 782 F.2d 1526, 1532 (11th Cir. 1986) (rejecting the application of the sham affidavit rule because the party's affidavit "is not necessarily inconsistent with his earlier deposition testimony").

In summary, none of the asserted inconsistencies between Feig's February 2011 affidavit and prior deposition testimony and admissions render the February 2011 affidavit a sham based on this

record, and Feig's February 2011 affidavit was properly considered in addressing the parties' Motions for Summary Judgment.

## II. Weiss's March 2011 Affidavit as a "Sham" Affidavit

The Government contends that Weiss's March 2011 affidavit is a sham because it contradicts his trial testimony and other evidence of record.  (Doc. No. 2371 at 9-10.)  Although the sham affidavit rule applies with equal force to affidavits of non-parties, *Santhuff v. Seitz*, 385 F. App'x 939, 945 (11th Cir. 2010), the Court will not strike Weiss's Affidavit as a sham at this time because it was not relied upon in the Report and Recommendation to create a genuine issue of material fact precluding the entry of summary judgment for the Government.  *See Junkins*, 736 F.2d at 657 (noting that the sham affidavit rule applies "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact").  Weiss's affidavit was mentioned once in the Magistrate Judge's analysis of the Government's Motion for Summary Judgment merely for the purpose of corroborating an assertion by Feig, which alone created a genuine issue of credibility.  (Doc. No. 2367 at 21.)  Therefore, Weiss's March 2011 affidavit will not be stricken as a sham at this juncture.

## III. Schneiderman's Recanted Testimony

In a 1992 deposition, Jan Schneiderman testified that she drafted the Separation Agreement based on a list of terms provided to her and that Feig came to her office to sign the Agreement. (Doc. No. 2340-8 at 33.)  However, Schneiderman asserted in her October 2010 declaration that she lied about her involvement in the execution of the Settlement Agreement during her 1992 deposition, that Weiss approached her about preparing a separation agreement in early 1990 in order to protect his assets, and that she did not affix her notary stamp on the Settlement Agreement.  (Doc. No. 2328-

29 ¶¶ 7, 31, 34.)  Magistrate Judge Spaulding reasoned that "[w]hich version of her prior statements Schneiderman will adopt if this matter proceeds to trial is a question that the Court cannot resolve on summary judgment."  (Doc. No. 2367 at 6 n.3.)  The Government now objects to this finding, arguing that because Schneiderman's inconsistent statements during her 1992 deposition are not admissible for the truth of the matter asserted and may only be used to impeach her, those statements cannot be used to create a genuine issue of material fact for trial.  (Doc. No. 2371 at 11.)

While it is true that evidence admissible only for impeachment purposes cannot create a genuine issue of material fact precluding the entry of summary judgment, *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996), Schneiderman's prior sworn deposition testimony is admissible not only to impeach but also for the truth of the matter asserted.  Pursuant to Federal Rule of Evidence 801(d)(1)(A), a testifying witness's prior inconsistent statements given under oath in a deposition are not hearsay and may be offered for the truth of the matter asserted.  Accordingly, the Magistrate Judge properly found that Schneiderman's inconsistent 1992 deposition testimony and October 2010 declaration created a genuine issue of material fact.

## IV.  Feig's Status as Nominee as to Viola Road

The Government contends that upon striking Feig's February 2011 affidavit as a sham, summary judgment should be entered for the Government on Feig's claim of innocent ownership of Viola Road because the remaining evidence of record conclusively demonstrates that Weiss exercised dominion and control over the Viola Road property and that Feig was merely Weiss's nominee.  (Doc. No. 2371 at 12-13.)  As discussed *supra* part I, Feig's February 2011 affidavit is not a sham and may be considered for purposes of the parties Motions for Summary Judgment. Finding no other arguments by the Government on this matter, the Court will adopt Magistrate Judge

Spaulding's recommendation that there is a genuine issue of material fact regarding Feig's ownership of the Viola Road property.

**V. Execution of Separation Agreement with Required Formalities**

Section 170(6) of the New York Domestic Relations Law mandates certain procedures for executing a separation agreement to be utilized as a predicate for a conversion divorce based upon spouses living separate and apart pursuant to the agreement. In like manner, Section 236(B)(3) of the New York Domestic Relations Law imposes several requirements for executing a marital separation agreement to be enforced in a matrimonial action with respect to economic matters such as property distribution, spousal support, and child custody. Both of these statutes require the spouses' signatures to be acknowledged or proven in the manner required to record a deed.

In discussing whether the Separation Agreement is invalid for purposes of the instant forfeiture proceeding due to improper acknowledgment of signatures, the Report and Recommendation noted that the Government "has not shown that simply because the Separation Agreement may not have been sufficient to support an action for divorce[,] it was null and void for all purposes." (Doc. No. 2367 at 17-18.) The Government objects to this statement, citing *In re Kovler*, 249 B.R. 238 (Bankr. S.D.N.Y. 2000), for the proposition that a separation agreement that is not validly executed or is otherwise a sham is not enforceable. (Doc. No. 2371 at 14.)

In *Kolver*, the bankruptcy court entered findings of fact and concluded that a separation agreement purporting to transfer ownership of real property from the debtor-husband to his wife was a backdated sham undertaken to remove the real property from the reach of the husband's creditors in violation of the New York law against fraudulent conveyances. *Kovler*, 249 B.R. at 259. In so holding, the court in *Kolver* noted that to be valid under New York domestic relations law, a marital

separation agreement must be acknowledged by a notary or other public official, not merely made under oath by the parties.  *Id.* at 251 n.8.

The court in *Kolver* did not squarely address the distinction drawn in the Report and Recommendation between separation agreements effective in divorce and matrimonial proceedings under New York law and separation agreements used for other purposes, such as proving innocent ownership in a forfeiture proceeding.  (Doc. No. 2367 at 17-18.)  Although the parties do not cite, and the Court has not found, any authority squarely addressing this issue, it is well-settled under New York law that unacknowledged settlement agreements are enforceable in some proceedings other than divorce and matrimonial actions.  *See, e.g.*, *Singer v. Singer*, 690 N.Y.S.2d 621, 622 (N.Y. App. Div. 1999) (holding that an unacknowledged settlement agreement was enforceable as an independent contract under which a wife could sue her husband for breach of contract); *Cicerale v. Cicerale*, 382 N.Y.S.2d 430, 433 (N.Y. Sup. Ct. 1976) ("[A]s to the parties themselves, the instrument as a 'separation agreement' may be effective without any acknowledgment . . . , and may be the proper basis for other action, but not one for a (conversion) divorce where it has not complied with the legislative mandate for it to constitute a basis for divorce."), *aff'd*, 387 N.Y.S.2d 1022 (N.Y. App. Div. 1976).  One New York treatise has observed that "a noncomplying [separation] agreement . . . is valid and enforceable in any nonmatrimonial litigation in which the agreement is germane, such as a Surrogate's Court proceeding after the death of a party." 9PT2 West's McKinney's Forms Matrimonial and Family Law § 5:2 (2011) (citing *In re Pavese*, 752 N.Y.S.2d 198, 206 (N.Y. Sur. Ct. 2002)).

The Court need not decide at this juncture whether an improperly acknowledged separation agreement may be given effect for purposes of the instant federal forfeiture proceeding.  Even if

proof of valid acknowledgment is required to enforce the Separation Agreement in the instant case, Schneiderman's 1992 deposition testimony that Feig signed the Agreement in her office, (Doc. No. 2340-8 at 33), and the presence of Schneiderman's notary stamp on the Separation Agreement acknowledging the signatures of Feig and Weiss, (Doc. No. 2340-11 at 8), create a genuine issue of material fact regarding whether the Separation Agreement was properly acknowledged under New York law.  *See Garguilio v. Garguilio*, 504 N.Y.S. 2d 502, 503 (N.Y. App. Div. 1986) (noting that N.Y. Dom. Rel. Law § 170(6) requires acknowledgment of both parties' signatures by a public official, typically a notary public).  Finding no other arguments by the Government on this matter, the Magistrate Judge properly denied summary judgment for the Government based on its argument that the Separation Agreement was not validly acknowledged under New York domestic relations law.

## VI.  Transfer of Viola Road to Feig as a Fraudulent Conveyance

In addressing whether the transfer of Viola Road to Feig pursuant to the Settlement Agreement was a fraudulent conveyance under New York law, the Magistrate Judge found that there was a genuine issue of material fact regarding Feig's knowledge of Weiss's purpose for the transfer. (Doc. No. 2367 at 19-20.)  The Government objects, asserting that the Magistrate Judge failed to consider whether Feig had constructive knowledge of Weiss's intent to defraud his creditors, not simply whether Feig had actual knowledge of Weiss's fraudulent scheme.  (Doc. No. 2371 at 15-17.)

In support of its objection, the Government relies on *HBE Leasing Corp. v. Frank*, 48 F.3d 623 (2d Cir. 1995), which states the New York law for setting aside fraudulent conveyances based on a transferee's constructive knowledge of the transferor's fraud as follows:

> [T]he transferee need not have actual knowledge of the scheme that renders the conveyance fraudulent.  Constructive knowledge of fraudulent schemes will be

attributed to transferees who were aware of circumstances that should have led them to inquire further into the circumstances of the transaction, but who failed to make such inquiry.

*Id.* at 636 (citation omitted).  Under this standard, constructive knowledge of a fraudulent scheme is attributed to a transferee based on the circumstances actually known to the transferee, not the circumstances of which the transferee should have been aware.  By arguing that constructive knowledge should be attributed to Feig arising from facts which she denied actually knowing but arguably should have known, namely that lawsuits had been filed against Windsor and Weiss and that Weiss was in bankruptcy, the Government misapprehends the applicable constructive knowledge standard.  (Doc. No. 2371 at 16-17.)

Feig testified that she and Weiss never discussed Weiss's finances or his businesses and that Weiss made no financial disclosures to her at the time she signed the Settlement Agreement.  (Doc. No. 2328-5 at 13-14.)  Feig also testified that she knew that Leo Fox, a bankruptcy attorney, represented Weiss in multiple matters but did not know the scope of Fox's representation.  (*Id.* at 7.)  According to Feig, she wanted to be separated from Weiss without getting a divorce, and she relied on her father, Weiss, and three rabbis to negotiate the Separation Agreement pursuant to religious custom that would allow her and her children to continue to live at the Viola Road residence.  (Doc. No. 2340-1 ¶¶ 7-8.)  Feig further testified that Weiss always provided for his family.  (*Id.* ¶ 10.)  Viewing this evidence in the light most favorable to Feig for purposes of the Government's summary judgment motion, the Court finds that there is a genuine issue of material fact regarding the extent of Feig's actual knowledge of Weiss's financial circumstances and debts.  Accordingly, a genuine issue of material fact exists regarding whether, based on her actual

knowledge, Feig should be attributed constructive knowledge that Weiss conveyed the Viola Road property with the intent to defraud his creditors. *Frank*, 48 F.3d at 636.

## VII.  Forfeiture of Concord Drive

The Magistrate Judge found that Feig presented sufficient evidence of dominion and control over the Concord Drive property to withstand the Government's Motion for Summary Judgment due to lack of standing.  (Doc. No. 2367 at 20-21.)  The Government objects, arguing that Feig's actions of record are insufficient as a matter of law to find that she exercised sufficient dominion and control over the Concord Drive property to be considered more than a mere nominee.  (Doc. No. 2371 at 18-20.)  For the reasons discussed below, the Court agrees with the Government that Feig lacks standing to challenge the forfeiture of Concord Drive and that summary judgment should be entered for the Government on this issue.

"One who has no interest of his own at stake always lacks standing."  *Weiss*, 467 F.3d at 1311 (quotation omitted).  "[A] person or entity cannot have a vested interest in property if that person or entity is found to be acting as a nominee for someone whose property is subject to the forfeiture."  *Id.* at 1308-09.  To determine whether Feig is more than a mere nominee of the Concord Drive property and thus has standing, the Court must look beyond the bare legal title to whether Feig actually exercised dominion and control over the property.  *See United States v. Morgan*, 224 F.3d 339, 343 (4th Cir. 2000) (affirming the use of a "dominion and control test" in looking beyond bare legal title to determine whether a wife had a property interest sufficient to prevent criminal forfeiture of the assets at issue); *accord United States v. A Single Family Residence*, 803 F.2d 625, 630 (11th Cir. 1986) (noting in the civil forfeiture context, "possession of bare legal title by one who does not

exercise dominion and control over the property is insufficient even to establish standing to challenge a forfeiture").

The record evidence of Feig's actions, even when viewed in the light most favorable to her, fails to demonstrate that she exercised any dominion and control over the Concord Drive property indicative of a true owner as opposed to a mere nominee. According to Feig, her father purchased the Concord Drive property outright in 1994, the property was titled in her name because her parents were not United States citizens, and she "arranged" to have the property remodeled at her father's expense. (Doc. No. 2340-1 ¶¶ 13-14.) Feig claimed that her father died two years after he purchased the Concord Drive property and that her mother continues to live at there. (*Id.* ¶ 14.) At the same time, Feig has lived at the Viola Road property since 1989, (Doc. No. 2328-5 at 3), and there is no evidence of record suggesting that Feig ever resided at or made day-to-day decisions regarding the Concord Drive property. In addition, there is no evidence of record that Feig inherited any or all of her father's interest in the Concord Drive property upon his death.

Feig explained that the bills for the Concord Drive property "always" went to her house because her parents do not speak English and because her mother does not know how to handle bills. (Doc. No. 2328-5 at 41.) Feig testified that she paid the bills on the Concord Drive property with funds provided by her mother and Weiss for that purpose, (*id.* at 38, 41), and there is no evidence of record that Feig paid the expenses of the Concord Drive property from any other source of funds, including her own.[2]

---

[2] During an unspecified period of time, Feig received a paycheck from Windsor, and she used the proceeds as "fun money," not to support herself. (Doc. No. 2328-5 at 23.)

Feig's ministerial payment of bills for the Concord Drive property from third-parties' funds is action indicative of a nominee and does not reasonably permit an inference that Feig exercised dominion or control over the property.  *See Weiss*, 467 F.3d at 1303 n.1 ("Nominee 'connotes the delegation of authority to the nominee in a representative or nominal capacity only, and does not connote the transfer or assignment to the nominee of any property in, or ownership of, the rights of the person nominating him.'" (quoting *Braxton v. United States*, 858 F.2d 650, 653 n.6 (11th Cir. 1988))); Black's Law Dictionary 1149 (9th ed. 2009) (defining "nominee" in pertinent part as "[a] party who holds bare legal title for the benefit of others or who receives and distributes funds for the benefit of others"); *cf. United States v. Totaro*, 345 F.3d 989, 995-96 (8th Cir. 2003) (finding that the defendant's wife was not merely a straw or nominal owner of a forfeited residence where she lived at the residence, raised her children there, was personally invested in the ownership of the property, and encumbered the property with three tax liens).  In addition, the 1997 mortgage of the Concord Drive property, which Feig maintained was "fraudulently arranged" by Weiss, (Doc. No. 2340-1 ¶ 17), cannot reasonably be viewed as evidence of true ownership by Feig.  *See United States v. One 1945 Douglas C-54 (DC-4) Aircraft, Serial No. 22186*, 604 F.2d 27, 29 (8th Cir. 1979) (noting that the title holder of an aircraft may not have standing to challenge its forfeiture given that the criminal defendant exercised dominion or control over the aircraft by using it as collateral to obtain bond money after his arrest).  Similarly, Feig's payment of the mortgage does not reasonably suggest a bona fide ownership interest in the Concord Drive property, as it is undisputed that Weiss provided Feig the funds to pay the mortgage.  (Doc. No. 2328-5 at 36.)

Feig refinanced the mortgage on the Concord Drive property in 2003 to obtain a lower interest rate on the advice and direction of her son.  (*Id.*)  The Government argues, without citing

any authority, that Feig's refinancing of a mortgage which she contends was fraudulently obtained cannot reasonably suggest that Feig exercised dominion or control of the Concord Road property. (Doc. No. 2371 at 19.)  Notwithstanding the Government's argument, any indicia of ownership by Feig in 2003 is irrelevant to this proceeding because Feig must show that her legal right to the property is superior to that of Weiss "*at the time of the commission of the acts which gave rise to the forfeiture of the property*" or that she was without cause to believe that the property was subject to forfeiture at the time of a bona fide purchase.  18 U.S.C. § 1963(l)(6)(A)-(B).  "[A] third party's claim is to be measured not as it might appear at the time of litigation, but rather as it existed at the time the illegal acts were committed" or the time of the alleged bona fide purchase.  *United States v. BCCI Holdings (Luxembourg), S.A.*, 46 F.3d 1185, 1190 (D.C. Cir. 1995).  Because Weiss's acts giving rise to the forfeiture of the Concord Drive property occurred prior to April 29, 1998, the date of the Indictment, (Doc. No. 1), Feig cannot rely on her 2003 refinancing of the Concord Drive property to establish an ownership interest in the Concord Drive property superior to Weiss's interest now forfeited to the Government.

Finding no other evidence of record from which it may be inferred that Feig exercised a right or interest in the Concord Drive property beyond that of a bare title holder and nominee, Feig lacks standing to challenge the forfeiture of the Concord Drive property.  *Weiss*, 467 F.3d at 1311.

## VIII.  Challenge to Citation of Authority

Feig objects to the citation of *United States v. One 1990 Beechcraft, 1900 C Twin Engine Turbo-Prop Aircraft*, 619 F.3d 1275, 1278 (11th Cir. 2010), arguing that the *Beechcraft* case applies a legal standard for civil *in rem* forfeiture under 18 U.S.C. § 983(d)(6)(B)(iii) which is inapplicable to the instant criminal forfeiture proceeding.  (Doc. No. 2372 at 1-2.)  The Court agrees that the

statute identified by Feig in *Beechcraft* is inapposite here, but that statute was not applied in the Report and Recommendation, let alone in a manner adverse to Feig. (Doc. No. 2367 at 15.)  In addition, the proposition for which Beechcraft was cited–that courts look beyond who possesses bare legal title to property to decide true ownership–is a correct statement of law applicable to the instant forfeiture proceeding. *See, e.g.*, *Braxton*, 858 F.2d at 654-55 (looking to the circumstances surrounding the conveyance, not merely the name on the title, in finding that the claimant was merely a nominee and thus could not prevail under Section 1963(l)). Accordingly, Feig's objection to the mere citation of *Beechcraft* is overruled.

## IX.  New York Fraudulent Transfer Statute of Limitations

Feig next argues that the Magistrate Judge erroneously rejected her claim that the Government cannot prevail by showing that the conveyance of Viola Road to Feig was a fraudulent transfer because the six-year statute of limitations for undoing fraudulent transfers under New York law has run. (Doc. No. 2372 at 3-4.)  This argument is without merit because, absent any statutory waiver, state statutes of limitations do not apply to actions filed by the federal government. *United States v. Moore*, 968 F.2d 1099, 1100 (11th Cir. 1992) (quoting *United States v. Summerlin*, 310 U.S. 414, 416 (1940)).  Finding no authority imposing state statutes of limitations on federal criminal forfeiture proceedings, Feig's argument that the Government is limited in this proceeding by the six-year statute of limitations for fraudulent conveyances under New York law is without merit.

## X.  Testimony of Jan Schneiderman Regarding Weiss's Stated Intentions

Jan Schneiderman declared that Weiss told her that he planned to purchase a home for Feig's parents. (Doc. No. 2328-29 ¶ 41.)  Noting Feig's objection that Schneiderman's statement was

inadmissible hearsay, Magistrate Judge Spaulding reasoned that the Court need not resolve this evidentiary issue to decide the pending Motions for Summary Judgment. (Doc. No. 2367 at 9 n.6.) Feig now objects to any consideration of Schneiderman's statement about what Weiss told her. (Doc. No. 2372 at 5.)

Schneiderman's disputed statement was not relied upon by the Magistrate Judge in her analysis of the pending Motions for Summary Judgment. (Doc. No. 2367 at 14-30.) Moreover, notwithstanding the admissibility of Schneiderman's statement regarding Weiss's intentions to purchase a house for Feig's parents, Feig lacks standing to contest the forfeiture of the Concord Drive property. *See supra* part VII. Therefore, the Court need not determine the admissibility of Schneiderman's statement that Weiss told her that he planned to purchase a home for Feig's parents at this juncture.

## XI.  Delay in Forfeiture Proceedings

As urged by Feig, the Magistrate Judge applied the four-factor test set forth in *Barker v. Wingo*, 407 U.S. 514 (1972), to determine whether the Government's delay in seeking the forfeiture of the Viola Road and Concord Drive properties violated her right to due process. (Doc. No. 2367 at 23.) The four *Barker* factors are the length of the delay, the Government's reason for the delay, the timeliness of the petitioner's assertion of rights, and the resulting prejudice to the petitioner. *Id.* at 530. Consistent with the Report and Recommendation, the Court assumes without deciding that the *Barker* test applies to challenges of delays by the Government in seeking forfeiture of substituted

assets[3] which have not been seized by the Government.  Feig raises several challenges touching upon the second and third *Barker* factors.

### A.  Reason for Delay in Seeking Forfeiture of Viola Road and Concord Drive

Feig objects to the Magistrate Judge's consideration of the declaration of Special Agent Harry J. Brister in the Report and Recommendation on the grounds that Feig was not afforded an opportunity to depose Brister.[4]  (Doc. No. 2372 at 5.)  On November 18, 2010, Magistrate Judge Spaulding entered an Order denying Feig's request to depose Brister, noting that the Government and Feig agreed that Brister "has no personal knowledge of the facts at issue."  (Doc. No. 2322 at 3.)  Brister's statements were not cited in the Report and Recommendation to support a ruling related to Feig's contested ownership of the Viola Road and Concord Drive properties.  Rather, Brister's declaration was cited in the Report and Recommendation to rebut Feig's claim that the Government prejudicially delayed the forfeiture proceedings of the Viola Road and Concord Drive properties.  (Doc. No. 2367 at 25.)  Feig does not identify any evidence of record disputing Brister's account of the Government's investigation to determine the extent and location of Weiss's assets or indicating that the Government could have sought the forfeiture of the Viola Road and Concord Drive properties any sooner than it did.  Thus, there was no error in citing Brister's declarations to refute

_____

[3]  Pursuant to Federal Rule of Criminal Procedure 32.2(e)(1)(B), the court may "at any time" amend an existing order of forfeiture to include substitute property that qualifies for forfeiture.

[4]  Feig also contends that "most of [Brister's testimony] is hearsay."  (Doc. No. 2372 at 5-6.) The Court need not address this objection because Feig has not specifically identified any alleged hearsay statements of Brister cited in the Report and Recommendation.  *See Macort*, 208 F. App'x at 783 (requiring a party challenging a report and recommendation to file written objections specifically identifying the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection).

Feig's claim that the Government unlawfully delayed seeking forfeiture of the Viola Road and Concord Drive properties.

Magistrate Judge Spaulding further noted that Feig's assertion of her Fifth Amendment privilege against self-incrimination during a civil deposition indicated that Feig had opportunities to advance the issue of her ownership of Viola Road prior to the instant forfeiture proceeding but failed to do so.  (Doc. No. 2367 at 25-26.)  Feig does not contest the Magistrate Judge's reference to Feig's assertion of the Fifth Amendment privilege, only that there is "no evidence to support the supposition that Petitioner's invocation of her Fifth Amendment privilege stymied the Government's efforts to locate and identify the Viola Road property or the Concord Drive property."  (Doc. No. 2371 at 7-8.)

The Government and the Receiver for National Heritage Life Insurance Company attempted to locate Weiss's assets for more than a decade, and Feig was deposed on October 23, 2004 in furtherance of that purpose.  (Doc. No. 2132 ¶¶ 11, 16.)  During that deposition, Feig asserted her Fifth Amendment privilege when asked who had been paying the expenses for the upkeep of the Viola Road property.  (Doc. No. 2309-1 ¶ 37.)  Feig also asserted her Fifth Amendment privilege with respect to questions regarding Weiss's transfer of Viola Road to her.  (Doc. No. 2132 ¶ 16.)  Although Feig "now feels her assertion of privilege under the Fifth Amendment was made in error based upon poor advice of counsel,"  (Doc. No. 2309-1 ¶ 37), the fact remains that she failed to answer questions regarding control of the Viola Road property in 2004.  Finding no other arguments by Feig on this matter, the Magistrate Judge did not err in finding that Feig contributed to the delay in the forfeiture proceedings by asserting her Fifth Amendment privilege against self-incrimination.  Accordingly, for the reasons set forth in the Report and Recommendation, any delay by the

Government in seeking the forfeiture of the Viola Road and Concord Drive properties does not weigh in favor of finding a violation of Feig's due process rights.  (Doc. No. 2367 at 25-26.)

### B.  Timeliness of Feig's Assertion of Rights in the Properties

In finding that Feig contributed to the delay of the Government seeking forfeiture of the Viola Road and Concord Drive properties, the Magistrate Judge reasoned that "Feig had the opportunity to explain the circumstances under which she acquired Viola Road as early as 1993, but she declined to do so." (Doc. No. 2367 at 26.)   Feig argues that this statement is factually incorrect because Feig answered every question put to her in depositions given in 1994 and 2003.  (Doc. No. 2372 at 6-7.)  The fact that Feig answered all of the questions propounded upon her during those depositions, without more, does not suggest that Feig was unable to disclose at any time how she acquired the Viola Road property.

Feig also objects to the Magistrate Judge's reasoning that Feig's repeated delays during the instant forfeiture proceeding weighed against finding that Feig has been prejudiced by any delays in attempted forfeiture of the Viola Road and Concord Drive properties.  (Doc. No. 2372 at 8-9; Doc. No. 2367 at 26.)  Feig's several requests for extensions of time in the instant forfeiture proceeding are not fatal to her argument that the Government's nine-year delay in seeking the forfeiture of the Viola Road and Concord Drive properties violated her due process rights.  However, Feig does not cite, and the Court has not found, any authority suggesting that the Magistrate Judge erred by citing Feig's repeated requests for extensions of time as evidence of delay by Feig in asserting her rights to the Viola Road and Concord Drive properties.  (Doc. No. 2367 at 26.) Accordingly, the Court adopts the Magistrate Judge's assessment that Feig's failure to timely assert her ownership interests weighs against finding a violation of Feig's due process rights.

**XII.  Standing to Challenge Preliminary Order of Forfeiture of Substitute Assets**

In the Report and Recommendation, the Magistrate Judge found that Feig lacked standing to challenge the preliminary order of forfeiture of substitute assets.  (Doc. No. 2367 at 29-30.)  Feig now objects to that finding.  (Doc. No. 2372 at 10-11.)

"[P]reliminary orders of forfeiture, . . . when entered by a district court, 'authorize[ ] the government to seize the specific property subject to forfeiture and to commence proceedings that comply with any statutes governing third-party rights.'"  *United States v. Cone*, 627 F.3d 1356, 1358 (11th Cir. 2010) (quoting *United States v. Petrie*, 302 F.3d 1280, 1284 (11th Cir. 2002)).  The exclusive procedures by which a non-party may vindicate untainted property interests before the forfeiture becomes final are provided in 18 U.S.C. § 1963(l) and Federal Rule of Criminal Procedure 32.2.  *See Gilbert*, 244 F.3d at 910 ("[I]t is clear that Congress intended section 1963(l) proceedings to provide the exclusive means for third-parties to assert their claims to forfeited property.").

Section 1963(l)(2) provides that a non-party "may . . . petition the court for a hearing to adjudicate the validity of his alleged interest in the property," not to dispute the finding that the defendant's interests in the property are subject to forfeiture.  Further, Section 1963(l)(6) limits the grounds upon which a third-party petitioner may rely to establish his interest in the property, and the invalidity of the underlying preliminary order of forfeiture is not one of those grounds.  *Gilbert*, 244 F.3d at 911.

Like the analogous criminal forfeiture statute in 21 U.S.C. § 853(n), "[n]owhere do the provisions [of Section 1963] grant petitioners a private cause of action or right to appeal a court's ruling outside of an ancillary forfeiture proceeding."  *Cone*, 627 F.3d at 1358.  Simply put, "the jury's special verdict of forfeiture establishes the extent of the defendant's interest in a certain

forfeitable asset." *Gilbert*, 244 F.3d at 911.  Therefore, third-party claimants may not challenge the forfeitability of the defendant's interest in the subject assets embodied in the preliminary order of forfeiture.  *See, e.g.*, *United States v. Muckle*, 709 F. Supp. 2d 1371, 1374 (M.D. Ga. 2010) ("Because the ancillary proceeding affords the exclusive opportunity for third parties to assert any ownership interest that would require amendment of a preliminary order of forfeiture, 'a third party has no right to challenge the preliminary order's finding of forfeitability.'" (quoting *United States v. Andrews*, 530 F.3d 1232, 1236 (10th Cir. 2008))).  Accordingly, Feig is limited to the statutory bases for demonstrating a superior interest in the property set forth in 18 U.S.C. § 1963(l)(6).

## XIII.  Summary

In summary, all of Feig's objections to the Report and Recommendation denying her Motion for Summary Judgment are overruled.  With respect to the Government's objections to the Report and Recommendation, the Court finds that Feig lacks standing to challenge the forfeiture of the Concord Drive property.  The remainder of the Government's objections to the Report and Recommendation are overruled.

### Conclusion

Based on the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1)      The Objections to Report and Recommendation by Petitioner Goldie Feig (Doc. No. 2372) are **OVERRULED**.

2)      The Objections to Report and Recommendation by the United States of America (Doc. No. 2371) are **SUSTAINED in part** and **OVERRULED in part**.  Petitioner Goldie Feig lacks standing to challenge to the forfeiture of 65 East Concord Drive, Monsey, New York, and that portion of her Petition for Innocent Ownership (Doc.

No. 2251) is **DISMISSED**.  The Objections of the Government are **OVERRULED,**

and the Report and Recommendation of the United States Magistrate Judge (Doc. No.

2367) is **AFFIRMED** in all other respects.

**DONE** and **ORDERED** in Chambers in Orlando, Florida on May 27, 2011.

PATRICIA C. FAWSETT, JUDGE
UNITED STATES DISTRICT COURT

Copies furnished to:

Counsel of Record